UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CASSEL, on behalf of himself and all others similarly situated, | ) ) ) | Case No. 11-cv-7045 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| ADOLOR CORPORATION, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

---

**DECLARATION OF EVAN J. SMITH, ESQUIRE IN SUPPORT OF PLAINTIFF'S
EMERGENCY MOTION FOR EXPEDITED DISCOVERY, EXPEDITED
PROCEEDINGS, AND A BRIEFING SCHEDULE ON PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

---

I, Evan J. Smith, do hereby declare:

1.      I am an attorney, duly licensed and admitted to practice law in the State of Pennsylvania and the United States District Court for the Eastern District of Pennsylvania.  I am a partner in the law firm of Brodsky & Smith, LLC, counsel for Plaintiff.  I have personal knowledge of the facts set forth in this Declaration.  If called upon and sworn as a witness, I could and would competently testify to these facts.

2.      On October 24, 2011, Adolor announced that it had entered into a definitive merger agreement (the "Merger Agreement") to be acquired by Cubist.  Pursuant to the terms of the Merger Agreement, Cubist will commence a tender offer to acquire all of the outstanding shares of Adolor for an initial payment of $4.25 per share in cash (the "Up-front Payment").  In addition to the Up-Front Payment, Adolor shareholders will receive one, non-transferable Contingent Payment Right ("CPR") (together with the Up-Front Payment, the "Merger Consideration").  The CPR will entitle the holder to receive an additional cash payment of up to

$4.50 for each share of Adolor they own if certain regulatory approvals and/or commercialization milestones for ADL5945 are achieved.  The total transaction is valued at up to $415 million – a price Plaintiff also alleges is woefully inadequate.

3.      On November 7, 2011, Defendants filed a Solicitation and Recommendation Statement on a Schedule 14D-9 ("14D-9").  The purpose of the 14D-9 is to provide Adolor shareholders with sufficient material information about the process leading up to the Proposed Transaction and the financial metrics the Board's financial advisor, Stifel, Nicholas & Company ("Stifel Nicholas"), used in issuing its fairness opinion.

4.      On November 10, 2011, Plaintiff filed the instant Complaint alleging that the 14D-9 falls far short from providing sufficient material information to shareholders, in violation of federal law, and thus, deprives the shareholders of the ability to make an informed, intelligent and rational decisions about whether to tender their shares.

5.      Attached hereto as Exhibit "A" to this Declaration is a true and correct copy of the Merger Agreement between Adolor and Cubist.

6.      Attached hereto as Exhibit "B" to this Declaration is a true and correct copy of the Solicitation and Recommendation Statement on a Schedule 14D-9 filed with the Securities Exchange Commission by Defendant Adolor.

I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge.

Dated: November 15, 2011                    By:*s/ Evan J. Smith, Esquire*
                                                 Evan J. Smith, Esquire

# EXHIBIT "A"

# ADOLOR CORP (ADLR)

# 8-K
Current report filing
Filed on 10/25/2011
Filed Period 10/24/2011

THOMSON REUTERS **ACCELUS**™



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported):  **October 24, 2011**

# ADOLOR CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-30039** | **31-1429198** |
|---|---|---|
| (State or other jurisdiction of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**700 Pennsylvania Drive,**
**Exton, PA 19341**
(Address of principal executive offices)      (Zip Code)

**(484) 595-1500**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01**          **Entry into a Material Definitive Agreement.**

*Agreement and Plan of Merger*

On October 24, 2011, Adolor Corporation, a Delaware corporation ("Adolor" or the "Company"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with Cubist Pharmaceuticals, Inc., a Delaware corporation ("Cubist"), and FRD Acquisition Corporation, a Delaware corporation and a wholly-owned subsidiary of Cubist ("Merger Sub").  Pursuant to the Merger Agreement, and upon the terms and subject to the conditions thereof, Merger Sub has agreed, and Cubist has agreed to cause, Merger Sub to commence a tender offer (the "Offer") to purchase all of the issued and outstanding shares of Common Stock, par value $0.0001 per share, of the Company (the "Shares"), for $4.25 per Share in cash (the "Closing Amount"), plus one contingent payment right for each Share (a "CPR"), which shall represent the right to receive up to $4.50 in cash subject to the fulfillment of certain conditions and/or the attainment of certain milestones.

The Merger Agreement provides that the Offer will commence within ten business days after the date of the Merger Agreement, and will remain open for at least 20 business days.

Pursuant to the Merger Agreement, after the consummation of the Offer, and subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement, Merger Sub will merge with and into Adolor (the "Merger"), with Adolor surviving as a wholly-owned subsidiary of Cubist.  Upon completion of the Merger, each Share outstanding immediately prior to the effective time of the Merger (excluding those Shares that are held by Cubist, Merger Sub, Adolor or stockholders perfecting their appraisal rights under Section 262 of the Delaware General Corporation Law (the "DGCL")) will be cancelled and converted into the right to receive the Closing Amount in cash (without interest and subject to applicable withholding taxes) and one CPR.  If Merger Sub holds 90% or more of the outstanding Shares immediately prior to the Merger, it may effect a "short-form" merger under the DGCL without additional approval by the Adolor's stockholders. Otherwise, Adolor will hold a special stockholders' meeting to obtain stockholders approval of the Merger.

Subject to the terms and conditions of the Merger Agreement, Adolor has granted Merger Sub an option (the "Top-Up Option") to purchase newly issued Shares (the "Top-Up Shares") so that, when added to the number of Shares owned by Merger Sub prior to the exercise of the Top-Up Option, Merger Sub will own at least ninety percent (90%) of the Shares then outstanding (determined on a "fully diluted basis" as defined in the Merger Agreement).  The Top-Up Option may not be exercised unless, following the acceptance of Shares pursuant to the Offer (the "Acceptance Time"), Merger Sub owns seventy percent (70%) or more of the Shares.  Merger Sub will pay the greater of (i) the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the date on which the Top-Up Option is exercised or (ii) the Closing Amount for each Share acquired upon exercise of the Top-Up Option.

Completion of the Offer is subject to customary conditions, including that there shall have been validly tendered and not validly withdrawn prior to the expiration of the Offer a majority of the Shares then outstanding (determined on a "fully diluted basis" as defined in the Merger Agreement).

The Merger Agreement contains representations, warranties and covenants of the parties customary for transactions of this type. Subject to certain limited exceptions in the Merger Agreement, Adolor has also agreed not to solicit or initiate discussions with third parties regarding other proposals to acquire Adolor and it has agreed to certain restrictions on its ability to respond to such proposals, subject to the fulfillment of certain fiduciary requirements of Adolor's Board of Directors. The Merger Agreement also contains customary termination provisions for Adolor and Cubist and provides that, in connection with the termination of the Merger Agreement under specified circumstances involving competing transactions or a change in the recommendation of the Adolor's Board of Directors or certain breaches of the Merger Agreement, Adolor may be required to pay Cubist a termination fee of $10,000,000.

All unvested Adolor stock options ("Company Options"), restricted stock units ("RSUs") and deferred stock units ("DSUs") outstanding immediately prior to the Acceptance Time shall vest as of the Acceptance Time.  As of the Effective Time, all Company stock plans shall terminate and all Company Options, RSUs and DSUs shall be cancelled.  Adolor shall provide written notice and an opportunity to exercise to all holders of Company Options prior to the Effective Time.  In full satisfaction of the cancellation of any Company Option that had a per-Share exercise price less than the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time, Cubist shall, or shall cause Adolor to, following the Effective Time, pay to the holder of such Company Option an amount in cash equal to the product of (i) the excess, if any, of the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time over the per-Share exercise price of such Company Option and (ii) the number of Shares subject thereto.  Subject to applicable tax and other withholding requirements, all vested RSUs and DSUs will be converted into the right to receive the Closing Amount and one CPR, or any such higher consideration as may be paid in the Offer, as promptly as practicable following the Effective Time.

The Merger Agreement is attached to this report to provide Adolor's stockholders with information regarding the terms of the Merger Agreement and is not intended to modify or supplement any factual disclosures about Adolor or Cubist in Adolor's or Cubist's public reports filed with the U.S. Securities and Exchange Commission (the "SEC").  In particular, the Merger Agreement and this summary of terms are not intended to be, and should not be relied upon as, disclosures regarding any facts or circumstances relating to Adolor or Cubist. The representations and warranties may not be intended as statements of fact but rather as a way of allocating contractual risk between the parties to the Merger Agreement and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors.  In addition, the assertions embodied in the representations and warranties contained in the Merger Agreement are qualified by information in a confidential disclosure schedule that the

3

parties have exchanged and may be modified by the information contained in such disclosure schedule.

The foregoing description of the Offer, Merger, and Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is attached as Exhibit 2.1 to this report and incorporated in this report by reference.

*Tender and Voting Agreements*

In connection with the Offer, Cubist, Merger Sub and each of the Company's directors and executive officers entered into Tender and Voting Agreements (each, a "Tender and Voting Agreement").  Pursuant to each Tender and Voting Agreement, the applicable director or executive officer has agreed, among other things, subject to the termination of such Tender and Voting Agreement, (i) to tender in the Offer (and not to withdraw) all Shares beneficially owned by them, provided, however, that there shall be no duty to tender Shares if such action would give rise to liability under Section 16(b) of the Exchange Act (ii) to vote such Shares in support of the Merger in the event stockholder approval is required to consummate the Merger, (iii) to appoint Cubist as his proxy to vote such shares in connection with the Merger Agreement, and (iv) not to otherwise transfer any of his Shares. Each Tender and Voting Agreement will terminate upon the termination of the Merger Agreement.

The foregoing description of the Tender and Voting Agreements set forth above does not purport to be complete and is qualified in its entirety by reference to the form of Tender and Voting Agreement, which is attached as Annex II to the Merger Agreement and incorporated in this report by reference.

*Contingent Payment Rights Agreement*

Pursuant to the Merger Agreement, Cubist and Computershare Inc., a Delaware corporation and its fully-owned subsidiary Computershare Trust Company, N.A., a national banking association (the "Rights Agent") will enter into a Contingent Payment Rights Agreement (the "CPR Agreement") governing the terms of the CPRs.  Each holder of a CPR is entitled to receive the following cash payments:

**FDA Approval**

- $3.00 per CPR payable if ADL 5945 is approved on or before July 1, 2019 and is the first oral monotherapy treatment for opioid induced constipation ("OIC") approved by the FDA without a maximum day limitation, or, if not the first approved product, is approved with a label that does not competitively disadvantage ADL 5945 relative to other FDA-approved OIC products (such approval, the "FDA Preferred Product Label Approval").

- This $3.00 amount will be reduced by $1.75 to $1.25 if ADL5945 is not the first approved product and is approved with a label that puts ADL 5945 at a competitive disadvantage relative to other FDA-approved OIC products.

4

**European Medicines Agency ("EMA") Approval**

- $1.50 per CPR payable if ADL5945 is approved on or before July 1, 2019 and is the first oral monotherapy treatment for OIC approved by the EMA without a maximum day limitation, or, if not the first approved product, is approved with a label that does not competitively disadvantage ADL 5945 relative to other EMA-approved OIC products (such approval, the "EMA Preferred Product Label Approval").

- This $1.50 amount will be reduced by $1.00 to $0.50 if ADL5945 is not the first approved product and is approved with a label that puts ADL 5945 at a competitive disadvantage relative to other EMA-approved OIC products.

**Sales Milestones**

If either the FDA Preferred Product Label Approval or the EMA Preferred Product Label Approval is not obtained by July 1, 2019, then each holder of a CPR is entitled to receive the following cash payments:

- If neither the FDA Preferred Product Label Approval nor the EMA Preferred Product Label Approval is obtained, then each holder of a CPR is entitled to receive $1.50 upon ADL 5945 achieving $400,000,000 in cumulative net sales over a specified period, and an additional $1.25 upon ADL 5945 achieving $800,000,000 in cumulative net sales over a specified period.

- If EMA Preferred Product Label Approval is obtained but FDA Preferred Product Label Approval is not obtained, then each holder of a CPR is entitled to receive $0.50 upon ADL 5945 achieving $400,000,000 in cumulative net sales over a specified period, and an additional $1.25 upon ADL 5945 achieving $800,000,000 in cumulative net sales over a specified period.

- If FDA Preferred Product Label Approval is obtained, but EMA Preferred Product Label Approval is not obtained, then each holder of a CPR is entitled to receive $1.00 upon ADL 5945 achieving $800,000,000 in cumulative net sales over a specified period.

Cubist has agreed to use certain diligent efforts to achieve each milestone, which efforts generally require Cubist, in carrying out its obligations, to use those efforts normally used by persons in the pharmaceutical business similar in size and resources to Cubist relating to seeking regulatory approval for a product candidate or commercialization of an approved product that is of similar market potential at a similar stage in its development or product life.

The foregoing description of the CPR Agreement set forth above does not purport to be complete and is qualified in its entirety by reference to the form of CPR Agreement, which is attached as Annex IV to the Merger Agreement and incorporated in this report by reference.

**Item 3.03**        **Material Modification to Rights of Security Holders.**

In contemplation of the Merger Agreement, on October 24, 2011, Adolor and Broadridge Corporate Issuer Solutions, Inc. ("Broadridge") entered into the Amendment (the "Amendment")

to the Amended and Restated Rights Agreement, dated as of January 31, 2011 (the "Rights Agreement"), between Adolor and Broadridge, which provides, among other things, that neither Cubist nor Merger Sub will become an "Acquiring Person" within the meaning of the Rights Agreement as a result of the execution of the Merger Agreement or the transactions contemplated thereby.  In addition, the Amendment amends the Rights Agreement so the Rights Agreements will terminate by its terms at the Acceptance Time.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the Amendment, which is incorporated by reference herein as Exhibit 4.1.

**Item 8.01**        <u>**Other Events.**</u>

On October 24, 2011, Adolor and Cubist issued a joint press release regarding the execution of the Merger Agreement.  A copy of the press release is furnished herewith as Exhibit 99.1 and incorporated herein by reference.

**Important Additional Information will be Filed with the SEC**

This filing is neither an offer to purchase nor a solicitation of an offer to sell securities. Cubist has not commenced the tender offer for shares of Adolor stock described in this filing.

At the time the tender offer is commenced, Cubist will file with the SEC and mail to Adolor stockholders a Tender Offer Statement on Schedule TO and related exhibits, including the offer to purchase, letter of transmittal and other related documents, and Adolor will file with the SEC and mail to its stockholders a Tender Offer Solicitation/Recommendation Statement on Schedule 14D-9 in connection with the transaction. These will contain important information about Cubist, Adolor, the transaction and other related matters. Investors and security holders are urged to read each of these documents carefully when they are available.  Investors and security holders will be able to obtain free copies of the Tender Offer Statement, the Tender Offer Solicitation/Recommendation Statement and other documents filed with the SEC by Cubist and Adolor through the web site maintained by the SEC at www.sec.gov. In addition, investors and security holders will be able to obtain free copies of the Tender Offer Statement, the Tender Offer Solicitation/Recommendation Statement and other documents filed with the SEC by contacting the Investor Relations departments of Cubist at Cubist Pharmaceuticals, Inc., 65 Hayden Avenue, Lexington, Massachusetts 02421, or the Investor Relations department of Adolor at Adolor Corporation, 700 Pennsylvania Drive, Exton, PA 19341.

**Cautionary Note Regarding Forward-Looking Statements**

Statements in this filing regarding the proposed transaction between Cubist and Adolor, the expected timetable for completing the transaction, future financial and operating results, benefits and synergies of the transaction, the expectation that the transaction will be accretive, Cubist's and Adolor's product candidates, including Cubist's plans to seek a partner for ADL5495,

6

Cubist's expectation of peak sales of ENTEREG, the expected impact of the anticipated transaction on Cubist's earnings, and any other statements about Cubist or Adolor's managements' future expectations, beliefs, goals, plans or prospects, constitute forward-looking statements.  For further information concerning forward-looking statements, please read the disclosure under the heading "Cautionary Note Regarding Forward-Looking Statements" in Cubist's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, and in Adolor's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, each of which has been filed with the SEC.  Any statements that are not statements of historical fact (including statements containing the words "believes," "plans," "anticipates," "expects," "estimates" and similar expressions) also should be considered to be forward-looking statements. There are a number of important factors that could cause actual results or events to differ materially from those indicated by such forward-looking statements, including: the possibility that certain closing conditions to the transaction will not be met; the ability to consummate the transaction, the ability of Cubist to successfully integrate Adolor's operations and employees; the ability to realize anticipated synergies and cost savings; risks related to drug development and commercialization; the ability of Cubist to obtain regulatory approval of ADL 5945 and the form of such regulatory approval; and the other factors described under the heading "Risk Factors" in Cubist's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, and in Adolor's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, each of which has been filed with the SEC.  Except as otherwise required by law, Cubist and Adolor disclaim any intention or obligation to update any forward-looking statements as a result of developments occurring after the date of this filing.

**Item 9.01**          <u>Financial Statements and Exhibits</u>.

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, by and among Cubist Pharmaceuticals, Inc., FRD Acquisition Corporation and Adolor Corporation, dated as of October 24, 2011. |
| 4.1 | Amendment to Amended and Restated Rights Agreement, by and among Adolor Corporation and Broadridge Corporate Issuer Solutions, Inc., dated as of October 24, 2011. |
| 99.1 | Joint Press Release issued by Adolor Corporation and Cubist Pharmaceuticals, Inc. on October 24, 2011. |

8

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrants have duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ADOLOR CORPORATION

Date: October 24, 2011

By:    /s/ John M. Limongelli
Name:  John M. Limongelli
Title:   Senior Vice President, General Counsel & Secretary

9

**Exhibit List**

| Exhibit Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, by and among Cubist Pharmaceuticals, Inc., FRD Acquisition Corporation and Adolor Corporation, dated as of October 24, 2011. |
| 4.1 | Amendment to Amended and Restated Rights Agreement, by and among Adolor Corporation and Broadridge Corporate Issuer Solutions, Inc., dated as of October 24, 2011. |
| 99.1 | Joint Press Release issued by Adolor Corporation and Cubist Pharmaceuticals, Inc. on October 24, 2011. |

**Exhibit 2.1**

*Execution Version*

AGREEMENT AND PLAN OF MERGER

AMONG

CUBIST PHARMACEUTICALS, INC.

FRD ACQUISITION CORPORATION

AND

ADOLOR CORPORATION

Dated as of October 24, 2011

TABLE OF CONTENTS

**Page**

SECTION 1 - THE OFFER AND THE MERGER ... 2

| | | |
|---|---|---|
| 1.1. | The Offer | 2 |
| 1.2. | Company Actions | 4 |
| 1.3. | The Merger | 5 |
| 1.4. | Effective Time | 5 |
| 1.5. | Closing | 5 |
| 1.6. | Directors and Officers of the Surviving Corporation | 6 |
| 1.7. | Subsequent Actions | 6 |
| 1.8. | Stockholders' Meeting | 6 |
| 1.9. | Merger Without Meeting of Stockholders | 7 |
| 1.10. | Top-Up Option | 7 |

SECTION 2 - CONVERSION OF SECURITIES ... 8

| | | |
|---|---|---|
| 2.1. | Conversion of Capital Stock | 8 |
| 2.2. | Exchange of Certificates | 9 |
| 2.3. | Dissenting Shares | 11 |
| 2.4. | Company Incentive Plans | 11 |
| 2.5. | Section 16 | 13 |
| 2.6. | Withholding | 13 |
| 2.7. | Transfer Taxes | 13 |

SECTION 3 - REPRESENTATIONS AND WARRANTIES OF COMPANY ... 14

| | | |
|---|---|---|
| 3.1. | Organization and Qualification | 14 |
| 3.2. | Authority to Execute and Perform Agreement | 15 |
| 3.3. | Capitalization | 15 |
| 3.4. | Company Subsidiaries | 17 |
| 3.5. | SEC Reports | 18 |
| 3.6. | Financial Statements | 18 |
| 3.7. | Absence of Undisclosed Liabilities | 20 |
| 3.8. | Absence of Adverse Changes | 20 |

3.9.    Compliance with Laws                                                                 20

i

Table of Contents, continued

| | | |
|---|---|---|
| 3.10. | Actions and Proceedings | 24 |
| 3.11. | Contracts and Other Agreements | 24 |
| 3.12. | Property | 26 |
| 3.13. | Insurance | 28 |
| 3.14. | Commercial Relationships | 29 |
| 3.15. | Tax Matters | 29 |
| 3.16. | Employee Benefit Plans | 32 |
| 3.17. | Employee Relations | 34 |
| 3.18. | Environmental Matters | 35 |
| 3.19. | No Breach | 37 |
| 3.20. | Board Approvals; Anti-Takeover; Vote Required | 37 |
| 3.21. | Financial Advisor | 38 |
| 3.22. | Information in the Offer Documents and the Schedule 14D-9 | 39 |
| 3.23. | Information in the Proxy Statement | 39 |
| **SECTION 4 - REPRESENTATIONS AND WARRANTIES OF PARENT** | | 40 |
| 4.1. | Organization | 40 |
| 4.2. | Authority to Execute and Perform Agreement | 40 |
| 4.3. | Information in the Offer Documents | 41 |
| 4.4. | Information in the Proxy Statement | 41 |
| 4.5. | Sub | 41 |
| 4.6. | Financing | 41 |
| 4.7. | Financial Advisor | 41 |
| 4.8. | Ownership of Company Common Stock | 41 |
| 4.9. | Litigation | 42 |
| 4.10. | No Other Representations or Warranties | 42 |
| **SECTION 5 - COVENANTS AND AGREEMENTS** | | 42 |
| 5.1. | Conduct of Business | 42 |
| 5.2. | No Solicitation | 46 |
| **SECTION 6 - ADDITIONAL AGREEMENTS** | | 49 |

6.1.    Proxy Statement                                                      49

6.2.    Meeting of Stockholders of the Company                               49

6.3.    Nasdaq; Post-Closing SEC Reports                                     50

Table of Contents, continued

| | | |
|---|---|---|
| 6.4. | Access to Information | 50 |
| 6.5. | Public Disclosure | 51 |
| 6.6. | Regulatory Filings; Reasonable Efforts | 51 |
| 6.7. | Notification of Certain Matters; Litigation | 53 |
| 6.8. | Indemnification | 53 |
| 6.9. | Directors | 55 |
| 6.10. | 401(k) | 56 |
| 6.11. | Employee Benefits | 56 |
| 6.12. | State Takeover Laws | 58 |
| SECTION 7 - CONDITIONS PRECEDENT TO THE OBLIGATION OF PARTIES TO CONSUMMATE THE MERGER | | 59 |
| 7.1. | Conditions to Obligations of Each Party to Effect the Merger | 59 |
| SECTION 8 - TERMINATION, AMENDMENT AND WAIVER | | 59 |
| 8.1. | Termination | 59 |
| 8.2. | Effect of Termination | 61 |
| 8.3. | Fees and Expenses | 61 |
| 8.4. | Amendment | 62 |
| 8.5. | Waiver | 62 |
| SECTION 9 - MISCELLANEOUS | | 62 |
| 9.1. | No Survival | 62 |
| 9.2. | Notices | 62 |
| 9.3. | Entire Agreement | 63 |
| 9.4. | Governing Law | 63 |
| 9.5. | Binding Effect; No Assignment; No Third-Party Beneficiaries | 63 |
| 9.6. | Counterparts and Signature | 64 |
| 9.7. | Severability | 64 |
| 9.8. | Submission to Jurisdiction; Waiver | 64 |
| 9.9. | Specific Performance | 65 |
| 9.10. | Rules of Construction; Certain Definitions | 65 |
| 9.11. | No Waiver; Remedies Cumulative | 66 |

9.12.   Waiver of Jury Trial                                                              66

iii

Table of Contents, continued

<u>ANNEXES</u>

Annex I — Conditions to the Offer
Annex II — Form of Tender and Voting Agreement
Annex III — Form of Certificate of Incorporation of the Surviving Corporation
Annex IV — Form of CPR Agreement

iv

## **Index of Defined Terms**

Capitalized terms in this Agreement shall have the defined meanings that appear in the provisions of the Agreement listed below.

|  | Section |
|---|---|
| Acceptance Time | 5.2(b) |
| Acquisition Proposal | 5.2(a) |
| Adverse Recommendation Change | 5.2(c) |
| Affiliate | 3.3(d) |
| Agreement | Preamble |
| Alternative Acquisition Agreement | 5.2(c) |
| Assignee | 9.5(a) |
| award | 3.3(b) |
| Book-Entry Share | 2.1(c) |
| business day | 9.10(b) |
| CERCLA | 3.18(b) |
| Certificate of Merger | 1.4 |
| Certificate | 2.1(c) |
| Closing | 1.5 |
| Closing Amount | Recitals |
| Closing Date | 1.5 |
| Code | 2.6 |
| Company | Preamble |
| Company Balance Sheet | 3.6(a) |
| Company Board of Directors | Recitals |
| Company Disclosure Letter | SECTION 3 |
| Company Joint Venture | 3.4(c) |
| Company's knowledge | 9.10(b) |
| Company Material Adverse Effect | 3.1(a) |
| Company Option | 2.4(a) |
| Company Preferred Stock | 3.3(a) |
| Company Quarterly Balance Sheet | 3.7 |
| Company Restricted Share | 2.4(b) |
| Company Restricted Stock | 2.4(b) |
| Company Rights | 3.3(a) |
| Company Rights Agreement | 3.3(a) |
| Company SEC Reports | 3.5 |
| Company Stockholder Approval | 6.1 |
| Company Stock Plans | 2.4(a) |
| Company Subsidiary | 3.4(a) |
| Confidentiality Agreement | 1.2(c) |
| Continuing Employee | 6.11(b) |
| CPR | Recitals |
| CPR Agreement | Recitals |

v

**Index of Defined Terms, continued**

| | Section |
|---|---|
| Current D&O Insurance | 6.8(b) |
| Delisting Period | 6.3 |
| DGCL | Recitals |
| Dissenting Shares | 2.3(a) |
| DSU | 2.4(c) |
| Effective Time | 1.4 |
| Employee Release | 6.11(d) |
| Environmental Laws | 3.18(e)(i) |
| ERISA | 3.16(a) |
| ERISA Affiliate | 3.16(b) |
| Exchange Act | 1.1(a) |
| Exchange Fund | 2.2(a) |
| Expiration Date | 1.1(a) |
| FCPA | 3.9(c) |
| FDA | 3.9(d) |
| Good Clinical Practices | 3.9(h) |
| Good Laboratory Practices | 3.9(h) |
| Good Manufacturing Practices | 3.9(i) |
| Governmental Entity | 9.10(b) |
| Hazardous Materials | 3.18(e)(ii) |
| HSR Act | 3.19 |
| IC Plans | 6.11(a) |
| Incentive Compensation Plan | 6.11(a) |
| Indemnified Parties | 6.8(a) |
| Independent Directors | 6.9(a) |
| IRS | 3.16(a) |
| Laws | 3.9(b) |
| Layoff Laws | 3.17(b) |
| Maximum Premium | 6.8(b) |
| Merger | 1.3(a) |
| Merger Agreement | Annex I |
| Merger Consideration | 2.1(c) |
| Minimum Condition | Annex I |
| Notice Period | 5.2(d) |
| OECD Convention | 3.9(c) |
| Offer | Recitals |
| Offer Condition | 1.1(a) |
| Offer Documents | 1.1(c) |
| Offer Price | Recitals |
| Offer to Purchase | 1.1(a) |
| on a fully diluted basis | 9.10(b) |
| Outside Date | 8.1(b)(ii) |
| Parent | Preamble |
| Paying Agent | 2.2(a) |

## Index of Defined Terms, continued

|  | Section |
|---|---|
| Performance-Based DSU | 2.4(c) |
| Permits | 3.9 |
| person | 9.10(b) |
| Plans | 3.16(a) |
| Post-Closing SEC Reports | 6.3 |
| Principal Stockholders | Recitals |
| Prior Plan | 6.11(c) |
| Program | 3.9(k) |
| Prohibited Payment | 3.9(c) |
| Proprietary Rights | 3.12(a) |
| Proxy Statement | 1.8(a)(ii) |
| Real Property | 3.12(b) |
| Regulation M-A | 1.1(c) |
| Release | 3.18(e)(iii) |
| Representatives | 5.2(a) |
| Reporting Tail Endorsement | 6.8(b) |
| Restraints | 8.1(b)(i) |
| Rights Agent | Recitals |
| Sales Incentive Compensation Plan | 6.11(a) |
| Sarbanes-Oxley Act | 3.6(b) |
| Schedule 14D-9 | 1.2(b) |
| Schedule TO | 1.1(b) |
| SEC | 1.1(a) |
| Securities Act | 3.11(c) |
| Severance | 6.11(d) |
| Shares | Recitals |
| Special Meeting | 1.8(a)(i) |
| Sub | Preamble |
| Sub Common Stock | 2.1 |
| Successor Plan | 6.11(c) |
| Superior Proposal | 5.2(b) |
| Surviving Corporation | 1.3(a) |
| Tax | 3.15(a) |
| Taxable | 3.15(a) |
| Tax Return | 3.15(a) |
| Tender Completion Time | 6.2 |
| Tender and Voting Agreements | Recitals |
| Terminated Employee | 6.11(d) |
| Termination Fee | 8.2(b) |
| Time-Vested DSU | 2.4(c) |
| Top-Up Option | 1.10(a) |
| Top-Up Shares | 1.10(a) |
| UK Bribery Act | 3.9(c) |

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER (this "Agreement") dated as of October 24, 2011 is among CUBIST PHARMACEUTICALS, INC. ("Parent"), a Delaware corporation, FRD ACQUISITION CORPORATION ("Sub"), a newly-formed Delaware corporation and a direct or indirect wholly-owned subsidiary of Parent, and ADOLOR CORPORATION (the "Company"), a Delaware corporation.

## R E C I T A L S

WHEREAS, Parent and the Board of Directors of each of Sub and the Company has approved the acquisition of the Company by Parent on the terms and conditions set forth in this Agreement;

WHEREAS, in furtherance thereof, it is proposed that Sub commence a tender offer (as it may be amended from time to time as permitted by this Agreement, the "Offer") to acquire all shares of the issued and outstanding common stock, par value $0.0001 per share, of the Company (the "Shares"), for (a) $4.25 for each Share, net to the seller in cash (the "Closing Amount"), without interest, plus (b) one contingent payment right for each Share (a "CPR"), which shall represent the right to receive the Payment Amounts (as such term is used in the Contingent Payment Rights Agreement in the form attached hereto as Annex IV (the "CPR Agreement") to be entered into between Parent and Computershare Inc., a Delaware corporation and its fully owned subsidiary Computershare Trust Company, N.A., a national banking association (the "Rights Agent")), if any, at the times provided for in the CPR Agreement, without interest; the Closing Amount plus one CPR, collectively, or any such higher consideration per Share as may be paid in the Offer, referred to herein as the "Offer Price"

WHEREAS, the Board of Directors of each of Sub and the Company has approved this Agreement and the transactions contemplated hereby, including the Merger following the Offer, in accordance with the Delaware General Corporation Law ("DGCL") and upon the terms and subject to the conditions set forth herein;

WHEREAS, the Board of Directors of the Company (the "Company Board of Directors") has determined that the consideration to be paid for each Share in the Offer and the Merger is fair to the holders of such Shares and has resolved to recommend that the holders of Shares accept the Offer and adopt this Agreement upon the terms and subject to the conditions set forth herein;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and inducement to Parent entering into this Agreement, certain Company stockholders (the "Principal Stockholders") have entered into tender and voting agreements, dated as of the date hereof, in substantially the form set forth in Annex II, pursuant to which, among other things, the Principal Stockholders have agreed to tender Shares to Sub in the Offer (the "Tender and Voting Agreement"); and

WHEREAS, the Company, Parent and Sub desire to make certain representations, warranties, covenants and agreements in connection with the Offer and the Merger.

NOW, THEREFORE, in consideration of the foregoing and the respective covenants, agreements, representations and warranties set forth herein, the parties agree as follows:

## SECTION 1 - THE OFFER AND THE MERGER

1.1.    <u>The Offer</u>.

(a)    Provided that this Agreement shall not have been terminated in accordance with Section 8.1, Parent shall cause Sub to, and Sub shall commence (within the meaning of Rule 14d-2 under the Securities Exchange Act of 1934, as amended (together with the rules and regulations promulgated thereunder, the "<u>Exchange Act</u>")) the Offer as promptly as practicable and in any event no later than the tenth (10th) business day following the date hereof.  The obligations of Sub to accept for payment and to pay for any Shares validly tendered and not withdrawn prior to the expiration of the Offer (as it may be extended in accordance with this Section 1.1(a) ) shall be subject only to the conditions set forth in <u>Annex I</u> (collectively, the "<u>Offer Conditions</u>" and each an "<u>Offer Condition</u>").  Subject to the prior satisfaction or, to the extent permitted, waiver by Parent and Sub of the Offer Conditions, Parent shall cause Sub to, and Sub shall, consummate the Offer in accordance with its terms and accept for payment and pay the Offer Price for all Shares tendered and not withdrawn promptly following the acceptance in compliance with Rule 14e-1(c) under the Exchange Act of Shares for payment pursuant to the Offer.  The Offer shall be made by means of an offer to purchase (the "<u>Offer to Purchase</u>") that contains the terms set forth in this Agreement and the Offer Conditions. Parent and Sub expressly reserve the right to waive any Offer Conditions, to increase the Offer Price and to make any other changes in the terms of the Offer; <u>provided</u>, <u>however</u>, that Sub shall not, and Parent shall cause Sub not to, decrease the Closing Amount or CPR Payment Amount, change the form of payment of the Closing Amount or CPR Payment Amount, decrease the number of Shares sought in the Offer, waive or change the Minimum Condition, impose additional conditions to the Offer, amend any of the Offer Conditions so as to broaden the scope of any such condition, extend the offer beyond a date that is twenty-one (21) business days after commencement of the Offer or the last extension in accordance with this Section 1.1, if any, of the Offer, whichever is later (the "<u>Expiration Date</u>") except as set forth below, or otherwise amend any other term or condition of the Offer in a manner materially adverse to the holders of Shares, in each case without the prior written consent of the Company.  Notwithstanding the foregoing and subject to the parties respective termination rights set forth in Section 8.1, Sub may, without the consent of the Company (i) extend the Offer beyond the initial expiration date if, at any scheduled (or extended) expiration of the Offer, any of the conditions to Sub's obligation to accept Shares for payment, shall not be satisfied or waived, (ii) extend the Offer for any period required by any rule, regulation or interpretation of the United States Securities and Exchange Commission ("<u>SEC</u>") or its staff applicable to the Offer.  In addition to the foregoing, Sub also may provide a "subsequent offering period" in accordance with Rule 14d-11 under the Exchange Act if, as of the Expiration Date, all of the conditions to Sub's obligations to accept for payment and pay for all Shares are satisfied or waived, but there shall not have been validly tendered and not withdrawn pursuant to the Offer that number of Shares necessary to permit the Merger to be effected without a meeting of the Company's stockholders in accordance with the DGCL.

2

(b)        Subject to the parties' respective termination rights set forth in Section 8.1, if, at the time at which the Offer is scheduled to expire, any Offer Condition has not been satisfied or has not been validly waived, then, if so requested by the Company by written notice on or prior to the date the Offer is then scheduled to expire, Sub shall extend the Offer for up to one period of not more than five (5) business days per extension period, until all of the Offer Conditions have been satisfied or, to the extent permitted, validly waived; provided, however, that the Company shall not have the right to request an extension pursuant to this Section 1.1(b) if, at the time of any proposed extension, an Acquisition Proposal has been publicly made and the Company Board of Directors failed to reaffirm its recommendation of the Offer within two (2) business days of Parent's request.

(c)        On the date of commencement of the Offer, Parent and Sub shall file with the SEC, pursuant to Regulation M-A under the Exchange Act ("Regulation M-A"), a Tender Offer Statement on Schedule TO with respect to the Offer (together with all amendments, supplements and exhibits thereto, the "Schedule TO").  The Schedule TO shall include, as exhibits, the Offer to Purchase and a form of letter of transmittal and summary advertisement (collectively, together with any amendments and supplements thereto, the "Offer Documents").  Subject to Section 5.2, the Company hereby consents to the inclusion in the Offer Documents of the recommendation and the approval of the Company Board of Directors referred to in Section 3.20(a).  Subject to the Company's compliance with Section 1.2(c), Parent and Sub agree to take all steps necessary to cause the Offer Documents to be filed with the SEC and disseminated to holders of Shares, in each case as and to the extent required by applicable Law.  Parent and Sub, on the one hand, and the Company, on the other hand, agree to promptly correct any information provided by it for use in the Offer Documents if and to the extent that it shall have become false or misleading in any material respect or as otherwise required by Law.  Parent and Sub further agree to take all steps necessary to cause the Offer Documents as so corrected to be filed with the SEC and disseminated to holders of Shares, in each case as and to the extent required by applicable Law.  The Company shall be given a reasonable opportunity to review and comment on the Schedule TO and any amendment thereto before it is filed with the SEC, and Parent and Sub shall give due consideration to all reasonable and appropriate additions, deletions or changes thereto suggested by the Company and its legal counsel.  In addition, Parent and Sub agree to provide the Company with any comments, whether written or oral, that Parent, Sub or their counsel may receive from time to time prior to the expiration or termination of the Offer, from the SEC or its staff with respect to the Offer Documents, promptly after receipt of such comments, and any written or oral responses thereto, and the Company shall be given a reasonable opportunity to review such comments and have the right to consult with Parent, Sub and their counsel prior to responding to any such comments, either in written or oral form, and Parent and Sub shall give due consideration to the reasonable and appropriate views and comments of the Company and its legal counsel related thereto.

(d)        Parent shall provide or cause to be provided to Sub promptly following the expiration of the Offer or any subsequent extension thereof, as applicable, all funds necessary to pay the aggregate Closing Amounts with respect to Shares that have been validly tendered and not withdrawn pursuant to the Offer and that Sub is obligated to accept for payment pursuant to the Offer and permitted to accept for payment under applicable Law.

3

(e)        Parent shall, at or prior to the Acceptance Time (as defined in Section 5.2(b)), duly authorize, execute and deliver the CPR Agreement.

1.2.        Company Actions.

(a)        Subject to Section 5.2 and to any consents or approvals of the Company's stockholders required under applicable Law, the Company hereby approves of and consents to the Offer, the Merger and the other transactions contemplated hereby.

(b)        On the date the Offer is commenced, the Company shall, in a manner that complies with Rule 14d-9 under the Exchange Act, file with the SEC a Tender Offer Solicitation/Recommendation Statement on Schedule 14D-9 (together with all amendments, supplements and exhibits thereto, the "Schedule 14D-9") which shall, subject to the provisions of Section 5.2, contain the recommendation of the Company Board of Directors referred to in Section 3.20(a) and all information required by Delaware Law.  The Company further agrees to take all steps necessary to cause the Schedule 14D-9 to be filed with the SEC and disseminated to holders of Shares, in each case as and to the extent required by applicable Law.  The Company shall provide to Parent a copy of the Company financial advisor's fairness opinion and a summary of the analysis underlying such fairness opinion to be included in the Schedule 14D-9.  The Company, on the one hand, and Parent and Sub, on the other hand, agree to promptly correct and supplement any information provided by it for use in the Schedule 14D-9 if and to the extent that it shall have become false or misleading in any material respect or as otherwise required by Law.  The Company agrees to take all steps necessary to cause the Schedule 14D-9 as so corrected to be filed with the SEC and disseminated to holders of the Shares, in each case as and to the extent required by applicable Law.  Parent and Sub shall be given the opportunity to review and comment on the Schedule 14D-9 and any amendment thereto before filing with the SEC and the Company and its counsel shall give due consideration to all reasonable and appropriate additions, deletions or changes thereto suggested by Parent and its counsel.  In addition, the Company agrees to provide Parent and Sub any comments, whether written or oral, that the Company or its counsel may receive from time to time from the SEC or its staff with respect to the Schedule 14D-9 promptly after receipt of such comments, and to consult with Parent, Sub and their counsel and give due consideration to all reasonable and appropriate additions, deletions or changes thereto suggest by Parent and its counsel prior to responding to any such comments, either in written or oral form.

(c)        The Company shall promptly furnish or cause to be furnished to Parent or Sub mailing labels, security position listings and all available listings and computer files containing the names and addresses of the record holders of the Shares as of a recent date, and of those persons becoming record holders subsequent to such date, and shall promptly furnish Parent or Sub with such information and assistance (including, but not limited to, lists of holders of the Shares, updated periodically, and their addresses, mailing labels and lists of security positions) as Parent or Sub or its agent(s) may reasonably request.  Subject to applicable Law, such information shall be held confidential by Parent and Sub under the terms of the Mutual Confidentiality and Non-Use Agreement, dated July 26, 2011, entered into between Parent and the Company (as amended, the "Confidentiality Agreement").  For the avoidance of doubt, the parties agree that the Confidentiality Agreement does not restrict steps to prepare, file or

4

disseminate the Offer Documents and any other documents necessary to consummate the transactions contemplated hereby.

1.3.     The Merger.

(a)     Subject to the terms and conditions of this Agreement, at the Effective Time, the Company and Sub shall consummate a merger (the "Merger") in accordance with the DGCL pursuant to which (i) Sub will be merged with and into the Company and the separate corporate existence of Sub will thereupon cease; (ii) the Company will be the successor or surviving corporation in the Merger and will continue to be governed by the Laws of the State of Delaware; (iii) the corporate existence of the Company with all its rights, privileges, powers and franchises will continue; and (iv) the Company will succeed to and assume all the rights and obligations of Sub. The corporation surviving the Merger is sometimes hereinafter referred to as the "Surviving Corporation." The Merger shall have the effects set forth in the DGCL. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, all the property, rights, privileges, powers and franchises of the Company and Sub shall be vested in the Surviving Corporation, and all debts, liabilities and duties of the Company and Sub shall become the debts, liabilities and duties of the Surviving Corporation.

(b)     At the Effective Time, the certificate of incorporation of the Company shall, by virtue of the Merger, be amended and restated in its entirety to be in the form of Annex III and, as so amended, shall be the certificate of incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(c)     At the Effective Time, and without any further action on the part of the Company or Sub, the bylaws of the Company shall be amended and restated in their entirety to be identical to the bylaws of Sub as in effect immediately prior to the Effective Time (except that such bylaws shall be amended to reflect that the name of the Surviving Corporation shall be Adolor Corporation), and, as so amended, shall be the bylaws of the Surviving Corporation until thereafter changed or amended as provided by the DGCL, the certificate of incorporation of the Surviving Corporation and such bylaws.

1.4.     Effective Time. Parent, Sub and the Company shall cause a certificate of merger complying with Section 251 of the DGCL or a certificate of ownership and merger complying with Section 253 of the DGCL, as applicable (either the "Certificate of Merger") to be executed and filed on the Closing Date (or on such other date as Parent and the Company may agree) with the Secretary of State of the State of Delaware as provided in the DGCL. The Merger shall become effective on the time and date on which the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or such later time and date as is specified in the Certificate of Merger (provided, however, that such later time and date shall not be more than five (5) business days after the filing without the written consent of the Company), such time hereinafter referred to as the "Effective Time."

1.5.     Closing. The closing of the Merger (the "Closing") will take place at 9:00 a.m. (Boston time) on a date to be specified by the parties, such date to be no later than the second (2nd) business day after satisfaction or waiver of all of the conditions set forth in SECTION 7 capable of satisfaction prior to the Closing (the "Closing Date"), at the offices of

Ropes & Gray LLP, Prudential Tower, 800 Boylston Street, Boston, Massachusetts 02199, unless another date or place is agreed to in writing by the parties hereto.

1.6.    <u>Directors and Officers of the Surviving Corporation</u>.  The directors of Sub immediately prior to the Effective Time shall, from and after the Effective Time, be the directors of the Surviving Corporation, and the officers of Sub immediately prior to the Effective Time shall, from and after the Effective Time, be the officers of the Surviving Corporation, in each case until their respective successors shall have been duly elected, designated or qualified, or until their earlier death, resignation or removal in accordance with the Surviving Corporation's certificate of incorporation and bylaws.  Prior to the Effective Time, the Company shall cause each member of the Company Board of Directors, other than Parent's or Sub's designees pursuant to Section 6.8, to execute and deliver a letter effectuating his or her resignation as a director of the Company upon the Effective Time.

1.7.    <u>Subsequent Actions</u>.  If at any time after the Effective Time the Surviving Corporation shall determine, in its sole discretion, or shall be advised, that any deeds, bills of sale, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm of record or otherwise in the Surviving Corporation its right, title or interest in, to or under any of the rights, properties or assets of either the Company or Sub acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger or otherwise to carry out this Agreement, then the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of either the Company or Sub, all such deeds, bills of sale, instruments of conveyance, assignments and assurances and to take and do, in the name and on behalf of each such corporation or otherwise, all such other actions and things as may be necessary or desirable to vest, perfect or confirm any and all right, title or interest in, to and under such rights, properties or assets in the Surviving Corporation or otherwise to carry out this Agreement.

1.8.    <u>Stockholders' Meeting</u>.

(a)    If required by applicable Law in order to consummate the Merger, the Company, acting through the Company Board of Directors, in accordance with applicable Law and the Company's certificate of incorporation and bylaws, shall:

(i)    duly call, give notice of, convene and hold a special meeting of its stockholders to consider the adoption of this Agreement (the "<u>Special Meeting</u>") as soon as reasonably practicable following the Acceptance Time;

(ii)    as soon as reasonably practicable following the Acceptance Time, prepare and file with the SEC under the Exchange Act a preliminary proxy or information statement relating to the Merger and this Agreement and use its reasonable best efforts to obtain and furnish the information required to be included by the SEC in the Proxy Statement and, after Parent shall have had a reasonable opportunity to review and comment on the Proxy Statement, respond promptly to any comments made by the SEC with respect to the preliminary proxy or information statement and cause a definitive proxy or information statement (in either case, the "<u>Proxy Statement</u>") to be mailed to its stockholders as promptly as practicable;

6

(iii)        subject to Section 5.2, include in the Proxy Statement the recommendation of the Company Board of Directors that the stockholders of the Company vote in favor of the adoption of this Agreement; and

(iv)        use commercially reasonable efforts to solicit from holders of Shares proxies in favor of the adoption of this Agreement and take all other action reasonably necessary or advisable to secure the approval of stockholders required by the DGCL and any other applicable Law and the Company's certificate of incorporation and bylaws to effect the Merger.

(b)        Parent agrees to vote, or cause to be voted, all of the Shares then beneficially owned by Sub in favor of the adoption of this Agreement and the approval of the Merger.

1.9.        Merger Without Meeting of Stockholders.  Notwithstanding Section 1.8, in the event that Sub has acquired at least ninety percent (90%) of the outstanding shares of each class of capital stock of the Company entitled to vote on the Merger, pursuant to the Offer or otherwise, the parties hereto agree, at the request of Parent and subject to SECTION 7, to take all necessary and appropriate action to cause the Merger to become effective as soon as practicable after such acquisition, without a meeting of stockholders of the Company, in accordance with and subject to the DGCL.

1.10.        Top-Up Option.

(a)        The Company hereby grants to Sub an irrevocable option (the "Top-Up Option"), exercisable only on the terms and conditions set forth in this Section 1.10, to purchase at a price per share equal to the greater of (i) the last reported sale price of a Share on The Nasdaq Stock Market on the last trading day prior to the date on which the Top-Up Option is exercised or (ii) the Closing Amount, newly issued Shares (the "Top-Up Shares") so that, when added to the number of Shares owned by Sub prior to the exercise of the Top-Up Option, Sub will own at least ninety percent (90%) of the Shares outstanding immediately after the issuance of the Top-Up Shares (not including in the Shares owned by Sub any Shares tendered pursuant to unfulfilled guaranteed delivery procedures); provided, however, that (i) the Top-Up Option shall not be exercisable for a number of Shares in excess of the Shares authorized and unissued at the time of exercise of the Top-Up Option and (ii) the Top-Up Option may not be exercised unless, following the Acceptance Time or after a subsequent offering period, seventy percent (70%) or more of the Shares shall be owned by Sub.  The Top-Up Option shall be exercisable once at any time following the Acceptance Time and prior to the earlier to occur of (A) the Effective Time and (B) the termination of this Agreement in accordance with its terms.  Sub may assign the Top-Up Option and its rights and obligations pursuant to this Section 1.10, in its sole discretion, to Parent.

(b)        The parties shall cooperate to ensure that the issuance and delivery of the Top-Up Shares complies with all applicable Laws, including compliance with an applicable exemption from registration under the Securities Act.  If Sub wishes to exercise the Top-Up Option, Sub shall give the Company written notice, specifying (i) the number of Shares owned by Sub, (ii) a place and a time for the closing of such purchase and (iii) the manner in which Sub

7

intends to pay the applicable purchase price.  The Company shall, as soon as practicable following receipt of such notice, deliver written notice to Sub specifying, based on the information provided by Sub in its notice, the number of Top-Up Shares.  Prior to the closing of the purchase of the Top-Up Shares, upon Sub's request, the Company shall use its reasonable best efforts to cause its transfer agent to certify in writing to Sub the number of Shares issued and outstanding (A) as of immediately prior to the exercise of the Top-Up Option and (B) after giving effect to the issuance of the Top-Up Shares.

(c)        The aggregate purchase price payable for the Top-Up Shares may be paid, at Sub's option, (i) in cash, (ii) by executing and delivering to the Company a promissory note having a principal amount equal to the balance of the remaining aggregate purchase price, or (iii) a combination thereof, provided that Sub shall use cash for at least the aggregate par value of the Top-Up Shares.  The Company Board has approved such consideration for the Top-Up Shares.  Any such promissory note shall include the following terms: (1) the maturity date shall be one (1) year after issuance, (2) the unpaid principal amount of the promissory note shall accrue simple interest at a per annum rate of 3.00% and (3) the promissory note may be prepaid in whole or in part at any time, without penalty or prior notice.

(d)        Parent and Sub acknowledge that the Shares that Sub may acquire upon exercise of the Top-Up Option shall not be registered under the Securities Act and shall be issued in reliance upon an exemption for transactions not involving a public offering.  Sub agrees that the Top-Up Option, and the Top-Up Shares to be acquired upon exercise of the Top-Up Option, if any, are being and shall be acquired by Sub for the purpose of investment and not with a view to, or for resale in connection with, any distribution thereof (within the meaning of the Securities Act).

(e)        The obligation of the Company to deliver Top-Up Shares upon the exercise of the Top-Up Option is subject to the conditions that (i) no provision of any applicable Law and no judgment, injunction, order or decree shall prohibit the exercise of the Top-Up Option or the delivery of the Top-Up Shares in respect of such exercise, (ii) due to the exercise of the Top-Up Option, the number of Shares owned by Parent, Sub and their Affiliates will constitute more than ninety percent (90%) of the number of Shares that will be outstanding on a fully-diluted basis immediately after the issuance of the Top-Up Shares, and (iii) Sub has accepted for payment all Shares validly tendered in the Offer and not withdrawn.

SECTION 2 - CONVERSION OF SECURITIES

2.1.        Conversion of Capital Stock.  As of the Effective Time, by virtue of the Merger and without any action on the part of the holders of any Shares or any shares of common stock, par value $0.01 per share, of Sub ("Sub Common Stock"):

(a)        Sub Common Stock.  Each issued and outstanding share of Sub Common Stock shall be converted into and become one (1) fully paid and nonassessable share of common stock of the Surviving Corporation.

(b)        Cancellation of Treasury Stock and Parent-Owned Stock.  All Shares that are owned by the Company as treasury stock and any Shares owned by Parent or Sub shall

8

automatically be cancelled and retired and shall cease to exist, and no consideration shall be payable in exchange therefor.

(c)     Conversion of Shares.  Subject to Section 2.4, each issued and outstanding Share (other than Shares to be cancelled in accordance with Section 2.1(b) and other than Dissenting Shares) shall be converted into the right to receive the (i) the Closing Amount, payable to the holder thereof in cash, without interest, plus (ii) one CPR, or any such higher consideration as may be paid in the Offer (the "Merger Consideration").  From and after the Effective Time, all such Shares shall no longer be outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder of a certificate (a "Certificate") or book-entry share (a "Book-Entry Share") representing any such Shares shall cease to have any rights with respect thereto, except the right to receive the Merger Consideration therefor, without interest thereon, upon the surrender of such Certificate or Book-Entry Share in accordance with Section 2.2.

2.2.     Exchange of Certificates.

(a)     Paying Agent.  Parent shall designate StockTrans, Inc. or another bank or trust company that is reasonably acceptable to the Company to act as agent for the holders of Shares in connection with the Merger (the "Paying Agent") and to receive the aggregate Closing Amounts to which holders of Shares shall become entitled pursuant to Section 2.1(c).  Parent shall cause the Surviving Corporation to provide to the Paying Agent on a timely basis, promptly (in any event no later than the immediately following business day) after the Effective Time, and as and when needed after the Effective Time, cash necessary to pay the aggregate Closing Amounts for the Shares converted in the Merger into the right to receive the Merger Consideration (such cash being hereinafter referred to as the "Exchange Fund").  If for any reason the Exchange Fund is inadequate to pay the aggregate Closing Amounts to which holders of Shares shall be entitled under Section 2.1(c), Parent shall promptly deposit or cause the Surviving Corporation promptly to deposit additional cash with the Paying Agent sufficient to make all payments of aggregate Closing Amounts, and Parent and the Surviving Corporation shall in any event be liable for payment thereof.  The Paying Agent may invest the cash in the Exchange Fund as directed by Parent; provided, however, that such investments, if any, shall be in obligations of or guaranteed by the United States or any agency or instrumentality thereof and backed by the full faith and credit of the United States, in commercial paper obligations rated P-1 or A-1 or better by Moody's Investors Service, Inc. or Standard & Poor's Corporation, respectively, or in money market funds that invest only in such United States government and commercial paper obligations.  Any interest and other income resulting from such investments shall be paid to Parent.  No investment of the Exchange Fund shall relieve Parent, Surviving Corporation or the Paying Agent from promptly making the payments required under this Article II, and following any losses from any such investment, Parent shall promptly provide any additional cash funds to the Paying Agent for the benefit of the Company's shareholders at the Effective Time in the amount of such losses, which additional funds will be deemed to be part of the Exchange Fund.

(b)     Exchange Procedures.  Promptly after the Effective Time, the Paying Agent shall mail to each holder of record of a Certificate or a Book-Entry Share, which immediately prior to the Effective Time represented outstanding Shares, whose shares were

9

converted pursuant to Section 2.1(c) into the right to receive the Merger Consideration (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificate or Book-Entry Shares shall pass, only upon delivery of the Certificates (or affidavits of loss for such Certificates) or Book-Entry Shares to the Paying Agent and shall be in such form and have such other provisions as Parent and the Company mutually agree prior to the Effective Time); and (ii) instructions for effecting the surrender of the Certificates or Book-Entry Shares in exchange for payment of the Merger Consideration. Upon surrender of a Certificate or Book-Entry Share for cancellation to the Paying Agent or to such other agent or agents as may be appointed by Parent, together with such letter of transmittal, duly executed and properly completed and such other documents as may be reasonably requested by the Paying Agent, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor the Merger Consideration for each Share formerly represented by such Certificate or Book-Entry Share, and the Certificate or Book-Entry Share so surrendered shall forthwith be cancelled. Until surrendered as contemplated by this Section 2.2, each Certificate or Book-Entry Share shall be deemed at any time after the Effective Time to represent only the right to receive the Merger Consideration in cash as contemplated by this Section 2.2, without interest thereon, and shall not evidence any interest in, or any right to exercise the rights of a stockholder or other equity holder of, the Company or the Surviving Corporation.

(c)     Transfer Books; No Further Ownership Rights in Shares.  At the Effective Time, the stock transfer books of the Company shall be closed and thereafter there shall be no further registration of transfers of Shares on the records of the Company.  From and after the Effective Time, the holders of Certificates or Book-Entry Shares evidencing ownership of Shares outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such Shares, except as otherwise provided for herein or by applicable Law. If, after the Effective Time, Certificates or Book-Entry Shares are presented to the Surviving Corporation for any reason, they shall be cancelled and exchanged as provided in this SECTION 2.

(d)     Termination of Exchange Fund; No Liability.  At any time following six (6)  months after the Effective Time, the Surviving Corporation shall be entitled to require the Paying Agent to deliver to it any funds (including any interest received with respect thereto) made available to the Paying Agent and not disbursed (or for which disbursement is pending subject only to the Paying Agent's routine administrative procedures) to holders of Certificates and Book-Entry Shares, and thereafter such holders shall be entitled to look only to the Surviving Corporation (subject to abandoned property, escheat or other similar Laws) only as general creditors thereof with respect to the Merger Consideration payable upon due surrender of their Certificates or Book-Entry Shares, without any interest thereon. Notwithstanding the foregoing, none of Parent, the Surviving Corporation nor the Paying Agent shall be liable to any holder of a Certificate or Book-Entry Share for Merger Consideration delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If Certificates or Book-Entry Shares are not surrendered prior to the time such Certificates or Book-Entry shares would otherwise escheat to, or become Property of, any Governmental Entity, unclaimed Merger Consideration payable with respect to such Shares shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any person previously entitled thereto.

10

(e)      <u>Lost Certificates</u>.  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the posting by such person of a bond in such amount as Parent may reasonably direct as indemnity against any claim that may be made against it or the Surviving Corporation with respect to such Certificate, the Paying Agent shall deliver in exchange for such lost, stolen or destroyed Certificate the applicable Merger Consideration with respect thereto.

2.3.    <u>Dissenting Shares</u>.

(a)      Notwithstanding anything in this Agreement to the contrary, Shares outstanding immediately prior to the Effective Time and held by a holder who has not voted in favor of the Merger or consented thereto in writing and who has complied with Section 262 of the DGCL (the "<u>Dissenting Shares</u>") shall not be converted into a right to receive the Merger Consideration, unless such holder fails to perfect or withdraws or otherwise loses his, her or its right to appraisal.  From and after the Effective Time, a stockholder who has properly exercised such appraisal rights shall not have any rights of a stockholder of the Company or the Surviving Corporation with respect to such Shares, except those provided under Section 262 of the DGCL.  A holder of Dissenting Shares shall be entitled to receive payment of the appraised value of such Shares held by him, her or it in accordance with Section 262 of the DGCL, unless, after the Effective Time, such holder fails to perfect or withdraws or loses his, her or its right to appraisal, in which case such Shares shall be converted into and represent only the right to receive the Merger Consideration, without interest thereon, upon surrender of the Certificates or Book-Entry Shares, pursuant to Section 2.2.  The parties hereby agree and acknowledge that in any appraisal proceeding with respect to the Dissenting Shares, and to the fullest extent permitted by applicable Law, the fair value of the Dissenting Shares shall be determined in accordance with Section 262 of the DGCL without regard to the Top-Up Option, the Top-Up Shares or any promissory note delivered by Sub or Parent to the Company in payment for the Top-Up Shares.

(b)      The Company shall give Parent (i) prompt written notice of any written demands for appraisal (including copies of such demands), attempted withdrawals of such demands and any other instruments received by the Company relating to rights of appraisal; and (ii) the opportunity to participate in the conduct of all negotiations and proceedings with respect to demands for appraisal.  Except with the prior written consent of Parent, the Company shall not voluntarily make any payment with respect to any demands for appraisal or settle or offer to settle any such demands for appraisal.

2.4.    <u>Company Incentive Plans</u>.

(a)      At the Acceptance Time, each stock option (each a "<u>Company Option</u>" and, collectively, the "<u>Company Options</u>") that was granted under the Company's Amended and Restated 1994 Equity Compensation Plan or its 2011 Stock-Based Incentive Compensation Plan (formerly known as the 2003 Amended and Restated Stock-Based Incentive Compensation Plan) (the "<u>Company Stock Plans</u>") and that is outstanding immediately prior to the Acceptance Time shall vest in full to the extent not already vested.  The Company shall have provided to each holder of a Company Option, prior to the Effective Time, written notice and an opportunity to exercise such Company Option prior to the Effective Time.  Between the Acceptance Time and

11

the Effective Time, Company Options that have an exercise price of less than $4.25 per share may be exercised, with such exercise effective immediately prior to the Effective Time, by assignment to the Surviving Corporation of a sufficient portion of the Closing Amount payable in the Merger with respect to the shares subject to such Company Options, provided that the holder of such Company Options irrevocably undertakes to exchange such shares pursuant to Section 2.2(b) hereof and instructs the Paying Agent to deduct the applicable portion of the Closing Amount that would otherwise be payable with respect to such shares.  At the Effective Time, each then-outstanding Company Option shall be canceled and shall immediately cease to be outstanding, without any payment in respect of such Company Option or cancellation thereof except as provided in the following sentence.  In full satisfaction of the cancellation of any Company Option described in the immediately preceding sentence that had a per-Share exercise price less than the last reported sale price of a Share on The Nasdaq Stock Market on the last trading day prior to the Acceptance Time, Parent shall, or shall cause the Surviving Corporation to, following the Effective Time, pay to the holder of such Company Option, (x) an amount in cash in respect thereof equal to the product of (I) the excess, if any, of the last reported sale price of a Share on The Nasdaq Stock Market on the last trading day prior to the Acceptance Time over the per-Share exercise price of such Company Option and (II) the number of Shares subject thereto (such payments to be net of applicable Taxes withheld pursuant to Section 2.6).  As of the Effective Time, no Person shall retain any rights with respect to any previously outstanding Company Options except for the rights of a holder to receive any payment expressly contemplated by this Section 2.4(a).

(b)     At the Acceptance Time, each share of restricted stock that was granted by the Company under a Company Stock Plan (each, a "Company Restricted Share" and, collectively, the "Company Restricted Stock") that is unvested and outstanding immediately prior to the Acceptance Time shall vest and, after satisfaction of all applicable Tax and other withholding requirements pursuant to Section 2.6, be converted into the right to receive, as promptly as practicable following the Effective Time, the Merger Consideration.

(c)     At the Acceptance Time, each performance-based deferred stock unit (each, a "Performance-Based DSU" and, collectively, the "Performance-Based DSUs") and each time-vested deferred stock unit (each, a "Time-Vested DSU" and, collectively, the "Time-Vested DSUs") (the Performance-Based DSUs and the Time-Vested DSUs being collectively referred to herein as the "DSUs") that was granted by the Company under a Company Stock Plan that is unvested and outstanding immediately prior to the Acceptance Time shall vest and shall be satisfied by delivery of an equivalent number of Shares, less such number of Shares as shall be withheld pursuant to Section 2.6 to satisfy applicable Tax and other withholding requirements, such remaining Shares to be converted into the right to receive, as promptly as practicable following the Effective Time, the Merger Consideration.

(d)     Any amounts to be paid pursuant to this Section 2.4 shall be in lieu of any amounts that would otherwise be payable pursuant to Section 2.1(c) in respect of Shares subject to Company Options, Company Restricted Shares and DSUs, as applicable.

(e)     As of the Effective Time, the Company Stock Plans shall terminate and all rights under any provision of any other plan, program or arrangement providing for the issuance or grant of any other interest in respect of the capital stock of the Company or any Company

12

Subsidiary shall be cancelled.  The Company shall take, or cause to be taken, all actions necessary to effectuate the foregoing provisions of this Section 2.4, including, but not limited to, sending out the requisite notices, obtaining any necessary resolutions of the Board or a committee thereof, and obtaining all consents necessary to cash out and cancel all Company Options, Company Restricted Stock, and DSUs, so as to ensure that, after the Effective Time, no person shall have any rights under the Company Stock Plans except for the right to receive the payments, if any, contemplated by Section 2.4(a), 2.4(b) or 2.4(c).

2.5.    <u>Section 16</u>.  The Company Board of Directors shall, to the extent necessary, take appropriate action, prior to or as of the Acceptance Time, to approve, for purposes of Section 16(b) of the Exchange Act the disposition and cancellation of Shares (and related derivative securities) resulting from the transactions contemplated by this Agreement.

2.6.    <u>Withholding</u>.  Each of Parent, Sub and Surviving Corporation shall be entitled to deduct and withhold, or cause the Paying Agent to deduct and withhold, from any cash consideration payable or otherwise deliverable pursuant to this Agreement to any holder or former holder of Shares, Company Options, Company Restricted Stock or DSUs, in each case directly or through an authorized agent with respect to any consideration payable or otherwise deliverable pursuant to this Agreement, such amounts as are required to be deducted or withheld under the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") or any provision of any other applicable federal, state, local or non-U.S. Tax Law from any such consideration, as reasonably determined by Parent.  To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid. Notwithstanding the foregoing and for the avoidance of doubt, (i) the Company shall (a) prior to the Acceptance Time, make arrangements consistent with the requirements of applicable law with each holder of Company Restricted Stock for the prompt satisfaction (through the withholding or tendering of Shares or otherwise) of all withholding tax obligations required to be satisfied in respect of the vesting of such Company Restricted Stock pursuant to Section 2.4(b) above, such arrangements to be reasonably satisfactory to Parent; and (b) satisfy or cause to be satisfied, timely and in full including through the withholding of Shares in the case of the DSUs, all tax withholdings required or in respect of any other vesting or payment event in respect of Company Options or DSUs for which the required tax remittance is due prior to the Effective Time, (ii) nothing in the preceding sentence shall limit the ability and right of the Surviving Corporation to satisfy its tax withholding obligations by other means, and (iii) to the extent the Company or Surviving Corporation remits payroll taxes (other than FUTA or the employer portion of FICA) or other required withholdings with respect to the vesting of Company Restricted Shares or in respect of any other vesting or payment event in respect of Company Options or DSUs and there is not a corresponding withholding from amounts payable to the employee or former employee (the amount not withheld, the "shortfall amount"), each of Parent, Sub and Surviving Corporation shall be entitled to deduct and withhold, or cause the Paying Agent to deduct and withhold, for the benefit of the Surviving Corporation, any such shortfall amount from any cash consideration described in the first sentence of this Section 2.6.

2.7.    <u>Transfer Taxes</u>.  If any payment pursuant to the Offer or the Merger is to be made to a person other than the person in whose name the surrendered Certificate or Book-Entry Share is registered, it shall be a condition of payment that the Certificate or Book-Entry Shares

13

surrendered shall be properly endorsed or shall be otherwise in proper form for transfer and that the person requesting such payment shall have paid all transfer and other Taxes required by reason of the payment to a person other than the registered holder of the Certificate or Book-Entry Share surrendered or shall have established to the satisfaction of Parent that such Tax either has been paid or is not applicable.

SECTION 3 - REPRESENTATIONS AND WARRANTIES OF COMPANY

Except as (i) set forth on the Disclosure Letter delivered by the Company to Parent on the date hereof (the "Company Disclosure Letter"), the section numbers of which are numbered to correspond to the section numbers of this Agreement to which they refer; provided, however, that (x) an item disclosed for any Section of this Agreement shall be deemed to have been disclosed for each other Section of this Agreement to the extent the relevance of such disclosure to such other Section is reasonably apparent on the face of such disclosure and (y) the mere inclusion of an item in such Company Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item constitutes a Company Material Adverse Effect, and (ii) factual information disclosed in any periodic report filed by the Company with the SEC after January 1, 2011 and publicly available prior to the date of this Agreement (excluding any disclosures under the heading "Risk Factors" and any other disclosures that are predictive or forward-looking in nature), the Company hereby makes the following representations and warranties to Parent and Sub:

3.1.    Organization and Qualification.

(a)    Each of the Company and each Company Subsidiary is a corporation or other legal entity duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has corporate or similar power and authority to own, lease and operate its assets and to carry on its business as now being and as heretofore conducted.  Each of the Company and each Company Subsidiary is qualified or otherwise authorized to transact business as a foreign corporation or other organization in all jurisdictions in which such qualification or authorization is required by Law, except for jurisdictions in which the failure to be so qualified or authorized and in good standing would not reasonably be expected to have a Company Material Adverse Effect.  "Company Material Adverse Effect" shall mean any change, event, circumstance, effect or development that, individually or in the aggregate with all other changes, events, circumstances, effects or developments that exist on the date of determination, has had a material adverse effect on (i) the assets, properties, business, capitalization, results of operations, or financial condition of the Company and the Company Subsidiaries, taken as a whole, or (ii) the ability of the Company to consummate the transactions contemplated by this Agreement; provided, however, that none of the following shall constitute or be deemed to contribute to a Company Material Adverse Effect or shall be taken into account in determining whether a Company Material Adverse Effect has occurred or would occur:  any adverse effect arising out of, resulting from or attributable to (i) (A) the United States or global economy generally or capital or financial markets generally, including changes in interest or exchange rates, (B) political conditions generally of the United States or any other country or jurisdiction in which the Company operates, (C) changes that are the result of factors generally affecting any of the industries in which the Company operates or in which products or services of the Business

14

are used or distributed, (D) any hostilities, act of war, sabotage, terrorism or military actions, or any escalation or worsening of any such hostilities, act of war, sabotage, terrorism or military actions, or (E) any changes or prospective changes in applicable Law or United States generally accepted accounting principles or interpretation thereof, (ii) the announcement of the transactions contemplated by this Agreement, (iii) any failure by the Company to achieve any earnings or other financial projections or forecasts (including securities analysts published projections), (iv) any change in the trading price or trading volume of the Shares, (v) actions taken with Parent's written consent or at Parent's written request, and (vi) the termination for cause or voluntary resignations, retirements or death or disability of any employees of the Company or any Company Subsidiary, except in the case of the foregoing clause (i) to the extent such effect or change is materially disproportionately adverse with respect to the Company as compared to other Persons engaged in the industries of the Company.

(b)     The Company has previously provided to Parent true and complete copies of the certificate of incorporation and bylaws or other organizational documents of the Company and each Company Subsidiary as presently in effect, and none of the Company or any Company Subsidiary is in default in the performance, observation or fulfillment of such documents, except, in the case of Company Subsidiaries, such defaults that, in the aggregate, would not reasonably be expected to have a Company Material Adverse Effect.

3.2.     Authority to Execute and Perform Agreement.  The Company has the corporate power and authority to enter into, execute and deliver this Agreement and, subject, in the case of consummation of the Merger, to the adoption of this Agreement by the holders of the Shares, to perform fully its obligations hereunder.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the Company Board of Directors.  No other action on the part of the Company is necessary to consummate the transactions contemplated hereby (other than adoption of this Agreement by the holders of the Shares).  This Agreement has been duly executed and delivered by the Company and (assuming due authorization, execution and delivery by Parent and Sub) constitutes a valid and binding obligation of the Company, enforceable in accordance with its terms, except to the extent enforceability may be limited by the effect of applicable bankruptcy, reorganization, insolvency, moratorium or other Laws affecting the enforcement of creditors' rights generally and the effect of general principles of equity, regardless of whether such enforceability is considered in a proceeding at Law or in equity.

3.3.     Capitalization.

(a)     The authorized capital stock of the Company as of the date of this Agreement consists of 99,000,000 Shares and 1,000,000 shares of preferred stock, par value $0.01 per share ("Company Preferred Stock").  The rights and privileges of each class of the Company's capital stock are as set forth in the Company's certificate of incorporation.  As of the date of this Agreement, (i) 46,601,704 Shares are issued and outstanding and 25,721 Shares are issued but not outstanding, and (ii) 35,000 shares of Company Preferred Stock have been designated as Series A Junior Participating preferred stock, all of which were reserved for issuance upon exercise of preferred stock purchase rights (the "Company Rights") issuable pursuant to the Amended and Restated Rights Agreement, dated as of January 31, 2011, between

15

the Company and StockTrans, Inc., as rights agent (the "<u>Company Rights Agreement</u>"), and no shares of Company Preferred Stock are issued or outstanding.

(b)        Section 3.3 of the Company Disclosure Letter includes a complete list, as of the date of this Agreement, of (i) each outstanding Company Option, Company Restricted Share, and DSU, for each such Company Option, Company Restricted Share, and DSU, (each, an "<u>award</u>") the name of the holder of the award, the number of Shares subject to the award , the Company Stock Plan under which the award was granted, the date of grant, the applicable vesting schedule, the expiration date (if any), the exercise price (if any), and, in the case of a Company Option, whether such Company Option is intended to be an incentive stock option, and (ii) the total number of Shares reserved for future issuance under each Company Stock Plan.  The Company Stock Plans have been duly approved by the Company's stockholders, including all amendments to the extent requiring stockholder approval under applicable law (including stock exchange requirements).  All equity and equity-based awards granted by the Company have been granted under the Company Stock Plans.  All outstanding Company Options were granted with an exercise price not less than the fair market value of a Share on the date of grant.

(c)        Except as set forth in this Section 3.3, (i) there are not as of the date of this Agreement, and at the Acceptance Time there will not be, any equity securities of any class of the Company, or any security exchangeable into or exercisable for such equity securities, issued, reserved for issuance or outstanding and (ii) there are not as of the date of this Agreement, and at the Acceptance Time there will not be, any options, restricted stock, restricted stock units, deferred stock units, warrants, equity securities, calls, rights, commitments or agreements to which the Company or any Company Subsidiary is a party or by which the Company or any Company Subsidiary is bound obligating the Company or any Company Subsidiary to issue, exchange, transfer, deliver, sell or cause to be issued, exchanged, transferred, delivered or sold, additional shares of capital stock or other equity or voting interests of the Company or any security or rights convertible into or exchangeable or exercisable for any such shares or other equity or voting interests, or obligating the Company or any Company Subsidiary to grant, extend, accelerate the vesting of, otherwise modify or amend or enter into any such option, warrant, equity security, restricted stock, restricted or deferred stock units, call, right, commitment or agreement, other than the Top-Up Option.  The Company does not have any outstanding stock appreciation rights, phantom stock, performance based rights or similar rights or obligations.

(d)        All outstanding Shares are, and all Shares subject to issuance as specified in this Section 3.3 upon issuance on the terms and conditions specified in the instruments pursuant to which they are issuable, will be, duly authorized, validly issued, fully paid and nonassessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, or subscription right; or any provision of the DGCL, the Company's certificate of incorporation or the Company's bylaws; or any agreement to which the Company is bound.  None of the Company or, to the Company's knowledge, any of its Affiliates, is a party to or is bound by any agreement with respect to the voting (including proxies) or sale or transfer of any shares of capital stock or other equity or voting interests of the Company.  For all purposes of this Agreement, the term "<u>Affiliate</u>" when used with respect to any person means

16

any other person who is an "affiliate" of that first person within the meaning of Rule 405 under the Securities Act.

(e)      There are no obligations, contingent or otherwise, of the Company or any Company Subsidiary to repurchase, redeem or otherwise acquire any Shares or the capital stock of the Company or any Company Subsidiary.  The Company has no outstanding bonds, debentures, notes or other indebtedness that have the right to vote on any matters on which stockholders may vote.

3.4.   Company Subsidiaries.

(a)      Section 3.4(a) of the Company Disclosure Letter sets forth a true and complete list of the names, jurisdictions of organization and capitalization of each Company Subsidiary and, for the Company and each Company Subsidiary, the jurisdictions in which it is qualified to do business.  Section 3.4(a) of the Company Disclosure Letter also sets forth for each such subsidiary the individuals who comprise the board of directors or comparable body for each such entity.  The Company agrees to take, or cause to be taken, the actions necessary so that those individuals will resign and be replaced by individuals specified by Parent effective as of the Effective Time.  All issued and outstanding shares or other equity interests of each Company Subsidiary are owned directly by the Company free and clear of any charges, liens, encumbrances, security interests or adverse claims.  As used in this Agreement, "Company Subsidiary" means any corporation, partnership or other organization, whether incorporated or unincorporated, of which (i) the Company or any Company Subsidiary is a general partner or (ii) at least 50% of the securities or other interests having voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation, partnership or other organization are directly or indirectly owned or controlled by the Company or by any Company Subsidiary, or by the Company and one or more Company Subsidiary.

(b)      Each Company Subsidiary is a corporation duly organized, validly existing and in good standing (to the extent such concepts are applicable) under the Laws of the jurisdiction of its incorporation, has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted, and is duly qualified to do business and is in good standing as a foreign corporation (to the extent such concepts are applicable) in each jurisdiction where the character of its properties owned, operated or leased or the nature of its activities makes such qualification necessary, except for such failures to be so organized, qualified or in good standing, individually or in the aggregate, that are not reasonably likely to have a Company Material Adverse Effect.  There are not as of the date hereof, and at the Effective Time there will not be, any subscriptions, options, conversion or exchange rights, warrants, repurchase or redemption agreements, or other agreements, claims or commitments of any nature whatsoever obligating any Company Subsidiary to issue, transfer, deliver or sell, or cause to be issued, transferred, delivered, sold, repurchased or redeemed, shares of the capital stock or other securities of the Company or any Company Subsidiary or obligating the Company or any Company Subsidiary to grant, extend or enter into any such agreement.  To the knowledge of the Company, there are no stockholder agreements, voting trusts, proxies or other agreements, instruments or understandings with respect to the voting of the capital stock of any Company Subsidiary.

17

(c)      Section 3.4(c) of the Company Disclosure Letter sets forth, for each Company Joint Venture, the interest held by the Company and the jurisdiction in which such Company Joint Venture is organized.  Interests in Company Joint Ventures held by the Company are held directly by the Company, free and clear of any charges, liens, encumbrances, security interests or adverse claims.  The term "Company Joint Venture" means any corporation or other entity (including partnership, limited liability company and other business association) that is not a Company Subsidiary and in which the Company or one or more Company Subsidiaries owns an equity interest (other than equity interests held for passive investment purposes which are less than 5% of any class of the outstanding voting securities or other equity of any such entity).

(d)      The Company does not control, directly or indirectly, any capital stock of any person that is not a Company Subsidiary.

3.5.      SEC Reports.  The Company has filed or furnished (as applicable) all registration statements, forms, reports, certifications and other documents required to be filed by the Company with the SEC since January 1, 2008.  All such registration statements, forms, reports and other documents (including those filed or furnished by the Company during such period, whether or not required to be so filed or furnished, and that the Company may file after the date hereof until the Closing) are referred to herein as the "Company SEC Reports."  The Company SEC Reports, giving effect to any amendments or supplements thereto, (i) were or will be filed on a timely basis, (ii) at the time filed, complied, or will comply when filed, as of each respective filing date as to form in all material respects with the applicable requirements of the Securities Act and the Exchange Act applicable to such Company SEC Reports and (iii) did not or will not at the time they were or are filed contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Reports or necessary in order to make the statements in such Company SEC Reports, in the light of the circumstances under which they were made, not misleading in any material respect.  There are no outstanding or unresolved comments from the SEC staff with respect to the SEC Reports.  No Company Subsidiary is required to file any form, report or other document with the SEC.  The Company has made available to Parent all comment letters from the SEC since January 1, 2008, and all responses thereto.  Section 3.5 of the Company Disclosure Letter lists all effective registration statements filed by the Company on Form S-3 or Form S-8 or otherwise relying on Rule 415 under the Securities Act.

3.6.      Financial Statements.

(a)      Each of the consolidated financial statements (including, in each case, any related notes and schedules) contained or to be contained in the Company SEC Reports at the time filed, and giving effect to any amendments or supplements thereto filed prior to the date of this Agreement, (i) complied or will comply as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto, (ii) were or will be prepared in accordance with United States generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as may be indicated in the notes to such financial statements or, in the case of unaudited interim financial statements, as permitted by the SEC on Form 10-Q under the Exchange Act), and (iii) fairly presented or will fairly present in all material respects the consolidated financial position of the Company and the Company Subsidiaries as of the dates indicated and the consolidated results of

18

its operations and cash flows for the periods indicated, consistent with the books and records of the Company and the Company Subsidiaries, and in accordance with United States generally accepted accounting principles applied on a consistent basis throughout the periods involved (except as may be indicated in the notes to such financial statements or, in the case of unaudited interim financial statements, as permitted by the SEC on Form 10-Q under the Exchange Act), except that the unaudited interim financial statements were or are subject to normal and recurring year end adjustments which were or will not be material in amount or effect.  The consolidated audited balance sheet of the Company as of December 31, 2010 included in the audited financial statements set forth in the Company's Annual Report on Form 10-K for the year ended December 31, 2010 is referred to herein as the "Company Balance Sheet."

(b)      The Company is in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act of 2002, as amended (the "Sarbanes-Oxley Act").  Each required form, report and document (including any amendment thereof and supplement thereto) containing financial statements that has been filed with or submitted or will be filed with or submitted to the SEC since January 1, 2008 was or will be accompanied by the certifications required to be filed or submitted by the Company's principal executive officer and principal financial officer pursuant to the Sarbanes-Oxley Act and Rule 13a-14 or 15d-14 promulgated under the Exchange Act and, at the time of filing or submission of each such certification, such certification complied or will comply in all material respects with the applicable provisions of the Sarbanes-Oxley Act and Rule 13a-14 or 15d-14 promulgated under the Exchange Act.  If the Company will be a "significant subsidiary" (as such term is defined in Article 1 of Regulation S-X promulgated under the Exchange Act) of Parent upon consummation of the Merger, the parties agree that failure of the Company's chief executive officer or chief financial officer to provide an unqualified certification in any certification required to be filed with any document filed with the SEC shall constitute an event that has a Company Material Adverse Effect.

(c)      The Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) access to assets is permitted only in accordance with management's general or specific authorization; and (iii) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are designed to ensure that all material information concerning the Company is made known on a timely basis to the individuals responsible for the preparation of the Company's SEC Reports.  Since the date of the filing of the Company's most recent annual report on Form 10-K, prior to the date of this Agreement, the Company's outside auditors and the audit committee of the Company Board of Directors have not been advised of (A) any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which adversely affect the Company's ability to record, process, summarize and report financial information, and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.  Any material change in internal control over financial reporting and any significant deficiency or material weakness in the design or operation of internal control over financial reporting required to be disclosed in any Company SEC Report or in any form, report or document filed by the Company with the SEC has been so disclosed and each

19

significant deficiency and material weakness previously so disclosed have been remediated.  The Company is in compliance in all material respects with the applicable listing and other rules and regulations of The Nasdaq Stock Market.

(d)      The Company is not a party to, or does not have any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar contract (including any contract or arrangement relating to any transaction or relationship between or among the Company, on the one hand, and any unconsolidated affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand, or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K under the Exchange Act)), where the result, purpose or intended effect of such contract or arrangement is to avoid disclosure of any material transaction involving, or material liabilities of, the Company in the Company SEC Reports.

3.7.      <u>Absence of Undisclosed Liabilities</u>.  Except as disclosed in the Company Balance Sheet or in the consolidated unaudited balance sheet of the Company in the unaudited financial statements set forth in the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011 (the "<u>Company Quarterly Balance Sheet</u>") and except for liabilities incurred in the ordinary course of business since the date of the Company Balance Sheet, the Company and the Company Subsidiaries do not have any liabilities required to be reflected or reserved against on or disclosed in the Company Balance Sheet that were not adequately reflected or reserved against on or disclosed in the Company Balance Sheet.  The Company has no material liabilities of any nature, whether accrued, absolute, contingent or otherwise, other than liabilities (a) adequately reflected or reserved against on or disclosed in the Company Balance Sheet or the Company Quarterly Balance Sheet, (b) included in Section 3.7 of the Company Disclosure Letter, or (c) that would not reasonably be expected to have a Company Material Adverse Effect.

3.8.      <u>Absence of Adverse Changes</u>.  Since the date of the Company Balance Sheet, there has not occurred any change, event, circumstance or development that is reasonably likely to have a Company Material Adverse Effect.  From the date of the Company Balance Sheet until the date of this Agreement, except as contemplated hereby, (a) the business of the Company and the Company Subsidiaries, taken as a whole, has been conducted in the ordinary course of business and (b) none of the Company or any of its subsidiaries has taken any action that would have required the consent of Parent under clauses (i), (iv), (vi), (vii), (ix), (xi), (xii), (xiii), (xiv) or (xv) of Section 5.1(b) of this Agreement, had such action or event occurred after the date of this Agreement.

3.9.      <u>Compliance with Laws</u>.

(a)      The Company and the Company Subsidiaries including their respective employees (to the extent applicable) have obtained each material Federal, state, county, local or foreign governmental consent, license, permit, grant or other authorization of a Governmental Entity (i) pursuant to which the Company or any Company Subsidiary currently operates or holds any interest in any of its properties or (ii) that is required for the operation of the business of the Company or any Company Subsidiary or the holding of any such interest ((i) and (ii) are herein collectively called "<u>Permits</u>"), and all of such Permits are in full force and effect, except where the failure to obtain or have any such Permit would not, individually or in the aggregate,

20

be reasonably likely to have a Company Material Adverse Effect; and no proceeding is pending or, to the knowledge of the Company, overtly threatened to revoke, suspend, cancel, terminate or adversely modify any such Permit.

(b)     The Company and the Company Subsidiaries have since January 1, 2010 complied in all material respects, with all federal, state, local or foreign laws, statutes, regulations, rules, ordinances and judgments, awards, decrees, orders, writs and injunctions, of any court or Governmental Entity (collectively, "Laws") relating to any of the property owned, leased or used by them, or applicable to their business, including, but not limited to, Laws relating to equal employment opportunity, discrimination, occupational safety and health, interstate commerce, anti-kickback, healthcare and antitrust.

(c)     Neither the Company, the Company Subsidiaries nor any of their respective directors, officers, or employees, nor, to the knowledge of the Company, any of its agents or distributors or any other person acting on behalf of the Company or any Company Subsidiary has at any time since January 1, 2010 (i) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA"), (ii) violated or is in violation of any applicable Law enacted in any jurisdiction in connection with or arising under the OECD Convention Combating Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention"), (iii) violated or is in violation of any provision of the UK Bribery Act of 2010 (the "UK Bribery Act"), (iv) made, offered to make, promised to make or authorized the payment or giving of, directly or indirectly, any bribe, rebate, payoff, influence payment, kickback or other unlawful payment or gift of money or anything of value prohibited under any applicable Law addressing matters comparable to those addressed by the FCPA, the UK Bribery Act, or the OECD Convention implementing legislation concerning such payments or gifts in any jurisdiction (any such payment, a "Prohibited Payment"), (v) been subject to any investigation by any Governmental Entity with regard to any Prohibited Payment, or (vi) violated or is in violation of any other Laws regarding use of funds for political activity or commercial bribery.

(d)     Neither the Company nor any Company Subsidiary has knowledge of any actual or threatened enforcement action by the U.S. Food and Drug Administration (the "FDA") or any other Governmental Entity which has jurisdiction over the operations of the Company and the Company Subsidiaries, and, since January 1, 2010, none has received notice of any pending or overtly threatened claim by the FDA or any other Governmental Entity which has jurisdiction over the operations of the Company and the Company Subsidiaries against the Company or the Company Subsidiaries, and the Company and the Company Subsidiaries have no knowledge or reason to believe that any Governmental Entity is considering such action.

(e)     Since January 1, 2008, all material reports, documents, claims and notices required to be filed, maintained, or furnished to the FDA or any Governmental Entity by the Company or the Company Subsidiaries have been so filed, maintained or furnished. All such reports, documents, claims, and notices were complete and correct in all material respects on the date filed (or were corrected in or supplemented by a subsequent filing) such that no material liability exists with respect to the completeness or accuracy of such filing.

21

(f)        Except as set forth on Section 3.9(f) of the Company Disclosure Letter, the Company and the Company Subsidiaries have not received any FDA Form 483, Warning Letter, untitled letter or other correspondence or notice from the FDA or other Governmental Entity alleging or asserting noncompliance with any applicable Laws or Permits, and the Company and Company Subsidiaries have no knowledge or reason to believe that the FDA or any Governmental Entity is considering such action.

(g)        Since January 1, 2010, the Company and the Company Subsidiaries have not received any notices, information request letters, correspondence, or orders from the FDA regarding new safety information, postmarketing clinical trials or studies, or risk evaluation and mitigation strategies asserting that labeling changes or postmarketing trials or studies will be required in order to ensure the safety of the Company's or the Company's Subsidiaries' products.

(h)        All studies, tests and preclinical and clinical trials being conducted by the Company or the Company Subsidiaries have been and are being conducted in material compliance with experimental protocols, procedures and controls pursuant to accepted professional scientific standards and applicable Laws, rules, regulations and guidances, including, but not limited to the applicable requirements of Good Laboratory Practices or Good Clinical Practices, as applicable.  To the knowledge of the Company, there are no studies, tests or trials the results of which materially call into question the clinical results described or referred to in the Company SEC Reports filed prior to the date hereof, when viewed in the context in which such results are described and the clinical state of development. The Company and the Company Subsidiaries have not received any written notices, correspondence or other communication from the FDA or any other Governmental Entity since January 1, 2010, requiring the termination, suspension or material modification of any ongoing or planned clinical trials conducted by, or on behalf of, the Company or the Company Subsidiaries, or in which the Company or the Company Subsidiaries have participated, and the Company and the Company Subsidiaries have no knowledge that the FDA or any other Governmental Entity will take such action.  For the purposes of this Agreement, (i) "Good Clinical Practices" means the FDA's standards for the design, conduct, performance, monitoring, auditing, recording, analysis, and reporting of clinical trials contained in 21 C.F.R. Parts 50, 54, 56, 312, 314, 320, 812, and 814 and (ii) "Good Laboratory Practices" means the FDA's standards for conducting non-clinical laboratory studies contained in 21 C.F.R. Part 58.

(i)        Since January 1, 2010, the manufacture of products by the Company and the Company Subsidiaries has been and is being conducted in material compliance with all applicable Laws including the FDA's current Good Manufacturing Practices, Good Laboratory Practices and Good Clinical Practices.  In addition, since January 1, 2010, the Company and the Company Subsidiaries have been and are in material compliance with all other applicable FDA requirements, including, but not limited to, registration and listing requirements set forth in 21 U.S.C. Section 360 and 21 C.F.R. Part 207 and 807.  For the purposes of this Agreement, "Good Manufacturing Practices" means the requirements set forth in the quality systems regulations for medical devices contained in 21 C.F.R. Part 820, and current good manufacturing practices for drugs, including but not limited to the regulations for drugs and finished pharmaceutical products contained in 21 C.F.R. Part 210 and 211, respectively.

22

(j)        Since January 1, 2010, the Company and the Company Subsidiaries have not either voluntarily or involuntarily, initiated, conducted, or issued, or caused to be initiated, conducted or issued, any recall, market withdrawal or replacement, safety alert, warning, "dear doctor" letter, investigator notice or other notice or action relating to an alleged lack of safety or efficacy of any product or product candidate.  The Company and the Company Subsidiaries have no knowledge of any facts which would cause (i) the recall, market withdrawal or replacement of any product sold or intended to be sold by the Company or the Company Subsidiaries; (ii) a change in the marketing classification or a material change in labeling of any such products; or (iii) a termination or suspension of marketing of any such products.

(k)        The Company and the Company Subsidiaries are and at all times since January 1, 2010 have been in material compliance with federal or state criminal or civil Laws (including without limitation the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), Stark Law (42 U.S.C. §1395nn), False Claims Act (31 U.S.C. §3729 et seq.), Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191), the Veterans Health Care Act of 1992, and any comparable state Laws), or the regulations promulgated pursuant to such Laws, or which are cause for civil penalties or mandatory or permissive exclusion from Medicare, Medicaid or any other state or federal health care program ("Program").  There is no civil, criminal, administrative or other action, suit, demand, claim, hearing, proceeding, notice or demand pending, received by or, to the knowledge of the Company, overtly threatened against the Company or any Company Subsidiary which could reasonably result in its exclusion from participation in any Program or other third-party payment programs in which the Company or any Company Subsidiary participates.

(l)        The Company and the Company Subsidiaries have complied in all material respects with all applicable export control Laws, including those administered by the U.S. Department of Commerce and the U.S. Department of State, and applicable asset control Laws, including those administered by the U.S. Department of the Treasury.

(m)        Neither the Company nor any Company Subsidiary, and, to the knowledge of the Company, none of their officers, employees, agents or clinical investigators has committed any act, made any statement or failed to make any statement that would reasonably be expected to provide a basis for the FDA to invoke its policy with respect to "Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities" set forth in 56 Fed. Reg. 46191 (September 10, 1991) and any amendments thereto. Neither the Company, a Company Subsidiary nor, to the knowledge of the Company, any of their officers, employees, or agents has been convicted of any (i) debarment under 21 U.S.C. Section 335a or any similar Law or (ii) exclusion under 42 U.S.C. Section 1320a-7 or any similar Law.

(n)        The Company and the Company subsidiaries have been, and are, in compliance with all Federal, state and foreign security and privacy standards regarding protected health information, including, as applicable, standards under the Health Insurance and Portability Act of 1996, including the regulations promulgated thereunder.

(o)        Neither the Company nor the Company Subsidiaries nor, to the knowledge of the Company or its Subsidiaries, any Company Partner, is subject to any pending or, to the knowledge of the Company or its Subsidiaries, threatened investigation by FDA, HHS-OIG or

23

DOJ pursuant to the Anti-Kickback Statute, the False Claims Act, the FDC Act or any other applicable Legal Requirement, including without limitation any equivalent or similar statute or regulation of any state or foreign regulatory or Governmental Entities.

3.10.    Actions and Proceedings.

(a)    There are no material outstanding orders, judgments, awards, injunctions, decrees or other requirements of any Governmental Entity against the Company, any Company Subsidiary or any of their securities, assets or properties.  There are no material actions, suits or claims or legal, administrative or arbitration proceedings pending or, to the knowledge of the Company, threatened against the Company, any Company Subsidiary, or any of their securities, assets or properties.

(b)    There are no pending nor, to the knowledge of the Company, overtly threatened civil, criminal or administrative actions, suits, demands, claims, hearings, notices of violation, investigations, proceedings or demand letters relating to any alleged hazard or alleged defect in design, manufacture, materials or workmanship, including any failure to warn or alleged breach of express or implied warranty or representation, relating to any product manufactured, distributed or sold by or on behalf of the Company or any Company Subsidiary.  There are no product liability claims pending against the Company.

3.11.    Contracts and Other Agreements.

(a)    Except as set forth on Section 3.11(a) of the Company Disclosure Letter, neither the Company nor any Company Subsidiary is a party to or bound by, and neither they nor their properties are subject to, any contract or other agreement required to be disclosed in a Form 10-K, Form 10-Q or Form 8-K of the SEC which is not disclosed in the Company's annual reports on Form 10-K, the Company's quarterly reports on Form 10-Q or the Company's current reports on Form 8-K, in each case, filed by the Company prior to the date of this Agreement.  All of such contracts and other agreements are valid, subsisting, in full force and effect, binding upon the Company or the applicable Company Subsidiary, and, to the knowledge of the Company, binding upon the other parties thereto in accordance with their terms, and the Company and the Company Subsidiaries have performed in all material respects their respective covenants thereunder which are presently required to be performed and are not in default under any of them, except for defaults or failures to perform which individually or in the aggregate would not reasonably be expected to result in termination of such agreement or result in a material liability for the Company, nor, to the knowledge of the Company, is any other party to any such contract or other agreement in default thereunder, except for defaults which individually or in the aggregate would not reasonably be expected to result in termination of such agreement or result in a material liability for the Company, nor does any condition exist that with notice or lapse of time or both would constitute a default thereunder, except for defaults which individually or in the aggregate would not reasonably be expected to result in termination of such agreement or result in a material liability for the Company.  Except as set forth on Section 3.11(a) of the Company Disclosure Letter, none of the execution, delivery, or performance of this Agreement, or the commencement or consummation of Offer, the Merger, or the other transactions contemplated by this Agreement, shall (i) constitute a default under or give rise to rights to any party under any of the agreements referred to in this Section 3.11 or (ii) create

24

obligations for, or alter obligations of, the Company, any Company Subsidiary, Parent, Sub or the Surviving Corporation in addition to those obligations of the Company or a Company Subsidiary in effect on the date of this Agreement.  The contracts and other agreements referred to in this Section 3.11 are collectively referred to as "Material Contracts," and each, a "Material Contract."  True and complete copies of the Material Contracts have been made available to Parent.

(b)        Except as provided in the Company SEC Reports filed prior to the date hereof, neither the Company nor any Company Subsidiary is a party to any agreement that limits or restricts the Company, any Company Subsidiary or any of their affiliates or successors in competing or engaging in any line of business, in any therapeutic area, in any geographic area or with any person.

(c)        Neither the Company nor any Company Subsidiary is a party to any agreement obligating the Company to file a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which filing has not yet been made, and the Company is in material compliance with each such agreement, all of which are listed on Section 3.11(c) of the Company Disclosure Letter. No registration rights involving the Company shall survive consummation of the Merger.

(d)        Other than agreements filed as exhibits to the Company's annual reports on Form 10-K or the Company's quarterly reports on Form 10-Q (including any incorporated therein by reference), unredacted copies of which have previously been provided or otherwise made available to Parent or as set forth on Section 3.11(d) of the Company Disclosure Letter, neither the Company nor any Company Subsidiary is a party to any agreement (i) involving research, development or the license of Proprietary Rights (as defined in Section 3.12(a)) requiring payment of royalties exceeding $100,000 per year, (ii) granting a right of first refusal, or right of first offer or comparable right with respect to Proprietary Rights, (iii) relating to a joint venture, partnership or other arrangement involving a sharing of profits, losses, costs or liabilities with another person involving amounts in excess of $100,000 per year, (iv) providing for the payment or receipt by the Company or any Company Subsidiary of milestone payments or royalties involving amounts in excess of $100,000 per year, (v) including or involving a loan to a director or officer, (vi) that involves a financial advisor or investment bank and provides for the payment of potential fees or rights of first refusal or similar rights to act in any capacity after the Effective Time, or (vii) that individually requires or contemplates aggregate expenditures by the Company and/or any Company Subsidiary in any twelve month period of more than $125,000.

(e)        To the knowledge of the Company, no officer or director of the Company has (whether directly or indirectly through another entity in which such person has a material interest, other than as the holder of less than two percent (2%) of a class of securities of a publicly traded company) any material interest in any property or assets of the Company (except as a stockholder and except for such compensation for service as an officer or director consistent with that which is disclosed in Company SEC Reports) and except for compensation for service of an officer or director) or a Company Subsidiary, any competitor, customer, supplier or agent of the Company or a Company Subsidiary or any person that is currently a party to any material contract or agreement with the Company or a Company Subsidiary.

(f)      Neither the Company nor any Company Subsidiary is party to any interest rate, equity or other swap or derivative instrument.

3.12.   <u>Property</u>.

(a)      To the Company's knowledge, the Company and the Company Subsidiaries own, are licensed to use, or otherwise have the right to use all patents, trademarks, service marks, trade names, trade secrets, copyrights and all other intellectual property (including, without limitation, biological materials), all registrations of any of the foregoing, or applications therefor, and all grants and licenses or other rights running to or from the Company or a Company Subsidiary that are material to their businesses as currently conducted (collectively, the "<u>Proprietary Rights</u>").  To the knowledge of the Company, the patents and patent applications, registered trademarks and registered copyrights owned by or licensed to the Company and the Company Subsidiaries and referred to above are subsisting and in good standing.  With respect to patents, registered trademarks and registered copyrights owned by the Company, the Company has timely paid all maintenance fees and annuities with respect thereto, and, as applicable, timely made such filings, renewals, declarations, statements and certifications required to maintain such items in good standing, except, in each case, where the Company has determined in the exercise of its reasonable business judgment that such patents, registered trademarks and registered copyrights are of no material value to the Company's business, provided that if such determination was made by the Company at any time after March 31, 2011, or is reasonably expected to be made prior to the Effective Time, such rights are separately identified on Section 3.12(a) of the Disclosure Letter.   To the Company's knowledge, each of the patents and patent applications owned by or licensed to the Company or Company Subsidiaries identifies all of the true and correct inventors of the applicable invention(s) claimed therein, and, to the Company's knowledge, the Company, Company Subsidiary and each such inventor have complied with all applicable duties of candor and good faith in their interaction with the applicable patent office.  To the Company's knowledge, assignment documents have been executed and filed with relevant Governmental Entities as necessary to transfer to the Company or a Company Subsidiary title to any of the Company's owned Proprietary Rights consisting of patents, patent applications, registered trademarks, registered copyrights and applications for registration of trademarks and copyrights previously owned by a third party, and to record such transfer.  The named inventors of each of the Company's owned patent applications have assigned the Company's owned patent applications to the Company.  On the expiration date of the Offer, the Company shall provide Parent with a schedule of any Taxes, maintenance fees or actions falling due within 90 days of such expiration with respect to such patents, registered trademarks and registered copyrights, and applications for issuance or registration of any of the foregoing.  To the Company's knowledge, the Company or Company Subsidiary has the rights (1) to obtain and maintain regulatory approvals for products arising under the Proprietary Rights, (2) to enforce all Proprietary Rights against third parties, except where the failure or inability to enforce would not be reasonably likely to have a Company Material Adverse Effect, and (3) with respect to the Proprietary Rights that have been licensed to the Company or Company Subsidiary on an exclusive basis, to obtain, exercise, assert and enforce the rights described in (1) and (2) above with the cooperation, joinder and/or other assistance of the applicable licensor.  To the Company's knowledge, there is no reasonable basis for any claim by any third party that the businesses of the Company or the Company Subsidiaries infringe upon the proprietary rights of others, nor, to the Company's knowledge, has the

26

Company or any Company Subsidiary received any charge, complaint, claim, demand, or notice alleging any interference, infringement, misappropriation, or conflict (including any claim that the Company, a Company Subsidiary or any of their affiliates must license or refrain from using any intellectual property rights).  To the Company's knowledge, no third party has infringed upon any of the Proprietary Rights.  Section 3.12(a) of the Company Disclosure Letter identifies (i) all issued patents and registered trademarks that have been issued to the Company or a Company Subsidiary, (ii) each pending application therefor submitted by the Company or a Company Subsidiary (iii) where known by the Company, all issued patents, registered trademarks and pending applications therefor owned by a third party who has granted the Company or a Company Subsidiary exclusive rights thereto (iv) each domain name owned by the Company and (v) any application for patent term extension or supplemental protection certificate with respect to (i) and (ii) above.  In the event that Company and any Company Subsidiary identify any pending or issued patents and trademarks not identified in Section 3.12(a) of the Company Disclosure Letter, Company will promptly notify Parent.  To the knowledge of the Company, neither the company nor any Company Subsidiary has agreed, or has an obligation, to indemnify any third party for or against any interference, infringement, misappropriation or other conflict involving the exploitation of Proprietary Rights.  To the knowledge of the Company, none of the activities of the employees of the Company or any Company Subsidiary on behalf of such entity violates any agreement or arrangement which any such employees have with former employers.  To the knowledge of the Company, each employee, contractor or consultant of the Company who has proprietary knowledge of or information relating to the manufacturing processes, or the formulation of the products, of the Company or a Company Subsidiary has executed and delivered to the Company an agreement or agreements restricting such person's right to use and disclose confidential information of the Company.  To the Company's knowledge, with respect to any patents owned by or licensed to the Company or Company Subsidiary, there is no pending, decided, settled or threatened opposition, interference proceeding, reexamination proceeding, cancellation proceeding, injunction or other proceeding before any Governmental Entity (collectively referred to hereinafter as "Disputes"), challenging the validity, enforceability or ownership of any such patent or the exploitation of such patent and, to the knowledge of the Company, no circumstances or grounds exist that would give rise to such a Dispute.  Except as would not be reasonably likely to have a Company Material Adverse Effect, there are no settlements, forbearances to sue, consents, judgments, or orders or similar obligations to which the Company or any Company Subsidiary is party that:  (i) restrict the use by the Company or Company Subsidiary of any Proprietary Rights; (ii) restrict the conduct of the business of the Company or any of its employees; or (iii) grant third parties any material rights under Proprietary Rights.  To the knowledge of the Company and except as would not be reasonably likely to have a Company Material Adverse Effect, no material trade secret of the Company has been disclosed or authorized to be disclosed to any third party in violation of confidentiality obligations to the Company and, to the knowledge of the Company, no party to a nondisclosure agreement with the Company is in breach or default thereof.  No current or former director, officer, consultant or employee of the Company will, after giving effect to the Offer and the Merger, own any of the Proprietary Rights.  To the knowledge of the Company and except as would not be reasonably likely to have a Company Material Adverse Effect, the execution of, the delivery of, the consummation of the Offer and Merger contemplated by, and the performance of the Company's obligations under, this Agreement will not result in any loss or impairment of any Proprietary Rights.  To the knowledge of the Company, neither government funding nor

27

government, academic or non-profit research facilities were used in the development of any of the patent applications owned by the Company.  The representations and warranties in Sections 3.11(d) and 3.12(a) are the sole and exclusive representations and warranties of the Company with respect to Proprietary Rights, and no other representation or warranty in Section 3 hereunder shall be construed to pertain to Proprietary Rights.

(b)     With respect to property other than Proprietary Rights, the Company and each Company Subsidiary has all assets, properties, rights and contracts necessary to permit the Company and the Company Subsidiaries to conduct their business as it is currently being conducted, except where the failure to have such assets, properties, rights and contracts would not be reasonably likely to have a Company Material Adverse Effect.  The Company and each Company Subsidiary has good, clear and marketable title to all of its properties, interests in properties and assets, real and personal, reflected in the Company Balance Sheet (except properties, interests in properties and assets sold or otherwise disposed of since the date of the Company Balance Sheet in the ordinary course of business consistent with past practice), or with respect to leased properties and assets, valid leasehold interests in such properties and assets, in each case, free and clear of all imperfections of title, restrictions, encroachments, liens and easements, except (i) liens for current Taxes not yet due and payable, that are payable without penalty or that are being contested in good faith by appropriate proceeding and for which an adequate reserve has been established on the Company Balance Sheet in accordance with generally accepted accounting principles, (ii) such imperfections of title, restrictions, encroachments, liens and easements as do not materially detract from or interfere with the use or value of the properties subject thereto or affected thereby, or otherwise materially impair business operations involving such properties, (iii) liens securing debt which are reflected on the Company Balance Sheet and (iv) with respect to leased real property, any liens placed or suffered to be placed on the fee estate underlying such leasehold.  There are no written or oral subleases, licenses, occupancy agreements or other contractual obligations that grant the right of use or occupancy of any real property leased by the Company or any Company Subsidiary (collectively, the "Real Property"), and there is no person in possession of the Real Property other than the Company and the Company Subsidiaries. The Company has not received written notice of any pending or threatened eminent domain, condemnation or similar proceeding affecting any Real Property leased by the Company or a Company Subsidiary.  To the knowledge of the Company, the property and equipment of the Company and each Company Subsidiary that are used in the operations of business are (i) in good operating condition and repair and (ii) have been maintained in accordance with normal industry practices, except where the failure to maintain such property and equipment would not reasonably be expected to have a Company Material Adverse Effect.  Section 3.12(b) of the Company Disclosure Letter lists all Real Property leased by the Company or a Company Subsidiary.  Neither the Company nor any Company Subsidiary owns any Real Property.

3.13.    Insurance.  All policies or binders of material fire, liability, product liability, workers' compensation, vehicular, directors' and officers' and other material insurance held by or on behalf of the Company and the Company Subsidiaries are in full force and effect in all material respects, are reasonably adequate for the businesses engaged in by the Company and the Company Subsidiaries and are in conformity in all material respects with the requirements of all leases or other agreements to which the Company or the relevant Company Subsidiary is a party and, to the knowledge of the Company, are valid and enforceable in accordance with their terms.

28

Neither the Company nor any Company Subsidiary is in default in any material respect with respect to any provision contained in such policy or binder nor has any of the Company or a Company Subsidiary failed to give any notice or present any material claim under any such policy or binder in due and timely fashion.  All premiums for each policy or binder have been paid for the current period, and there are no outstanding premium finance payments due for such period. There are no material outstanding unpaid claims under any such policy or binder.  Neither the Company nor any Company Subsidiary has received notice of cancellation or non-renewal of any such policy or binder.  All applications for the Company's currently effective directors' and officers' insurance were true, correct and complete in all material respects when submitted to the carrier.  No coverage limits of insurance policies covering the Company or a Company Subsidiary have been exhausted.

3.14.    <u>Commercial Relationships</u>.  Except as disclosed in Section 3.14 of the Company Disclosure Letter, during the last twelve months, none of the Company's or the Company Subsidiaries' material suppliers, collaborators, distributors, licensors or licensees has canceled or otherwise terminated its relationship with the Company or a Company Subsidiary or has materially altered its relationship with the Company or a Company Subsidiary.  To the knowledge of the Company, the Company has not received written notice from any such entity, to terminate, cancel or otherwise materially modify its relationship with the Company or a Company Subsidiary.

3.15.    <u>Tax Matters</u>.

(a)    For purposes of this Agreement, the term "<u>Tax</u>" (and, with correlative meaning, "<u>Taxes</u>" and "<u>Taxable</u>") means all United States federal, state and local, and all non-U.S., income, profits, franchise, gross receipts, payroll, transfer, sales, employment, social security (or similar), unemployment insurance, workers' compensation, use, property, excise, value added, ad valorem, estimated, stamp, alternative or add-on minimum, recapture, capital, escheat, unclaimed property, withholding and any other taxes, charges, duties, impositions or assessments, and any other taxes, fees, charges, levies, excises, duties or similar assessments, together with all interest, penalties and additions imposed on or with respect to such amounts.  "<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement filed or required to be filed with any taxing authority in connection with the determination, assessment, collection or imposition of any Taxes, including any attachments thereto and any amendments thereof.

(b)    All federal income Tax Returns and other material Tax Returns required to be filed by or with respect to the Company or any Company Subsidiary have been timely and properly filed.  All such Tax Returns are true, correct and complete in all material respects, and all material Taxes due and payable by the Company or any Company Subsidiary, whether or not shown on any Tax Return, have been paid except for those Taxes that are being contested in good faith by appropriate proceedings and for which an adequate reserve has been established on the Company Balance Sheet in accordance with generally accepted accounting principles.  The Company and the Company Subsidiaries file Tax Returns in all jurisdictions where they are required to so file, and no written claim has ever been made by any taxing authority in any jurisdiction where the Company or any Company Subsidiary does not file Tax Returns that the Company or the Company Subsidiaries are or may be subject to taxation by that jurisdiction.

29

(c)        No material Tax audit is currently pending or threatened in writing with respect to the Company or any Company Subsidiary, nor have any deficiencies for any Taxes been proposed, asserted, threatened or assessed in writing against the Company or any Company Subsidiary which have not been fully paid or adequately reserved for on the Company Balance Sheet in accordance with generally accepted accounting principles.

(d)        Neither the Company nor any Company Subsidiary has in force any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Tax of the Company or any Company Subsidiary, except in each case with respect to Taxes that are being contested in good faith by appropriate proceedings and for which an adequate reserve has been established on the Company Balance Sheet in accordance with generally accepted accounting principles.

(e)        With respect to any period for which Tax Returns have not yet been filed, or for which Taxes are not yet due or owing, the Company has, in accordance with and at such times as required by generally accepted accounting principles, made due and sufficient accruals or reserves for all material Taxes for such period (excluding any "deferred taxes" or similar items that reflect timing differences between tax and financial accounting principles) in the Company's books and records, including the Company Balance Sheet.

(f)        The Company and the Company Subsidiaries have withheld all material amounts required by Law or contract to be withheld from the wages, salaries or other payments to (i) employees, independent contractors, creditors, stockholders of or consultants to the Company and (ii) any other third party.  Such withheld amounts were either duly paid to the appropriate taxing authority to the extent due and payable or, to the extent not due and payable, adequately reserved for on the Company Balance Sheet in accordance with generally accepted accounting principles.  The Company and the Company Subsidiaries have complied in all material respects with all record keeping and reporting requirements in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(g)        The Company and the Company Subsidiaries are not a party to or bound by, nor do they have any obligation under, any material Tax sharing agreement or similar contract or arrangement or other agreement under which the Company or any Company Subsidiary may have a material liability for Taxes of a third-party (other than such an agreement or contract exclusively between or among any of the Company and wholly-owned direct or indirect subsidiaries of the Company and other than customary Tax indemnifications contained in credit agreements that do not principally relate to Tax).  Neither the Company nor any Company Subsidiary has any material liability for the Taxes of any other person (other than the Company and the Company Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, by contract, or otherwise.

(h)        Neither the Company nor any Company Subsidiary has made any payments that will, upon consummation of the transactions contemplated by this Agreement, be deemed to have included, or is a party to any agreement, contract, arrangement or plan that could reasonably be expected to result in the payment of, any "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provisions of state, local or non-

30

U.S. Tax Law).  Neither the Company nor any Company Subsidiary is a party to, or is otherwise obligated under, any contract, agreement, plan or arrangement that provides for the gross up of a Tax imposed by Section 4999 of the Code (or any corresponding provisions of state, local or non-U.S. Tax Law).

(i)        Neither the Company nor any Company Subsidiary has been or is a party to any agreement, contract, arrangement or plan (i) that as to any tax period commencing prior to the date hereof for which an income tax return has not been filed as of the date hereof has resulted, or (ii) that as to any subsequent tax period ending on or prior to the Effective Time could result, in any payment or benefit that was not or would not be deductible for federal income tax purposes by reason of the deduction limit imposed by Section 162(m) of the Code.

(j)        Neither the Company nor any Company Subsidiary has, within the past seven years, distributed stock of another corporation, or has had its stock distributed by another corporation, in a transaction that was governed, or purported or intended to be governed, in whole or in part, by Sections 355 or 361 of the Code.

(k)        Since December 31, 2005, neither the Company nor any Company Subsidiary has (i) changed any Tax accounting methods, policies or practices of the Company or any of the Company Subsidiaries, except as required by regulations or guidelines or applicable Law or otherwise disclosed in a Tax Return, (ii) changed or amended any material Tax election of the Company or any of the Company Subsidiaries, (iii) filed any amended federal income or material state income Tax Return or claim for refund of the Company or any of the Company Subsidiaries, or (iv) settled or compromised any material federal income or material state income Tax liability or refund of the Company or any of the Company Subsidiaries.

(l)        The Company has made available to Parent complete and correct copies of all Tax Returns, examination reports, Code Section 382 studies prepared by a nationally recognized accounting firm and statements of deficiencies assessed against or agreed to by the Company or any Company Subsidiary filed or received by the Company or any Company Subsidiary since December 31, 2008, which have been requested in writing by Parent prior to the date hereof.

(m)        No closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or non-U.S. Law) has been entered into by or with respect to the Company or any of its Subsidiaries that will have continuing effect after the Closing Date.

(n)        Since December 31, 2010 and through the date hereof, neither the Company nor any of the Company Subsidiaries has filed for or requested any adjustments pursuant to Section 481(a) of the Code or any similar provision of state or local law that will result in a material amount of Tax by reason of a change in accounting method.

(o)        Neither the Company nor any of the Company Subsidiaries will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) installment sale or open transaction disposition made on or prior to the

31

Closing Date or (ii) prepaid amount received on or prior to the Closing Date except for amounts for which the Company has reserved an amount for or accounted for as a deferred tax liability.

(p) Other than as shown on any Tax Return, neither the Company nor any of the Company Subsidiaries has engaged in any "reportable transaction" identified pursuant to Treasury Regulation Section 1.6011-4(b) or any corresponding or similar provisions of state, local or non-U.S. Law that have not previously been reported on a Tax Return.

(q) Neither the Company nor any Company Subsidiary is party to any material written agreement, contract or arrangement that could be treated as a partnership for federal state, local or non-U.S. Tax purposes (other than those specified in Section 3.4(a) or 3.4(c)).

3.16. Employee Benefit Plans.

(a) Section 3.16(a) of the Company Disclosure Letter lists each "benefit plan" (as hereinafter defined) (i) that is maintained, contributed (or required to be contributed) to, or sponsored by the Company or any Company Subsidiary, or (ii) to which the Company or any Company Subsidiary is a party, or (iii) with respect to which the Company or any Company Subsidiary has any liability, including any contingent liability (collectively, the "Plans").  For purposes of the preceding sentence, a "benefit plan" is any of the following that benefits or is intended to benefit any current or former employee, director, consultant or independent contractor of the Company or any ERISA Affiliate (as defined in Section 3.16(b)), or the beneficiaries or dependents of any such Person:  (A) an "employee benefit plan" described in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); (B) a stock bonus, stock option, stock purchase, restricted stock, restricted stock unit, stock appreciation right, or other equity-based plan, policy, program, agreement or arrangement; (C) any material incentive, bonus, deferred compensation, welfare-benefit, retiree medical or life insurance, retirement, supplemental retirement, termination, salary continuation, severance, change in control, or any fringe benefit or other similar employee benefit plan, policy, program, agreement or arrangement, whether written or unwritten, (D) an employment, consulting, severance or other similar agreement.  With respect to each Plan, the Company has made available to Parent a true and complete copy of each of the following, together with all amendments:  (1)  the documents embodying the Plan or, where a Plan has not been reduced to writing, a written summary of all material Plan terms, (2) in the case of any funded Plan, the trust agreement or similar instrument, (3) for each Plan subject to the requirement that annual reports be filed on a Form 5500, the three most recently filed annual reports, with schedules, financial statements and auditor's opinion attached, if applicable, (4) in the case of each Company Stock Plan, form agreements evidencing outstanding Company Options, Company Restricted Stock, Time-Vested DSUs and Performance-Vested DSUs (and, in each case, if individual agreements deviate in any material respect from the form, the individual agreements), (5) in the case of each Plan intended to be qualified under Section 401(a) of the Code, the most recent Internal Revenue Service ("IRS") determination or opinion letter applicable to the Plan (plus, if a request for a determination letter is pending, a copy of such request), (6) related custodial agreements, insurance policies (including fiduciary liability insurance covering the fiduciaries of the Plan), administrative services and similar agreements, and investment advisory or investment management agreements, if any, and (7) copies of the most recent summary plan description

32

(including any  summaries of material modifications issued since the last summary plan description) or similar summary and any employee handbook.

(b)        During the past six years, none of the Company or any Company Subsidiary or any other person  that together with the Company or any Company Subsidiary is or was treated as a single employer under Section 414(b), (c), (m) or (o) of the Code (each, together with the Company and any Company Subsidiary, an "<u>ERISA Affiliate</u>") has contributed or been required to contribute to or has sponsored, maintained or participated in, and neither the Company nor any ERISA Affiliate has any liability (nor does any circumstance exist that could result in any liability to the Company or any ERISA Affiliate) with respect to, (i) a pension plan (within the meaning of Section 3(2) of ERISA) subject to Section 412 of the Code or Title IV of ERISA, (ii) a "multiemployer plan" (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) or (iii) a "voluntary employees' beneficiary association" within the meaning of Section 501(c)(9) of the Code or a "welfare benefit fund" within the meaning of Section 419(e) of the Code.

(c)        Each Plan that is intended to be qualified under Section 401(a) of the Code is the subject of a favorable determination or opinion letter from the IRS.  No such determination or opinion letter has been revoked or to the Company's knowledge been threatened to be revoked, and to the Company's knowledge, no event has occurred nor does any circumstance exist that could reasonably be expected to result in any loss of qualification under Section 401(a) of the Code for any Plan that is intended so to be qualified.

(d)        Each Plan, including any associated trust or fund, has been maintained and administered at all times in all material respects in accordance with its terms and with the applicable provisions of ERISA, the Code and other applicable Law (including, where applicable, non-U.S. Law).  To the Company's knowledge, nothing has occurred with respect to any Plan that has subjected or could reasonably be expected to subject the Company, any ERISA Affiliate, or any Plan participant or beneficiary to any material tax or penalty under Sections 409 or 502 of ERISA or Chapter 43 of the Code.  All filings and reports with respect to each Plan required to have been submitted to the IRS, the United States Department of Labor, or any other Governmental Entity have been properly and timely submitted, except where failure to do so would not result in a material liability.

(e)        No Plan provides health, life or disability insurance, or other welfare benefits to former employees of the Company or any Company Subsidiary, and neither the Company nor any Company Subsidiary has any obligation to provide any such benefits to any current employee following retirement or other termination of employment, in each case except for group health plan benefit continuation coverage to the extent required under Part 6 of Subtitle B of Title I of ERISA.

(f)        No administrative investigation, inquiry, audit or other proceeding by the IRS, Department of Labor, or other Governmental Entity, and no other lawsuit, claim, or other controversy, other than routine claims for benefits (including under domestic relations orders) in the ordinary course, is pending or, to the knowledge of the Company, threatened with respect to any Plan.  No Plan is the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

33

(g)        Each of the Company and Company Subsidiary, and to the Company's knowledge, each third-party plan administrator, has at all relevant times properly classified each provider of services to the Company and each Company Subsidiary as an employee or independent contractor, as the case may be, for all purposes relating to each Plan for which such classification could be relevant, except as could not reasonably be expected to give rise to a material liability.

(h)        The Company is not a party to, nor is it otherwise obligated under, any contract, agreement, plan or arrangement that provides for the gross up by the Company of any Tax imposed by Section 409A(a)(1)(B) or Section 409A(b) of the Code.

(i)        The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with any separation from service or other triggering event under the applicable arrangement, (i) entitle any employee, director, officer, consultant or independent contractor of the Company or any Company Subsidiary to severance pay, unemployment compensation or any other payment, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee, director, officer, consultant or independent contractor, (iii) directly or indirectly cause the Company or any Company Subsidiary to transfer or set aside any assets to fund any benefits under any Plan, or (iv) otherwise give rise to a material liability under any Plan.

(j)        Each Plan can be amended, terminated or otherwise discontinued by the Company after the Effective Time in accordance with the terms of such Plan and without the consent of any other person or any increase in payments or benefits on account of such action, except where failure to do so would not result in a material liability.

(k)        None of the Plans is (or, if it were an "employee benefit plan" as defined in Section 3(3) of ERISA, would be) described in Section 4(b)(4) of ERISA.

3.17.    Employee Relations.

(a)        Except as set forth in Section 3.17(a) of the Company Disclosure Letter, all employees are employed on an "at-will" basis such that employment can be terminated at any time for any reason without any amounts being owed to such individual other than with respect to compensation and benefits accrued before the termination.  True and complete information as to the name, current job title, date of hire/election and base salary for each of the last two years of all current employees, directors and executive officers of the Company has been made available to Parent.

(b)        Except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect, the Company and each Company Subsidiary (i) is currently in compliance in all material respects with all applicable Laws respecting labor and employment, including without limitation employment practices, terms and conditions of employment and wages and hours (ii) since January 1, 2010, has withheld all amounts required by Law to be withheld from the wages of employees, (iii) is not liable for any arrears of wages or other direct compensation for any services performed or amounts required to be reimbursed to any employees, consultants or independent contractors (other than payments to be made for

34

recent past services in the next regularly scheduled pay cycle or in the ordinary course) or any taxes or any penalty for failure to comply with any of the foregoing, (iv) is not liable for any payment to any trust or other fund or to any Governmental Entity, with respect to unemployment compensation, social security or similar social insurance programs or obligations for employees (other than routine payments to be made in the ordinary course of business and consistent with past practice),and (v) since January 1, 2011, has complied with the Worker Adjustment Retraining and Notification Act of 1988 and analogous state Laws (collectively, "Layoff Laws").

(c)        No labor dispute, work stoppage, group picketing, lockout or strike in respect of the Company or any Company Subsidiary is pending or, to the knowledge of the Company, threatened.  To the Company's knowledge, neither the Company nor any Company Subsidiary is a party to or threatened with any governmental investigation, administrative charge or litigation involving any employee, consultant or independent contractor or by or before any Governmental Entity concerning Laws in respect of labor and employment, including without limitation charges of unfair labor practices or discrimination complaints, except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.  Since January 1, 2011, neither the Company nor any Company Subsidiary has engaged in any unfair labor practices within the meaning of the National Labor Relations Act or any analogous Law, except as would not, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.  Neither the Company nor any Company Subsidiary is presently a party to or bound by any collective bargaining agreement or other contract with a labor union, works council or similar organization other than as set forth in Section 3.17 of the Company Disclosure Letter and no such agreement or contract is being negotiated by the Company or any Company Subsidiary.  To the Company's knowledge, no effort by or on behalf of any labor union to organize any employees of the Company or any Company Subsidiary is ongoing or threatened in writing and no petition has been filed or proceedings instituted before the National Relations Board or other labor relations board seeking recognition or certification of a bargaining representative for any employee or group of employees of the Company or any Company Subsidiary.

(d)        Section 3.17(d) of the Company Disclosure Letter sets forth a list of all individuals currently engaged by the Company to perform services as independent contractors for the Company or any Company Subsidiary.  Accurate and complete copies of all written agreements with any such independent contractor, or the form thereof, have been made available to Parent.

3.18.    Environmental Matters.  Except as set forth in Schedule 3.18 of the Company Disclosure Letter:

(a)        Neither the Company nor any of the Company Subsidiaries is in material violation of or has been notified in writing that it is in material violation of any Environmental Law (as defined in Section 3.18(e)(i)).  There has been no generation, use, handling, storage or disposal of any Hazardous Materials by the Company or any of the Company Subsidiaries in material violation of any Environmental Law at any site owned or operated by, or premises leased by, the Company or any of the Company Subsidiaries during the period of the Company's or such Company Subsidiary's ownership, operation or lease nor, to the Company's knowledge, has there been or is there threatened any Release (as defined in Section 3.18(e)(iii)) of any

35

Hazardous Materials into, on, at, under or from any such site or premises by the Company or any of the Company Subsidiaries during such period in material violation of any Environmental Law (which violation is pending and unresolved) or in a manner which would reasonably be expected to result in any material liability for the Company or the Company Subsidiary.

(b)     Except for matters that have been fully resolved or as would not reasonably be expected to result in material liability of the Company or any Company Subsidiary, neither the Company nor any Company Subsidiary has received written notification that, and the Company has no knowledge that, any site currently or formerly owned or operated by, or premises currently or formerly leased by, the Company or any Company Subsidiary is the subject of any Federal, state or local civil, criminal or administrative investigation evaluating whether, or alleging that any action by the Company or any Company Subsidiary is necessary to respond to a Release or a threatened Release of any Hazardous Material.  No site or premises owned, operated or leased by the Company or any Company Subsidiaries is listed, or to the Company's knowledge, proposed for listing, on the National Priorities List or the Comprehensive Environmental Response, Compensation, and Liability Information System, both as maintained under the Federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), or on any comparable state governmental lists.  Except for matters that have been fully resolved or as would not reasonably be expected to result in material liability of the Company or any Company Subsidiary, neither the Company nor any Company Subsidiary has received written notification of, and the Company has no knowledge of, any potential responsibility or liability of the Company or any Company Subsidiary pursuant to the provisions of (i) CERCLA, (ii) any similar Federal, state, local, foreign or other Environmental Law, or (iii) any order issued pursuant to the provisions of any such Environmental Law.

(c)     The Company and the Company Subsidiaries have obtained all material permits required by Environmental Law necessary to enable them to conduct their respective businesses and are in compliance in all material respects with such permits.  All such permits are in full force and effect and there are no pending (and, to the Company's knowledge, no threatened) proceedings that seek the revocation, cancellation, suspension or any adverse modification of any such permits.

(d)     To the Company's knowledge, there is no environmental or health and safety matter with respect to the operation of its business or properties that would, individually or in the aggregate, be reasonably likely to have a Company Material Adverse Effect.

(e)     For purposes of this Agreement:

(i)     "Environmental Laws" means any applicable Federal, state, local or foreign Laws, in each case as amended and in effect in the jurisdiction in which the applicable site or premises are located, pertaining to the protection of human health, safety or the environment, including without limitation, the following statutes and all regulations promulgated thereunder: the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Federal Clean Air Act, 42 U.S.C. § 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et

36

seq.; the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq.; the Atomic Energy Act, 42 U.S.C. § 2014 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. § 651 et seq.; any state or local statute of similar effect; and any Laws relating to protection of safety, health or the environment which regulate the management or disposal of biological agents or substances including medical or infectious wastes;

(ii)      "Hazardous Materials" means (A) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "chemical substances," "toxic substances," "toxic pollutants," "pollutants," "contaminants," "pesticides," or "oil" as defined in any applicable Environmental Law, or (B) any petroleum or petroleum products, natural or synthetic gas, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, urea formaldehyde foam insulation, radon and any other substance defined or designated as hazardous, toxic or harmful to human health, safety or the environment under any Environmental Law; and

(iii)      "Release" has the meaning specified in CERCLA.

3.19.      No Breach.  Except for (a) filings with the SEC under the Exchange Act, (b) filings with the Secretary of State of the State of Delaware contemplated herein, (c) the filing of a Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act, of 1976, as amended (the "HSR Act") and any similar filings in foreign jurisdictions and (d) matters listed in Section 3.19 of the Company Disclosure Letter, the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated hereby will not (i) violate any provision of the certificate of incorporation or bylaws of the Company, (ii) violate, conflict with or result in the breach of any of the terms or conditions of, result in modification of, require any notice or action under, or otherwise give any other contracting party the right to terminate, accelerate obligations under or receive payment under or constitute (or with notice or lapse of time or both constitute) a default under, any instrument, contract or other agreement to which the Company or any Company Subsidiary is a party or to which any of them or any of their assets or properties is bound or subject, (iii) violate any Law applicable to the Company or the Company Subsidiaries or by which any of the Company's or the Company Subsidiaries' assets or properties is bound, (iv) violate any Permit, (v) require any filing with, notice to, or permit, consent or approval of, any governmental or regulatory body, or (vi) result in the creation of any lien or other encumbrance on the assets or properties of the Company or a Company Subsidiary, excluding from the foregoing clauses (ii), (iii), (iv), (v), and (vi) violations, breaches and defaults which, and, filings, notices, permits, consents and approvals the absence of which, in the aggregate, could not reasonably be expected to have a Company Material Adverse Effect and would not interfere with the ability of the Company to consummate the transactions contemplated hereby or materially increase the costs of consummation of the Offer and the Merger.

3.20.      Board Approvals; Anti-Takeover; Vote Required.

(a)      The Company Board of Directors, at a meeting duly called and held at which all directors were present, has unanimously (i) duly and validly approved and taken all

37

corporate action required to be taken by the Company Board of Directors to authorize this Agreement and the consummation of the transactions contemplated hereby, (ii) resolved that the transactions contemplated hereby are advisable and in the best interests of the stockholders of the Company, and (iii) subject to the other terms and conditions of this Agreement, resolved to recommend that the stockholders of the Company accept the Offer, tender their Shares to Sub pursuant to the Offer, and adopt this Agreement, and none of the aforesaid actions by the Company Board of Directors has been amended, rescinded or modified.

(b)     Assuming the accuracy of the representations of Parent and Sub in SECTION 4, the Company has taken all action necessary such that no restrictions contained in any "fair price," "control share acquisition," "business combination" or similar statute (including Section 203 of the DGCL) will apply to the execution, delivery or performance of this Agreement and the Tender and Voting Agreements with the Principal Stockholders.

(c)     If approval by the Company's stockholders is required under the DGCL to approve and adopt this Agreement, the only vote necessary for such approval is the affirmative vote of the holders of a majority of the outstanding Shares.

(d)     The Company (acting through a compensation committee of the Company's Board of Directors composed solely of independent directors (as such term is used in Rule 14d-10(d) under the Exchange Act)) has taken or will take all steps necessary to cause each compensation, severance or other benefit agreement, arrangement or understanding between the Company or a Company Subsidiary and any of its or their current or former officers, directors or employees to be approved as an employment compensation arrangement and to satisfy the requirements of the non-exclusive safe-harbor set forth in Rule 14d-10(d) under the Exchange Act.  The Company has provided or will provide copies of all resolutions adopted or actions taken in connection with such employment compensation arrangement, and each such employment compensation arrangement in existence as of the date of this Agreement is listed on Section 3.20(d) of the Company Disclosure Letter.

(e)     The Company Board of Directors has taken such action as is necessary with respect to the Company Rights Agreement such that (i) the execution and delivery of this Agreement and the transactions contemplated hereby will not (x) result in Parent becoming an "Acquiring Person" under the Company Rights Agreement or (y) result in the grant of any rights to any person under the Company Rights Agreement or enable, require or cause the Company Rights to become exercisable, detach from the Shares, be exercised or deemed exercised, or be distributed or otherwise triggered and (ii) the Company Rights will terminate immediately prior to the Acceptance Time.

3.21.     Financial Advisor.

(a)     The Company Board of Directors has received the opinion of Stifel, Nicolaus & Company, Incorporated to the effect that, as of the date of such opinion, the consideration to be received in the Offer and the Merger, by the holders of the Shares (other than as set forth in such opinion) is fair, from a financial point of view, to such holders.  The Company shall forward to Parent, solely for informational purposes, a copy of the written

38

version of such opinion, as required by Section 1.2(b) promptly following the execution of this Agreement and in no event later than five (5) business days after the date of this Agreement.

(b)     Other than Stifel, Nicolaus & Company, Incorporated, no broker, finder, agent or similar intermediary has acted on behalf of the Company in connection with this Agreement or the transactions contemplated hereby, and there are no brokerage commissions, finders' fees or similar fees or commissions payable in connection herewith based on any agreement, arrangement or understanding with the Company, or any action taken by the Company.  The Company previously has provided or made available to Parent a copy of Stifel, Nicolaus & Company, Incorporated's engagement letter, and the fees set forth therein are the only fees payable to Stifel, Nicolaus & Company, Incorporated.

3.22.    <u>Information in the Offer Documents and the Schedule 14D-9</u>.  The information supplied by the Company expressly for inclusion or incorporation by reference in the Offer Documents or the Schedule 14D-9, including any amendments thereof and supplements thereto, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  The Schedule 14D-9, including any amendments thereof and supplements thereto, will comply in all material respects with the requirements of applicable Laws and, on the date filed with the SEC and on the date first published or sent or given to the Company's stockholders, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, except that the Company makes no representation or warranty with respect to statements made in the Schedule 14D-9, including any amendments thereof and supplements thereto, based on information furnished by Parent or Sub expressly for inclusion therein.  The Company has obtained all necessary consents to permit the inclusion in its entirety, and a fair summary of the analysis underlying, the fairness opinion of Stifel, Nicolaus & Company, Incorporated in the Schedule 14D-9, including any amendments thereof and supplements thereto.

3.23.    <u>Information in the Proxy Statement</u>.  The Proxy Statement, if any, (and any amendment thereof and supplement thereto) at the date mailed to the Company's stockholders and at the time of any meeting of the Company stockholders to be held in connection with the Merger, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, except that no representation is made by the Company with respect to statements made therein based on information supplied in writing by Parent or Sub expressly for inclusion in the Proxy Statement, including any amendments thereof and supplements thereto.  The Proxy Statement, including any amendments thereof and supplements thereto, as to information supplied by the Company for inclusion therein, will comply in all material respects with the requirements of applicable Laws.  The Company has obtained all necessary consents to permit the inclusion in its entirety, and a fair summary of the analysis underlying, the fairness opinion of Stifel, Nicolaus & Company, Incorporated in the Proxy Statement, including any amendments thereof and supplements thereto.

39

SECTION 4 - REPRESENTATIONS AND WARRANTIES OF PARENT

Parent and Sub hereby make the following representations and warranties to the Company:

4.1.     <u>Organization</u>.  Parent is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware.  All of the issued and outstanding capital stock of Sub is owned, beneficially and of record, by Parent.  Except for obligations and liabilities incurred in connection with its incorporation and the transactions contemplated by this Agreement, Sub has not and, prior to the Acceptance Time, will not have incurred, directly or indirectly, any material obligations or liabilities or engaged in any business activities or entered into any agreements or arrangements.

4.2.     <u>Authority to Execute and Perform Agreement</u>.

(a)     Parent and Sub have the corporate power and authority to enter into, execute and deliver this Agreement and to perform fully their obligations hereunder and the transactions contemplated hereby.  The Board of Directors of each of Parent and Sub has approved this Agreement and the transactions contemplated hereby.  No approval by Parent's stockholders is required to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by Parent and Sub and constitutes a valid and binding obligation, enforceable against them in accordance with its terms, except to the extent enforceability may be limited by the effect of applicable bankruptcy, reorganization, insolvency, moratorium or other Laws affecting the enforcement of creditors' rights generally and the effect of general principles of equity, regardless of whether such enforceability is considered in a proceeding at Law or in equity.

(b)     Except for (i) filings with the SEC under the Exchange Act, (ii) filings with the Secretary of State of the State of Delaware contemplated herein, (iii) filings under the Pennsylvania Takeover Disclosure Law and (iv) the filing of a Notification and Report Form under the HSR Act and any similar filings in foreign jurisdictions, the execution, delivery and performance of this Agreement by Parent and Sub and the consummation by Parent and Sub of the transactions contemplated hereby will not (i) violate any provision of the organizational documents of Parent or Sub, (ii) violate, conflict with or result in the breach of any of the terms or conditions of, result in modification of, require any notice or action under, or otherwise give any other contracting party the right to terminate, accelerate obligations under or receive payment under or constitute (or with notice or lapse of time or both constitute) a default under, any instrument, contract or other agreement to which Parent or Sub is a party or to which either of them or any of their respective assets or properties is bound or subject, (iii) violate any Law applicable to Parent or Sub or by which any of their respective assets or properties is bound, (iv) violate any governmental permit, (v) require any filing with, notice to, or permit, consent or approval of, any Governmental Entity, excluding from the foregoing clauses (ii), (iii), (iv) and (v) violations, conflicts breaches, modifications and defaults which, and filings, notices, permits, consents and approvals the absence of which, in the aggregate, would not reasonably be expected to have a material adverse effect on the ability of Parent and Sub to consummate the transactions contemplated hereby.

40

4.3.     Information in the Offer Documents.  The information supplied by either of Parent or Sub expressly for inclusion or incorporation by reference in the Offer Documents or the Schedule TO, including any amendments thereof and supplements thereto, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  The Schedule TO, including any amendments thereof and supplements thereto, will comply in all material respects with the requirements of applicable Laws and, on the date filed with the SEC and on the date first published or sent or given to the Company's stockholders, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading, except that neither of Parent or Sub makes any representation or warranty with respect to statements made in the Schedule TO, including any amendments thereof and supplements thereto, based on information furnished by the Company expressly for inclusion therein.

4.4.     Information in the Proxy Statement.  The Proxy Statement, if any (and any amendment thereof and supplement thereto), at the date mailed to the Company's stockholders and at the time of any meeting of the Company stockholders to be held in connection with the Merger, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading, except that no representation is made by either of Parent or Sub other than with respect to statements made therein based on information supplied by Parent or Sub expressly for inclusion in the Proxy Statement, including any amendments thereof and supplements thereto. The Proxy Statement, as to information supplied by either of Parent or Sub for inclusion therein, will comply in all material respects with the requirements of applicable Laws.

4.5.     Sub.  Sub is duly organized, validly existing and in good standing as a Delaware corporation.   Sub has been formed solely for the purpose of engaging in the transactions contemplated by this Agreement.

4.6.     Financing.  Parent currently has available to it, and Parent will cause Sub to have, (a) at the Acceptance Time, sufficient unrestricted funds to pay the aggregate Closing Amounts for all Shares validly tendered into the Offer, subject to the terms and conditions of the Offer and this Agreement and (b) at the Effective Time, sufficient unrestricted funds to pay in full the aggregate Closing Amounts, subject to the terms and conditions of this Agreement.

4.7.     Financial Advisor.  Parent, and not the Company, shall be liable for any fee or other commission payable to any broker, finder, agent or similar intermediary engaged by Parent or Sub in connection with the transactions contemplated hereby.

4.8.     Ownership of Company Common Stock.   Neither Parent, Sub nor any Affiliate controlled by Parent beneficially owns (within the meaning of Section 13 of the Exchange Act and the rules and regulations promulgated thereunder), or will prior to the Acceptance Time (with respect to Sub) or the Effective Time (with respect to Parent and its other controlled Affiliates but not Sub) beneficially own, any shares of Company Common Stock, or is, or will

41

prior to the Acceptance Time (with respect to Sub) or the Effective Time (with respect to Parent and its other controlled Affiliates but not Sub) become, a party to any contract, arrangement or understanding (other than this Agreement and the other agreements contemplated herein) for the purpose of acquiring, holding, voting or disposing of any shares of Company Common Stock.

4.9.     <u>Litigation</u>.  As of the date of this Agreement, there is no suit, action or proceeding pending or, to the knowledge of Parent, overtly threatened through written contact by counsel to the plaintiff or claimant against Parent or any of its Affiliates that, individually or in the aggregate, would reasonably be expected to have a material adverse effect on the ability of Parent and Sub to consummate the transactions contemplated by this Agreement.

4.10.    <u>No Other Representations or Warranties</u>.  Except for the representations and warranties contained in this Agreement, Parent and Sub acknowledge that neither the Company nor any other Person on behalf of the Company makes, and Parent and Sub are not relying upon, any other express or implied representation or warranty with respect to the Company or with respect to any other information provided to Parent or Sub in connection with the transactions contemplated by this Agreement.

## SECTION 5 - COVENANTS AND AGREEMENTS

5.1.     <u>Conduct of Business</u>.  During the period from the date of this Agreement and continuing until the earliest of (i) the termination of this Agreement pursuant to its terms (ii) such time as designees of Parent first constitute at least a majority of the Company Board of Directors pursuant to section 6.9 or (iii) the Effective Time, the Company and each Company Subsidiary shall, except as otherwise contemplated or expressly permitted by this Agreement or expressly provided in Section 5.1 of the Company Disclosure Letter, required by Law or consented to in writing by Parent carry on its business in the ordinary course, in substantially the same manner as heretofore conducted.  Without limiting the generality of the foregoing, except as otherwise contemplated or expressly permitted by this Agreement, expressly provided in Section 5.1 of the Company Disclosure Letter, or consented to in writing by Parent during the period from the date of this Agreement and continuing until the earliest of (i) the termination of this Agreement pursuant to its terms (ii) such time as designees of Parent first constitute at least a majority of the Company Board of Directors pursuant to Section 6.9 or (iii) the Effective Time, the Company shall observe the following covenants:

(a)     <u>Affirmative Covenants Pending Closing</u>.  Except as may be consented to in writing by Parent (such consent not to be unreasonably withheld, conditioned or delayed), the Company shall and shall cause the Company Subsidiaries to:

(i)     <u>*Preservation of Personnel*</u>.  Use commercially reasonable efforts, consistent with past practice, to preserve intact and keep available the services of present employees, consultants, independent contractors and executive officers of the Company and the Company Subsidiaries; provided that the Company shall not be obligated to increase compensation of any employee or take any action inconsistent with this Section 5.1.

42

(ii)     _Insurance_.  Use commercially reasonable efforts to keep in effect casualty, product liability, workers' compensation and other insurance policies in coverage amounts substantially similar to those in effect at the date of this Agreement.

(iii)     _Preservation of the Business; Maintenance of Properties, Contracts_.  Use commercially reasonable efforts to preserve the business of the Company, to develop, commercialize and pursue regulatory approvals for the Company's product candidates and products and to advertise, promote and market the products of the Company and the Company Subsidiaries, and use commercially reasonable efforts to keep the Company's properties substantially intact, to preserve its goodwill and business, to maintain all physical properties in such operating condition as will permit the conduct of the Company's business on a basis consistent with past practice, and to perform and comply in all material respects with the terms of the contracts referred to in Section 3.11.

(iv)     _Contracts_.  Use reasonable best efforts to enter into those certain contracts and arrangements listed in Section 5.1(a)(iv) of the Company Disclosure Letter prior to the Effective Time.

(v)     _Intellectual Property Rights_.  Use commercially reasonable efforts to obtain, preserve and protect the Proprietary Rights.

(vi)     _Regulatory Matters_.  (x) Notify and consult with Parent promptly (A) after receipt of any communication from any Governmental Entity or inspections of any manufacturing or clinical trial site and before giving any submission to a Governmental Entity, and (B) prior to making any material change to a study protocol, adding new trials, making any material change to a manufacturing plan or process, or making a material change to the development timeline for any of its product candidates or programs and (y) invite Parent to attend all significant meetings with the FDA.

(b)     _Negative Covenants Pending Closing_.  The Company shall not and shall cause the Company Subsidiaries not to engage in any of the following acts, except where such prohibition would violate applicable Law:

(i)     _Disposition of Assets_.  Sell or transfer, or mortgage, pledge, lease, license or otherwise encumber any of its assets, including its Proprietary Rights, other than sales or transfers in the ordinary course of business and in amounts not exceeding, in the aggregate, $125,000;

(ii)     _Liabilities_.  Incur any indebtedness for borrowed money in excess of $125,000 in the aggregate or incur any obligation or liability or enter into any contract or commitment, except for contracts or commitments that can be terminated or rescinded by the Company within six (6) months of entering into such contract or commitment without the Company incurring penalties in excess of $25,000, involving aggregate potential payments to or by the Company or any Company Subsidiary, in an amount in excess of $125,000;

(iii)     _Compensation_.  (A) Increase the compensation payable to or that may become payable to any officer, director, employee, agent or consultant or (B) enter into any employment, severance, retention, bonus, tax gross-up or other agreement or arrangement with

43

any officer, director, employee, agent or consultant of the Company or a Company Subsidiary (other than, in the case of a departed employee other than an officer or director, to fill a vacancy on an employment at will basis and without any material increase in pay), or adopt, or increase the benefits (including fringe benefits) under, any Plan or otherwise, except (1) in each case, as required by Law, or pursuant to the terms of any Plan disclosed in Section 3.16(a) of the Company Disclosure Letter and (2) for actions described in subclause A with respect to employees with an annual base salary less than $150,000, or for any such actions with respect to agents or consultants, in each case who are not officers or directors, provided that such actions are taken in the ordinary course of business consistent with past practice; or make any loans to any of its directors, officers or employees, agents or consultants, except for the advancement of business expenses in the ordinary course of business consistent with past practice, or make any change in its existing borrowing or lending arrangements for or on behalf of any such persons pursuant to any Plan or otherwise;

(iv)    _Plans, Unions_.  Establish, adopt, amend, enter into, or terminate any Plan, any plan, agreement, program, policy, trust, fund or other arrangement that would be a Plan if it were in existence as of the date of this Agreement or enter into any collective bargaining agreement or other agreement with a labor union, works council or similar organization, except as required by Law, by the terms of any Plan or pursuant to any existing agreement disclosed in Section 3.16(a) or Section 5.1(b)(iv) of the Company Disclosure Letter;

(v)    _Capital Stock_.  Make any change in the number of shares of its capital stock authorized, issued or outstanding or grant or accelerate the exercisability of any share of restricted stock, option, warrant or other right to purchase, or convert any obligation into, shares of its capital stock, declare or pay any dividend or other distribution with respect to any shares of its capital stock, sell or transfer any shares of its capital stock, or redeem or otherwise repurchase any shares of its capital stock; provided, however, the foregoing limitations shall not apply in connection with the accelerated vesting, conversion or exercise of convertible securities outstanding on the date of this Agreement, including, without limitation, the accelerated vesting and issuance of Shares upon the exercise of Company Options the accelerated vesting of Company Restricted Shares or the settlement of Time-Vested DSUs or Performance-Based DSUs, in each case, as provided in Section 2.4;

(vi)    _Certificate of Incorporation, By-Laws, Directors and Officers_.  Cause, permit or propose any amendments to the certificate of incorporation or bylaws of the Company or any Company Subsidiary or elect or appoint any new directors or officers;

(vii)    _Acquisitions_.  Make, or permit to be made, any material acquisition, lease, investment, or capital contribution outside the ordinary course of business consistent with past practice;

(viii)    _Capital Expenditures_.  Authorize any single capital expenditure in excess of $75,000 or capital expenditures which in the aggregate exceed $125,000;

(ix)    _Accounting Policies_.  Except as may be required as a result of a change in Law or in generally accepted accounting principles, change any of the accounting practices or principles used by it;

44

(x)      *Taxes*.  Change or amend any material Tax election or settle or compromise any material federal, state, local or non-U.S. Tax liability, change its annual tax accounting period, change any material method of Tax accounting, enter into any closing agreement relating to any material Tax, file any amended material Tax Return, file any material Tax Return in a manner inconsistent with past practice, surrender any right to claim a material Tax refund, or consent to any extension or waiver of the limitations period applicable to any material Tax claim or assessment;

(xi)      *Legal*.  Commence, settle or compromise any pending or threatened suit, action or claim which (A) is material to the business of the Company or any Company Subsidiary, (B)  would involve restrictions on the business activities of the Company or any Company Subsidiary, or (C) would involve the issuance of Company securities;

(xii)      *Extraordinary Transactions*.  Adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of the Company Subsidiaries (other than the Offer and Merger); amend, alter, or terminate the Company Rights Agreement, except as contemplated by Section 3.20(e); or take any action to render inapplicable, or to exempt any person from the provisions of the DGCL or any other Law that purports to limit or restrict business combinations or the ability to acquire or vote shares of capital stock, except as contemplated by this Agreement;

(xiii)      *Payment of Indebtedness*.  Pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction, in the ordinary course of business and consistent with past practice;

(xiv)      *Loans and Advances*.  Make any loans, advances or capital contributions to, or investments in, any other person (other than to wholly-owned subsidiaries of the Company or customary advances to employees for travel and business expenses in the ordinary course of business);

(xv)      *Layoff Laws*.  Effectuate a "plant closing" or "mass layoff," as those terms are defined in the applicable Layoff Law;

(xvi)      *New Agreements/Amendments*.  Except as contemplated in this Agreement, enter into or modify, or permit a Company Subsidiary to enter into or modify, any material license, development, research, or collaboration agreement, lease or other contract with any other person;

(xvii)      *Confidentiality and Non-Competition Agreements*.  Modify, amend or terminate, or waive, release or assign in a manner adverse to the Company any material rights or claims with respect to any confidentiality agreement or non-competition agreement to which the Company is a party;

(xviii)      *Authorizations, Agreements and Obligations*.  Authorize or commit or agree, in writing or otherwise, to take, any of the foregoing actions.

(c)      Advice of Changes.  The Company shall promptly advise Parent orally and in writing of any change or event that has had or would reasonably be expected to have a Company Material Adverse Effect.

5.2.   No Solicitation.

(a)      The Company and each Company Subsidiary has, and has caused its officers, directors, employees, investment bankers, attorneys, accountants or other agents or those of the Company Subsidiaries (collectively, "Representatives") to have, ceased and terminated all existing solicitations, initiations, encouragements, discussions, negotiations and communications with any persons or entities with respect to any offer or proposal or potential offer or proposal relating to any transaction or proposed transaction or series of related transactions, other than the transactions contemplated hereby, involving:  (A) any consolidation, business combination, merger or similar transaction involving the Company or any Company Subsidiary; (B) any recapitalization, restructuring, liquidation or dissolution of the Company or any Company Subsidiary; (C) any issuance by the Company, individually or in the aggregate, of over fifteen percent (15%) of its equity securities; or (D) any sale, lease, exchange, transfer, license, acquisition or disposition of assets of the Company or Company Subsidiaries (including for this purpose the outstanding equity securities of a Company Subsidiary) for consideration equal to fifteen percent (15%) or more of the market value of all of the outstanding Shares on the last trading day prior to the date of this Agreement or fifteen percent (15%) of the consolidated total assets of the Company and the Company Subsidiaries (each of clauses (A)-(D), an "Acquisition Proposal").  Except as provided in this Section 5.2, from the date of this Agreement until the earlier of termination of this Agreement or the Effective Time, the Company shall not and shall cause its Representatives and each Company Subsidiary not to directly or indirectly (i) initiate, solicit or encourage, or take any action to facilitate the making of, any offer or proposal which constitutes or is reasonably likely to lead to an Acquisition Proposal, (ii) enter into any agreement with respect to an Acquisition Proposal, or (iii) engage in negotiations or discussions with, or provide any non-public information or data to, any person (other than Parent or any of its affiliates or representatives) relating to any Acquisition Proposal or grant any waiver or release under any standstill agreement.  The Company agrees that any violations of the restrictions set forth in this Section 5.2 by any of its Representatives shall be deemed to be a breach of this Agreement (including this Section 5.2) by the Company.  Notwithstanding the foregoing, nothing contained in this Section 5.2 or any other provision hereof shall prohibit the Company or the Company Board of Directors from taking and disclosing to the Company's stockholders its position with respect to any tender or exchange offer by a third party pursuant to Rules 14d-9 and 14e-2 promulgated under the Exchange Act.

(b)      Notwithstanding the foregoing, prior to the acceptance of Shares pursuant to the Offer (the "Acceptance Time"), the Company and its Representatives may furnish information concerning its business, properties or assets to any person pursuant to a confidentiality agreement with terms no less favorable to the Company than those contained in the Confidentiality Agreement and may negotiate and participate in discussions and negotiations with such person concerning an Acquisition Proposal if, but only if, such person has, not resulting from any knowing material violation of this Section 5.2, submitted a written proposal to the Company relating to such Acquisition Proposal which the Board of Directors determines in good faith, after consultation with its financial advisor, is or is reasonably expected to lead to a

46

Superior Proposal.  From and after the date hereof and prior to the Acceptance Time, the Company shall, within forty eight (48) hours, notify Parent in the event that the Company or any Company Subsidiary or Representatives receives (i) any Acquisition Proposal or indication by any person that it is considering making an Acquisition Proposal, (ii) any request for non-public information relating to the Company or any Company Subsidiary related to an Acquisition Proposal, or (iii) any inquiry or request for discussions or negotiations regarding any Acquisition Proposal.  The Company shall provide Parent, within such forty eight (48) hour period, with the identity of such Person and a copy of such Acquisition Proposal, indication, inquiry or request (or, where such Acquisition Proposal is not in writing, a description of the material terms and conditions of such Acquisition Proposal, indication, inquiry or request), including any modifications thereto.  The Company shall keep Parent reasonably informed, no later than forty eight (48) hours after the occurrence of any changes, developments, discussions or negotiations, of the status of any Acquisition Proposal, indication, inquiry or request (including the material terms and conditions thereof and of any modification thereto), and any material developments, discussions and negotiations, including furnishing copies of any written inquiries, correspondence, and draft documentation.  Without limiting the foregoing, the Company shall promptly (and in any event within forty eight (48) hours) notify Parent in writing if it determines to begin providing information or to engage in discussions or negotiations concerning an Acquisition Proposal and shall in no event begin providing such information or engaging in such discussions or negotiations prior to providing such notice.  The Company shall not, and shall cause the Company Subsidiaries not to, enter into any agreement with any Person subsequent to the date of this Agreement that would restrict the Company's ability to provide such information to Parent.  The Company shall not, and shall cause the Company Subsidiaries not to, terminate, waive, amend or modify any provision of, or grant permission or request under, any standstill or confidentiality agreement to which it or any of the Company Subsidiaries is or becomes a party.  The Company will promptly provide to Parent any non-public information concerning the Company or the Company Subsidiaries provided or made available pursuant to this Section 5.2(b) which was not previously provided or made available to Parent.  For purposes of this Agreement, a "Superior Proposal" is an unsolicited written Acquisition Proposal, that the Company Board of Directors believes in good faith is *bona fide*, to acquire more than fifty percent (50%) of the equity securities or consolidated total assets of the Company and the Company Subsidiaries pursuant to a tender or exchange offer, a merger, a consolidation, business combination or recapitalization, or a sale or license of its assets, (A) on terms which the Company Board of Directors determines in its good faith judgment to be more favorable to the holders of Shares than the transactions contemplated by this Agreement (after consultation with its financial and legal advisors), taking into account all the terms and conditions of such proposal and this Agreement, including the timing and likelihood of consummating the transactions contemplated by such proposal and this Agreement, and (B) which the Company Board of Directors has determined to be reasonably capable of being completed on the terms proposed, taking into account all financial, regulatory, legal and other aspects of such proposal.

      (c)     Except as set forth herein, neither the Company Board of Directors nor any committee thereof shall (i) withdraw, withhold, qualify or modify, or publicly propose to withdraw, withhold, qualify or modify, the approval or recommendation by the Company Board of Directors or any such committee of the Offer, this Agreement, or the Merger, (ii) approve or recommend or publicly propose to approve or recommend, any Acquisition Proposal (any action referred to in the foregoing clauses (i) and (ii) being referred to as an "Adverse Recommendation

47

Change") or (iii) enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, or similar agreement (an "Alternative Acquisition Agreement"), providing for the consummation of a transaction contemplated by any Acquisition Proposal (other than a confidentiality agreement referred to in Section 5.2(b) entered into in the circumstances referred to in Section 5.2(b)).  The Company shall, promptly following a determination by the Company Board of Directors that an Acquisition Proposal is a Superior Proposal, notify Parent of such determination.

        (d)      Notwithstanding anything in this Section 5.2 to the contrary, prior to the Acceptance Time, if (i) the Company receives a written Acquisition Proposal from a third party that the Company Board of Directors believes in good faith is *bona fide*, (ii) a knowing material breach by the Company or a Company Subsidiary of this Section 5.2 has not resulted in the making of such Acquisition Proposal, and (iii) the Company Board of Directors concludes in good faith, after consultation with outside counsel and its financial advisors, such Acquisition Proposal constitutes a Superior Proposal after giving effect to all of the adjustments to the terms of this Agreement which may be committed to by Parent, the Company Board of Directors may, if it determines in good faith, after consultation with outside counsel, that failure to take such action would be inconsistent with the fiduciary duties of the Board of Directors to the stockholders of the Company under applicable Law, (A) effect an Adverse Recommendation Change and/or (B) terminate this Agreement to enter into an Alternative Acquisition Agreement with respect to such Superior Proposal; provided, however, that the Company shall not terminate this Agreement pursuant to the foregoing clause (B), and any purported termination pursuant to the foregoing clause (B) shall be void and of no force or effect, unless in advance of or concurrently with such termination the Company (1) pays the fee required by and pursuant to the terms of Section 8.2 and (2) within two (2) business days following such termination enters into a binding definitive Alternative Acquisition Agreement for such Superior Proposal; and provided, further, that the Company Board of Directors may not effect a change of its recommendation pursuant to the foregoing clause (A) or terminate this Agreement pursuant to the foregoing clause (B) unless (1) the Company or a Company Subsidiary or Representative shall not have materially breached this Section 5.2 in connection with the making of such Acquisition Proposal, (2) the Company shall have provided prior written notice to Parent, at least four (4) business days in advance (the "Notice Period"), of its intention to take such action with respect to such Superior Proposal, which notice shall specify the material terms and conditions of any such Superior Proposal (including the identity of the party making such Superior Proposal), and shall have contemporaneously provided a copy of the proposed Alternative Acquisition Agreement with respect to such Superior Proposal, (3) prior to effecting such Adverse Recommendation Change or terminating this Agreement to enter into a definitive Alternative Acquisition Agreement with respect to such Superior Proposal, the Company shall, and shall cause its Representatives to, during the Notice Period, negotiate with Parent in good faith (to the extent Parent desires to negotiate) to permit Parent to make such adjustments in the terms and conditions of this Agreement so that such Acquisition Proposal ceases to constitute a Superior Proposal, and (4) following any negotiation described in the immediately preceding clause (3), such Acquisition Proposal continues to constitute a Superior Proposal.  In the event of any material revisions to the financial terms of the Superior Proposal after the start of the Notice Period, the Company shall be required to deliver a new written notice to Parent and to comply with the requirements of this Section 5.2 with respect to such new written notice, and the Notice Period shall be deemed to have re-commenced on the date of such new notice.  Notwithstanding

48

the foregoing, if fewer than four (4) business days remains before the then scheduled expiration date of the Offer, the Notice Period with respect to the Company Board of Directors effecting a change of its recommendation pursuant to the foregoing clause (A) shall not apply, provided, however, that, in such a circumstance, the Notice Period with respect to the Company terminating this Agreement pursuant to the foregoing clause (B) shall remain four (4) business days.  Any Adverse Recommendation Change shall not change the approval of the Company Board of Directors for purposes of causing any state takeover statute or other Law to be inapplicable to the transactions contemplated by this Agreement, including each of the Offer and the Merger, or to the Tender and Voting Agreements.

(e)      Notwithstanding the foregoing, the Company Board of Directors may make an Adverse Recommendation Change in the absence of an Acquisition Proposal if the Company Board of Directors has concluded in good faith, after consultation with its outside counsel, that an Adverse Recommendation Change is necessary to comply with its fiduciary duties, provided, however, that the Company Board of Directors shall not make an Adverse Recommendation Change unless the Company has (A) provided to Parent at least four (4) business days' prior written notice (or such shorter period as remains prior to one day prior to the scheduled expiration date of the Offer) advising Parent that the Company Board of Directors intends to take such action and specifying the reasons therefore in reasonable detail and (B) during such four (4) business day, or shorter, period, if requested by Parent, engaged in good faith negotiations with Parent to amend this Agreement in such a manner that obviates the need or reason for the Adverse Recommendation Change.

## SECTION 6 - ADDITIONAL AGREEMENTS

6.1.      Proxy Statement.  If required by the Exchange Act, the Company shall, as soon as practicable following the expiration of the Offer, prepare and file with the SEC the Proxy Statement in preliminary form, and each of the Company, Parent and Sub shall use commercially reasonable efforts to respond as promptly as practicable to any comments of the SEC with respect thereto.  The Company shall notify Parent promptly of the receipt of any comments from the SEC or its staff and of any request by the SEC or its staff for amendments or supplements to the Proxy Statement or for additional information and shall supply Parent with copies of all correspondence between the Company or any of its representatives, on the one hand, and the SEC or its staff, on the other hand, with respect to the Proxy Statement.  If at any time prior to receipt of the adoption of this Agreement by the required vote of the holders of the outstanding Shares (the "Company Stockholder Approval") there shall occur any event that should be set forth in an amendment or supplement to the Proxy Statement, the Company shall use commercially reasonable efforts to promptly prepare and mail to its stockholders such an amendment or supplement to the extent required by applicable Law.  The Company shall not mail any Proxy Statement, or any amendment or supplement thereto, to which Parent reasonably objects.  The Company shall use commercially reasonable efforts to cause the Proxy Statement to be mailed to the Company's stockholders as promptly as practicable after filing with the SEC.  Subject to the terms and conditions of this Agreement, the Proxy Statement shall contain the recommendation of the Company Board of Directors in favor of the Merger.

6.2.      Meeting of Stockholders of the Company.  If, following the Tender Completion Time, the adoption of this Agreement by the holders of Shares is required under the DGCL in

49

order to consummate the Merger, the Company shall take all actions in accordance with applicable Law, the Company's certificate of incorporation and bylaws and the rules of The Nasdaq Stock Market to promptly and duly call, give notice of, convene and hold as promptly as practicable, a Special Meeting. For purposes of this Agreement, the term "Tender Completion Time" means the latest to occur of (x) the Acceptance Time, (y) the closing of the purchase of the Top-Up Shares or the failure by Sub to exercise the Top-Up Option during the exercise period provided in Section 1.10 and (z) if a subsequent offering period is commenced by Sub, the expiration of such subsequent offering period.

    6.3.    Nasdaq; Post-Closing SEC Reports.  Prior to the Effective Time, the Company shall cooperate with Parent and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its part under applicable Laws and rules and policies of The Nasdaq Stock Market to enable the delisting by the Surviving Corporation of the Shares from The Nasdaq Stock Market and the deregistration of the Shares under the Exchange Act promptly after the Effective Time. Parent will use commercially reasonable efforts to cause the Surviving Corporation to file with the SEC (a) a Form 25 on the Closing Date and (b) a Form 15 on the first business day that is at least ten (10) days after the date the Form 25 is filed (such period between the Form 25 filing date and the Form 15 filing date, the "Delisting Period"). If the Surviving Corporation is reasonably likely to be required to file any reports pursuant to the Exchange Act during the Delisting Period, the Company will deliver to Parent at least five (5) business days prior to the Closing a substantially final draft of any such reports reasonably likely to be required to be filed during the Delisting Period ("Post-Closing SEC Reports"). The Post-Closing SEC Reports provided by the Company pursuant to this Section 6.3 will (i) not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading and (ii) comply in all material respects with the provisions of applicable Laws.

    6.4.    Access to Information.  Prior to the Effective Time, Parent shall be entitled, through its employees and representatives, to have such access to the assets, properties, business and operations of the Company and the Company Subsidiaries in connection with Parent's investigation of the Company with respect to the transactions contemplated hereby except as prohibited by applicable Law. Any such investigation and examination shall be conducted at reasonable times during normal business hours upon reasonable advance notice and under reasonable circumstances so as to limit disruption to or impairment of the Company's business; provided, however, such investigation and examination shall not include the right to conduct any sampling or testing, including any so-called Phase II testing, of the properties. No investigation by Parent shall diminish or obviate any of the representations, warranties, covenants or agreements of the Company contained in this Agreement. The Company shall furnish the representatives of Parent during such period with all such information and copies of such documents concerning the affairs of the Company as such representatives may reasonably request and cause its Representatives to cooperate fully with such representatives of Parent in connection with such investigation. The information and documents so provided shall be subject to the terms of the Confidentiality Agreement. Notwithstanding the foregoing, neither the Company nor any of its Subsidiaries shall be required to provide access to or disclose information designated as competitively sensitive or where the Company reasonably determines that such access or disclosure would jeopardize the attorney-client privilege of the Company or

50

any of its Subsidiaries or contravene any Law or any contract entered into prior to the date of this Agreement and listed in Section 6.4 of the Disclosure Letter to which the Company or any of its Subsidiaries is a party.

6.5.   <u>Public Disclosure</u>.   The initial press release concerning the Offer and the Merger shall be a joint press release and, thereafter, so long as this Agreement is in effect, neither Parent, Sub nor the Company will disseminate any press release or other announcement concerning the Merger, the Offer or this Agreement or the other transactions contemplated by this Agreement to any third party, except as may be required by Law or by any listing agreement with a national stock exchange, without the prior consent of each of the other parties hereto, which consent shall not be unreasonably withheld conditioned or delayed.  Notwithstanding the foregoing, the Company may disseminate press releases or other announcements regarding an Acquisition Proposal or Adverse Recommendation Change in accordance with the terms of Section 5.2 without the prior consent of Parent or Sub.  The parties have agreed to the text of the joint press release announcing the execution of this Agreement.  Notwithstanding the foregoing, without prior consent of the other party, each party (a) may communicate information that is not confidential information of the other party with financial analysts, investors and media representatives in a manner consistent with its past practice in compliance with applicable Law and (b) may disseminate material substantially similar to material included in a press release or other document previously approved for external distribution by the other parties.  Each party agrees to promptly make available to the other parties copies of any written communications made without prior consultation with the other parties.

6.6.   <u>Regulatory Filings; Reasonable Efforts</u>.

(a)   As promptly as practicable after the date hereof and in compliance with all applicable regulatory requirements, each of Parent, Sub and the Company shall make all filings, notices, petitions, statements, registrations, submissions of information, application or submission of other documents required by any Governmental Entity in connection with the Offer, the Merger and the other transactions contemplated hereby, including, without limitation: (i) Notification and Report Forms with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice as required by the HSR Act, (ii) filings required by the merger notification or control Laws of any applicable jurisdiction, as agreed by the parties hereto, and (iii) any filings required under the Securities Act, the Exchange Act, any applicable state or securities or "blue sky" Laws and the securities Laws of any foreign country, or any other applicable Laws or rules and regulations of any Governmental Entity relating to the Offer and the Merger.  Each of Parent and the Company will cause all documents that it is responsible for filing with any Governmental Entity under this Section 6.6 to comply in all material respects with all applicable Laws and rules and regulations of any Governmental Entity.

(b)   Each of Parent, Sub, and the Company shall promptly supply the other with any information which may be reasonably required in order to effectuate any filings or applications pursuant to this Section 6.6.

(c)   Each of Parent, Sub and the Company will notify the others promptly upon the receipt of:  (i) any communication or comments from any officials of any

51

Governmental Entity in connection with any filings made pursuant hereto and (ii) any request by any officials of any Governmental Entity for amendments or supplements to any filings made pursuant to, or information provided to comply in all material respects with, any applicable Laws and rules and regulations of any Governmental Entity.  Whenever any event occurs that is required to be set forth in an amendment or supplement to any filing made pursuant to Section 6.6(a), Parent, Sub or the Company, as the case may be, will promptly inform the others of such occurrence and cooperate in filing with the applicable Governmental Entity such amendment or supplement.

(d)       Upon the terms and subject to the conditions set forth in this Agreement, each of the parties agrees to use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Offer, the Merger and the other transactions contemplated hereby, including complying in all material respects with all applicable Laws and with all rules and regulations of any Governmental Entity and using its reasonable best efforts to accomplish the following:  (i) the causing of all the conditions set forth in SECTION 7 and in all of the Offer Conditions to be satisfied and to consummate and make effective the Offer, the Merger and the other transactions contemplated hereby, (ii) the obtaining of all reasonably requested actions or nonactions, waivers, consents, clearances, approvals, orders and authorizations from Governmental Entities and the making of all reasonably requested registrations, declarations and filings (including registrations, declarations and filings with Governmental Entities, if any), (iii) the obtaining of all reasonably requested consents, approvals or waivers from third parties, (iv) the defending of any suits, claims, actions, investigations or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed, and (v) the execution or delivery of any additional instruments necessary to consummate the transactions contemplated hereby, and to carry out fully the purposes of, this Agreement.  In connection with and without limiting the foregoing, the Company and its Board of Directors shall, if any state takeover statute or similar statute or regulation is or becomes applicable to the Offer, the Merger, this Agreement or any of the other transactions contemplated hereby, use their reasonable best efforts to ensure that the Offer, the Merger and the other transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such statute or regulation on the Offer, the Merger, this Agreement and the other transactions contemplated hereby.  In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors of the Company, Parent and Sub shall use their reasonable best efforts to take, or cause to be taken, all such necessary actions.  Parent shall cause Sub to fulfill all Sub's obligations under, and pursuant to, this Agreement.  Nothing in this Agreement shall require Parent, the Surviving Corporation or any other subsidiary of Parent to sell, hold separate, license or otherwise dispose of any assets or conduct their business in a specified manner, or agree or proffer to sell, hold separate, license or otherwise dispose of any assets or conduct their business in a specified manner, or permit or agree to the sale, holding separate, licensing or other disposition of, any assets of Parent, the Surviving Corporation or any other subsidiary of Parent or the Company, whether as a condition to obtaining any approval from, or to avoid potential

litigation or administrative action by, a Governmental Entity or any other person or for any other reason.

6.7.    <u>Notification of Certain Matters; Litigation</u>.   Each party shall give prompt notice to the other parties of (a) the occurrence or non-occurrence of any event of which such party has knowledge the occurrence or non-occurrence of which would cause any representation or warranty made by such party in this Agreement to be untrue or inaccurate in any material respect at any time from the date hereof to the Effective Time, (b) any Offer Condition that is unsatisfied at any time from the date hereof to the Acceptance Time of which such party has knowledge (other than the condition contained in clause (i) of the first paragraph of the Offer Conditions, as to which such notice shall be given if such condition is unsatisfied as of any scheduled expiration date of the Offer), and (c) any material failure of such party or any of its Representatives to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder of which such party has knowledge; <u>provided</u>, <u>however</u>, that no such notification shall affect the representations, warranties, covenants or agreements of the parties, the conditions to the obligations of the parties under this Agreement or the remedies available to the party receiving such notification.   Without limiting the foregoing, each party shall, within twenty-four (24) hours after it has notice of any of the following notify the other parties of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, (ii) any notice or other communication from any Governmental Entity in connection with the transactions contemplated by this Agreement, and (iii) any actions, suits, claims, investigations or proceedings instituted or threatened against such party or any of its directors, officers or Affiliates, including by any stockholder of such party, before any court or Governmental Entity, relating to or involving or otherwise affecting the such party or any of its Subsidiaries which, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to this Agreement or relating to this Agreement or the transactions contemplated hereby, or seeking damages or discovery in connection with such transactions.   Parent shall have the right to participate in, but not control, the defense of any such actions, suits, claims, investigations or proceedings under clause (iii) above with respect to the Company, and the Company shall consult with Parent regarding the defense or settlement of any such actions, suits, claims, investigations or proceedings and shall consider Parent's views with respect to such actions, suits, claims, investigations or proceedings.

6.8.    <u>Indemnification</u>.

(a)     Parent agrees that any rights to indemnification or exculpation (including the payment of reasonable attorney's fees and expenses in advance of the final disposition of any claim, action, suit, proceeding or investigation) now existing in favor of the current or former directors or officers of the Company and the current or former directors or officers of each Company Subsidiary (the "<u>Indemnified Parties</u>" and, each, an "<u>Indemnified Party</u>") as provided in their respective organizational documents, in effect as of the date hereof, with respect to matters occurring at or prior to the Effective Time shall survive the Merger and shall continue in full force and effect for a period of six (6) years after the Effective Time, and Parent guarantees any such obligations of the Surviving Corporation.   During such period, Parent shall not, nor shall it permit the Surviving Corporation to, amend, repeal or otherwise modify such provisions for indemnification in any manner that would materially and adversely affect the rights

53

thereunder of individuals who at any time on or prior to the Effective Time were directors or officers of the Company or directors or officers of any of Company Subsidiary in respect of actions or omissions occurring at or prior to the Effective Time (including, without limitation, the transactions contemplated by this Agreement), unless such modification is required by Law; provided, however, that in the event any claim or claims are asserted or made either prior to the Effective Time or within such six (6) year period, all rights to indemnification in respect of any such claim or claims shall continue until disposition of any and all such claims.  Parent guarantees the payment of any obligation of the Surviving Corporation to indemnify an Indemnified Party.

(b)     Subject to the next sentence, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, (i) maintain, at no expense to the beneficiaries, in effect for six (6) years from the Effective Time, the current policies of the directors' and officers' liability insurance maintained by the Company (the "Current D&O Insurance") with respect to matters existing or occurring at or prior to the Effective Time (including the transactions contemplated by this Agreement), so long as the annual premium therefor would not be in excess of three hundred percent (300%) of the last annual premium paid prior to the Effective Time (such three hundred percent (300%), the "Maximum Premium"), or (ii) purchase a six (6) year extended reporting period endorsement with respect to the Current D&O Insurance (a "Reporting Tail Endorsement") and maintain such endorsement in full force and effect for its full term, provided, however, that prior to the Surviving Corporation taking any actions in clauses (i) or (ii) above, Parent shall be provided the opportunity to purchase, in lieu thereof, a substitute policy with the same coverage limits and substantially similar terms as in the Reporting Tail Endorsement proposed to be purchased by the Surviving Corporation.  If the Company's or the Surviving Corporation's existing insurance expires, is terminated or canceled during such six (6) year period or exceeds the Maximum Premium, the Surviving Corporation shall obtain, and Parent shall cause the Surviving Corporation to obtain, as much directors' and officers' liability insurance as can be obtained for the remainder of such period for an annualized premium not in excess of the Maximum Premium, on terms and conditions no less advantageous to the Indemnified Parties than the Company's existing directors' and officers' liability insurance.

(c)     In the event that Parent or the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or a substantial portion of its properties and other assets to any Person, then, and in each such case, Parent or the Surviving Corporation, as applicable, shall cause proper provision to be made so that such successors and assigns shall assume the obligations set forth in this Section 6.8.

(d)     The provisions of this Section 6.8 are intended to be for the benefit of, and will be enforceable by, each Indemnified Party, his or her heirs and his or her Representatives and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have from the Company or any other Person by contract or otherwise.

54

6.9.    <u>Directors</u>.

(a)    Promptly upon the first acceptance for payment pursuant to the Offer of Shares that represent at least a majority of the issued and outstanding Shares, and the transfer of funds to a paying agent to cover the Closing Amount with respect to such Shares, Parent shall be entitled to designate such number of directors on the Company Board of Directors as will give Parent, subject to compliance with Section 14(f) of the Exchange Act, representation on the Company Board of Directors equal to at least that number of directors, rounded up to the next whole number, which is the product of (x) the total number of directors on the Company Board of Directors (giving effect to the directors elected pursuant to this sentence) multiplied by (y) the percentage that (I) such number of Shares so accepted for payment by Sub and with respect to which funds were transferred to a paying agent to cover the Closing Amount plus the number of Shares otherwise owned by Parent, Sub, or any other subsidiary of Parent bears to (II) the number of such Shares outstanding, and the Company shall, at such time, cause Parent's designees to be so elected; <u>provided</u>, <u>however</u>, that in the event that Parent's designees are appointed or elected to the Company Board of Directors, until the Effective Time, the Company Board of Directors shall have at least three (3) directors who are directors on the date of this Agreement and who are not officers of the Company and are independent directors for purposes of The Nasdaq Stock Market listing requirements (the "<u>Independent Directors</u>"); and <u>provided</u>, <u>further</u>, that, in such event, if the number of Independent Directors shall be reduced below three (3) for any reason whatsoever, any remaining Independent Directors (or Independent Director, if there shall be only one remaining) shall be entitled to designate persons to fill such vacancies who shall be deemed to be Independent Directors for purposes of this Agreement or, if no Independent Directors then remain, the other directors shall designate three persons to fill such vacancies who are not officers or affiliates of the Company and are independent directors for purposes of The Nasdaq Stock Market listing requirements, Parent or Sub, and such persons shall be deemed to be Independent Directors for purposes of this Agreement.  At such time, the Company shall, upon Parent's request, also cause persons elected or designated by Parent to constitute the same percentage (rounded up to the next whole number) as is on the Company Board of Directors of (i) each committee of the Company Board of Directors, (ii) each board of directors (or similar body) of each of the Company's Subsidiaries, and (iii) each committee (or similar body) of each such board, in each case only to the extent required by applicable Law or the rules of any stock exchange on which the Shares are listed.  Subject to applicable Law, the Company shall take all action requested by Parent necessary to effect any such election, including mailing to its stockholders the Information Statement containing the information required by Section 14(f) of the Exchange Act and Rule 14f-1 promulgated thereunder, and the Company shall make such mailing with the mailing of the Schedule 14D-9 (provided that Parent and Sub shall have provided to the Company on a timely basis, and shall be solely responsible for, all information required to be included in the Information Statement with respect to Parent's and Sub's designees).  In connection with the foregoing, the Company shall promptly, at the option of Sub, either increase the size of the Company Board of Directors or obtain the resignation of such number of its current directors, or both, as is necessary to enable Sub's designees to be elected or appointed to the Company Board of Directors as provided above.

(b)    Notwithstanding anything in this Agreement to the contrary, if Parent's designees constitute a majority of the Company Board of Directors after the Acceptance Time and prior to the Effective Time, then the affirmative vote of a majority of the Independent

55

Directors (or if only one (1) exists, then the vote of such Independent Director) shall be required to (i) amend or terminate this Agreement by the Company, (ii) exercise or waive any of the Company's rights, benefits or remedies hereunder, if such action would materially and adversely affect holders of Shares other than Parent or Sub, (iii) amend the certificate of incorporation or bylaws of the Company, or (iv) take any other action of the Company Board of Directors under or in connection with this Agreement or the transactions contemplated hereby; provided, however, that if there shall be no Independent Directors as a result of such persons' deaths, disabilities or refusal to serve, then such actions may be effected by majority vote of the entire Company Board of Directors.

6.10.    401(k).  Except with the prior written consent of Parent, during the period from the date of this Agreement to the Effective Time, the Company shall not (i) make any contribution to the Company's 401(k) plan other than as consistent with past practice or required under the terms of such plan as in effect on the date of this Agreement, or (ii) make any required contribution to the Company's 401(k) plan in Shares.  If requested by Parent in writing prior to the scheduled expiration date of the Offer, the Company shall, not later than the day before the day on which the Acceptance Time occurs (but subject to the occurrence of the Acceptance Time), terminate the Company's 401(k) plan.

6.11.    Employee Benefits.

(a)      Each employee of the Company as of the Acceptance Time (i) who is a participant in the Company's performance-based Incentive Compensation Plan (the "Incentive Compensation Plan") shall be entitled to receive from the Company, the Surviving Corporation or the Parent, as the case may be, the amount of any bonus payable to such employee under the Incentive Compensation Plan for calendar year 2011, calculated assuming target achievement by the Company and such employee of all applicable performance goals, if any, and (ii) who is a participant in the Company's Account Manager, Regional Sales Director and National Sales Director Field Sales Incentive Compensation Plan for Trimester 3 (September — December 2011) (the "Sales Incentive Compensation Plan" and together with the Incentive Compensation Plan, the "IC Plans") shall be entitled to receive from the Company, the Surviving Corporation or the Parent, as the case may be, the greater of (y) the amount of any bonus payable to such employee under the Sales Incentive Compensation Plan for such trimester, calculated assuming target achievement by the Company and such employee of all applicable performance goals, if any, and (z) the actual amount of goal attainment for such employee under such plan.  The amount of bonus payable under this Section 6.11(a)(i) or (ii) herein shall be paid at the earlier of (i) such time as such bonus otherwise would have been paid to such employee by the Company consistent with past practice and (ii) such time as the employee is terminated by the Surviving Corporation or Parent.  Section 6.11(a) of the Company Disclosure Letter sets forth the 2011 target bonus amounts and percentages for each employee as of the date of this Agreement.  In addition, each such employee shall have an aggregate potential bonus opportunity for calendar year 2012 no less favorable than the percentage bonus opportunity available to such employee in 2011, as set forth in Section 6.11(a) of the Company Disclosure Letter.

(b)      At least until the first anniversary of the Effective Time, each employee of the Company who continues to be employed by the Surviving Corporation during such period (a "Continuing Employee") shall be provided a base salary at a rate no less than the rate of the

56

annual base salary provided to such Continuing Employee on the date hereof and employee benefits that are substantially comparable in the aggregate to the benefits provided to similarly situated Parent employees based on levels of responsibility.

(c)        Each Continuing Employee who participates in (or is otherwise eligible for) any such Company plan immediately prior to the Acceptance Time will receive service credit for all periods of employment with the Company or Company Subsidiaries, as applicable, prior to the Effective Time for purposes of vesting, eligibility and (only for purposes of determining the amount of vacation and Severance (as defined in Section 6.11(d) below)) benefit levels under any Parent employee plan in which such employee participates after the Effective Time, to the same extent and for the same purposes thereunder as such service was recognized under an analogous Company compensation plan in effect on the date hereof.   If on or after the Effective Time, any Continuing Employee becomes covered under any benefit plan providing medical, dental, health, pharmaceutical or vision benefits (a "Successor Plan"), other than the plan in which he or she participated immediately prior to the Effective Time (a "Prior Plan"), Parent shall use its commercially reasonable efforts to ensure that (i) such Continuing Employee shall not be subject to any restrictions or limitations with respect to pre-existing condition exclusions, waiting periods and actively-at-work requirements (except to the extent such exclusions or requirements were applicable under the corresponding Prior Plan) and (ii) such Continuing Employee shall be permitted to take into account any eligible expenses incurred by such employee and his or her covered dependents during the plan year in which the employee elects to be covered under the Successor Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such employee and/or his or her covered dependents for that year, to the extent that such expenses were incurred during the applicable plan year in which such employee or covered dependent was covered under a corresponding Prior Plan.

(d)        Parent shall or shall cause the Surviving Corporation to provide severance benefits ("Severance") to each Continuing Employee whose employment is terminated by the Surviving Corporation without Cause (as defined in this Section 6.11(d)) or by reason of a reduction in the workforce or job elimination, in each case at any time prior to the first anniversary of the Effective Time, other than an employee who is eligible for participation in the Company's Executive Severance Pay Program, or who has a binding contractual right to severance benefits pursuant to any agreement with the Company, (each a "Terminated Employee"), subject to the Terminated Employee's providing a timely and effective release of claims in favor of the Company, the Surviving Corporation and the Parent (the "Employee Release").   Severance shall be paid to such Terminated Employee in an amount equal to twelve weeks Base Pay (as defined in this Section 6.11(d)) plus an additional week of base pay for each year of continuing service by such Terminated Employee to the Company, the Surviving Corporation, Parent and its Affiliates.   For the avoidance of doubt, a Terminated Employee's years of continuing service shall be rounded up to the nearest whole year in calculating the number of additional weeks of Base Pay that are added to the twelve weeks of Base Pay. Severance shall be paid to each Terminated Employee in the form of a lump sum cash payment, as soon as reasonably practicable (taking into account the requirement of a release) following the Terminated Employee's date of termination.   For purposes of this Section 6.11(d), "Base Pay" shall mean the weekly base salary of the Terminated Employee on the date of his or her termination of employment.   No such Severance payments shall be made if the Terminated

57

Employee is terminated for Cause. "Cause" shall mean (i) fraud, misappropriation or embezzlement against the Surviving Corporation, Parent or its Affiliates, (ii) falsification of records or similar acts, (iii) gross neglect of or willful failure to perform substantial job duties, (iv) commission of a felony or other crime involving dishonesty, violence or moral turpitude, or (v) insubordination, defined as the refusal by an employee to follow management's rational and lawful instructions regarding a job-related matter.

(e)      If a Terminated Employee elects COBRA continuation coverage, then for a period of three months beginning on the first day of the month immediately following the month of the Terminated Employee's date of termination or until the Terminated Employee's eligibility for such coverage ceases, if earlier, Parent shall or shall cause the Surviving Corporation to (i) pay the full cost of such coverage or (ii) if Parent determines that payment of such cost could result in any penalty or tax to Parent or the Surviving Corporation, pay additional severance to the Terminated Employee in an amount equal to such cost.  In addition, Parent shall or shall cause the Surviving Corporation to provide outplacement services to each Terminated Employee for a period of six months and for each employee who is eligible for participation in the Company's Executive Severance Pay Program for a period of twelve months. All payments to or on behalf of a Terminated Employee under this Section 6.11 shall be conditioned on the employee providing an Employee Release.

(f)      Nothing contained herein, whether express or implied, shall be construed or applied so as to require Parent or any of its subsidiaries to continue any plan or to continue the employment of any Person.  No provision of this Agreement shall be construed to create any right to any compensation or benefits on the part of any Continuing Employee or other future, present or former employee of Parent, the Surviving Corporation or their respective subsidiaries or be deemed to make any employee of the parties or their respective subsidiaries a third party beneficiary of this Agreement, including this Section 6.11, or any rights relating hereto.  No provision of this Section 6.11 is intended to, or shall, constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise or shall be construed or applied so as to result in a duplication of benefits or payments.

6.12.    State Takeover Laws.  If any "fair price," "business combination" or "control share acquisition" statute or other similar statute or regulation is or becomes applicable to any of the transactions contemplated by this Agreement, the parties hereto shall use their respective commercially reasonable efforts to (a) take such actions as are reasonably necessary so that the transactions contemplated hereunder may be consummated as promptly as practicable on the terms contemplated hereby and (b) otherwise take all such actions as are reasonably necessary to eliminate or minimize the effects of any such statute or regulation on such transactions.

6.13.    FIRPTA Certificate.  Prior to each of the Acceptance Time and the Effective Time, the Company shall execute and deliver to Parent and Sub a certificate (in a form reasonably acceptable to Parent and Sub) conforming to the requirements of Treasury Regulations Sections 1.1445-2(c)(3) and 1.897-2(h).

58

SECTION 7 - CONDITIONS PRECEDENT TO THE OBLIGATION OF PARTIES TO CONSUMMATE THE MERGER

7.1.    <u>Conditions to Obligations of Each Party to Effect the Merger</u>.  The respective obligations of each party to this Agreement to effect the Merger shall be subject to the satisfaction or written waiver at or prior to the Closing Date of the following conditions:

(a)    <u>Stockholder Approval</u>.  This Agreement shall have been adopted by the requisite vote of the holders of the Shares, to the extent required pursuant to the requirements of the certificate of incorporation and the DGCL.

(b)    <u>Statutes; Court Orders</u>.  No statute, rule, executive order or regulation shall have been enacted, issued, enforced or promulgated by any Governmental Entity which prohibits the consummation of the Merger, and there shall be no order or injunction of a court of competent jurisdiction in effect preventing or making illegal the consummation of the Merger.

(c)    <u>Consummation of the Offer</u>.  The Shares validly tendered and not withdrawn pursuant to the Offer shall have been accepted for payment pursuant to the Offer and the terms of this Agreement; provided, however, that neither Parent nor Sub shall be entitled to assert the failure of this condition if, in breach of this Agreement or the terms of the Offer, Sub shall have failed to purchase any of the Shares validly tendered and not withdrawn pursuant to the Offer.

SECTION 8 - TERMINATION, AMENDMENT AND WAIVER

8.1.    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time before the Effective Time, whether before or after stockholder approval thereof:

(a)    By mutual written consent of Parent and the Company duly authorized by the Board of Directors of Parent and the Company Board of Directors; or

(b)    By either Parent or the Company:

(i)    if a court of competent jurisdiction or other Governmental Entity shall have issued an order, decree or ruling or taken any other action, and such order, decree or ruling or other action shall have become final and non-appealable, or there shall exist any statute, rule or regulation, in each case, permanently restraining, enjoining or otherwise prohibiting (collectively, "<u>Restraints</u>") the consummation of the Offer or the Merger; provided, however, that the party seeking to terminate this Agreement pursuant to this Section 8.1(b)(i) shall have used its reasonable best efforts to prevent the entry of and to remove such Restraints and complied with Section 6.6; or

(ii)    if the Acceptance Time has not occurred by the date that is four (4) months after the date hereof (the "<u>Outside Date</u>"); provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall not be available to any party whose action or failure to fulfill any obligation under this Agreement has been the principal cause of, or resulted in, the failure of the Acceptance Time to occur by such date; or

59

(c)     By Parent if, (i) there has been a breach by the Company of, or inaccuracy in, any representation, warranty, covenant or agreement of the Company set forth in this Agreement (A) which would give rise to the failure of a condition set forth in clause (c) or (d) of Annex I and (B) such breach or inaccuracy is not capable of being cured; or (ii) due to an occurrence or circumstance that has resulted in a failure to satisfy any Offer Condition that is not capable of being cured, Sub shall have allowed the Offer to terminate, without having accepted any Shares for payment, unless such occurrence or circumstance shall have been caused by or resulted from the failure of Parent or Sub to perform, in any material respect, any of their covenants or agreements contained in this Agreement or the breach by Parent or Sub of any of their representations or warranties contained in this Agreement; provided, however, that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(c) if Parent is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(d)     By the Company if, prior to the Acceptance Time, there has been a breach by Parent or Sub of, or any inaccuracy in, any representation, warranty, covenant or other agreement of Parent or Sub set forth in this Agreement, which breach or inaccuracy is reasonably expected to prevent Parent or Sub from performing in all material respects its obligations and covenants required to be performed by it under this Agreement (and such breach or inaccuracy is not capable of being cured); provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(d) if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(e)     By Parent, at any time prior to the Acceptance Time, if the Company Board of Directors shall have (A) effected an Adverse Recommendation Change, (B) recommended to the Company's stockholders an Acquisition Proposal, or publicly announced its intention to enter into an Alternative Acquisition Agreement, (C) failed to publicly reaffirm its recommendation of this Agreement or the Offer within two (2) business days of Parent's request, or (D) failed to recommend against, or taken a neutral position with respect to, a tender or exchange offer related to an Acquisition Proposal in any position taken pursuant to Rules 14d-9 and 14e-2 under the Exchange Act; or

(f)     At any time prior to the Acceptance Time, by the Company, if the Company has received a Superior Proposal, which, after giving effect to all of the adjustments that may be committed to by Parent pursuant to Section 5.2, the Company Board of Directors determines in good faith (after consultation with its financial advisors) continues to constitute a Superior Proposal, provided the Company shall not have knowingly materially violated or breached any of its obligations under Section 5.2 in connection with the making of such Superior Proposal; or

(g)     By Parent, if upon a vote at a duly held meeting to obtain the Company Stockholder Approval, such approval is not obtained, provided, however, that Parent may not terminate this Agreement under this Section 8.1(g) if the Shares owned by Parent or any of its subsidiaries shall not have been voted in favor of adopting this Agreement.

60

8.2.    Effect of Termination.

(a)     Any termination of this Agreement under Section 8.1 hereof will be effective immediately upon the delivery of a written notice of the terminating party to the other party hereto and, if then due, payment of the Termination Fee.  In the event of termination of this Agreement as provided in Section 8.1 hereof, this Agreement shall forthwith become null and void and be of no further force or effect and there shall be no liability on the part of Parent, Sub or the Company (or any of their respective directors, officers, employees, stockholders, agents or representatives), except as set forth in the penultimate sentence of Section 6.4, SECTION 8 and SECTION 9, each of which shall remain in full force and effect and survive any termination of this Agreement; provided, however, that nothing herein shall relieve any party from liability for fraud or intentional breach of any of its representations, warranties, covenants or agreements set forth in this Agreement (it being understood that the failure of Parent or Sub to accept for payment and pay for the Shares validly tendered and not withdrawn pursuant to the Offer promptly following the Expiration Date in the event that all Offer Conditions have been satisfied or, to the extent permitted, waived, as of the Expiration Date shall be deemed an intentional breach by Parent and Sub pursuant to this Agreement). Notwithstanding anything to the contrary in this Agreement, in no event shall the Company be required to pay the Termination Fee on more than one occasion.

(b)     If Parent shall have terminated this Agreement pursuant to Section 8.1(e), the Company shall promptly pay Parent a termination fee (the "Termination Fee") of $10,000,000, but in no event later than two (2) business days after the date of receipt of Parent's termination notice.  If the Company terminates this Agreement pursuant to Section 8.1(f), it shall, in connection with and as a condition to such termination, pay Parent the Termination Fee.  If Parent terminates this Agreement pursuant to Section 8.1(c)(ii) due to the failure to satisfy the Minimum Condition or 8.1(c)(i) due to a material breach of Section 5.2, or if the Company terminates pursuant to Section 8.1(b)(ii), and in each case at or prior to the time of termination an Acquisition Proposal has been made (and, with regard to any termination pursuant to Section 8.1(c)(ii), such Acquisition Proposal has been publicly made), then the Company shall pay Parent the Termination Fee upon signing a definitive agreement for a transaction relating to an Acquisition Proposal (or, if earlier, the consummation of a transaction contemplated by an Acquisition Proposal), provided such signing (or, if earlier, such consummation) occurs within nine (9) months of the termination date.  All amounts due hereunder shall be payable by wire transfer in immediately available funds to such account as Parent may designate in writing to the Company.  If the Company fails to promptly make any payment required under this Section 8.2(b) and Parent commences a suit to collect such payment, the Company shall indemnify Parent for its fees and expenses (including attorneys fees and expenses) incurred in connection with such suit and shall pay interest on the amount of the payment at the prime rate of Bank of America (or its successors or assigns) in effect on the date the payment was payable pursuant to this Section 8.2(b). For purposes of this Section 8.2(b) only, the term "Acquisition Proposal" shall have the meaning assigned to such term in Section 5.2(a) except that all references to "15%" therein shall be deemed to be references to "50%."

8.3.    Fees and Expenses.  Except as set forth in Section 8.2, all fees, costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses whether or not the Merger is consummated.

61

8.4.    <u>Amendment</u>.  Subject to applicable Law and as otherwise provided in the Agreement, this Agreement may be amended, modified and supplemented in any and all respects, whether before or after any vote of the stockholders of the Company contemplated hereby, by written agreement of the parties hereto, by action taken by their respective Boards of Directors, but after the Tender Completion Time, no amendment shall be made which decreases the Merger Consideration and, after the approval of this Agreement by the stockholders, no amendment shall be made which by Law requires further approval by such stockholders without obtaining such further approval.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

8.5.    <u>Waiver</u>.  At any time prior to the Effective Time, either party hereto may (a) extend the time for the performance of any of the obligations or other acts of the other party hereto or (b) waive compliance with any of the agreements of the other party or any conditions to its own obligations, in each case only to the extent such obligations, agreements and conditions are intended for its benefit; provided, that any such extension or waiver shall be binding upon a party only if such extension or waiver is set forth in a writing executed by such party.

## SECTION 9 - MISCELLANEOUS

9.1.    <u>No Survival</u>.  None of the representations and warranties contained herein shall survive the Effective Time.

9.2.    <u>Notices</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by facsimile transmission (with receipt confirmed by telephone or by automatic transmission report) or by electronic mail (with receipt confirmed by telephone), or two (2) business days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

(a)      if to Parent or Sub, to:

Cubist Pharmaceuticals, Inc.
65 Hayden Avenue
Lexington, Massachusetts 02421
Attn:       Tamara L. Joseph, Senior Vice President, General Counsel and Secretary
Telephone:   (781) 860-8660

with a copy to:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts  02199
Attn:       Paul M. Kinsella
Email:      paul.kinsella@ropesgray.com
Telephone:   (617) 951-7921
Facsimile:   (617) 235-0822

62

(b)      if to the Company, to:

        Adolor Corporation
        700 Pennsylvania Drive
        Exton, PA 19341
        Attn:      John M. Limongelli, Senior Vice President, General Counsel & Secretary
        Email:     jlimongelli@adolor.com
        Telephone:  (484) 595-1963

        with a copy to:

        Dechert LLP
        2929 Arch Street
        Philadelphia, Pennsylvania 19104
        Attn:   James A. Lebovitz & Ian A. Hartman
        Email:  james.lebovitz@dechert.com & ian.hartman@dechert.com
        Telephone:    (215) 994-4000
        Facsimile:     (215) 994-2222

Any party may by notice given in accordance with this Section 9.2 to the other parties designate updated information for notices hereunder.

9.3.     <u>Entire Agreement</u>.  This Agreement (including the Schedules, Annexes and Exhibits hereto and the documents and instruments referred to herein) contains the entire agreement among the parties with respect to the Offer, the Merger and related transactions, and supersedes all prior agreements, written or oral, among the parties with respect thereto, other than (a) the Confidentiality Agreement, which  shall survive and remain in full force and effect and (b) the Tender and Voting Agreements with the Principal Stockholders.

9.4.     <u>Governing Law</u>.  This Agreement and all actions arising under or in connection therewith shall be governed by and construed in accordance with the Laws of the State of Delaware, regardless of the Laws that might otherwise govern under applicable principles of conflicts of law thereof.

9.5.     <u>Binding Effect; No Assignment; No Third-Party Beneficiaries</u>.

(a)      This Agreement shall not be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, except that Sub may assign, at no additional cost or expense to the Company, in its sole discretion and without the consent of any other party, any or all of its rights, interests and obligations hereunder to (i) Parent, (ii) to Parent and one or more direct or indirect wholly-owned subsidiaries of Parent, or (iii) to one or more direct or indirect wholly-owned subsidiaries of Parent (each, an "<u>Assignee</u>"). Any such Assignee may thereafter assign, in its sole discretion and without the consent of any other party, any or all of its rights, interests and obligations hereunder to one or more additional Assignees; <u>provided</u>, <u>however</u>, that in connection with any assignment to an

63

Assignee, Parent and Sub (or the assignor) shall agree to remain liable for the performance by Parent and Sub (and such assignor, if applicable) of their obligations hereunder.  Subject to the preceding sentence, but without relieving any party hereto of any obligation hereunder, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

(b)     Nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than Parent, Sub and the Company and their respective successors and permitted assigns any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, other than (i) Section 6.8, which shall confer third-party beneficiary rights to the parties identified therein, and (ii) the right of the Company's stockholders to receive the Closing Amount at the Acceptance Time or the Merger Consideration at the Effective Time.

9.6.    <u>Counterparts and Signature</u>.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties, it being understood that all parties need not sign the same counterpart.  This Agreement may be executed and delivered by facsimile or by an electronic scan delivered by electronic mail.

9.7.    <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.  The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

9.8.    <u>Submission to Jurisdiction; Waiver</u>.  Each of the Company, Parent and Sub irrevocably agrees that any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby or for recognition and enforcement of any judgment in respect hereof brought by the other party hereto or its successors or assigns shall be brought and determined in the state courts of the State of Delaware or, the United States District Court for the District of Delaware, and each of the Company, Parent and Sub hereby irrevocably submits with regard to any action or proceeding for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts.  Each of the Company, Parent and Sub hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and (c) to the fullest extent permitted by applicable Law, that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

9.9.    <u>Specific Performance</u>.  Notwithstanding anything in this Agreement to the contrary, the parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at Law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any state court of the State of Delaware or the United States District Court for the District of Delaware, this being in addition to any other remedy to which they are entitled at Law or in equity.

9.10.    <u>Rules of Construction; Certain Definitions</u>.

(a)    Except where expressly stated otherwise in this Agreement, the following rules of interpretation apply to this Agreement:  (i) "either" and "or" are not exclusive and "include", "includes" and "including" are not limiting; (ii) "hereof", "hereto", "hereby", "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "date hereof" refers to the date set forth in the initial caption of this Agreement; (iv) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if" (v) descriptive headings, the table of defined terms and the table of contents are inserted for convenience only and do not affect in any way the meaning or interpretation of this Agreement; (vi) definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; (vii) references to a person are also to its permitted successors and assigns; (viii) references to an "Article", "Section", "Exhibit", "Annex" or "Schedule" refer to an Article or Section of, or an Exhibit, Annex or Schedule to, this Agreement; (ix) references to "$" or otherwise to dollar amounts refer to the lawful currency of the United States; (x) references to a federal, state, local or foreign statute or Law include any rules, regulations and delegated legislation issued thereunder; and (xi) references to a communication by a regulatory agency include a communication by the staff of such regulatory agency.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party hereto.  No summary of this Agreement prepared by any party shall affect the meaning or interpretation of this Agreement.  The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or ruling of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(b)    The following definitions apply to this Agreement: (i) references to the "<u>Company's knowledge</u>" and words of similar import shall mean the knowledge of the executive officers of the Company listed on Section 9.10(b) of the Company Disclosure Letter who are primarily responsible for the matter(s) in question; (ii) references to the number of Shares then outstanding "<u>on a fully diluted basis</u>" means the number of Shares then outstanding, together with the Shares pursuant to Company Restricted Stock and Shares that the Company may be required to issue pursuant to then outstanding Time-Vested DSUs, Performance-Based DSUs or Company Option whether or not vested or then outstanding, provided that the exercise price of an option is not greater than $2 above the sum of (x) the Closing Amount and (y) the CPR

Payment Amount; (iii) the term "<u>Governmental Entity</u>" shall mean any foreign or domestic arbitrator, court, nation, government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial regulatory or administrative functions of, or pertaining to, government; (iv) the term "<u>business day</u>" shall mean any day on which the principal offices of the SEC in Washington, DC are open to accept filings other than a day on which banking institutions located in New York, New York are permitted or required by Law to remain closed; and (v) the term "<u>person</u>" shall mean any individual, corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization, entity or Governmental Entity.

9.11.   <u>No Waiver; Remedies Cumulative</u>.  No failure or delay on the part of any party hereto in the exercise of any right hereunder will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty or agreement herein, nor will any single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive to, and not exclusive of, any rights or remedies otherwise available.

9.12.   <u>Waiver of Jury Trial</u>.  EACH OF PARENT, COMPANY AND SUB HEREBY IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENT OR ACTION RELATED HERETO OR THERETO.

*[Remainder of Page Intentionally Left Blank]*

66

IN WITNESS WHEREOF, the parties have executed this Agreement and Plan of Merger under seal as of the date first stated above.

ADOLOR CORPORATION

By:  /s/ Michael R. Dougherty
     Name:   Michael R. Dougherty
     Title:    President & CEO

[Signature Page to Agreement and Plan of Merger]

CUBIST PHARMACEUTICALS, INC.


By:   /s/ Michael W. Bonney
     Name:   Michael W. Bonney
     Title:      President and Chief Executive Officer


FRD ACQUISITION CORPORATION


By:   /s/ Michael W. Bonney
     Name:   Michael W. Bonney
     Title:   President


[Signature Page to Agreement and Plan of Merger]

**Annex I**

**Conditions to the Offer**

Notwithstanding any other provisions of the Offer, and in addition to (and not in limitation of) Sub's rights to extend and amend the Offer at any time in its sole discretion (subject to the provisions of the Merger Agreement), Sub shall not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-l(c) under the Exchange Act (relating to Sub's obligation to pay for or return tendered Shares promptly after termination or withdrawal of the Offer), pay for, and may delay the acceptance for payment of or, subject to the restriction referred to above, the payment for, any validly tendered Shares if (i) immediately prior to the expiration of the Offer (as extended in accordance with the Merger Agreement) the number of Shares validly tendered (excluding Shares tendered pursuant to unfulfilled guaranteed delivery procedures), and not validly withdrawn does not equal at least a majority of the Shares then outstanding on a fully diluted basis on the date of purchase (the "Minimum Condition"); (ii) immediately prior to the expiration of the Offer (as extended in accordance with the Merger Agreement) any waiting period (and any extensions thereof) and any approvals or clearances applicable to the Offer or the consummation of the Merger under the HSR Act and any provisions under applicable comparable Laws of foreign jurisdictions shall not have expired, or been terminated or obtained, as applicable; or (iii) any of the following events shall occur and be continuing:

(a)      there shall be pending any suit, action or proceeding by any Governmental Entity (i) seeking to prohibit or impose any material limitations on Parent's or Sub's ownership or operation (or that of any of their respective subsidiaries or affiliates) of all or any material portion of their or the Company's or the Company Subsidiaries' businesses or assets, taken as a whole, or to compel Parent or Sub or their respective subsidiaries or affiliates to dispose of or hold separate any material portion of the business or assets of the Company or Parent or their respective subsidiaries, (ii) seeking to prohibit or make illegal the making or consummation of the Offer or the Merger or the performance of any of the other transactions contemplated by the Merger Agreement, (iii) seeking to impose material limitations on the ability of Sub, or render Sub unable, to accept for payment, pay for or purchase some or all of the Shares pursuant to the Offer or the Merger, (iv) seeking to impose material limitations on the ability of Sub or Parent effectively to exercise full rights of ownership of the Shares, including, without limitation, the right to vote the Shares purchased by it on all matters properly presented to the Company's stockholders, or (v) seeking to require divestiture by Parent or any of its subsidiaries or affiliates of the Shares;

(b)      there shall be any statute, rule, regulation, judgment, order or injunction enacted, entered, enforced, promulgated or deemed applicable in the good faith judgment of Parent based on advice of counsel, by or on behalf of a Government Entity, to the Offer, the Merger or any other transaction contemplated hereby, or any other action shall be taken by any Governmental Entity, that would reasonably be expected to result, directly or indirectly, in any of the consequences referred to in clauses (i) through (v) of paragraph (a) above;

Annex I - 1

(c)        (1) the representations and warranties of the Company contained in the Merger Agreement, other than those in Section 3.2, Section 3.3(a), (b) and (c), the first sentence of Section 3.8, Section 3.11(b) and Section 3.19, shall not be true and correct, without giving effect to the words "materially" or "material" or to any qualification based on the defined term "Company Material Adverse Effect," except where the failure to be so true and correct, individually or in the aggregate, does not have or would not reasonably be expected to have a Company Material Adverse Effect; (2) the representations and warranties of the Company contained in Section 3.2, clause (i) of Section 3.19 and Section 3.20 shall not be true and correct in all material respects; (3) the representations and warranties of the Company contained in Section 3.3(a), (b) and (c) shall not be true and correct; provided, however, that any deviation therein of not more than 25,000 Shares in the aggregate shall not be deemed to make such representations and warranties untrue or incorrect, (4) the representations and warranties of the Company contained in Sections 3.11(b) and 3.19 (except for clause (i)) shall not be true and correct except where the failure to be so true and correct, individually or in the aggregate, does not have or would not reasonably be expected to have a material adverse effect on the assets, properties, business, capitalization, results of operations, or financial condition of Parent and its subsidiaries, taken as a whole, or (5) the representations and warranties of the Company contained in the first sentence of Section 3.8 shall not be true and correct; provided that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clauses (1) - (5) as applicable) only as of such date or period.

(d)        the Company shall have breached or failed, in any material respect, to perform or to comply with any agreement, obligation or covenant to be performed or complied with by it under the Merger Agreement and such failure to perform or to comply shall not have been cured;

(e)        since the date of this Agreement, there shall have occurred any events, changes, circumstances, events or developments which have had, or which are reasonably likely to have or constitute, individually or in the aggregate, a Company Material Adverse Effect;

(f)        Parent and Sub shall have failed to receive a certificate executed by the Company's Chief Executive Officer or President on behalf of the Company, dated as of the scheduled expiration of the Offer, to the effect that the conditions set forth in paragraphs (c), (d), and (e) of this Annex I have not occurred; or

(g)        the Merger Agreement shall have been terminated in accordance with its terms.

The foregoing conditions are for the sole benefit of Parent and Sub, may be asserted by Parent or Sub regardless of the circumstances giving rise to such condition, and may be waived by Parent or Sub in whole or in part at any time and from time to time and in the sole discretion of Parent or Sub, subject in each case to the terms of the Merger Agreement. The failure by Parent or Sub at any time to exercise any of the foregoing rights shall not be deemed a waiver of any such right and, each such right shall be deemed an ongoing right which may be asserted at any time and from time to time.

The term "<u>Merger Agreement</u>" shall be deemed to refer to the Agreement to which this <u>Annex I</u> is annexed.  The other capitalized terms used in this <u>Annex I</u> shall have the meanings set forth in the Merger Agreement.

Annex I - 3

**Annex II**

## TENDER AND VOTING AGREEMENT

**THIS TENDER AND VOTING AGREEMENT** (this "Agreement") dated [                    ], 2011, is entered into between Cubist Pharmaceuticals, Inc., a Delaware corporation ("Parent"), FRD Acquisition Corporation, a Delaware corporation and direct or indirect wholly owned subsidiary of Parent ("Sub"), and                    , ("Stockholder"), with respect to (i) the shares of common stock, par value $0.0001 per share (the "Shares"), of Adolor Corporation a Delaware corporation (the "Company"), (ii) all securities exchangeable, exercisable or convertible into Shares, and (iii) any securities issued or exchanged with respect to such Shares, and upon any recapitalization, reclassification, merger, consolidation, spin-off, partial or complete liquidation, stock dividend, split-up or combination of the securities of the Company or upon any other change in the Company's capital structure, in each case whether now owned or hereafter acquired by the Stockholder (collectively, the "Securities").

### W I T N E S S E T H:

**WHEREAS**, Parent, Sub and the Company have entered into an Agreement and Plan of Merger dated as of the date hereof (the "Merger Agreement") pursuant to which Sub has agreed to make a tender offer described therein and thereafter merge with and into the Company (the "Merger") with the result that the Company becomes a wholly owned subsidiary of Parent;

**WHEREAS**, as of the date hereof, Stockholder beneficially owns and has the power to dispose of the Securities set forth on Schedule I hereto and has the power to vote the Shares set forth thereon;

**WHEREAS**, Parent and Sub desire to enter into this Agreement in connection with their efforts to consummate the acquisition of the Company;

**WHEREAS**, capitalized terms used in this Agreement and not defined have the meaning given to such terms in the Merger Agreement.

**NOW, THEREFORE**, in contemplation of the foregoing and in consideration of the mutual agreements, covenants, representations and warranties contained herein and intending to be legally bound hereby, the parties hereto agree as follows:

1.     Certain Covenants.

1.1     Lock-Up.  Subject to Section 1.5, except as contemplated by the Merger Agreement, Stockholder hereby covenants and agrees that between the date hereof and the Termination Date, Stockholder will not (a) directly or indirectly, sell, transfer, assign, pledge, hypothecate, tender, encumber or otherwise dispose of or limit its right to vote in any manner any of the Securities, or agree to do any of the foregoing, or (b) take any action which would have the effect of preventing or disabling Stockholder from performing its obligations under this Agreement.  Notwithstanding the foregoing, in connection with any transfer not involving or

Annex II - 1

relating to any Acquisition Proposal (as defined in the Merger Agreement), Stockholder may transfer any or all of the Securities as follows: (i) in the case of a Stockholder that is an entity, to any subsidiary, partner or member of Stockholder, and (ii) in the case of an individual Stockholder, to Stockholder's spouse, ancestors, descendants, estate or any trust for any of their benefits or to a charitable trust; provided, however, that in any such case, prior to and as a condition to the effectiveness of such transfer, (x) each person to which any of such Securities or any interest in any of such Securities is or may be transferred (a) shall have executed and delivered to Parent and Sub a counterpart to this Agreement pursuant to which such person shall be bound by all of the terms and provisions of this Agreement, and (b) shall have agreed in writing with Parent and Sub to hold such Securities or interest in such Securities subject to all of the terms and provisions of this Agreement, and (y) this Agreement shall be the legal, valid and binding agreement of such person, enforceable against such person in accordance with its terms.

       1.2      <u>No Solicitation</u>.  Between the date hereof and the Termination Date, except as permitted by Section 5.2 of the Merger Agreement, the Stockholder shall not and shall not authorize any agent, representative, affiliate, advisor, attorney, accountant or associate of Stockholder (collectively, "<u>Representatives</u>") to, directly or indirectly, take any action that the Company is prohibited from taking under Section 5.2 of the Merger Agreement.

       1.3      <u>Certain Events</u>.  This Agreement and the obligations hereunder will attach to the Securities and will be binding upon any person to which legal or beneficial ownership of any or all of the Securities passes, whether by operation of Law or otherwise, including without limitation, the Stockholder's successors or assigns.  This Agreement and the obligations hereunder will also attach to any additional Shares or other Securities of the Company issued to or acquired by the Stockholder.

       1.4      <u>Grant of Proxy; Voting Agreement</u>.

       (a)      The Stockholder has revoked or terminated any proxies, voting agreements or similar arrangements previously given or entered into with respect to the Securities and hereby irrevocably appoints Parent as proxy for Stockholder to vote the Securities for Stockholder and in Stockholder's name, place and stead, at any annual or special meeting, or at any adjournment thereof or pursuant to any consent of the stockholders of the Company, in lieu of a meeting or otherwise, whether before or after the Acceptance Time (as defined in the Merger Agreement), for the adoption of the Merger Agreement.  Parent acknowledges that the proxy granted hereby shall not be effective for any other purpose other than that specified in the previous sentence.  The parties acknowledge and agree that neither Parent, nor Parent's successors, assigns, subsidiaries, divisions, employees, officers, directors, stockholders, agents and affiliates shall owe any duty to, whether in law or otherwise, or incur any liability of any kind whatsoever, including without limitation, with respect to any and all claims, losses, demands, causes of action, costs, expenses (including reasonable attorney's fees) and compensation of any kind or nature whatsoever to the Stockholder in connection with or as a result of any voting by Parent of the Securities or any execution of any consent.  The parties acknowledge that, pursuant to the authority hereby granted under the irrevocable proxy, Parent may vote the Securities in furtherance of its own interests, and Parent is not acting as a fiduciary for the Stockholder.

Annex II - 2

(b)        Notwithstanding the foregoing grant to Parent of the irrevocable proxy, if Parent elects not to exercise its rights to vote the Securities pursuant to the irrevocable proxy, Stockholder agrees to vote the Securities during the term of this Agreement in favor of or give its consent to, as applicable, a proposal to adopt the Merger Agreement as described in Section 1.4 at any annual or special meeting or action of the stockholders of the Company in lieu of a meeting or otherwise.

(c)        This irrevocable proxy shall not be terminated by any act of the Stockholder or by operation of law, whether by the death or incapacity of the Stockholder or by the occurrence of any other event or events (including, without limiting the foregoing, the termination of any trust or estate for which Stockholder is acting as a fiduciary or fiduciaries or the dissolution or liquidation of any corporation or partnership).  If between the execution hereof and the Termination Date, Stockholder should die or become incapacitated, or if any trust or estate holding the Securities should be terminated, or if any corporation or partnership holding the Securities should be dissolved or liquidated, or if any other such similar event or events shall occur before the Termination Date, certificates representing the Securities shall be delivered by or on behalf of Stockholder in accordance with the terms and conditions of the Merger Agreement and this Agreement, and actions taken by Parent hereunder shall be as valid as if such death, incapacity, termination, dissolution, liquidation or other similar event or events had not occurred, regardless of whether or not Parent has received notice of such death, incapacity, termination, dissolution, liquidation or other event.

1.5        Tender of Securities.  Stockholder agrees, in exchange for the consideration described in the Merger Agreement, to tender the Shares beneficially owned as of the date hereof and set forth on Schedule I hereto for which Stockholder has sole dispositive power to Sub in the Offer as soon as practicable following the commencement of the Offer, and in any event not later than five (5) business days following the commencement of the Offer, and Stockholder shall not withdraw any such Shares so tendered unless the Offer is terminated; provided, however, that Stockholder shall have no duty or obligation to tender any Shares into the Offer if such action would cause Stockholder to incur liability under Section 16(b) of the Exchange Act.

1.6        Option.

(a)        On the terms and subject to the conditions set forth herein, Stockholder hereby grants to Parent an irrevocable option (the "Option") to purchase all of the right, title and interest of Stockholder in and to Stockholder's Securities with a price per share equal to the Offer Price; provided, however, that Stockholder shall have no duty or obligation to sell any Securities to Parent if such action would cause Stockholder to incur liability under Section 16(b) of the Exchange Act.  Parent may exercise the Option in whole, but not in part, if, but only if, (i) Sub has acquired Shares pursuant to the Offer and (ii) Stockholder has failed to tender into the Offer any Shares or shall have withdrawn the tender of any Shares into the Offer in breach of this Agreement.  Parent may exercise the Option at any time within the sixty (60) days following the date when such Option first becomes exercisable.

(b)        In the event that Parent is entitled to and wishes to exercise the Option, Parent shall send a written notice to Stockholder specifying the place and the date for the

Annex II - 3

closing of such purchase, which date shall be not more than sixty (60) days after the date of such notice; provided that in the event that prior notification to, or approval of, any Governmental Entity is required in connection with the exercise of the Option or there shall be in effect any preliminary or final injunction or other order issued by any Governmental Entity prohibiting the exercise of the Option, the period of time during which the date of the closing may be fixed shall be extended until the tenth (10th) day following the last date on which all required approvals shall have been obtained, all required waiting periods shall have expired or been terminated and any such prohibition shall have been vacated, terminated or waived.

(c)     At the closing of the purchase of Stockholder's Securities pursuant to exercise of the Option, simultaneously with the payment by Parent of the purchase price for Stockholder's Securities, such Stockholder shall deliver, or cause to be delivered, to the Sub certificates representing Securities duly endorsed to Parent or accompanied by stock powers or other transfer documents duly executed by the Company in blank, together with any necessary stock transfer stamps properly affixed, free and clear of all Encumbrances.

1.7     <u>Public Announcement</u>.  Stockholder shall consult with Parent before issuing any press releases or otherwise making any public statements with respect to the transactions contemplated herein and shall not issue any such press release or make any such public statement without the approval of Parent, except as may be required by Law, including any filings with the Securities and Exchange Commission (the "<u>SEC</u>") pursuant to the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>").  This Section 1.7 shall terminate and be null and void upon the earlier of (i) the Termination Date and (ii) consummation of the Merger.

1.8     <u>Disclosure</u>.  Stockholder hereby authorizes Parent and Sub to publish and disclose in any announcement or disclosure required by the SEC, The Nasdaq Stock Market or any other national securities exchange and in the Offer Documents and, if necessary, the Proxy Statement (each as defined in the Merger Agreement), (including all documents and schedules filed with the SEC in connection with either of the foregoing), its identity and ownership of the Securities and the nature of its commitments, arrangements and understandings under this Agreement.  Parent and Sub hereby authorize Stockholder to make such disclosure or filings as may be required by the SEC or The Nasdaq Stock Market or any other national securities exchange.

2.     <u>Representations and Warranties of Stockholder</u>.  Stockholder hereby represents and warrants to Parent and Sub, as of the date hereof and as of the date Sub purchases Shares pursuant to the Offer, that:

2.1     <u>Ownership</u>.  Stockholder has good and marketable title to, and is the sole legal and beneficial owner of the Securities set forth on Schedule I hereto, in each case free and clear of all liabilities, claims, liens, options, proxies, charges, participations and encumbrances of any kind or character whatsoever, other than those arising under the securities laws or under the Company's governance documents or under any registration rights agreement between the Company and Stockholder (collectively, "<u>Liens</u>").  At the time Sub purchases the Shares pursuant to the Offer, Stockholder will transfer and convey to Parent or its designee good and

marketable title to the Shares included in the Securities, free and clear of all Liens created by or arising through Stockholder.

        2.2    <u>Authorization</u>.  Stockholder has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and has sole voting power and sole power of disposition, with respect to the Securities with no restrictions on its voting rights or rights of disposition pertaining thereto except pursuant to applicable community property laws.  Stockholder has duly executed and delivered this Agreement and this Agreement is a legal, valid and binding agreement of Stockholder, enforceable against Stockholder in accordance with its terms.  If the Stockholder is married and the Securities constitute community property, this Agreement has been duly authorized, executed and delivered by the Stockholder's spouse, and this Agreement is a legal, valid and binding agreement of the Stockholder's spouse, enforceable against the Stockholder's spouse in accordance with its terms.

        2.3    <u>No Violation</u>.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (a) require the Stockholder to file or register with, or obtain any permit, authorization, consent or approval of, any governmental agency, authority, administrative or regulatory body, court or other tribunal, foreign or domestic, or any other entity other than filings with the SEC pursuant to the Exchange Act, or (b) violate, or cause a breach of or default under, or conflict with any contract, agreement or understanding, any Law binding upon the Stockholder, except for such violations, breaches, defaults or conflicts which are not, individually or in the aggregate, reasonably likely to have a material adverse effect on the Stockholder's ability to satisfy its obligations under this Agreement.  No proceedings are pending which, if adversely determined, will have an adverse effect on any ability to vote or dispose of any of the Securities. The Stockholder has not previously assigned or sold any of the Securities to any third party.

        2.4    <u>Stockholder Has Adequate Information</u>.  Stockholder is a sophisticated seller with respect to the Securities and has adequate information concerning the business and financial condition of the Company to make an informed decision regarding the sale of the Securities and has independently and without reliance upon either Sub or Parent and based on such information as Stockholder has deemed appropriate, made its own analysis and decision to enter into this Agreement.  Stockholder acknowledges that neither Sub nor Parent has made and neither makes any representation or warranty, whether express or implied, of any kind or character except as expressly set forth in this Agreement.  Stockholder acknowledges that the agreements contained herein with respect to the Securities by Stockholder are irrevocable (prior to the Termination Date), and that Stockholder shall have no recourse to the Securities, Parent or Sub, except with respect to breaches of representations, warranties, covenants and agreements expressly set forth in this Agreement.

        2.5    <u>No Setoff</u>.  The Stockholder has no liability or obligation related to or in connection with the Securities other than the obligations to Parent and Sub as set forth in this Agreement.  There are no legal or equitable defenses or counterclaims that have been or may be asserted by or on behalf of the Company or the Stockholder to reduce the amount of the Securities or affect the validity or enforceability of the Securities.

Annex II - 5

3.        <u>Representations and Warranties of Parent and Sub</u>.  Parent and Sub hereby represent and warrant to Stockholder, as of the date hereof that:

3.1        <u>Authorization</u>.  Parent and Sub have all requisite corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.  Parent and Sub have duly executed and delivered this Agreement and this Agreement is a legal, valid and binding agreement of each of Parent and Sub, enforceable against each of Parent and Sub in accordance with its terms.

3.2        <u>No Violation</u>. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will violate, or cause a breach of or default under, any contract or agreement, any statute or law, or any judgment, decree, order, regulation or rule of any governmental agency, authority, administrative or regulatory body, court or other tribunal, foreign or domestic, or any other entity or any arbitration award binding upon Parent or Sub, except for such violations, breaches or defaults which are not reasonably likely to have a material adverse effect on either Parent's or Sub's ability to satisfy its obligations under this Agreement.

4.        <u>Survival of Representations and Warranties</u>.  The respective representations and warranties of Stockholder, Parent and Sub contained herein shall not be deemed waived or otherwise affected by any investigation made by the other party hereto.  The representations and warranties contained herein shall survive the closing of the transactions contemplated hereby until the expiration of the applicable statute of limitations, including extensions thereof.

5.        <u>Specific Performance</u>.  Stockholder acknowledges that Sub and Parent will be irreparably harmed and that there will be no adequate remedy at law for a violation of any of the covenants or agreements of Stockholder which are contained in this Agreement.  It is accordingly agreed that, in addition to any other remedies which may be available to Sub and Parent upon the breach by Stockholder of such covenants and agreements, Sub and Parent shall have the right to obtain injunctive relief to restrain any breach or threatened breach of such covenants or agreements or otherwise to obtain specific performance of any of such covenants or agreements.

6.        <u>Miscellaneous</u>.

6.1        <u>Term</u>.  This Agreement and all obligations hereunder shall terminate upon the earlier of (i) the day after the Merger is consummated, (ii) the Outside Date (as defined in the Merger Agreement), (iii) the date of any modification or amendment to the Merger Agreement or waiver of a Company right under the Merger Agreement, and (iv) the termination of the Merger Agreement (the earliest of (i), (ii), (iii) and (iv), the "<u>Termination Date</u>").

6.2        <u>Fiduciary Duties</u>.  Notwithstanding anything in this Agreement to the contrary: (a) the Stockholder makes no agreement or understanding herein in any capacity other than in the Stockholder's capacity as a record holder and beneficial owner of Securities and not in such Stockholder's capacity as a director, officer or employee, or as a trustee or fiduciary for any employee benefit plan or trust, and (b) nothing herein will be construed to limit or affect any action or inaction by the Stockholder or any Representative of the Stockholder, as applicable,

Annex II - 6

serving on the Company Board of Directors or on the board of directors of any Company Subsidiary or as an officer or fiduciary of the Company or any of Company Subsidiary, acting in such person's capacity as a director, officer or fiduciary of the Company or any Company Subsidiary.

6.3     Expenses.  Each of the parties hereto shall pay its own expenses incurred in connection with this Agreement. Each of the parties hereto warrants and covenants to the others that it will bear all claims for brokerage fees attributable to action taken by it.

6.4     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective representatives and permitted successors and assigns.

6.5     Entire Agreement.  This Agreement contains the entire understanding of the parties and supersedes all prior agreements and understandings between the parties with respect to its subject matter.  This Agreement may be amended only by a written instrument duly executed by the parties hereto.

6.6     Headings.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6.7     Assignment.  Without limitation to Section 1.1, this Agreement shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.  No party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties; provided, however, that each of Parent and Sub may freely assign its rights to another direct or indirect wholly owned subsidiary of Parent or Sub without such prior written approval but no such assignment shall relieve Parent or Sub of any of its obligations hereunder.  Any purported assignment requiring consent without such consent shall be void.

6.8     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be an original, but each of which together shall constitute one and the same Agreement.

6.9     Notices.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by facsimile transmission (with receipt confirmed by telephone or by automatic transmission report) or by electronic mail (with receipt confirmed by telephone), or two business days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

Annex II - 7

     (a)      if to Parent or Sub, to:

       Cubist Pharmaceuticals, Inc.
       65 Hayden Avenue
       Lexington, Massachusetts 02421
       Attn:       Tamara L. Joseph, Senior Vice President, General Counsel and Secretary
       Telephone:     (781) 860-8660

       with a copy to:

       Ropes & Gray LLP
       Prudential Tower
       800 Boylston Street
       Boston, Massachusetts 02199
       Attn: Paul M. Kinsella
       Email: paul.kinsella@ropesgray.com
       Telephone:     (617) 951-7921
       Facsimile:     (617) 235-0822

     (b)      If to Stockholder, to the addresses indicated on Schedule I hereto.

Any party may by notice given in accordance with this Section 6.9 to the other parties to designate updated information for notices hereunder.

     6.10     <u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of Delaware, without regard to its principles of conflicts of Laws.

     6.11     <u>Enforceability</u>.  The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.  Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible and, absent agreement among the parties, a court is authorized to so modify this Agreement.

     6.12     <u>Further Assurances</u>.  From time to time, at Parent's request and without further consideration, Stockholder shall execute and deliver to Parent such documents and take such action as Parent may reasonably request in order to consummate more effectively the transactions contemplated hereby and to vest in Parent good, valid and marketable title to the Securities, including, but not limited to, using commercially reasonable efforts to cause the appropriate transfer agent or registrar to transfer of record the Securities.

Annex II - 8

6.13     <u>Remedies Not Exclusive</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity will be cumulative and not alternative, and the exercise of any thereof by either party will not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

6.14     <u>Waiver of Jury Trial</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.15     <u>No Agreement Until Executed</u>. This Agreement shall not constitute or be deemed to evidence a contract, agreement, arrangement or understanding between the parties hereto unless and until (a) the Company Board of Directors has adopted and approved the possible acquisition of the Shares by Parent and Sub pursuant to the Merger Agreement, (b) the Merger Agreement is executed by all parties thereto and (c) this Agreement is executed by all parties hereto.

*[The rest of this page has intentionally been left blank]*

Annex II - 9

**IN WITNESS WHEREOF**, Parent, Sub and Stockholder have caused this Agreement to be duly executed as of the day and year first above written.

**CUBIST PHARMACEUTICALS, INC.**

By:
Name:
Title:


**FRD ACQUISITION CORPORATION**

By:
Name:
Title:


**STOCKHOLDER:**


Name:

Annex II - 10

**SCHEDULE I TO**
**THE TENDER AND VOTING AGREEMENT**

1.       Securities held by Stockholder:

| Stockholder | Shares | Options to Purchase Shares | Restricted Stock | DSUs |
|---|---|---|---|---|
| | | | | |

2.       Address to which notices or other communications are to be sent in accordance with Section 6.9 of this Agreement:

      Stockholder:

                Facsimile:
                Email:

      with a copy to:

                Facsimile:
                Email:

      and with a copy to:

Annex II - 11

**AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
[COMPANY]**

* * * * *

1.      The name of the corporation is:  [COMPANY]

2.      The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle.  The name of its registered agent at such address is The Corporation Trust Company.

3.      The purpose of this corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

4.      The total number of shares of stock which this corporation shall have authority to issue is One Thousand (1,000) shares of Common Stock, $0.01 par value per share, amounting in the aggregate to One Hundred Dollars ($100.00).  Each share of Common Stock shall be entitled to one vote.

5.      Elections of directors need not be by written ballot unless the by-laws of this corporation shall provide.

6.      Meetings of stockholders may be held within or without the State of Delaware, as the by-laws may provide.  The books of the corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the board of directors or in the by-laws of the corporation.

7.      This corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a director or officer of this corporation or while a director or officer is or was serving at the request of this corporation as a director, officer, partner, trustee, employee or agent of any corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against expenses (including attorney's fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred (and not otherwise recovered) in connection with the investigation, preparation to defend or defense of such action, suit, proceeding or claim; provided, however, that the foregoing shall not require this corporation to indemnify or advance expenses to any person in connection with any action, suit, proceeding, claim or counterclaim initiated by or on behalf of such person unless such action, suit, proceeding, claim or counterclaim was authorized in the specific case by the board of directors of the corporation.  Such indemnification shall not be exclusive of other indemnification rights arising under any by-law, agreement, vote of

directors or stockholders or otherwise and shall inure to the benefit of the heirs and legal representatives of such person.  Any person seeking indemnification under this paragraph 7 shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established.  Any repeal or modification of the foregoing provisions of this paragraph 7 shall not adversely affect any right or protection of a director or officer of this corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

8.        A director of this corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent that exculpation from liability is not permitted under the General Corporation Law of the State of Delaware as in effect at the time such liability is determined.  No amendment or repeal of this paragraph 9 shall apply to or have any effect on the liability or alleged liability of any director of the corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

9.        The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

*[Remainder of Page Intentionally Left Blank]*

Annex III - 2

**Annex IV**

CONTINGENT PAYMENT RIGHTS AGREEMENT

THIS CONTINGENT PAYMENT RIGHTS AGREEMENT, dated as of [            ], 2011 (this "<u>Agreement</u>"), is entered into by and between Cubist Pharmaceuticals, Inc., a Delaware corporation ("<u>Parent</u>"), and Computershare Inc., a Delaware corporation and its fully owned subsidiary and Computershare Trust Company, N.A., a national banking association, as Rights Agent.

## RECITALS

WHEREAS, Parent, FRD Acquisition Corporation, a Delaware corporation ("<u>Sub</u>"), and Adolor Corporation, a Delaware corporation (the "<u>Company</u>"), have entered into an Agreement and Plan of Merger dated as of October 24, 2011 (as it may be amended or supplemented from time to time pursuant to the terms thereof, the "<u>Merger Agreement</u>"), pursuant to which Sub (a) has made a tender offer (the "<u>Offer</u>") to acquire all of the outstanding shares of common stock, par value $0.0001 per share, of the Company ("<u>Company Common Stock</u>") and (b) following acceptance of the shares of Company Common Stock pursuant to the Offer, will merge with and into the Company, with the Company surviving the Merger as a subsidiary of Parent;

WHEREAS, pursuant to the Merger Agreement, in each of the Offer and the Merger, Parent has agreed to provide to Company's stockholders the right to receive contingent cash payments as hereinafter described; and

WHEREAS, pursuant to this Agreement, the maximum potential amount payable per CPR is $4.50.

NOW, THEREFORE, in consideration of the foregoing and the consummation of the transactions referred to above, Parent and Rights Agent agree, for the equal and proportionate benefit of all Holders (as hereinafter defined), as follows:

1.      DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

1.1.      <u>Definitions</u>.  Capitalized terms used but not otherwise defined herein will have the meanings ascribed to them in the Merger Agreement.  As used in this Agreement, the following terms will have the following meanings:

"<u>Acting Holders</u>" means, at the time of determination, Holders of at least thirty percent (35%) of the outstanding CPRs.

"<u>Assignee</u>" has the meaning set forth in Section 6.3.

"<u>Board of Directors</u>" means the board of directors of Parent.

"Board Resolution" means a copy of a resolution certified by the secretary or an assistant secretary of Parent to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to the Rights Agent.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to remain closed.

"CPRs" means the rights of Holders to receive contingent cash payments pursuant to this Agreement.

"CPR Register" has the meaning set forth in Section 2.3(b).

"CPR Shortfall" has the meaning set forth in Section 4.8.

"Diligent Efforts" means, with respect to the Product, efforts of a Person to carry out its obligations, and to cause its controlled Affiliates and Product licensees, if any, to carry out their respective obligations, using such efforts and employing such resources normally used by Persons in the pharmaceutical business similar in size and resources to Parent relating to seeking regulatory approval for a product candidate or commercialization of an approved product that is of similar market potential at a similar stage in its development or product life, taking into account issues of market exclusivity, product profile, including efficacy, safety, tolerability and convenience, the competitiveness of alternate products in the marketplace or under development, the availability of existing forms or dosages of the Product for other indications, the launch or sales of a generic or biosimilar product, the regulatory environment and the profitability of the Product (including pricing and reimbursement status) and other relevant considerations, including technical, commercial, legal, scientific and/or medical factors.

"DTC" means The Depository Trust Company or any successor thereto.

"Eight Hundred Million Dollar Sales Target" means the achievement of cumulative worldwide Net Sales of $800 million prior to the earlier of (i) the fifth anniversary of the earlier of (a) the first commercial sale of the Product in the United States or (b) the Major Market Sales Date and (ii) July 1, 2024.

"EMA" means the European Medicines Agency, or any successor agency.

"EMA Approval" means the decision of the European Commission addressed to Parent, any of its controlled Affiliates or any Assignee granting marketing authorization through the centralized procedure for the Product, following a positive opinion by the EMA, which authorization grants Parent, any of its controlled Affiliates or any Assignee the right to market and sell the Product immediately for use in the European Union for the treatment of opioid induced constipation on or before the Regulatory Approval Payment Target Date.  For clarity, EMA Approval does not refer to approval in one or more individual Major Market countries of the European Union.

"EMA Approval Payment Amount" means an amount equal to $0.50 per CPR, payable in cash, without interest.

Annex IV - 2

"<u>EMA Approval Payment Notice</u>" has the meaning set forth in Section 2.4.

"<u>EMA Payment Trigger Date</u>" means a date on which either of the following occurs: (a) EMA Approval without EMA Preferred Product Label Approval or (b) EMA Preferred Product Label Approval.

"<u>EMA Preferred Product Label Approval</u>" means an EMA Approval that contains a product label for the Indication without a maximum day limitation, provided that (a) the Product is the first product to receive marketing authorization from the EMA for use in the European Union in the Indication without a maximum day limitation or (b) if it is not the first product to receive marketing authorization from the EMA for use in the European Union in the Indication without a maximum day limitation, EMA Approval does not require either (i) the inclusion of a "black symbol" referred to in Article 23 of Regulation (EC) 726/2004, as amended), in the Summary of Product Characteristics and the package leaflet of the Product, or (ii) implementation of a REMS other than a "black symbol" or REMS, as applicable, that does not competitively disadvantage the Product relative to other products without a maximum day limitation that have received marketing authorization from the EMA for use in the European Union in the Indication.

"<u>EMA Preferred Product Label Payment Amount</u>" means an amount equal to $1.50 per CPR, payable in cash, without interest.

"<u>FDA</u>" means the U.S. Food and Drug Administration, or any successor agency.

"<u>FDA Approval</u>" means receipt by Parent, any of its controlled Affiliates or any Assignee, on or before the Regulatory Approval Payment Target Date, of a final approval letter from the FDA with respect to a new drug application for the Product, which approval letter grants Parent, any of its controlled Affiliates or any Assignee the right to market and sell the Product for use in the United States for the treatment of opioid induced constipation.

"<u>FDA Approval Payment Amount</u>" means an amount equal to $1.25 per CPR, payable in cash, without interest.

"<u>FDA Approval Payment Notice</u>" has the meaning set forth in Section 2.4.

"<u>FDA Payment Trigger Date</u>" means a date on which either of the following occurs: (a) FDA Approval without FDA Preferred Product Label Approval or (b) FDA Preferred Product Label Approval.

"<u>FDA Preferred Product Label Approval</u>" means an FDA Approval that contains a product label for the Indication without a maximum day limitation, provided that (a) the Product is the first product to be approved by the FDA for use in the Indication without a maximum day limitation or (b) if it is not the first product to be approved by the FDA for use in the Indication without a maximum day limitation, the FDA Approval does not require either (i) the inclusion of a "boxed warning" (as defined in 21 CFR 201.57(c)(1)) in the product labeling or (ii) implementation of a REMS, other than a "boxed warning" or REMS, as applicable, that does not competitively disadvantage the Product relative to other products without a maximum day limitation approved by the FDA for use in the United States in the Indication.

Annex IV - 3

"FDA Preferred Product Label Payment Amount" means an amount equal to $3.00 per CPR, payable in cash, without interest.

"Four Hundred Million Dollar Sales Target" means the achievement of cumulative worldwide Net Sales of $400 million prior to the earlier of (i) the fifth anniversary of the earlier of (a) the first commercial sale of the Product in the United States or (b) the Major Market Sales Date and (ii) July 1, 2024.

"Governmental Entity" means any foreign or domestic arbitrator, court, nation, government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial regulatory or administrative functions of, or pertaining to, government.

"Holder" means a Person in whose name a CPR is registered in the CPR Register at the applicable time.

"Independent Accountant" means an independent certified public accounting firm of nationally recognized standing designated either (i) jointly by the Acting Holders and Parent, or (ii) if such parties fail to make a designation, jointly by an independent public accounting firm selected by Parent and an independent public accounting firm selected by the Acting Holders.

"Indication" means the oral monotherapy treatment of opioid induced constipation.

"Major Market" means each of the United Kingdom, France, Germany, Spain or Italy.

"Major Market Sales Date" means the first date on which there have been, on that date or on any earlier date, commercial sales of the Product in at least three of the Major Markets.

"Milestone Notice" has the meaning set forth in Section 2.4.

"Milestone Payment Amount" means if, as of the Regulatory Approval Payment Target Date, (1) neither FDA Preferred Product Label Approval, nor EMA Preferred Product Label Approval has been obtained, (a) $1.50 if the Four Hundred Million Dollar Sales Target is achieved and (b) an additional $1.25 if the Eight Hundred Million Dollar Sales Target is achieved, (2) EMA Preferred Product Label Approval has been obtained, but FDA Preferred Product Label Approval has not been obtained, (a) $0.50 if the Four Hundred Million Dollar Sales Target is achieved and (b) an additional $1.25 if the Eight Hundred Million Dollar Sales Target is achieved, and (3) FDA Preferred Product Label Approval has been obtained, but EMA Preferred Product Label Approval has not been obtained, $1.00 if the Eight Hundred Million Dollar Sales Target is achieved.  For reference only, a summary of potential Milestone Payment Amounts has been attached as Appendix A to this Agreement.

"Milestone Payment Date" means each date on which a Milestone Payment Amount is paid.

"Milestones" shall mean, collectively, the FDA Approval, the FDA Preferred Product Label Approval, the EMA Approval, the EMA Preferred Product Label Approval, the Four Hundred Million Dollar Sales Target and the Eight Hundred Million Dollar Sales Target.

"Net Sales" means the gross amount invoiced by or on behalf of the relevant Selling Entity for the Product sold to third parties other than any other Selling Entity, less the Permitted Deductions, all as determined in accordance with the Selling Entity's usual and customary accounting methods consistent with the treatment of other branded prescription products commercialized by the applicable Selling Entity, which shall be in accordance with generally accepted accounting principles or International Financial Reporting Standards, including the accounting methods for translating activity denominated in foreign currencies into United States dollar amounts; provided, however, that in no event shall any sales consummated after June 30, 2024 be included in the calculation of Net Sales.  In the case of any sale of the Product between or among the Company, its Affiliates, licensees and sublicensees, for resale, Net Sales will be calculated as above only on the value charged or invoiced on the first arm's-length sale thereafter to a third party.  In the case of any sale for value other than exclusively for money (but excluding any patient assistance programs), Net Sales will be calculated on the market price of the Product in the jurisdiction of sale during the relevant period.

"Net Sales Statement" means a written statement of Parent, certified by the Chief Financial Officer of Parent, setting forth with reasonable detail (i) an itemized calculation of the gross amounts invoiced by the Selling Entities for the Product sold to third parties other than any other Selling Entity, (ii) an itemized calculation of the Permitted Deductions, (iii) to the extent that sales for the Products is recorded in currencies other than United States dollars, the exchange rates used for conversion of such foreign currency into United States dollars, and (iv) the calculation of the Milestone Payment Amounts due, if any.

"Officer's Certificate" means a certificate signed by the chief executive officer, president, chief financial officer, any vice president, the controller, the treasurer or the secretary, in each case of Parent, in his or her capacity as such an officer, and delivered to the Rights Agent.

"Payment Amount" means any Regulatory Approval Payment Amount or any Milestone Payment Amount, as applicable.

"Payment Date" means any Regulatory Approval Payment Date or any Milestone Payment Date, as applicable.

"Payment Targets" means EMA Preferred Product Label Approval, FDA Preferred Product Label Approval and Sales Milestones.

"Permitted Deductions" means the following deductions to the extent included in the gross invoiced sales price of the Product, or otherwise directly paid or incurred by the Selling Entity with respect to the sale:

(1)        normal and customary trade and quantity discounts;

(2)        amounts repaid or credited by reasons of defects, recalls, returns, rebates or allowances of goods or because of retroactive price reductions specifically identifiable to the Product;

(3)        chargebacks, rebates (or the equivalent thereof) and other amounts paid on sale of the Product, including such payments mandated by programs of Governmental Entities;

Annex IV - 5

(4)     rebates (or the equivalent thereof) and administrative fees paid to medical healthcare organizations, to group purchasing organizations or to trade customers in line with approved contract terms or other normal and customary understandings and arrangements;

(5)     tariffs, duties, excise, sales, value-added and other taxes (other than taxes based on net income) and charges of Governmental Entities;

(6)     reasonable reserves made for uncollectible amounts on previously sold products;

(7)     discounts pursuant to indigent patient programs and patient discount programs and coupon discounts;

(8)     transportation, freight, postage, importation, shipping insurance and other handling expenses; and

(9)     required distribution commissions and fees (including fees related to services provided pursuant to distribution service agreements with wholesalers, fee-for-service wholesaler fees and inventory management fees) payable to any third party providing distribution services to the Selling Entities.

"Permitted Transfer" means: a transfer of CPRs (a) upon death of a Holder by will or intestacy; (b) pursuant to a court order; (c) by operation of law (including by consolidation or merger) or without consideration in connection with the dissolution, liquidation or termination of any corporation, limited liability company, partnership or other entity; or (d) in the case of CPRs held in book-entry or other similar nominee form, from a nominee to a beneficial owner and, if applicable, through an intermediary, to the extent allowable by DTC.

"Product" means the small molecule, peripherally-acting *mu* opioid receptor antagonist currently known as ADL5945.

"Regulatory Approval Payment Amount" means (1) for FDA Approval without FDA Preferred Product Label Approval, the FDA Approval Payment Amount, (2) for FDA Preferred Product Label Approval, the FDA Preferred Product Label Payment Amount, (3) for EMA Approval without EMA Preferred Product Label Approval, the EMA Approval Payment Amount, and (4) for EMA Preferred Product Label Approval, the EMA Preferred Product Label Payment Amount, as applicable; provided that if FDA Preferred Product Label Approval is obtained at any time after FDA Approval is obtained, the applicable Regulatory Approval Payment Amount will be equal to the difference between (i) the FDA Preferred Product Label Payment Amount and (ii) the FDA Approval Payment Amount, and if EMA Preferred Product Label Approval is obtained at any time after EMA Approval is obtained, the applicable Regulatory Approval Payment Amount will be equal to the difference between (i) the EMA Preferred Product Label Payment Amount and (ii) the EMA Approval Payment Amount.  For reference only, a summary of potential Regulatory Approval Payment Amounts has been attached as Appendix A to this Agreement.

"Regulatory Approval Payment Date" has the meaning set forth in Section 2.4.

"<u>Regulatory Approval Payment Notice</u>" means the EMA Approval Payment Notice or the FDA Approval Payment Notice, as applicable.

"<u>Regulatory Approval Payment Target Date</u>" means July 1, 2019.

"<u>REMS</u>" means, in the United States, a risk evaluation and mitigation strategy required by the FDA under the authority granted to it in 28 U.S.C. § 355-1, and in the European Union, a risk management plan as described in the EMA's Guideline on Risk Management Systems for Medicinal Products for Human Use (2005).

"<u>Review Request Period</u>" has the meaning set forth in Section 4.5.

"<u>Rights Agent</u>" means the Rights Agent named in the first paragraph of this Agreement, until a successor Rights Agent will have become such pursuant to the applicable provisions of this Agreement, and thereafter "Rights Agent" will mean such successor Rights Agent.

"<u>Sales Milestone</u>" means the Four Hundred Million Dollar Sales Target or the Eight Hundred Million Dollar Sales Target, as applicable.

"<u>Sales Milestone Trigger Date</u>" means for any Sales Milestone, if either FDA Preferred Product Label Approval or EMA Preferred Product Label Approval has not been achieved before or on the Regulatory Approval Payment Target Date, the date after the Regulatory Approval Payment Target Date on which such Sales Milestone is first achieved.

"<u>Selling Entity</u>" means Parent, any Assignee, and each of their controlled Affiliates, licensees and sublicensees.

1.2.    <u>Rules of Construction</u>.  Except as otherwise explicitly specified to the contrary, (a) references to a Section means a Section of this Agreement unless another agreement is specified, (b) the word "including" (in its various forms) means "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (d) words in the singular or plural form include the plural and singular form, respectively, (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement and (f) all references to dollars or "$" refer to United States dollars.

2.      CONTINGENT PAYMENT RIGHTS

2.1.    <u>CPRs</u>.  The CPRs represent the rights of Holders to receive contingent cash payments pursuant to this Agreement.  The initial Holders will be determined pursuant to the terms of the Merger Agreement.

2.2.    <u>Nontransferable</u>.  The CPRs may not be sold, assigned, transferred, pledged, encumbered or in any other manner transferred or disposed of, in whole or in part, other than through a Permitted Transfer.

2.3.    No Certificate; Registration; Registration of Transfer; Change of Address.

(a)    The CPRs will not be evidenced by a certificate or other instrument.

(b)    The Rights Agent will keep a register (the "CPR Register") for the purpose of registering CPRs and transfers of CPRs as herein provided.  The CPR Register will initially show one position for Cede & Co representing all the shares of Company Common Stock held by DTC on behalf of the street holders of the shares of Company Common Stock tendered by such holders in the Offer or held by such holders as of immediately prior to the Effective Time.  The Rights Agent will have no responsibility whatsoever directly to the street name holders with respect to transfers of CPRs unless and until such CPRs are transferred into the name of such street name holders in accordance with Section 2.2 of this Agreement.  With respect to any payments to be made under Section 2.4 below, the Rights Agent will accomplish the payment to any former street name holders of shares of Company Common Stock by sending one lump payment to DTC.  The Rights Agent will have no responsibilities whatsoever with regard to the distribution of payments by DTC to such street name holders.

(c)    Subject to the restrictions on transferability set forth in Section 2.2, every request made to transfer a CPR must be in writing and accompanied by a written instrument of transfer in form reasonably satisfactory to the Rights Agent pursuant to its guidelines, duly executed by the Holder thereof, the Holder's attorney duly authorized in writing, the Holder's personal representative or the Holder's survivor, and setting forth in reasonable detail the circumstances relating to the transfer.  Upon receipt of such written notice, the Rights Agent will, subject to its reasonable determination that the transfer instrument is in proper form and the transfer otherwise complies with the other terms and conditions of this Agreement (including the provisions of Section 2.2), register the transfer of the CPRs in the CPR Register.  No service charge shall be made for any registration of transfer of a CPR, but Parent may require payment of a sum sufficient to cover any stamp or other tax or governmental charge that is imposed in connection with any such registration of transfer.  The Rights Agent shall have no duty or obligation to take any action under any section of this Agreement that requires the payment by a Holder of a CPR of applicable taxes or charges unless and until the Rights Agent is satisfied that all such taxes or charges have been paid.  All duly transferred CPRs registered in the CPR Register will be the valid obligations of Parent and will entitle the transferee to the same benefits and rights under this Agreement as those held immediately prior to the transfer by the transferor.  No transfer of a CPR will be valid until registered in the CPR Register.

(d)    A Holder may make a written request to the Rights Agent to change such Holder's address of record in the CPR Register.  The written request must be duly executed by the Holder.  Upon receipt of such written notice, the Rights Agent will promptly record the change of address in the CPR Register.

2.4.    Payment Procedures.

(a)    On or before the fifth Business Day following (i) any EMA Payment Trigger Date and (ii) July 1, 2019, Parent will deliver to the Rights Agent a notice (the "EMA

Annex IV - 8

<u>Approval Payment Notice</u>") indicating whether EMA Approval was achieved, and if achieved, whether EMA Preferred Product Label Approval was achieved.  On or before the fifth Business Day following (i) any FDA Payment Trigger Date and (ii) July 1, 2019, Parent will deliver to the Rights Agent a notice (the "<u>FDA Approval Payment Notice</u>") indicating whether FDA Product Approval was achieved, and if achieved, whether FDA Preferred Product Label Approval was achieved.  On or before the fifth Business Day following (i) any Sales Milestone Trigger Date and (ii) July 1, 2024, unless prior to such date one or more Regulatory Approval Payment Notices was delivered to the Rights Agent indicating both FDA Preferred Product Label Approval and EMA Preferred Product Label Approval had been achieved, Parent will deliver to the Rights Agent a notice (the "<u>Milestone Notice</u>") indicating whether a Sales Milestone was achieved.

(b)	The Rights Agent will, within ten Business Days of receipt of any Regulatory Approval Payment Notice (each such date, a "<u>Regulatory Approval Payment Date</u>"), send each Holder at its registered address a copy of the Regulatory Approval Payment Notice.  If a Regulatory Approval Payment Amount is payable to the Holders, then at the time the Rights Agent sends a copy of a Regulatory Approval Payment Notice to the Holders, the Rights Agent will also pay the applicable Regulatory Approval Payment Amount to each of the Holders (the amount to which each Holder is entitled to receive will be the applicable Regulatory Approval Payment Amount multiplied by the number of CPRs held by such Holder as reflected on the CPR Register) by check mailed to the address of each Holder as reflected in the CPR Register as of the close of business on the last Business Day prior to such Regulatory Approval Payment Date.

(c)	The Rights Agent will, within ten Business Days of receipt of any Milestone Notice, send each Holder at its registered address a copy of the Milestone Notice.  If a Milestone Payment Amount is payable to the Holders, then at the time the Rights Agent sends a copy of a Milestone Notice to the Holders, the Rights Agent will also pay the applicable Milestone Payment Amount to each of the Holders (the amount to which each Holder is entitled to receive will be the applicable Milestone Payment Amount multiplied by the number of CPRs held by such Holder as reflected on the CPR Register) by check mailed to the address of each Holder as reflected in the CPR Register as of the close of business on the last Business Day prior to such Milestone Payment Date.

(d)	Parent shall be entitled to deduct or withhold, or cause the Rights Agent to deduct or withhold, from any Payment Amount otherwise payable pursuant to this Agreement such amounts as may be required to be deducted or withheld therefrom under the Code, the Treasury Regulations thereunder, or any other applicable Tax Law, as may be determined by Parent or the Rights Agent. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid, and as soon as practicable after any payment of such taxes by Parent or the Rights Agent, Parent shall deliver (or shall cause the Rights Agent to deliver) to the person to whom such amounts would otherwise have been paid the original or a certified copy of a receipt issued by the applicable taxing authority evidencing such payment, a copy of the return reporting such payment, or other reasonably acceptable evidence of such payment.

Annex IV - 9

(e)        Any portion of any Payment Amount that remains undistributed to the Holders six months after an applicable Payment Date will be delivered by the Rights Agent to Parent, upon demand, and any Holder will thereafter look only to Parent for payment of such Payment Amount, without interest, but such Holder will have no greater rights against Parent than those accorded to general unsecured creditors of Parent under applicable law.

(f)        Neither Parent nor the Rights Agent will be liable to any person in respect of any Payment Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If any Payment Amount has not been paid immediately prior to the date on which such Payment Amount would otherwise escheat to or become the property of any Governmental Entity, any such Payment Amount will, to the extent permitted by applicable law, become the property of Parent, free and clear of all claims or interest of any person previously entitled thereto.

2.5.    No Voting, Dividends or Interest; No Equity or Ownership Interest in Parent.

(a)        The CPRs will not have any voting or dividend rights, and interest will not accrue on any amounts payable on the CPRs to any Holder.

(b)        The CPRs will not represent any equity or ownership interest in Parent or in any constituent company to the Merger.

3.        THE RIGHTS AGENT

3.1.    Certain Duties and Responsibilities.  The Rights Agent will not have any liability for any actions taken or not taken in connection with this Agreement, except to the extent of its willful misconduct, bad faith or gross negligence.

3.2.    Certain Rights of Rights Agent.  The Rights Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations will be read into this Agreement against the Rights Agent.  In addition:

(a)        the Rights Agent may rely and will be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)        whenever the Rights Agent will deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Rights Agent may, in the absence of bad faith, gross negligence or willful misconduct on its part, rely upon an Officer's Certificate;

(c)        the Rights Agent may engage and consult with counsel of its selection and the written advice of such counsel or any opinion of counsel will be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon;

Annex IV - 10

(d)       the permissive rights of the Rights Agent to do things enumerated in this Agreement will not be construed as a duty;

(e)       the Rights Agent will not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(f)       Parent agrees to indemnify Rights Agent for, and hold Rights Agent harmless against, any loss, liability, claim, demands, suits or expense arising out of or in connection with Rights Agent's duties under this Agreement, including the costs and expenses of defending Rights Agent against any claims, charges, demands, suits or loss, unless such loss has been determined by a court of competent jurisdiction to be a result of Rights Agent's gross negligence, bad faith or willful or intentional misconduct; and

(g)       Parent agrees (i) to pay the fees and expenses of the Rights Agent in connection with this Agreement as agreed upon in writing by Rights Agent and Parent on or prior to the date hereof, and (ii) to reimburse the Rights Agent for all taxes and governmental charges, reasonable expenses and other charges of any kind and nature incurred by the Rights Agent in the execution of this Agreement (other than taxes imposed on or measured by the Rights Agent's net income and franchise or similar taxes imposed on it (in lieu of net income taxes)).  The Rights Agent will also be entitled to reimbursement from Parent for all reasonable and necessary out-of-pocket expenses paid or incurred by it in connection with the administration by the Rights Agent of its duties hereunder.

3.3.       Resignation and Removal; Appointment of Successor.

(a)       The Rights Agent may resign at any time by giving written notice thereof to Parent specifying a date when such resignation will take effect, which notice will be sent at least 60 days prior to the date so specified but in no event will such resignation become effective until a successor Rights Agent has been appointed.  Parent has the right to remove Rights Agent at any time by a Board Resolution specifying a date when such removal will take effect but no such removal will become effective until a successor Rights Agent has been appointed.  Notice of such removal will be given by Parent to Rights Agent, which notice will be sent at least 60 days prior to the date so specified.

(b)       If the Rights Agent provides notice of its intent to resign, is removed or becomes incapable of acting, Parent, by a Board Resolution, will as soon as is reasonably possible appoint a qualified successor Rights Agent who may be a Holder but may not be an officer of Parent.  The successor Rights Agent so appointed will, forthwith upon its acceptance of such appointment in accordance with Section 3.4, become the successor Rights Agent.

(c)       Parent will give notice of each resignation and each removal of a Rights Agent and each appointment of a successor Rights Agent by mailing written notice of such event by first-class mail to the Holders as their names and addresses appear in the CPR Register.  Each notice will include the name and address of the successor Rights Agent.  If Parent fails to send such notice within ten days after acceptance of appointment by a

Annex IV - 11

successor Rights Agent, the successor Rights Agent will cause the notice to be mailed at the expense of Parent.

3.4.   <u>Acceptance of Appointment by Successor</u>.  Every successor Rights Agent appointed hereunder will execute, acknowledge and deliver to Parent and to the retiring Rights Agent an instrument accepting such appointment and a counterpart of this Agreement, and thereupon such successor Rights Agent, without any further act, deed or conveyance, will become vested with all the rights, powers, trusts and duties of the retiring Rights Agent.  On request of Parent or the successor Rights Agent, the retiring Rights Agent will execute and deliver an instrument transferring to the successor Rights Agent all the rights, powers and trusts of the retiring Rights Agent.

4.   COVENANTS

4.1.   <u>List of Holders</u>.  Parent will furnish or cause to be furnished to the Rights Agent in such form as Parent receives from the Company's transfer agent (or other agent performing similar services for the Company), the names and addresses of the Holders within ten Business Days of the Effective Time.

4.2.   <u>Payment of Payment Amounts</u>.  Parent will promptly deposit with the Rights Agent, for payment to each Holder, the applicable Payment Amount, if any, prior to an applicable Payment Date if such amount is payable in accordance with the terms of this Agreement.

4.3.   <u>Milestones</u>.  Parent shall, and shall cause its controlled Affiliates to, use Diligent Efforts to achieve each of the Milestones.

4.4.   <u>Books and Records</u>.  Parent shall, and shall cause its Subsidiaries to, keep true, complete and accurate records in sufficient detail to enable the Holders and their consultants or professional advisors to determine the amounts payable hereunder.

4.5.   Audits.

(a)     Upon the written request of the Acting Holders within one (1) year of the delivery of any Milestone Notice (the "<u>Review Request Period</u>") but no more than once per Milestone Notice, Parent shall permit, and shall cause its controlled Affiliates to permit, the Independent Accountant to have access during normal business hours to such of the records of the Company as may be reasonably necessary to verify the accuracy of the Net Sales Statement and the figures underlying the calculations set forth therein, including, without limitation, all written materials related to any sale transaction reasonably requested by such Independent Accountant.  The Independent Accountant shall be charged to come to a final determination with respect to those specific items in the Net Sales Statement that the parties disagree on and submit to it for resolution.  All other items in the Net Sales Statement that the parties do not submit, prior to the end of the Review Request Period, to the Independent Accountant for resolution shall be deemed to be agreed by the parties and the Independent Accountant shall not be charged with calculating or validating those agreed upon items.  If issues are submitted to the Independent Accountant for resolution, Parent shall, and shall cause to its controlled

Annex IV - 12

Affiliates to, furnish to the Independent Accountant such access, work papers and other documents and information related to those disputed issues as the Independent Accountant may request and as are available to Parent. The Independent Accountant shall disclose to Parent and the Acting Holders any matters directly related to their findings to the extent necessary to verify the accuracy or completeness of the Net Sales Statements. The fees charged by such accounting firm shall be paid Parent.

(b)        If the Independent Accountant concludes that either the Four Hundred Million Dollar Sales Target or the Eight Hundred Million Dollar Sales Target was achieved and a Milestone Payment Amount that was properly due was not paid to the Holders (the difference in payment being the "CPR Shortfall"), Parent shall pay the CPR Shortfall with respect to each CPR within ten (10) days of the date the Acting Holders deliver to Parent the Independent Accountant's written report. The decision of the Independent Accountant shall be final, conclusive and binding on Parent and the Holders, shall be non-appealable and shall not be subject to further review.

(c)        If, upon the expiration of the Review Request Period, the Acting Holders have not requested a review of the Net Sales Statement in accordance with this Section 4.8, the calculations set forth in the Net Sales Statement shall be binding and conclusive upon the Holders.

(d)        Each person seeking to receive information from Parent in connection with a review pursuant to this Section 4.8 shall enter into, and shall cause its accounting firm to enter into, a reasonable and mutually satisfactory confidentiality agreement with Parent or any controlled Affiliate obligating such party to retain all such information disclosed to such party in confidence pursuant to such confidentiality agreement.

5.        AMENDMENTS

5.1.      Amendments without Consent of Holders.

(a)        Without the consent of any Holders or the Rights Agent, Parent, when authorized by a Board Resolution, at any time and from time to time, may enter into one or more amendments hereto, to evidence the succession of another Person to Parent and the assumption by any such successor of the covenants of Parent herein as provided in Section 6.3.

(b)        Without the consent of any Holders, Parent, when authorized by a Board Resolution, and the Rights Agent, in the Rights Agent's sole and absolute discretion, at any time and from time to time, may enter into one or more amendments hereto, for any of the following purposes:

(i)        to evidence the succession of another Person as a successor Rights Agent and the assumption by any such successor of the covenants and obligations of the Rights Agent herein;

(ii)        to add to the covenants of Parent such further covenants, restrictions, conditions or provisions as Parent and the Rights Agent will consider to be for the

protection of the Holders; provided that, in each case, such provisions do not adversely affect the interests of the Holders;

(iii)       to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; provided that, in each case, such provisions do not adversely affect the interests of the Holders;

(iv)       as may be necessary or appropriate to ensure that the CPRs are not subject to registration under the Securities Act or the Exchange Act; or

(v)       any other amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement, unless such addition, elimination or change is adverse to the interests of the Holders.

(c)       Promptly after the execution by Parent and the Rights Agent of any amendment pursuant to the provisions of this Section 5.1, Parent will mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the CPR Register, setting forth such amendment.

5.2.       <u>Amendments with Consent of Holders</u>.

(a)       Subject to Section 5.1 (which amendments pursuant to Section 5.1 may be made without the consent of the Holders), with the consent of the Holders of not less than a majority of the outstanding CPRs, whether evidenced in writing or taken at a meeting of the Holders, Parent, when authorized by a Board Resolution, and the Rights Agent may enter into one or more amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement, even if such addition, elimination or change is materially adverse to the interest of the Holders; provided, however, that no such amendment shall, without the consent of the Holders of eighty (80%) percent of the outstanding CPRs:

(i)       modify in a manner adverse to the Holders (A) any provision contained herein with respect to the termination of this Agreement or the CPRs, (B) the time for, and amount of, any payment to be made to the Holders pursuant to this Agreement, or (C) the Milestones,

(ii)       reduce the number of CPRs, or

(iii)       modify any provisions of this Section 5.2, except to increase the percentage of Holders from whom consent is required or to provide that certain provisions of this Agreement cannot be modified or waived without the consent of the Holder of each outstanding CPR affected thereby.

(b)       Promptly after the execution by Parent and the Rights Agent of any amendment pursuant to the provisions of this Section 5.2, Parent will mail (or cause the Rights Agent

Annex IV - 14

to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the CPR Register, setting forth such amendment.

5.3.     <u>Execution of Amendments</u>.  In executing any amendment permitted by this Section 5, the Rights Agent will be entitled to receive, and will be fully protected in relying upon, an opinion of counsel selected by Parent stating that the execution of such amendment is authorized or permitted by this Agreement.  The Rights Agent may, but is not obligated to, enter into any such amendment that affects the Rights Agent's own rights, privileges, covenants or duties under this Agreement or otherwise.

5.4.     <u>Effect of Amendments</u>.  Upon the execution of any amendment under this Section 5, this Agreement will be modified in accordance therewith, such amendment will form a part of this Agreement for all purposes and every Holder will be bound thereby.

6.       OTHER PROVISIONS OF GENERAL APPLICATION

6.1.     <u>Notices to Rights Agent and Parent</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by facsimile transmission (with receipt confirmed by telephone or by automatic transmission report) or by electronic mail, or two (2) business days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

If to the Rights Agent, to it at:

[•]
Telephone:     [•]
Facsimile:      [•]
Email:           [•]
Attention:      [•]

If to Parent, to it at:

Cubist Pharmaceuticals, Inc.
65 Hayden Avenue
Lexington, Massachusetts 02421
Attn:            Tamara L. Joseph, Senior Vice President,
                    General Counsel and Secretary
Telephone:     (781) 860-8660

with a copy to:

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone:     617-951-7921
Facsimile:      617-235-0822

Annex IV - 15

Email:        paul.kinsella@ropesgray.com
Attention:    Paul M. Kinsella

The Rights Agent or Parent may specify a different address or facsimile number by giving notice in accordance with this Section 6.1.

6.2.      Notice to Holders.  Where this Agreement provides for notice to Holders, such notice will be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the Holder's address as it appears in the CPR Register, not later than the latest date, and not earlier than the earliest date, if any, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder will affect the sufficiency of such notice with respect to other Holders.

6.3.      Parent Successors and Assigns.  Parent may assign, in its sole discretion and without the consent of any other party, any or all of its rights, interests and obligations hereunder to one or more direct or indirect wholly-owned subsidiaries of Parent or to any purchaser or licensee of substantial rights to the Product (each, an "Assignee").  Any such Assignee may thereafter assign, in its sole discretion and without the consent of any other party, any or all of its rights, interests and obligations hereunder to one or more additional Assignees; provided, however, that in connection with any assignment to an Assignee, Parent and Sub (or the other assignor) shall agree to remain liable for the performance by Parent and Sub (and such other assignor, if applicable) of their obligations hereunder.  This Agreement will be binding upon, inure to the benefit of and be enforceable by Parent's successors and each Assignee, and this Agreement shall not restrict Parent's, any Assignee's or any of their respective successor's ability to merge or consolidate.  Each of Parent's successors shall expressly assume by an instrument supplemental hereto, executed and delivered to the Rights Agent, the due and punctual payment of the CPRs and the due and punctual performance and observance of all of the covenants and obligations of this Agreement to be performed or observed by Parent.

6.4.      Benefits of Agreement.  Nothing in this Agreement, express or implied, will give to any Person (other than the Rights Agent, Parent, Parent's successors and assignees, and the Holders) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the, Rights Agent, Parent, Parent's successors and assignees, and the Holders.  The rights of Holders are limited to those expressly provided in this Agreement and the Merger Agreement.

6.5.      Governing Law.  This Agreement, the CPRs and all actions arising under or in connection therewith shall be governed by and construed in accordance with the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law thereof, provided, however, that the laws of the respective jurisdictions of incorporation of each of the parties shall govern the relative rights, obligations, powers, duties and other internal affairs of such party and its board of directors.

6.6.      Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force

and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.  The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

6.7.   <u>Counterparts and Signature</u>.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that the parties need not sign the same counterpart.

6.8.   <u>Termination</u>.  This Agreement will be terminated and of no force or effect, the parties hereto will have no liability hereunder, and no payments will be required to be made, upon the earlier to occur of (a) the mailing by the Rights Agent to the address of each Holder as reflected in the CPR Register the full amount of all potential Payment Amounts required to be paid under the terms of this Agreement and (b) the expiration of the final Review Request Period, unless there is an ongoing audit pursuant to Section 4.8, in which case until such audit has been completed.  In no event will any Regulatory Approval Payment Amount become payable after the Regulatory Approval Payment Target Date, nor will any Milestone Payment Amount become payable on account of sales of the Product consummated after June 30, 2024.

6.9.   <u>Entire Agreement</u>.  This Agreement and the Merger Agreement (including the schedules, annexes and exhibits thereto and the documents and instruments referred to therein) contain the entire understanding of the parties hereto and thereto with reference to the transactions and matters contemplated hereby and thereby and supersedes all prior agreements, written or oral, among the parties with respect hereto and thereto.  If and to the extent that any provision of this Agreement is inconsistent or conflicts with the Merger Agreement, this Agreement will govern and be controlling.

6.10.   <u>Dispute Resolution</u>.  Any dispute arising out of or relating to this contract, including the breach, termination or validity thereof, shall be finally resolved by arbitration in accordance with the International Institute for Conflict Prevention and Resolution Rules for Non-Administered Arbitration by three arbitrators, of whom each party shall designate one in accordance with the    screened' appointment procedure provided in Rule 5.4.  The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrator(s) may be entered by any court having jurisdiction thereof.  The place of the arbitration shall be New York, New York.  In any such dispute, actions on behalf of Holders, including initiation of arbitration, shall be approved by the Acting Holders.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

Annex IV - 17

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

CUBIST PHARMACEUTICALS, INC.

By:
Name:
Title:

[RIGHTS AGENT]

By:
Name:
Title:

Annex IV - 18

### Appendix A

**POTENTIAL REGULATORY APPROVAL PAYMENT AMOUNTS**

|  | **FDA APPROVAL PAYMENTS** | **EMA APPROVAL PAYMENTS** | **COMBINED APPROVAL PAYMENTS** |
|---|---|---|---|
| Regulatory Approval Only; No Preferred Product Label Approval | $          1.25 | $          0.50 | $          1.75 |
| Preferred Product Label Approval | $          3.00 | $          1.50 | $          4.50 |
| TOTAL POTENTIAL REGULATORY APPROVAL PAYMENT AMOUNTS | $          3.00 | $          1.50 | $          4.50 |

### POTENTIAL MILESTONE PAYMENT AMOUNTS

|  | **Both FDA and EMA Preferred Product Label Approval** | **NEITHER FDA, NOR EMA, PREFERRED PRODUCT LABEL APPROVAL** | **EMA PREFERRED PRODUCT LABEL APPROVAL ONLY** | **FDA Preferred Product Label Approval Only** |
|---|---|---|---|---|
| ADDITIONAL PAYMENT AT $400M CUMULATIVE WW NET SALES | $          0.00 | $          1.50 | $          0.50 | $          0.00 |
| ADDITIONAL PAYMENT AT $800M CUMULATIVE WW NET SALES | $          0.00 | $          1.25 | $          1.25 | $          1.00 |
| TOTAL POTENTIAL ADDITIONAL SALES MILESTONE PAYMENT | $          0.00 | $          2.75 | $          1.75 | $          1.00 |

**Exhibit 4.1**

EXECUTION VERSION

AMENDMENT TO AMENDED AND RESTATED RIGHTS AGREEMENT

THIS AMENDMENT (the "Amendment"), dated as of October 24, 2011, to the Amended and Restated Rights Agreement (the "Rights Agreement"), dated as of January 31, 2011, between ADOLOR CORPORATION, a Delaware corporation (the "Company"), and BROADRIDGE CORPORATE ISSUER SOLUTIONS, INC. (formerly known as STOCKTRANS, A BROADRIDGE COMPANY), a Pennsylvania corporation (the "Rights Agent"), is being executed at the direction of the Company.  Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings given them in the Rights Agreement.

W I T N E S S E T H

WHEREAS, Section 27 of the Rights Agreement provides that the Company and the Rights Agent may, if the Company so directs, supplement or amend any provision of the Rights Agreement without the approval of any holders of certificates representing shares of Common Stock;

WHEREAS , Cubist Pharmaceuticals, Inc., FRD Acquisition Corporation and the Company contemplate entering into an Agreement and Plan of Merger (the "Merger Agreement");

WHEREAS, the Company desires to amend the Rights Agreement, as set forth herein, to facilitate the transactions contemplated by the Merger Agreement.

NOW, THEREFORE, in accordance with the procedures for amendment of the Rights Agreement set forth in Section 27 thereof, and in consideration of the foregoing and the mutual agreements herein set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1.        AMENDMENT TO SECTION 1.  The definition of "Acquiring Person" in Section 1(a) of the Rights Agreement is hereby amended by deleting clause (ii) of Section 1(a)in its entirety and the following should be inserted in its place:

An Acquiring Person shall not include (A) the Company, (B) any Subsidiary of the Company, (C) any employee benefit and/or savings plan of the Company, or of any Subsidiary of the Company, or any Person or entity organized, appointed or established by the Company for or pursuant to the terms of any such plan, (D) any Person who falls within the definition of an Acquiring Person pursuant to Section 1(a)(i), but falls within such definition solely as a result of a reduction in the number of shares of Common Stock (or securities convertible into or exchangeable for Common Stock) outstanding due to the acquisition of Beneficial Ownership of shares of Common Stock by the Company unless and until such Person, after that such Person has become an Acquiring Person as a result of such acquisition of Beneficial Ownership of Common Stock by the Company, acquires Beneficial Ownership of any additional shares of Common Stock, (E) any Person

who qualifies as an Acquiring Person pursuant to Section 1(a)(i), if the Board of Directors determines in good faith that a Person who would not otherwise be an Acquiring Person had become such solely as a result of an inadvertent acquisition (including, without limitation, because (x) such Person was unaware that it beneficially owned a percentage of the Common Stock that would otherwise cause such Person to be an "Acquiring Person," as defined pursuant to the foregoing provisions of Section 1(a)(i), or (y) such Person was aware of the extent of the Common Shares it beneficially owned but had no actual knowledge of the consequences of such Beneficial Ownership under this Agreement), without any intention of changing or influencing the control of the Company, and such Person divests as promptly as practicable a sufficient number of shares of Common Stock so that such Person would no longer be an Acquiring Person pursuant to Section 1(a)(i), and (F) Cubist Pharmaceuticals, Inc. ("Cubist") and FRD Acquisition Corporation ("Sub"), or any of their respective Affiliates by reason of (I) the approval, execution, delivery, performance or public announcement of the Merger Agreement (the "Merger Agreement"), dated as of October 24, 2011, among Cubist, Sub and the Company, (II) the commencement or public announcement of the Offer (as defined in the Merger Agreement), (III) the purchase of Common Stock pursuant to the Offer, (IV) the consummation or public announcement of the Merger (as defined in the Merger Agreement), (V) the exercise, or public announcement of the exercise, of the Top-Up Option (as defined in the Merger Agreement) and the purchase of the Top-Up Shares (as defined in the Merger Agreement), (VI) the execution and entry into Tender and Voting Agreements (as defined in the Merger Agreement) to be entered into by and among Cubist, Sub and certain stockholders of the Company, (VII)  any combination of (I) through (VI).

Section 2.          New Section.  A new Section 35 shall be added to the Rights agreement which shall read in its entirety:

Notwithstanding anything herein to the contrary, immediately prior to the Acceptance Time (as defined in the Merger Agreement), this Agreement shall terminate and shall have no further force and effect and the Rights shall expire and become null and void, without any payment, liability or obligation on the part of the Company, the Rights Agent or the holders of any Rights to any holder. The Company shall give the Rights Agent prior written notice of the Acceptance Time and shall remain obligated to pay the Rights Agent and to indemnify the Rights Agent in accordance with Section 18 of the Rights Agreement.

Section 3.          Effectiveness.  This Amendment shall become effective as of the date first written above, as if executed on such date.  Except as specifically amended by this Amendment, all other terms and conditions of the Rights Agreement shall remain in full force and effect and are hereby ratified and confirmed.

Section 4.          Benefits of this Agreement.  Nothing in this Agreement shall be construed to give to any Person other than the Company, the Rights Agent and the registered holders of the Rights Certificates (and, prior to the Distribution Date, registered holders of the Common Stock)

any legal or equitable right, remedy or claim under this Agreement; but this Agreement shall be for the sole and exclusive benefit of the Company, the Rights Agent and the registered holders of the Rights Certificates (and, prior to the Distribution Date, registered holders of the Common Stock).

Section 5.    <u>Governing Law</u>.  This Amendment shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such State applicable to contracts made and to be performed entirely within such State; provided, however, that all provisions regarding the rights, duties and obligations of the Rights Agent shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

Section 6.    <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.  A signature to this Amendment transmitted electronically shall have the same authority, effect and enforceability as an original signature.

Section 7.    <u>Descriptive Headings</u>.  Descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

[*Remainder of page intentionally left blank*]

[*Signature Page to Amendment to Amended and Restated Rights Agreement*]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed, all as of the day and year first above written.

ADOLOR CORPORATION

By:      /s/ Michael R. Dougherty
Name:   Michael R. Dougherty
Title:     President and CEO

BROADRIDGE CORPORTE ISSUER SOLUTIONS, INC.

By:      /s/ Linnette Samuels
Name:   Linnette Samuels
Title:     Vice President

Exhibit 99.1

FOR IMMEDIATE RELEASE

                                          

### CUBIST PHARMACEUTICALS TO ACQUIRE ADOLOR

ACQUISITION ADDS FIRST-IN-CLASS HOSPITAL PRODUCT ENTEREG®
AND PROMISING LATE-STAGE COMPOUND ADL5945

TRANSACTION EXPECTED TO BE ACCRETIVE IN 2012

**Lexington, Mass., and Exton, Pa., October 24, 2011 —** Cubist Pharmaceuticals, Inc. (NASDAQ: CBST) and Adolor Corporation (NASDAQ: ADLR) today announced that they have signed a definitive agreement under which Cubist will acquire all of the outstanding shares of Adolor for $4.25 per share in cash, or approximately $190 million on a fully-diluted basis, net of Adolor's third quarter 2011 cash balance. In addition to the upfront cash payment, each Adolor stockholder will receive one Contingent Payment Right (CPR), entitling the holder to receive additional cash payments of up to $4.50 for each share they own if certain regulatory approvals and/or commercialization milestones for ADL5945 are achieved. The total transaction is valued at up to $415 million, net of Adolor's third quarter 2011 cash balance, and is expected to be accretive in 2012.

Under the agreement, Cubist will commence a tender offer to purchase all of the outstanding shares of Adolor for the upfront cash payment and a CPR. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close in the fourth quarter of 2011.

Adolor markets ENTEREG® (alvimopan), the first and only FDA-approved therapy to accelerate the time to upper and lower gastrointestinal recovery following partial large or small bowel resection surgery with primary anastomosis. ENTEREG is an oral, peripherally-acting *mu* opioid receptor antagonist. Cubist, with its focus on addressing acute care and hospital needs, will leverage its existing commercial operations to promote ENTEREG. Launched in 2008, ENTEREG generated more than $25 million in U.S. sales in 2010 and $15.7 million through June 30, 2011. Cubist anticipates peak ENTEREG sales of over $100 million annually.

Adolor's lead development program is ADL5945, an oral, peripherally-restricted *mu* opioid receptor antagonist. It is currently in development for the treatment of chronic opioid induced constipation (OIC), a growing, multi-billion dollar, currently underserved market. Adolor announced positive Phase 2 data for ADL5945 in August 2011 and Phase 3 trials are expected to be initiated in 2012. Cubist plans to retain certain U.S. and specialty rights while seeking a partner to assist with ex-U.S. and primary care commercialization.

"This transaction is an excellent strategic fit for Cubist and the latest milestone in what has been a transformational year for the company," said Cubist President and Chief Executive Officer Michael Bonney. "ENTEREG is a first-in-class therapy with strong growth potential, and we believe our experienced sales force and strong commercial platform will realize the potential of this important hospital product. With the addition of ADL5945, Cubist will have a truly outstanding late-stage pipeline

65 Hayden Avenue, Lexington, MA 02421 P 781.860.8660 F 781.861.0566 www.cubist.com

with three strong candidates addressing significant markets. We are excited about the acquisition of Adolor and believe it will deliver significant value to our shareholders, hospital customers, and patients."

Michael Dougherty, Adolor's President and Chief Executive Officer, stated, "This transaction delivers significant immediate value to Adolor stockholders, as well as potential future value through the CPRs. Cubist shares our commitment to patients and their health care providers, and we expect that ENTEREG and ADL5945 will benefit from Cubist's proven track record and larger platform in development and commercialization."

Terms of the CPR call for additional cash payments of up to $4.50 per CPR. The CPR will entitle each Adolor stockholder to receive up to $3.00 per share if ADL5945 receives regulatory approval in the U.S. and up to $1.50 per share if ADL5945 receives regulatory approval in the European Union, in both instances prior to July 1, 2019. In each case, the size of the payment would depend on the parameters of the approval. The CPR will not be publicly traded.

Morgan Stanley is acting as the financial advisor to Cubist. Stifel Nicolaus Weisel is acting as the financial advisor to Adolor. Ropes & Gray LLP is serving as legal counsel to Cubist and Dechert LLP is serving as legal counsel to Adolor.

******CONFERENCE CALL & WEBCAST INFORMATION******
Cubist will host a conference call and live audio webcast

WHEN: Monday, October 24, 2011 at 8:00 a.m. ET
LIVE DOMESTIC & CANADA CALL-IN: 877-407-8289
LIVE INTERNATIONAL CALL-IN: 201-689-8341

24-HOUR REPLAY DOMESTIC & CANADA: 877-660-6853
24-HOUR REPLAY INTERNATIONAL: 201-612-7415

REPLAY PASSCODES (BOTH REQUIRED FOR PLAYBACK):
ACCOUNT #: 351 CONFERENCE ID #: 381866

CALL WILL ALSO BE BROADCAST LIVE, LISTEN ONLY, VIA THE WEB AT:
www.cubist.com
Replay will be available for 90 days via the Internet at www.cubist.com
***********

**About Cubist**

Cubist Pharmaceuticals, Inc. is a biopharmaceutical company focused on the research, development, and commercialization of pharmaceutical products that address significant unmet medical needs in the acute care environment. Cubist is headquartered in Lexington, Mass. Additional information can be found at Cubist's web site at www.cubist.com.

**About Adolor**

Adolor Corporation is a biopharmaceutical company specializing in the discovery, development and commercialization of novel prescription pain and pain management products.

Adolor's first approved product in the United States is ENTEREG® (alvimopan), which is indicated to accelerate the time to upper and lower gastrointestinal recovery following partial large or small bowel resection surgery with primary anastomosis. ENTEREG is available only for short-term (15 doses) use in hospitalized patients. Only hospitals that have registered in and met all of the requirements for the ENTEREG Access Support and Education (E.A.S.E.®) program may use ENTEREG. For more information on ENTEREG, including its full prescribing information, the Boxed Warning regarding short-term hospital use and the E.A.S.E. Program, visit www.ENTEREG.com.

The Company's lead development program compound is ADL5945, a novel *mu* opioid receptor antagonist being developed for chronic OIC that demonstrated positive results in Phase 2 trials. The Company also has several earlier-stage compounds under development for the management of pain and CNS disorders.

For more information, visit www.adolor.com.

**About the Contingent Payment Right (CPR)**

Terms of the CPR agreement call for additional cash payments of up to $4.50 per CPR under certain circumstances. The CPR will not be publicly traded. The regulatory approvals/commercialization milestones and payments can be summarized as follows:

•      $3.00 per CPR payable if ADL5945 is approved by July 1, 2019 and is the first oral monotherapy treatment for OIC approved by FDA without certain restrictions, or, if not the first approved, is approved with a label that does not competitively disadvantage the product relative to other FDA-approved OIC products.

  This $3.00 amount will be reduced by $1.75 to $1.25 if ADL5945 is not the first approved and is approved with a non-competitive label, provided that such $1.75 can be earned back if certain sales milestones are achieved.

•      $1.50 per CPR payable if ADL5945 is approved by July 1, 2019 and is the first oral monotherapy treatment for OIC approved by the European Medicines Agency (EMA) without certain restrictions, or, if not the first approved, is approved with a label that does not competitively disadvantage the product relative to other EMA-approved OIC products.

  This $1.50 amount will be reduced by $1.00 to $0.50 if ADL5945 is not first approved and is approved with a non competitive label, provided that such $1.00 can be earned back if certain sales milestones are achieved.

**Additional Information**

The CPRs will be deemed contingent consideration under the revised standard IFRS 3 (business combinations), applicable to all transactions undertaken on January 1, 2010 or thereafter. As a result, the fair value of the CPR at the date of change of control will be included in the price of the acquisition and set off by a financial liability, the amount of which will reflect the obligation to pay the potential price adjustments in cash. Future changes in the fair value of the CPR tied to post-acquisition events will be recognized in Cubist's income statement.

**Important Additional Information will be Filed with the U.S. Securities Exchange Commission (SEC)**

This press release is neither an offer to purchase nor a solicitation of an offer to sell securities. Cubist has not commenced the tender offer for shares of Adolor stock described in this press release.

At the time the tender offer is commenced, Cubist will file with the SEC and mail to Adolor stockholders a Tender Offer Statement on Schedule TO and related exhibits, including the offer to purchase, letter of transmittal and other related documents, and Adolor will file with the SEC and mail to its stockholders a Tender Offer Solicitation/Recommendation Statement on Schedule 14D-9 in connection with the transaction. These will contain

important information about Cubist, Adolor, the transaction, and other related matters. Investors and security holders are urged to read each of these documents carefully when they are available. Investors and security holders will be able to obtain free copies of the Tender Offer Statement, the Tender Offer Solicitation/Recommendation Statement, and other documents filed with the SEC by Cubist and Adolor through the Website maintained by the SEC at www.sec.gov. In addition, investors and security holders will be able to obtain free copies of the Tender Offer, the Tender Offer Solicitation/Recommendation Statement, and the other documents filed with the SEC by contacting the Investor Relations departments of Cubist or Adolor at their respective email addresses, included below.

**Cautionary Note Regarding Forward-Looking Statements**

Statements in this press release regarding the proposed transaction between Cubist and Adolor, the expected timetable for completing the transaction, future financial and operating results, benefits and synergies of the transaction, the expectation that the transaction will be accretive, Cubist's and Adolor's product candidates, including Cubist's plans to seek a partner for ADL5495, Cubist's expectation of peak sales of ENTEREG, the expected impact of the anticipated transaction on Cubist's earnings, and any other statements about Cubist or Adolor managements' future expectations, beliefs, goals, plans, or prospects constitute forward-looking statements. For further information concerning forward-looking statements, please read the disclosure under the heading "Cautionary Note Regarding Forward-Looking Statements" in Cubist's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, and in Adolor's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, each of which has been filed with the SEC. Any statements that are not statements of historical fact (including statements containing the words "believes," "plans," "anticipates," "expects," "estimates," and similar expressions) should also be considered to be forward-looking statements. There are a number of important factors that could cause actual results or events to differ materially from those indicated by such forward-looking statements, including: the possibility that certain closing conditions to the transaction will not be met; the ability to consummate the transaction; the ability of Cubist to successfully integrate Adolor's operations and employees; the ability to realize anticipated synergies and cost savings; risks related to drug development and commercialization; and the other factors described under the heading "Risk Factors" in Cubist's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, and in Adolor's Quarterly Report on Form 10-Q for the quarter ended June 30, 2011, each of which has been filed with the SEC. Except as otherwise required by law, Cubist and Adolor disclaim any intention or obligation to update any forward-looking statements as a result of developments occurring after the date of this press release.

**Cubist Contacts:**

INVESTORS:
Eileen C. McIntyre
Senior Director, Investor Relations
(781) 860-8533
eileen.mcintyre@cubist.com

MEDIA:
Tim Hunt
Senior Vice President, Public Affairs
(781) 860-8103

Sard Verbinnen & Co
Andrew Cole/Chris Kittredge/Briana Kelly
(212) 687-8080
cubist-sardverb@sardverb.com

**Adolor Contacts:**

INVESTORS/Media:
Stephen W. Webster
SVP, Finance and CFO
(484) 595-1500
swebster@adolor.com

# EXHIBIT "B"

SC 14D9 1 a2206119zsc14d9.htm SC 14D9
QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## Schedule 14D-9

### SOLICITATION/RECOMMENDATION STATEMENT
**PURSUANT TO SECTION 14(d)(4) OF THE SECURITIES EXCHANGE ACT OF 1934**

---

# ADOLOR CORPORATION
(Name of Subject Company)

# ADOLOR CORPORATION
(Name of Person(s) Filing Statement)

**COMMON STOCK, PAR VALUE $0.0001 PER SHARE**
(Title of Classes of Securities)

**00724X102**
(CUSIP Number of Classes of Securities)

---

**John M. Limongelli**
**Senior Vice President,**
**General Counsel and Secretary**
**Adolor Corporation**
**700 Pennsylvania Drive**
**Exton, PA 19341**
**(484) 595-1500**

---

(Name, Address and Telephone Number of Person Authorized
to Receive Notice and Communications On Behalf of the Person(s) Filing)

**Copy to:**
**James A. Lebovitz**
**Ian A. Hartman**
**Dechert LLP**
**Cira Centre**
**2929 Arch Street**
**Philadelphia, PA 19104**
**(215) 994-4000**

o    Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

**Item 1.    Subject Company Information.**

(a)    *Name and Address.* The name of the subject company is Adolor Corporation, a Delaware corporation ("*Adolor*" or the "*Company*"). The principal executive offices of Adolor are located at 700 Pennsylvania Drive, Exton, Pennsylvania, 19341, and Adolor's telephone number is (484) 595-1500.

(b)    *Securities.* This Solicitation/Recommendation Statement on Schedule 14D-9 (together with the exhibits and annexes, this "*Schedule 14D-9*") relates to the common stock, par value $0.0001 per share, of the Company (the "*Shares*"). As of the close of business on November 4, 2011, there were 46,603,391 Shares issued and outstanding (including shares of restricted stock). The number of Shares issued and outstanding does not include any shares of common stock subject to options or any deferred stock units outstanding as of November 4, 2011.

**Item 2.    Identity and Background of Filing Person.**

(a)    *Name and Address.* The name, address and telephone number of the Company, which is filing this Schedule 14D-9, is set forth in Item 1(a) above.

(b)    *Tender Offer.* This Schedule 14D-9 relates to a tender offer (the "*Offer*") by FRD Acquisition Corporation, a Delaware corporation ("*Purchaser*") and wholly-owned subsidiary of Cubist Pharmaceuticals, Inc., a Delaware corporation ("*Parent*"), disclosed in a Tender Offer Statement on Schedule TO filed with the Securities and Exchange Commission (the "*SEC*") on November 7, 2011 (as amended or supplemented from time to time, the "*Schedule TO*"), to purchase all of the outstanding Shares at a purchase price of $4.25 per Share in cash (the "*Closing Amount*"), plus one non-transferable contingent payment right for each Share (a "*CPR*"), which shall represent the right to receive up to $4.50 in cash subject to the fulfillment of certain conditions and/or the attainment of certain milestones, upon the terms and subject to the conditions set forth in the Offer to Purchase, dated November 7, 2011 (as amended or supplemented from time to time, the "*Offer to Purchase*"), and in the related Letter of Transmittal, dated November 7, 2011 (as amended or supplemented from time to time, the "*Letter of Transmittal*"). For purposes of this Schedule 14D-9, the Closing Amount and one CPR, or any such higher consideration as may be paid in the Offer, are referred to as the "*Offer Price*". Copies of the Offer to Purchase and the Letter of Transmittal are filed as Exhibits (a)(1)(A) and (a)(1)(B) hereto, respectively, and are incorporated by reference herein.

The Offer is being made pursuant to an Agreement and Plan of Merger, dated as of October 24, 2011 (the "*Merger Agreement*") by and among the Company, Parent and Purchaser. Pursuant to the Merger Agreement, after the consummation of the Offer, and subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement, Purchaser will merge with and into the Company (the "*Merger*"), with the Company surviving as a wholly-owned subsidiary of Parent (the "*Surviving Corporation*"). Upon completion of the Merger, each Share outstanding immediately prior to the effective time of the Merger (the "*Effective Time*") (excluding those Shares that are held by Parent, Purchaser, the Company or stockholders perfecting their appraisal rights under Section 262 of the Delaware General Corporation Law (the "*DGCL*")) will be cancelled and converted into the right to receive the Closing Amount in cash (without interest and subject to applicable withholding taxes) and one CPR, or any such higher consideration as may be paid in the Offer (the "*Merger Consideration*"). If Purchaser holds 90% or more of the outstanding Shares immediately prior to the Merger, it may effect a "short-form" merger under the DGCL without additional approval by the Company's stockholders. Otherwise, the Company will hold a special stockholders' meeting to obtain stockholders' approval of the Merger.

The treatment of awards under the Company's benefit plans, including options, restricted stock awards and deferred stock units, is discussed below under Item 3—Past Contacts, Transactions, Negotiations and Agreements.

2

The foregoing description of the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is attached to this Schedule 14D-9 as Exhibit (e)(1) and is incorporated by reference herein.

Pursuant to the Merger Agreement, Parent and Broadridge Corporate Issuer Solutions, Inc., a Pennsylvania corporation, as rights agent (the "*Rights Agent*") will enter into a Contingent Payment Rights Agreement (the "*CPR Agreement*") governing the terms of the CPRs. Each holder of a CPR is entitled to receive the following cash payments:

*U.S. Food and Drug Administration ("FDA") Approval*:

- $3.00 per CPR payable if ADL5945 is approved by the FDA on or before July 1, 2019 and is either (1) the first oral monotherapy treatment for opioid induced constipation ("*OIC*") approved by the FDA without a maximum day limitation, or (2) if not the first product to be so approved, the FDA-approved label does not competitively disadvantage ADL5945 relative to other FDA-approved OIC products (such approval, the "*FDA Preferred Product Label Approval*").

- This $3.00 amount will be reduced by $1.75 to $1.25 if ADL5945 is approved by the FDA for OIC, but does not otherwise meet the criteria for the FDA Preferred Product Label Approval.

*European Medicines Agency ("EMA") Approval*:

- $1.50 per CPR payable if ADL5945 is approved by the EMA on or before July 1, 2019 and is either (1) the first oral monotherapy treatment for OIC approved by the EMA without a maximum day limitation, or (2) if not the first product to be so approved, the EMA-approved label does not competitively disadvantage ADL5945 relative to other EMA-approved OIC products (such approval, the "*EMA Preferred Product Label Approval*").

- This $1.50 amount will be reduced by $1.00 to $0.50 if ADL5945 is approved by the EMA for OIC, but does not otherwise meet the criteria for the EMA Preferred Product Label Approval.

*Sales Milestones*:

If either the FDA Preferred Product Label Approval or the EMA Preferred Product Label Approval is not obtained by July 1, 2019, then each holder of a CPR is entitled to receive the following cash payments:

- If neither the FDA Preferred Product Label Approval nor the EMA Preferred Product Label Approval is obtained, then each holder of a CPR is entitled to receive $1.50 upon ADL5945 achieving $400,000,000 in cumulative worldwide net sales prior to the earlier of (1) July 1, 2024, and (2) the fifth anniversary of the earlier of (a) the first commercial sale of ADL5945 in the United States and (b) the first date on which there have been commercial sales of ADL5945 in at least three of the following five major European markets: the United Kingdom, France, Germany, Spain and Italy (the "*$400 Million Sales Target*"), and an additional $1.25 upon ADL5945 achieving $800,000,000 in cumulative worldwide net sales over the same period (the "*$800 Million Sales Target*").

- If EMA Preferred Product Label Approval is obtained, but FDA Preferred Product Label Approval is not obtained, then each holder of a CPR is entitled to receive $0.50 upon

3

ADL5945 achieving the $400 Million Sales Target, and an additional $1.25 upon ADL5945 achieving the $800 Million Sales Target.

- If FDA Preferred Product Label Approval is obtained, but EMA Preferred Product Label Approval is not obtained, then each holder of a CPR is entitled to receive $1.00 upon ADL5945 achieving the $800 Million Sales Target.

Parent has agreed to use certain diligent efforts to achieve each milestone, which efforts generally require Parent, in carrying out its obligations, to use those efforts normally used by persons in the pharmaceutical business similar in size and resources to Parent relating to seeking regulatory approval for a product candidate or commercialization of an approved product that is of similar market potential at a similar stage in its development or product life.

The foregoing description of the form of CPR Agreement does not purport to be complete and is qualified in its entirety by reference to the form of CPR Agreement, which is attached as Annex IV to the Merger Agreement and incorporated by reference herein.

As set forth in the Schedule TO, (i) the address of the principal executive offices of Purchaser is 65 Hayden Avenue, Lexington, Massachusetts 02421, and the telephone number at that location is (781) 860-8660, and (ii) the address of the principal executive offices of Parent is 65 Hayden Avenue, Lexington, Massachusetts 02421, and the telephone number at that location is (781) 860-8660.

**Item 3.    Past Contacts, Transactions, Negotiations and Agreements.**

Except as set forth in this Schedule 14D-9, including in the Information Statement of the Company attached to this Schedule 14D-9 as Annex I hereto, which is incorporated by reference herein (the "*Information Statement*"), as of the date of this Schedule 14D-9, there are no material agreements, arrangements or understandings and no actual or potential conflicts of interest between the Company or its affiliates and (i) its executive officers, directors or affiliates, or (ii) Parent, Purchaser or their respective executive officers, directors or affiliates. The Information Statement included in Annex I is being furnished to the Company's stockholders pursuant to Section 14(f) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), and Rule 14f-1 promulgated thereunder, in connection with Parent's right pursuant to the Merger Agreement to designate persons to the board of directors of the Company (the "*Company Board*", the "*Board*" or the "*Company's Board of Directors*") promptly upon the first acceptance for payment pursuant to the Offer of Shares that represent at least a majority of the issued and outstanding Shares, and the transfer of funds to a paying agent to cover the Closing Amount with respect to such Shares.

In considering the recommendation of the Company Board, you should be aware that the Company's directors and executive officers have interests in the Offer that are different from, or in addition to, those of its stockholders. These interests may create potential conflicts of interest. The Company Board was aware of these interests and considered them, among other matters, in making its recommendation. The Company's executive officers are Michael R. Dougherty, Stephen W. Webster, John M. Limongelli and George R. Maurer. Mr. Dougherty also is a member of the Company Board.

*(a)    Arrangements with Current Executive Officers and Directors of the Company.*

**Director and Officer Exculpation, Indemnification and Insurance**

As permitted under Section 145 of the DGCL, the Company has included in its certificate of incorporation, as amended and restated (the "*Charter*"), a provision that the Company shall, to the fullest extent permitted by the DGCL, indemnify any and all persons whom the Company has the power to indemnify under said section from and against any and all of the expenses, liabilities, or other matters referred to in or covered by said section. The Charter further provides that such indemnification shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any by-law, agreement, vote of stockholders, or disinterested directors or otherwise, both

4

as to action in their official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

In addition, the Amended and Restated Bylaws of the Company (the "*Bylaws*") provide that the Company shall indemnify each person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "*proceeding*") by reason of the fact that such person is or was a director or officer of the Company or a constituent corporation absorbed in a consolidation or merger, or is or was serving at the request of the Company or a constituent corporation absorbed in a consolidation or merger, as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, or is or was a director or officer of the Company serving at its request as an administrator, trustee or other fiduciary of one or more of the employee benefit plans of the Company or other enterprise, against expenses (including attorneys' fees), liability and loss actually and reasonably incurred or suffered by such person in connection with such proceeding, whether or not the indemnified liability arises or arose from any threatened, pending or completed proceeding by or in the right of the Company, except to the extent that such indemnification is prohibited by applicable law. The Bylaws also permit the Company in certain circumstances to make advance payments of expenses to any persons entitled to indemnification thereunder.

In addition, the Company maintains directors' and officers' liability insurance.

Pursuant to the Merger Agreement, for a period of six years following the Effective Time, Parent has agreed to maintain in effect any rights with respect to matters occurring at or prior to the Effective Time to indemnification or exculpation existing in favor of the Company's directors or officers in the Charter and Bylaws as in effect immediately prior to the Effective Time. In addition, the Merger Agreement provides that, for a period of six years following the Effective Time, Parent shall not, nor shall it permit the Surviving Corporation to, amend, repeal or otherwise modify such provisions for indemnification in any manner that would adversely affect the rights thereunder of individuals who at any time on or prior to the Effective Time were directors or officers of the Company or directors or officers of any subsidiary of the Company in respect of actions or omissions occurring at or prior to the Effective Time (including, without limitation, the transactions contemplated by the Merger Agreement), unless such modification is required by law. The Merger Agreement also provides that in the event any claim or claims are asserted or made either prior to the Effective Time or within such six year period, all rights to indemnification in respect of any such claim or claims shall continue until disposition of any and all such claims. Parent guarantees the payment of any obligation of the Surviving Corporation to indemnify any director or officer of the Company.

The Merger Agreement further provides that, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to: (i) maintain for a period of six years after the Effective Time, at no expense to the beneficiaries, the current policies of the directors' and officers' liability insurance maintained by the Company with respect to matters existing or occurring at or prior to the Effective Time (including the transactions contemplated by the Merger Agreement), so long as the annual premium therefor would not be in excess of 300% of the last annual premium paid prior to the Effective Time, or (ii) purchase a six year extended reporting period endorsement with respect to the directors' and officers' liability insurance and maintain such endorsement in full force and effect for its full term, *provided*, *however*, that prior to the Surviving Corporation taking any actions in clauses (i) or (ii), Parent shall be provided the opportunity to purchase, in lieu thereof, a substitute policy with the same coverage limits and substantially similar terms as in the endorsement proposed to be purchased by the Surviving Corporation. The Merger Agreement also provides that if the Company's or the Surviving Corporation's existing insurance expires, is terminated or canceled during such six year period or exceeds the maximum premium discussed above, the Surviving Corporation shall obtain, and Parent shall cause the Surviving Corporation to obtain, as much directors' and officers' liability insurance as can be obtained for the remainder of such period for an annualized premium not in excess of such maximum premium, on terms and conditions no less advantageous to the indemnified parties than the Company's existing directors' and officers' liability insurance.

5

The Merger Agreement also provides that, in the event that Parent or the Surviving Corporation or any of their respective successors or assigns (i) consolidates with or merges into any other person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or a substantial portion of its properties and other assets to any person, then, and in each such case, Parent or the Surviving Corporation, as applicable, shall cause proper provision to be made so that such successors and assigns shall assume the obligations set forth above.

### Treatment of Incentives under the Merger Agreement

*Stock Options:*   Each stock option (each a "*Company Option*" and, collectively, the "*Company Options*") that was granted under the Company's Amended and Restated 1994 Equity Compensation Plan or its 2011 Stock-Based Incentive Compensation Plan (formerly known as the 2003 Amended and Restated Stock-Based Incentive Compensation Plan) (the "*Company Stock Plans*") outstanding immediately prior to the Acceptance Time shall vest as of the Acceptance Time. As of the Effective Time, all Company Stock Plans shall terminate and all Company Options shall be cancelled. The Company shall provide written notice and an opportunity to exercise to all holders of Company Options prior to the Effective Time. In full satisfaction of the cancellation of any Company Option that had a per-Share exercise price less than the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time, Parent shall, or shall cause the Surviving Corporation to, following the Effective Time, pay to the holder of such Company Option an amount in cash equal to the product of (i) the excess, if any, of the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time over the per-Share exercise price of such Company Option and (ii) the number of Shares subject thereto. At the Effective Time, all outstanding "out-of-the-money" Company Options (options with a per Share exercise price at or above the last reported sale price on the NASDAQ stock market on the last trading day prior to the Acceptance Time) will be cancelled without further obligation.

*Restricted Stock:*   Each unvested share of restricted stock that was granted by the Company under a Company Stock Plan (a "*Company Restricted Share*" and, collectively, the "*Company Restricted Stock*") outstanding immediately prior to the Acceptance Time shall vest as of the Acceptance Time and, after satisfaction of all applicable tax and other withholding requirements, be converted into the right to receive, as promptly as practicable following the Effective Time, the Merger Consideration.

*Deferred Stock Units:*   Each unvested performance-based deferred stock unit (a "*Performance-Based DSU*" and, collectively, the "*Performance-Based DSUs*") and each time-vested deferred stock unit (a "*Time-Vested DSU*" and, collectively, the "*Time-Vested DSUs*") (the Performance-Based DSUs and the Time-Vested DSUs being collectively referred to herein as the "*DSUs*") outstanding immediately prior to the Acceptance Time shall vest as of the Acceptance Time and shall be satisfied by delivery of an equivalent number of Shares, less such number of Shares as shall be withheld to satisfy applicable tax and other withholding requirements. At the Effective Time, such remaining Shares shall be converted into the right to receive the Merger Consideration as promptly as practicable following the Effective Time.

*2011 Incentive Compensation:*   Each employee of the Company as of the Acceptance Time (i) who is a participant in the Company's performance-based Incentive Compensation Plan (the "*Incentive Compensation Plan*") shall be entitled to receive from the Company, the Surviving Corporation or the Parent, as the case may be, the amount of any bonus payable to such employee under the Incentive Compensation Plan for calendar year 2011, calculated assuming target achievement by the Company and such employee of all applicable performance goals, if any, and (ii) who is a participant in the Company's Account Manager, Regional Sales Director and National Sales Director Field Sales Incentive Compensation Plan for Trimester 3 (September—December 2011) (the "*Sales Incentive Compensation Plan*" and together with the Incentive Compensation Plan, the "*IC Plans*") shall be

6

entitled to receive from the Company, the Surviving Corporation or the Parent, as the case may be, the greater of (y) the amount of any bonus payable to such employee under the Sales Incentive Compensation Plan for such trimester, calculated assuming target achievement by the Company and such employee of all applicable performance goals, if any, and (z) the actual amount of goal attainment for such employee under such plan. The amount of bonus payable under the relevant section of the Merger Agreement shall be paid at the earlier of (i) such time as such bonus otherwise would have been paid to such employee by the Company consistent with past practice and (ii) such time as the employee is terminated by the Surviving Corporation or Parent.

### Employment Agreements

Each of Messrs. Michael R. Dougherty, Stephen W. Webster, John M. Limongelli, and George R. Maurer, the Company's named executive officers (each a "*NEO*"), is party to a letter agreement with the Company (collectively, the Letter Agreements). Under these Letter Agreements, if the NEO's employment is terminated by the Company without Cause or by the NEO for Good Reason within ninety (90) days prior to or twelve (12) months following a "change in control" (as each such term is defined in the Letter Agreements) of the Company (each, a "*Qualifying Termination*"), the NEO will be entitled to the following payments and benefits (subject, in the case of Mr. Dougherty only, to his execution of a release):

(i)     an amount equal to the sum of (a) the NEO's current base salary and (b) the bonus amount paid for the NEO's performance for the immediately preceding calendar year, paid in twelve (12) monthly installments following the Qualifying Termination; and

(ii)    continuation of medical, dental and life insurance benefits for a period of twelve (12) months following the Qualifying Termination.

In addition to the payments and benefits set forth above, the Company will pay for outplacement services for each NEO for a period of twelve (12) months following a Qualifying Termination.

The Acceptance Time will constitute a "change in control" as defined in the Letter Agreements between the Company and the NEOs. The following table sets forth the estimated payments that, in addition to equity-based award benefits described below, would be owed to each NEO as of the Acceptance Time assuming that (i) the Acceptance Time occurred on November 4, 2011 (the last practicable date prior to the filing of this Schedule 14D-9) and (ii) each NEO underwent a Qualifying Termination at the Acceptance Time. Because the actual dates of the Acceptance Time and, if applicable, the NEO's Qualifying Termination will be later than November 4, 2011, the actual value of the payments and benefits owed to the NEOs by the Company could differ from the values set forth in the table below.

| Name | 1x Base Salary | 1x Bonus | Benefit Continuation | Outplacement | Total |
|---|---|---|---|---|---|
| **Michael R. Dougherty** | $ 457,668 | $ 171,904 | $ 25,584 | $ 25,000 | $ 680,156 |
| **Stephen W. Webster** | $ 349,981 | $ 83,654 | $ 25,584 | $ 25,000 | $ 484,219 |
| **John M. Limongelli** | $ 349,981 | $ 83,654 | $ 25,584 | $ 25,000 | $ 484,219 |
| **George R. Maurer** | $ 285,000 | $ 69,006 | $ 19,611 | $ 25,000 | $ 398,617 |

*See "Item 8. Additional Information—Information about Golden Parachute Compensation" below for further information with respect to certain of these arrangements and for a quantification of all amounts potentially payable to the NEOs in connection with the Offer and completion of the Merger.*

### Stock Options

The following table sets forth the approximate value of the cash payments that each NEO and director of Adolor would receive in exchange for the cancellation of all of his vested and unvested

7

Company Options pursuant to the Merger Agreement, assuming the Acceptance Time and the Effective Time occurred on November 4, 2011 (the last practicable date prior to the filing of this Schedule 14D-9) and the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time was $4.53 (the average closing market price of the Shares over the first five business days following the first public announcement of the Merger). This information is based on the number of stock options held by Adolor's NEOs and directors as of November 4, 2011 and assumes no exercise or expiration of those Company Options prior to the Effective Time. Because the actual dates of the Acceptance Time and the Effective Time will be later than November 4, 2011, because the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the Acceptance Time could be greater or less than $4.53, and because an NEO or director could exercise some or all of such Company Options prior to the Effective Time, the actual value of the cash payments that each NEO and director will receive in exchange for the cancellation of his unvested Company Options could differ from the values set forth in the table below. All values are shown before reduction for applicable withholding tax.

| Name | Vested Options | Value | Unvested Options | Value | Total Value |
|---|---|---|---|---|---|
| Michael R. Dougherty | 419,998 | $ 628,647 | 235,002 | $ 713,703 | $ 1,342,350 |
| Stephen W. Webster | 58,749 | $ 169,672 | 71,251 | $ 219,228 | $ 388,900 |
| John M. Limongelli | 166,978 | $ 314,441 | 118,022 | $ 308,359 | $ 622,800 |
| George R. Maurer | 110,415 | $ 178,260 | 69,585 | $ 211,040 | $ 389,300 |
| Armando Anido | 90,000 | $ 204,000 | 60,000 | $ 185,100 | $ 389,100 |
| Georges Gemayel, Ph.D. | 115,000 | $ 225,750 | 60,000 | $ 185,100 | $ 410,850 |
| Paul Goddard, Ph.D. | 90,000 | $ 204,000 | 60,000 | $ 185,100 | $ 389,100 |
| George V. Hager, Jr. | 90,000 | $ 204,000 | 60,000 | $ 185,100 | $ 389,100 |
| David M. Madden | 205,000 | $ 326,400 | 60,000 | $ 185,100 | $ 511,500 |
| Guido Magni, M.D., Ph.D. | 70,000 | $ 188,000 | 60,000 | $ 185,100 | $ 373,100 |
| Claude H. Nash, Ph.D. | 90,000 | $ 204,000 | 60,000 | $ 185,100 | $ 389,100 |
| Donald E. Nickelson | 90,000 | $ 204,000 | 60,000 | $ 185,100 | $ 389,100 |

The following table sets forth the approximate amounts each NEO and director would receive if, instead of allowing his Company Options to be cancelled at the Effective Time, as illustrated in the preceding table, he exercised all of his Company Options (other than Company Options with an exercise price greater than $4.25 per share) effective immediately prior to the Effective Time and received the Merger Consideration (net of the exercise price) for the Shares underlying such Company Options, but no amount was paid with respect to any CPR received for such Shares. All values are shown before reduction for applicable withholding tax.

| Name | Vested Options | Value | Unvested Options | Value | Total Value |
|---|---|---|---|---|---|
| Michael R. Dougherty | 419,998 | $ 511,048 | 235,002 | $ 647,903 | $ 1,158,951 |
| Stephen W. Webster | 58,749 | $ 153,223 | 71,251 | $ 199,277 | $ 352,500 |
| John M. Limongelli | 166,978 | $ 267,687 | 118,022 | $ 275,313 | $ 543,000 |
| George R. Maurer | 110,415 | $ 147,343 | 69,585 | $ 191,557 | $ 338,900 |
| Armando Anido | 90,000 | $ 178,800 | 60,000 | $ 168,300 | $ 347,100 |
| Georges Gemayel | 115,000 | $ 193,550 | 60,000 | $ 168,300 | $ 361,850 |
| Paul Goddard, Ph.D. | 90,000 | $ 178,800 | 60,000 | $ 168,300 | $ 347,100 |
| George V. Hager, Jr. | 90,000 | $ 178,800 | 60,000 | $ 168,300 | $ 347,100 |
| David M. Madden | 205,000 | $ 269,000 | 60,000 | $ 168,300 | $ 437,300 |
| Guido Magni, M.D., Ph.D. | 70,000 | $ 168,400 | 60,000 | $ 168,300 | $ 336,700 |
| Claude H. Nash | 90,000 | $ 178,800 | 60,000 | $ 168,300 | $ 347,100 |

| Donald Nickelson | 90,000 | $ | 178,800 | | 60,000 | $ | 168,300 | $ | 347,100 |

8

*See "Contingent Payment Rights" below for information on amounts the NEOs and directors would receive with respect to CPRs received in connection with the exercise of their vested and unvested Company Options (other than Company Options with an exercise price greater than $4.25 per share) if such CPRs are paid out in full.*

*See "Item 8. Additional Information—Information about Golden Parachute Compensation" below for further information with respect to certain of these arrangements and for a quantification of all amounts potentially payable to the NEOs in connection with the Offer and completion of the Merger.*

### Restricted Stock and Deferred Stock Units

The following table sets forth the value of all outstanding Company Restricted Shares and DSUs that would vest as of the Acceptance Time, assuming that no amount will be paid with respect to CPRs received in connection with such Company Restricted Shares and in respect of Shares delivered upon settlement of DSUs. Because amounts could be paid with respect to CPRs received in connection with such Company Restricted Shares and in respect of Shares delivered pursuant to the DSUs, the actual value of the cash payments that each NEO will receive with respect to his unvested Company Restricted Shares and DSUs could differ from the values set forth in the table below. All values are shown before reduction for applicable withholding tax.

| Name | Unvested Company Restricted Shares and DSUs | Value |
|---|---|---|
| Michael R. Dougherty | 493,750(1) | $ 2,098,438 |
| Stephen W. Webster | 141,250(2) | $ 600,313 |
| John M. Limongelli | 191,250(3) | $ 812,813 |
| George R. Maurer | 148,750(4) | $ 632,188 |

(1) Includes 37,500 unvested Company Restricted Shares and 456,250 unvested DSUs.

(2) Includes no unvested Company Restricted Shares and 141,250 unvested DSUs.

(3) Includes no unvested Company Restricted Shares and 191,250 unvested DSUs.

(4) Includes no unvested Company Restricted Shares and 148,750 unvested DSUs.

*See "Contingent Payment Rights" below for further information on the amounts the NEOs would receive with respect to CPRs received pursuant to the Merger Agreement in respect of Company Restricted Shares and in respect of Shares delivered pursuant to the DSUs if such CPRs are paid out in full.*

*See "Item 8. Additional Information—Information about Golden Parachute Compensation" below for further information with respect to certain of these arrangements and for a quantification of all amounts potentially payable to the NEOs in connection with the Offer and completion of the Merger.*

### Contingent Payment Rights

As described in Item 2(b) above, each Share tendered in the Offer shall receive the Closing Amount plus one CPR. The following table sets forth the approximate value each NEO and director of the Company would receive if the CPRs pay out $4.50 (the maximum amount payable per CPR) assuming that (i) the NEOs and directors exercise each of their Company Options with an exercise price less than or equal to $4.25 per share (and that no Company Option with an exercise price greater than $4.25 per share will be exercised) and receive in respect of each Share received upon exercise, in addition to the Closing Amount, one CPR and (ii) each holder of Restricted Shares and DSUs will receive, in addition to the Closing Amount, one CPR for each share constituting or underlying the referenced award. Because (a) the CPRs will not necessarily pay out at their full value, if they pay out at all, and (b) the NEOs and directors will not receive CPRs with respect to Shares underlying Company Options that they do not exercise or Shares that the NEOs tender in the Offer or have withheld to satisfy withholding tax obligations in connection with Company Restricted Shares and

9

DSUs, the actual number of CPRs each NEO and director receives and the actual amount those CPRs pay out could differ substantially from what is set forth in the table.

| Name | Shares Underlying Vested Company Options | Maximum CPR Value | Shares Underlying Unvested Awards | Maximum CPR Value | CPR Value Total |
|---|---|---|---|---|---|
| Michael R. Dougherty | 419,998 | $ 1,889,991 | 728,752 | $ 3,279,384 | $ 5,169,375 |
| Stephen W. Webster | 58,749 | $ 264,371 | 212,501 | $ 956,255 | $ 1,220,626 |
| John M. Limongelli | 166,978 | $ 751,401 | 309,272 | $ 1,391,724 | $ 2,143,125 |
| George R. Maurer | 110,415 | $ 496,868 | 218,335 | $ 982,508 | $ 1,479,376 |
| Armando Anido | 90,000 | $ 405,000 | 60,000 | $ 270,000 | $ 675,000 |
| Georges Gemayel, Ph.D. | 115,000 | $ 517,500 | 60,000 | $ 270,000 | $ 787,500 |
| Paul Goddard, Ph.D. | 90,000 | $ 405,000 | 60,000 | $ 270,000 | $ 675,000 |
| George V. Hager, Jr. | 90,000 | $ 405,000 | 60,000 | $ 270,000 | $ 675,000 |
| David M. Madden | 205,000 | $ 922,500 | 60,000 | $ 270,000 | $ 1,192,500 |
| Guido Magni, M.D., Ph.D. | 70,000 | $ 315,000 | 60,000 | $ 270,000 | $ 585,000 |
| Claude H. Nash, Ph.D. | 90,000 | $ 405,000 | 60,000 | $ 270,000 | $ 675,000 |
| Donald Nickelson | 90,000 | $ 405,000 | 60,000 | $ 270,000 | $ 675,000 |

*See "Item 8. Additional Information—Information about Golden Parachute Compensation" below for further information with respect to certain of these arrangements and for a quantification of all amounts potentially payable to the NEOs in connection with the Offer and completion of the Merger.*

**2011 Incentive Compensation**

The following table sets forth the amount of the bonus that will be payable to each NEO under the Company's Incentive Compensation Plan for calendar year 2011, provided that the NEO is employed by the Company as of the Acceptance Time.

| Name | 2011 Bonus |
|---|---|
| Michael R. Dougherty | $ 251,717(1) |
| Stephen W. Webster | $ 122,493(2) |
| John M. Limongelli | $ 122,493(3) |
| George R. Maurer | $ 99,750(4) |

(1)    Based on a target bonus equal to 55% of Mr. Dougherty's 2011 base salary of $457,668.

(2)    Based on a target bonus equal to 35% of Mr. Webster's 2011 base salary of $349,981.

(3)    Based on a target bonus equal to 35% of Mr. Limongelli's 2011 base salary of $349,981.

(4)    Based on a target bonus equal to 35% of Mr. Maurer's 2011 base salary of $285,000.

*See "Item 8. Additional Information—Information about Golden Parachute Compensation" below for further information with respect to certain of these arrangements and for a quantification of all amounts potentially payable to the NEOs in connection with the Offer and completion of the Merger.*

**Tender and Voting Agreements**

In connection with the Offer, Parent, Purchaser and each of the Company's directors and NEOs entered into Tender and Voting Agreements (each a "*Tender and Voting Agreement*"). Pursuant to each Tender and Voting Agreement, the applicable director or NEO has agreed, among other things, subject to the termination of such Tender and Voting Agreement, (i) to tender in the Offer (and not to withdraw) all Shares beneficially owned by them, *provided, however*, that there shall be no duty to tender Shares if such action would give rise to liability under Section 16(b) of the Exchange Act, (ii) to

10

vote such Shares in support of the Merger in the event stockholder approval is required to consummate the Merger, (iii) to appoint Parent as his proxy to vote such shares in connection with the Merger Agreement and (iv) not to otherwise transfer any of his Shares. Each Tender and Voting Agreement will terminate upon the termination of the Merger Agreement.

The foregoing description of the Tender and Voting Agreements does not purport to be complete and is qualified in its entirety by reference to the form of Tender and Voting Agreement, which is attached as Annex II to the Merger Agreement and is incorporated by reference herein.

(b)   *Arrangements with Parent and the Purchaser.*

### Merger Agreement

The summary of the Merger Agreement and the description of the conditions to the Offer contained in the Offer to Purchase are incorporated by reference herein. Such summary and description do not purport to be complete and are qualified in their entirety by reference to the Merger Agreement, which is attached to this Schedule 14D-9 as Exhibit (e)(1) and is incorporated by reference herein.

The Merger Agreement is attached to this Schedule 14D-9 to provide the Company's stockholders with information regarding the terms of the Merger Agreement and is not intended to modify or supplement any factual disclosures about the Company or Parent in the Company's or Parent's public reports filed with the SEC. In particular, the Merger Agreement and this summary of terms are not intended to be, and should not be relied upon as, disclosures regarding any facts or circumstances relating to the Company or Parent. The representations and warranties may not be intended as statements of fact but rather as a way of allocating contractual risk between the parties to the Merger Agreement and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. In addition, the assertions embodied in the representations and warranties contained in the Merger Agreement are qualified by information in a confidential disclosure letter that the parties have exchanged and may be modified by the information contained in such disclosure letter.

### Confidentiality Agreement

On July 26, 2011, Parent and the Company entered into a Mutual Confidentiality and Non-Use Agreement (as amended, the "*Confidentiality Agreement*") pursuant to which Parent has agreed that, subject to certain limitations, any information concerning the Company and its subsidiaries that is of a confidential or proprietary nature furnished to it or its advisors by or on behalf of the Company shall be held confidential. The foregoing description of the Confidentiality Agreement does not purport to be complete and is qualified in its entirety by reference to the Confidentiality Agreement, which is attached to this Schedule 14D-9 as Exhibit (e)(2) and is incorporated herein by reference.

### Item 4.   The Solicitation or Recommendation.

(a)   *Solicitation or Recommendation.*

The Company Board, during a meeting held on October 23, 2011, by unanimous vote determined that the Offer and the Merger are advisable and in the best interests of the stockholders of the Company and approved the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, on the terms and subject to the conditions set forth therein. Accordingly, the Company Board unanimously recommends that the stockholders of the Company accept the Offer, tender their Shares to Purchaser pursuant to the Offer and, if required by Delaware law, vote their Shares in favor of the adoption of the Merger Agreement in accordance with the applicable provisions of Delaware law.

11

(b)    *Background of the Offer and Merger.*

The Company's management has regularly explored and assessed, and discussed with the Company Board, potential strategic alternatives available to the Company. These alternatives included strategies to grow and expand the Company's business and operations through collaboration agreements and licensing agreements, divest assets, or possibly merge or combine the Company's operations with other companies in the pharmaceutical industry.

Specifically, since 2008, the Company's management has been regularly engaged in exploring opportunities for its opioid induced constipation ("*OIC*") program. Over the course of the last year, confidentiality agreements have been signed with eleven companies interested in Adolor's OIC program. Additionally, the Company has explored external opportunities for ENTEREG as well as discussions with regard to earlier stage development programs, such as beloxepin.

As part of these routine outreach efforts, on March 30, 2011, employees of the Company, including Kevin Taylor, the Company's Vice President Business Development, met with employees of Parent to discuss beloxepin.

On May 11, 2011, Mr. Taylor and an employee of Parent had a telephone conversation to follow-up on the March 30 meeting.

On May 19, an employee of the Company met with representatives of Parent to discuss certain of the Company's programs.

On June 15, 2011, Mr. Taylor requested a meeting with representatives of Parent at an industry conference to be held in late June in Washington, D.C.

On June 28, Mr. Taylor met with Brad Prosek, Parent's Senior Director of Business Development, and Praveen Tipirneni, Parent's Vice President of Business Development, at that conference, where they discussed the Company's business. Following these discussions, the parties agreed to schedule a call between Michael W. Bonney, Parent's President and Chief Executive Officer, and Michael R. Dougherty, the Company's President and Chief Executive Officer.

On July 5, 2011, Mr. Bonney called Mr. Dougherty and discussed the possibility of a strategic relationship between the companies.

In mid-July, Mr. Dougherty called Mr. Bonney and agreed that the companies should explore the possibility of a strategic relationship. It was agreed that Parent and the Company should enter into an agreement to ensure the confidentiality of information exchanged during discussions between the companies.

Following this discussion, the companies negotiated a confidentiality agreement which was executed on July 26. The confidentiality agreement included a standstill provision that prohibited Parent from acquiring stock of the Company, except in certain limited circumstances, for twelve (12) months.

On August 2, 2011, management from both companies met at Parent's headquarters in Lexington, Massachusetts. During the meeting, the Company's management made confidential presentations regarding ENTEREG and its OIC program.

On August 10, Adolor publicly announced positive, statistically significant top line results from its two Phase 2 studies of ADL5945 in chronic non-cancer pain patients with OIC. That same day, Robert J. Perez, Parent's Executive Vice President and Chief Operating Officer, called to congratulate Mr. Dougherty on these Phase 2 results. It was agreed that Parent would be granted access to the Company's electronic data room, where the Company housed confidential information, and on August 12, the Company provided Parent access.

12

On August 22, Mr. Dougherty, Mr. Bonney and Mr. Perez attended dinner together. At that dinner, they discussed the Company's programs and opportunities that may exist between Parent and the Company. Mr. Dougherty discussed his perspectives regarding the market and the undervalued nature of the Company's assets. The parties discussed the utilization of contingent payment rights in the pharmaceutical industry.

Two days following this dinner, on August 24, the Company Board held a special meeting. The Company Board was briefed on Mr. Dougherty's recent discussions with Parent. The Company Board discussed the plan to seek an indication of interest from Parent. The Company Board also approved the appointment of Stifel, Nicolaus & Company, Incorporated ("*Stifel Nicolaus*") to serve as financial advisor to the Company.

The next day, Mr. Dougherty phoned Mr. Bonney and invited Parent to submit to the Company an indication of interest.

On August 30, Stifel Nicolaus spoke to Morgan Stanley & Co. LLC ("*Morgan Stanley*"), Parent's financial advisor, to discuss a potential transaction.

On August 31, Mr. Bonney called Mr. Dougherty to discuss the Company's strategy. Mr. Bonney expressed concern that the Company was engaging in discussions with other potential acquirers and collaborators. In response, Mr. Dougherty agreed to accelerate two due diligence calls between Parent and the Company. Those two calls were held the following day.

At a meeting in New York City on September 6, 2011, Mr. Bonney delivered a letter to Mr. Dougherty. The letter was a non-binding indication of interest which set forth the proposed terms of a potential transaction, including the cash price and contingent payment rights, on which Parent would be willing to acquire the Company. Under the terms of Parent's letter, the Company's stockholders would receive a $4.00 per share up-front cash payment and the right to receive a $3.00 per share cash payment if ADL5945 received final FDA approval by January 1, 2017 and such approval met certain product labeling criteria. If approval was not obtained on such terms, no contingent payment would be made.

The Company Board held a special meeting on September 8 to discuss the letter received from Parent. Representatives of Dechert LLP ("*Dechert*"), legal counsel to the Company, provided the Company Board with an overview of its fiduciary duties in the context of a proposed acquisition of the Company. The Company Board discussed the letter from Parent, and authorized the Company's management to conduct discussions with Parent in an effort to improve the terms of Parent's offer. The Company Board discussed at length the terms of Parent's proposal, in particular the CPR. The Company Board authorized management to intensify its ongoing outreach efforts and authorized Stifel Nicolaus to participate in discussions with other potential acquirers and strategic partners.

Following the September 8 Company Board meeting, Company management and Stifel Nicolaus discussed on multiple occasions an extensive list of companies with which management had previous interactions regarding its programs. Management and Stifel Nicolaus discussed the companies on the list that might have a strategic interest in the Company, as well as sufficient financial resources to support an acquisition of the Company. Additional companies also were considered, and following these discussions, it was determined that outreach efforts would be undertaken by Stifel Nicolaus (in some cases with assistance from Company management) with 10 companies to gauge interest in a potential transaction with the Company. These outreach efforts occurred during the period from September 8 to October 3.

On September 9, Mr. Dougherty and Mr. Bonney spoke by phone and arranged a meeting in Lexington, Massachusetts with Mr. Bonney to discuss the terms of Parent's offer. Mr. Dougherty indicated that the Company was seeking up-front cash consideration of $5.50 per share. Mr. Bonney indicated that Parent was not willing to offer that amount.

13

Mr. Dougherty traveled to Lexington, Massachusetts on September 12. There, Mr. Bonney and Mr. Dougherty discussed the terms of Parent's offer, including the up-front cash consideration and CPR amount and terms, and Mr. Dougherty again discussed up-front cash consideration of $5.50 per share, as well as a CPR payment of $3.50 per share. In addition, Mr. Dougherty proposed different terms upon which the CPR would be paid. Mr. Bonney also inquired about the possibility of the Company granting Parent a period of exclusivity to negotiate a transaction. Mr. Dougherty informed Mr. Bonney that the Company was not willing to grant Parent exclusivity at that time.

Parent sent the Company a second offer letter, dated September 13, with revised terms. The Company received that letter on September 15. Mr. Bonney also called Mr. Dougherty to inform him of the terms of the letter. Under the terms of Parent's letter, the Company's stockholders would receive a $4.25 per share up-front cash payment, the right to receive a $1.75 per share cash payment if ADL5945 received final FDA approval by January 1, 2017 and such approval met certain product labeling criteria, and the right to receive a $1.75 per share cash payment if ADL5945 received final EMA approval by January 1, 2017 and such approval met certain product labeling criteria. If neither FDA nor EMA approval was obtained on such terms, no contingent payment would be made.

The Company Board held a special meeting on September 16 during which it received an update on the negotiations with Parent, the terms of the most recent letter from Parent and the outreach efforts being conducted by Stifel Nicolaus and Company management. Stifel Nicolaus presented materials concerning valuation of the Company and comparable transactions in the pharmaceutical industry. Stifel Nicolaus also discussed the use of CPRs as a form of consideration in transactions in the pharmaceutical industry. The Company Board, with management and in executive session, discussed the merits of the proposal from Parent. The Company Board also considered the prospects of the Company on a stand-alone basis. At the conclusion of the executive session, the Company Board authorized the formation of a committee (the "*Committee*") to communicate with and advise management on the negotiations with Parent, as needed. The Committee was not delegated the authority to act on behalf of the Company Board. The three members of the Committee were: David Madden, Armando Anido and George V. Hager, Jr.

Mr. Dougherty and Mr. Bonney discussed the status of negotiations on September 16 and September 18.

The Committee held its first meeting on September 19. The Committee reviewed valuation materials prepared by Stifel Nicolaus and discussed Mr. Dougherty's proposed counteroffer to Parent.

On September 19, Stifel Nicolaus engaged in discussions concerning the proposed acquisition of the Company by Parent with Morgan Stanley.

The Committee met again on September 20 to discuss Mr. Dougherty's proposed counteroffer to Parent. The Committee also reviewed materials prepared by Stifel Nicolaus concerning valuation of the Company.

The Company Board held a special meeting on September 21. The Company Board received an update on Mr. Dougherty's proposed counteroffer to Parent. Stifel Nicolaus provided an update on its discussions with other potential acquirers and strategic partners.

On September 21, after consultation with the Committee, the Company Board, members of the Company's senior management and representatives of Dechert and Stifel Nicolaus, Mr. Dougherty sent a counteroffer to Mr. Bonney with revised terms for a potential acquisition of the Company by Parent. Mr. Dougherty also called Mr. Bonney to inform him of the terms of the counteroffer. Under the terms of the Company's counteroffer, the Company's stockholders would receive a $4.75 per share up-front cash payment, the right to receive a $1.00 per share cash payment upon the filing of a new drug application with the FDA for ADL5945 for the treatment of OIC, the right to receive a $1.25 per share cash payment if ADL5945 received final FDA approval (to be increased to $2.50 if such approval

14

met certain product labeling criteria), and the right to receive a $0.75 per share cash payment if ADL5945 received final EMA approval (to be increased to $1.50 if such approval met certain product labeling criteria). Mr. Bonney, during his call with Mr. Dougherty, indicated Parent was not willing to continue negotiations indefinitely with the Company without an exclusive right to negotiate. Mr. Dougherty informed Mr. Bonney that the Company was not willing to grant Parent exclusivity at that time. Mr. Bonney reiterated to Mr. Dougherty that Parent was not willing to increase the amount of the up-front cash payment.

On September 23, the Committee met to discuss the current status of the negotiations with Parent.

Mr. Dougherty and Mr. Bonney spoke again on September 23 during which Mr. Bonney verbally presented Mr. Dougherty with revised terms. Under Parent's revised terms, the Company's stockholders would receive a $4.25 per share up-front cash payment, the right to receive a $0.75 per share cash payment if ADL5945 received final FDA approval by January 1, 2017 (to be increased to $3.00 if such approval met certain product labeling criteria), and the right to receive a $0.25 per share cash payment if ADL5945 received final EMA approval by January 1, 2017 (to be increased to $1.50 if such approval met certain product labeling criteria).

On September 26, Mr. Dougherty and Mr. Bonney spoke again, and Mr. Dougherty informed Mr. Bonney that the Company would respond to Parent's offer shortly.

The Company Board held a special meeting on September 28. Mr. Dougherty discussed the status of negotiations with Parent as well as his plans with respect to the further negotiations of such terms. Mr. Dougherty outlined several areas for further negotiation with respect to the terms of the CPRs. These included (i) increasing the amount of the payment to be made on any approval which does not include a preferred product label, (ii) granting the opportunity to earn back the higher payment amounts for an approval which does not include a preferred product label, (iii) extending the dates by which any approval would need to be obtained to trigger a payment under the CPRs, and (iv) strengthening certain other terms of the CPRs. Stifel Nicolaus and management also presented a review of outreach efforts.

Mr. Dougherty traveled to Lexington, Massachusetts on September 29 to meet with Mr. Bonney and discussed the points that he had outlined for the Company Board. Mr. Dougherty and Mr. Bonney came to general agreement on the substantially final financial terms for a possible transaction. Mr. Bonney again raised the issue of exclusivity, indicating that Parent required a period of exclusive negotiations between the Company and Parent.

On September 30, Parent sent the Company a third offer letter, with revised terms generally reflecting the terms discussed by Mr. Dougherty and Mr. Bonney on September 29. Parent also sent the Company a proposed letter agreement pursuant to which the Company would be prohibited from discussing a potential strategic transaction with any third party during an exclusivity period, which Parent stated was required to continue discussions and negotiations. That same day, Mr. Bonney called Mr. Dougherty to discuss the terms of the letters.

Mr. Dougherty, Mr. Bonney, Mr. Perez and other representatives of the Company and Parent discussed the terms of the letters on multiple occasions between October 2, 2011 and October 4, 2011.

The Company sent revised letters to Parent on October 3 reflecting its counterproposal on the terms of the proposed acquisition of the Company by Parent and the exclusivity period.

The Company Board held a special meeting on October 3 to receive an update on Parent's letters. Following discussions regarding the letters, the Company Board received an update on Stifel Nicolaus' discussions with other potential acquirers and strategic partners. The Company Board discussed the fact that no potential acquirers or strategic partners had made an offer for a transaction with the Company or indicated that they were prepared to make an offer soon. The Company Board considered that,

15

despite the lengthy and intensive outreach efforts with respect to its OIC program, the Company had not received a term sheet or partnering proposal from a potential partner. With respect to ENTEREG, the Company Board noted that a non-binding verbal indication of interest had been received. The Company Board also considered the prospects of the Company on a stand-alone basis. The Company Board concluded that a potential transaction with Parent provided greater value to the stockholders of the Company than other available options at that time. At the conclusion of the meeting, the Company Board authorized Mr. Dougherty to enter into the exclusivity letter agreement with Parent.

Mr. Bonney and Mr. Dougherty discussed the terms of the Company's letters on October 4. Following these discussions, Parent and the Company executed a letter agreement dated October 4, 2011, which called for an exclusivity period that would end on October 25. Later that day, Parent sent to the Company a proposed merger agreement and a proposed form of contingent payment rights agreement. Parent also sent the Company a diligence request list.

Between October 4 and October 23, the parties negotiated the terms of the merger agreement and the form of contingent payment rights agreement. The Company sent comments to the Merger Agreement and form of contingent payment rights agreement on October 7. The Company proposed to lower the termination fee from the $14 million fee that Parent had proposed to $7 million and to narrow the scope of the non-solicitation covenant.

Throughout this period, Parent conducted due diligence on the Company and its business. On October 10 and October 11, a number of employees and members of management of both companies, including Mr. Perez and Mr. Dougherty, held multiple meetings at the Company's headquarters in Exton, Pennsylvania.

On October 13, 2011, representatives of the Company and Parent, including Dechert and Ropes & Gray LLP ("*Ropes & Gray*"), Parent's outside counsel, met in Boston, Massachusetts to negotiate the merger agreement and the form of contingent payment rights agreement.

On October 14, Mr. Bonney and Mr. Dougherty discussed the status of negotiations. That same day, Ropes & Gray distributed revised drafts of the Merger Agreement and the form of contingent payment rights agreement.

On October 17, representatives of the Company and Parent, including Dechert and Ropes & Gray, held further negotiations of the merger agreement and the form of contingent payment rights agreement. Later that day, Dechert distributed a revised draft of the merger agreement.

On October 18, Dechert distributed a revised draft of the form of contingent payment rights agreement.

On October 22, employees of the Company, including Mr. Dougherty, and employees of Parent, including Mr. Bonney, held a telephone conference to discuss outstanding diligence items.

On October 23, Mr. Bonney called Mr. Dougherty to inform him that the board of directors of Parent had unanimously approved the proposed transaction.

On October 23, the Company Board held a special meeting to review and discuss the negotiations with Parent, which were substantially complete. Dechert provided the Company Board with an overview of its fiduciary duties in the context of a proposed acquisition of the Company and reviewed the terms of the draft Merger Agreement and the form of contingent payment rights agreement. At the request of the Company Board, Stifel Nicolaus delivered its oral opinion (which was subsequently confirmed in writing as of October 23, 2011) to the effect that, as of that date and based on and subject to the various assumptions and limitations to be described in its written opinion, the consideration to be received by the common stockholders of the Company in the Offer and the Merger was fair to such stockholders, from a financial point of view. The full text of Stifel Nicolaus' written opinion dated October 23, 2011, which sets forth, among other things, the procedures followed, assumptions made,

16

matters considered and limitations and qualifications on the review undertaken in connection with the opinion, is attached to this Schedule 14D-9 as Annex II.

At the October 23 Company Board meeting, following the presentations by Dechert and Stifel Nicolaus, the Company Board considered the provisions of the Merger Agreement, including the respective representations, warranties and covenants and termination rights of the parties, the $10 million termination fee payable by the Company, the terms and conditions of the Top-Up Option (as defined below), including the consideration that Purchaser would pay for the Shares acquired upon exercise of the Top-Up Option, and the Company's ability to respond to certain unsolicited takeover proposals following execution of the Merger Agreement, as well as the provisions of the form of contingent payment rights agreement. The Company Board then unanimously approved the merger agreement and recommended that Adolor's stockholders tender all of their Shares pursuant to the Offer and, if applicable, vote their Shares in favor of the adoption of the Merger Agreement and the Merger. The Company Board also approved an amendment to the Company's rights plan so that it would not be triggered by the execution of the Merger Agreement, or by the Offer, the Merger or any related transactions.

Following the October 23 Company Board meeting, Mr. Dougherty called Mr. Bonney to inform him that the Company Board had unanimously approved the proposed transaction.

On October 24, 2011, the parties finalized the Merger Agreement and related schedules and the form of CPR Agreement. The Company and Parent then executed the Merger Agreement and issued a joint press release announcing the transaction.

(c)   *Reasons for the Recommendation of the Company Board*

In evaluating the Merger Agreement and the Offer, the Merger and the other transactions contemplated thereby, the Company Board consulted with Adolor's management, legal counsel and financial advisor and, in recommending that Adolor's stockholders tender all of their Shares pursuant to the Offer and, if applicable, vote their Shares in favor of the adoption of the Merger Agreement and the Merger, in accordance with the applicable provisions of the DGCL, considered a number of factors, including the following:

- *Financial Condition and Prospects of the Company.* The Company Board considered the current and historical financial condition, results of operations, business and prospects of the Company as well as the Company's financial plan, prospects and need for significant financing if it were to remain an independent company. The Company Board also considered the potential long-term value of the Company taking into account the risks and future prospects of the Company.

- *Transaction Financial Terms; Premium to Market Price.* The Company Board considered both (1) the non-contingent, up-front portion of the per Share consideration of $4.25 (without interest), which represented a 121.4% premium over the closing price of the Shares on October 21, 2011, the last trading day before the Offer and the Merger were announced, and a 145.7% premium over the closing price of the Shares on September 23, 2011, and (2) the total potential per Share consideration, including the payments under the CPRs, of $8.75 (without interest), which represented a 355.7% premium over the closing price of the Shares on October 21, 2011, the last trading day before the Offer and the Merger were announced, and a 405.8% premium over the closing price of the Shares on September 23, 2011.

- *Certainty of Value.* The Company Board considered the form of consideration to be paid to holders of Shares in the Offer and the Merger and the certainty of value of the non-contingent, up-front cash portion of the per Share consideration. The Company Board also considered that the contingent cash portion provided an opportunity to share in the potential success of ADL5945, while recognizing that tendering in the Offer would cap the opportunity for

17

stockholders to participate in the future growth of the Company at the value of any payments under the CPRs.

- *Strategic Alternatives.* The Company Board considered potential strategic alternatives available to the Company, as well as potential stockholder value that may be generated from remaining an independent public company. The Company Board discussed the need for significant financing to develop ADL5945, the possibility of being acquired by other companies and other transactions which might involve collaborations or divestiture of assets, as well as the potential benefits, risks and uncertainties associated with each such alternative. The Company Board also discussed the fact that (i) no potential acquirers or strategic partners had made an offer for a transaction with the Company or indicated that they were prepared to make an offer, (ii) despite the lengthy and intensive outreach efforts with respect to its OIC program, the Company had not received a term sheet or partnering proposal from a potential partner, and (iii) with respect to ENTEREG, that a non-binding verbal indication of interest had been received. The Company Board concluded that a potential transaction with Parent provided greater value to the stockholders of the Company than other available options. The Company Board believed that the Offer and the Merger provided the Company's stockholders with an attractive opportunity to receive enhanced value for their Shares.

- *Historical Trading Prices.* The Company Board considered the relationship of the Offer Price to the historical trading prices of the Shares.

- *Timing of Completion.* The Company Board considered the anticipated timing of the consummation of the transactions contemplated by the Merger Agreement, and the structure of the transaction as a tender offer for all outstanding Shares, which should allow stockholders to receive the Offer Price in a relatively short time frame, followed by the Merger in which stockholders will receive the same consideration as received in the Offer. The Company Board also considered the business reputation of Parent and its management and the substantial financial resources of Parent and, by extension, Purchaser, which the Company Board believed supported the conclusion that an acquisition transaction with Parent and Purchaser could be completed relatively quickly and in an orderly manner.

- *Opinion of the Company's Financial Advisor.* The Company Board considered the opinion of Stifel Nicolaus, and its financial presentation, dated October 23, 2011, to the Company Board that, as of that date and subject to and based on the assumptions made, procedures followed, matters considered, limitations of the review undertaken and qualifications contained in the opinion, the consideration to be paid to the common stockholders of the Company in the Offer and the Merger is fair to such stockholders, from a financial point of view, as more fully described below in this Item 4 under "Opinion of the Financial Advisor to the Company" and as set forth in the full text of such opinion attached hereto as Annex II.

- *Terms of the Merger Agreement.* The Company Board considered the provisions of the Merger Agreement, including the respective representations, warranties and covenants and termination rights of the parties and termination fee payable by the Company.

- *Ability to Respond to Certain Unsolicited Takeover Proposals.* The Company Board considered the fact that the Merger Agreement prohibits the Company and its representatives and subsidiaries from, directly or indirectly, (a) initiating, soliciting or encouraging, or taking any action to facilitate the making of, any offer or proposal which constitutes or is reasonably likely to lead to an Acquisition Proposal (as that term is defined in the Merger Agreement), (b) entering into any agreement with respect to an Acquisition Proposal, or (c) engaging in negotiations or discussions with, or providing non-public information or data to, any person (other than Parent or any of its affiliates or representatives) relating to any Acquisition Proposal or granting any waiver or release under any standstill agreement. The Company Board understood that, while

18

potentially having the effect of discouraging third parties from proposing a competing business combination transaction, these provisions were conditions to Parent's willingness to enter into the Merger Agreement and were believed by the Company Board to be reasonable in light of, among other things, the benefits of the Offer and the Merger to the Company stockholders. The Company Board also considered the fact that the Merger Agreement allows the Company to furnish information concerning its business, properties or assets to any person pursuant to a confidentiality agreement with terms no less favorable to the Company than those contained in the Confidentiality Agreement and negotiate and participate in discussions and negotiations with such person concerning an Acquisition Proposal if, but only if, such person has, not resulting from any knowing material violation of Section 5.2 of the Merger Agreement, submitted a written proposal to the Company relating to such Acquisition Proposal which the Company Board determines in good faith, after consultation with its financial advisor, is or is reasonably expected to lead to a Superior Proposal (as that term is defined in the Merger Agreement), subject to certain covenants and conditions, including payment of a termination fee. In addition, the Company Board considered the fact that it could terminate the Merger Agreement to accept a Superior Proposal prior to the closing of the Offer.

- *Conditions to the Consummation of the Offer and the Merger; Likelihood of Closing.* The Company Board considered the reasonable likelihood of the consummation of the transactions contemplated by the Merger Agreement in light of the conditions in the Merger Agreement to the obligations of the Purchaser to accept for payment and pay for the Shares tendered pursuant to the Offer.

- *Termination Fee.* The Company Board considered the termination fee of $10 million that could become payable pursuant to the Merger Agreement under certain circumstances, including termination of the Merger Agreement to accept a Superior Proposal.

- *Appraisal Rights.* The Company Board considered the availability of appraisal rights with respect to the Merger for Company stockholders who properly exercise their rights under the DGCL, which would give these stockholders the ability to seek and be paid a judicially determined appraisal of the "fair value" of their shares of Common Stock at the completion of the Merger.

- *Pre-Closing Covenants.* The Company Board considered that, under the terms of the Merger Agreement, the Company has agreed that it will conduct its business in the ordinary course of business consistent with past practice and, subject to specified exceptions, that the Company will not undertake various actions related to the conduct of its business without the prior written consent of Parent. The Company Board further considered that these provisions may limit the Company's ability to pursue business opportunities that it would otherwise pursue.

- *Tax Treatment.* The Company Board considered that the Merger Consideration to be received by the holders of Shares in the Offer and the Merger might be taxable to such holders for U.S. federal income tax purposes.

- *Regulatory Approval and Third-Party Consents.* The Company Board considered the regulatory approvals and third party consents that may be required to consummate the Offer and the Merger and the prospects for receiving any such approvals and consents, if necessary.

   In making its recommendation, the Company Board was aware of and took into consideration the interests of certain Company executives, including the President and Chief Executive Officer, who is a member of the Company Board, in the Offer and the Merger as a result of the agreements referred to in Item 3 of this Schedule 14D-9 and their holding of Shares, Company Options, Company Restricted Shares and DSUs as referenced in Item 3 of this Schedule 14D-9.

19

The Company Board did not assign relative weights to the foregoing factors or determine that any factor was of particular importance. Rather, the Company Board viewed their position and recommendations as being based on the totality of the information presented to and considered by them. Individual members of the Company Board may have given different weight to different factors.

*(d) Opinion of Financial Advisor to the Company.*

The Company Board approved the appointment of Stifel Nicolaus to act as the Company's financial advisor in connection with a possible sale of the Company and to provide to the Company Board a fairness opinion in connection with any proposed transaction on August 24, 2011, and the Company retained Stifel Nicolaus on October 5, 2011. On October 23, 2011, Stifel Nicolaus delivered its written Opinion, dated October 23, 2011 (the "*Opinion*"), to the Company Board that, as of the date of the Opinion and subject to and based on the assumptions made, procedures followed, matters considered, limitations of the review undertaken and qualifications contained in such Opinion, the consideration to be paid to the common stockholders of the Company in the Offer and Merger (collectively, the "*Transaction*") is fair to such stockholders, from a financial point of view.

Adolor did not impose any limitations on Stifel Nicolaus with respect to the investigations made or procedures followed in rendering its Opinion. In selecting Stifel Nicolaus, the Company Board considered, among other things, the fact that Stifel Nicolaus is a reputable investment banking firm with substantial experience advising companies in the healthcare and pharmaceutical sectors and in providing strategic advisory services in general. Stifel Nicolaus, as part of its investment banking business, is continuously engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. In the ordinary course of its business, Stifel Nicolaus and its affiliates may actively trade the securities of Adolor and Parent for its own account and for the account of its customers and, accordingly, may at any time hold a long or short portion in such securities.

**The full text of the written Opinion of Stifel Nicolaus is attached to this Schedule 14D-9 as Annex II and is incorporated into this document by reference. The summary of Stifel Nicolaus' Opinion set forth in this Schedule 14D-9 is qualified in its entirety by reference to the full text of the Opinion. Stockholders are urged to read the Opinion carefully and in its entirety for a discussion of the procedures followed, assumptions made, other matters considered and limits of the review undertaken by Stifel Nicolaus in connection with such Opinion.**

Stifel Nicolaus' Opinion was approved by its fairness committee. The Opinion was provided for the information of, and directed to, the Company Board for its information and assistance in connection with its consideration of the financial terms of the Transaction. The Opinion does not constitute a recommendation to the Company Board as to how the Company Board should vote on any aspect of the Transaction or to any stockholder of Adolor as to whether such stockholder should tender his, her or its shares of common stock pursuant to the Offer or, if applicable, as to how any such stockholder should vote at any stockholders' meeting at which the Merger is considered, or whether or not any stockholder of Adolor should enter into a voting or stockholders' agreement with respect to the Transaction, or exercise any dissenters' or appraisal rights that may be available to such stockholder. In addition, the Opinion does not compare the relative merits of the Transaction with any other alternative transaction or business strategy which may have been available to the Company Board or the Company and does not address the underlying business decision of the Company Board or the Company to proceed with or effect the Transaction. Moreover, it does not address the fairness of the Transaction to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors or other constituencies of Adolor; nor does it address the fairness of the amount or nature of any compensation to be paid or payable to any of Adolor's officers, directors or

20

employees, or class of such persons, in connection with the Transaction, whether relative to the consideration to be received by Adolor's stockholders or otherwise.

In connection with its Opinion, Stifel Nicolaus, among other things:

- reviewed the draft of the Merger Agreement, dated October 23, 2011, which is the last draft made available to Stifel Nicolaus;

- reviewed the draft of the CPR Agreement, dated October 18, 2011, which is the last draft made available to Stifel Nicolaus;

- reviewed and analyzed certain publicly available financial and other information for the Company, including equity research and certain relevant financial and operating data furnished to Stifel Nicolaus by the management of the Company;

- reviewed and analyzed certain internal financial analyses, financial projections, reports and other information concerning the Company prepared by the management of the Company, including projections for the Company provided by the management of the Company (the "*Company Projections*");

- discussed with certain members of the management of the Company the historical and current business operations, financial condition and prospects of the Company and such other matters Stifel Nicolaus deemed relevant;

- reviewed and analyzed certain operating results and the reported price and trading histories of the Company as compared to operating results and the reported price and trading histories of certain publicly traded companies Stifel Nicolaus deemed relevant;

- reviewed and analyzed certain financial terms of the Transaction as compared to the financial terms of certain selected business combinations Stifel Nicolaus deemed relevant;

- reviewed and analyzed, based on the Company Projections, the cash flows generated by the Company on a stand-alone basis to determine the present value of the Company's discounted cash flows;

- performed, reviewed and analyzed a sum-of-the-parts analysis, based on the Company Projections; and

- reviewed and analyzed such other information and such other factors, and conducted such other financial studies, analyses and investigations, as Stifel Nicolaus deemed relevant for the purposes of Stifel Nicolaus' Opinion.

In addition, Stifel Nicolaus took into account its assessment of general economic, market and financial conditions and its experience in other transactions, as well as its experience in securities valuations and its general knowledge of the industry in which the Company operates.

In conducting its review, Stifel Nicolaus, with the Company Board's consent, relied upon and assumed, without independent verification, the accuracy and completeness of all the financial and other information that was made available, supplied, or otherwise communicated to Stifel Nicolaus by or on behalf of Adolor, or that was otherwise reviewed by Stifel Nicolaus, including, without limitation, publicly available information, and Stifel Nicolaus did not assume any responsibility for independently verifying any of such information. Stifel Nicolaus further relied upon the assurances of Adolor management that it was unaware of any facts that would make such information incomplete or misleading.

With respect to estimates, forecasts or projections of the Company's future financial performance prepared by or reviewed with management of the Company or obtained from public sources (including the Company Projections), Stifel Nicolaus relied upon the statements of the Company's management

21

that such estimates, forecasts and projections (and the assumptions and bases therefor) were reasonable and assumed that such estimates, forecasts and projections represented the best available estimates, forecasts and projections and, with respect to estimates, forecasts and projections prepared by management of the Company, were prepared in good faith on assumptions which, in light of the circumstances under which they were made, were reasonable, as has been represented and warranted by the Company or, with respect to estimates, forecasts and projections obtained from public sources, represented reasonable estimates, forecasts and projections. Such estimates, forecasts and projections were not prepared with the expectation of public disclosure and are based on numerous variables and assumptions that are inherently uncertain, including, without limitation, factors related to general economic and competitive conditions. Accordingly, actual results could vary significantly from those set forth in such estimates, forecasts and projections. Stifel Nicolaus relied on these estimates, forecasts and projections without independent verification or analyses and does not in any respect assume any responsibility for the accuracy or completeness thereof. Stifel Nicolaus relied upon, without independent verification, the assessment of the Company's management as to the existing products and services of the Company and viability of, and risks associated with, the future products and services of the Company. Stifel Nicolaus expresses no opinion as to the Company Projections or any other estimates, forecasts and assumptions or the assumptions on which they were made.

Stifel Nicolaus was not requested to make, and did not make, an independent evaluation, physical inspection, valuation or appraisal of the properties, facilities, assets, or liabilities of Adolor, and was not furnished with any such materials.

Stifel Nicolaus assumed, with the Company Board's consent, that any material liabilities (contingent or otherwise, known or unknown) of the Company are set forth in its financial statements or were disclosed to Stifel Nicolaus by the Company's management. Stifel Nicolaus assumed that there has been no material change in the assets, financial condition, business or prospects of the Company since the date of the most recent relevant financial statements made available to Stifel Nicolaus. With respect to all legal matters relating to the Company, Parent and the Transaction, Stifel Nicolaus relied on the advice of legal counsel to the Company.

Stifel Nicolaus' Opinion was limited to whether the consideration to be received by the common stockholders of the Company in connection with the Transaction is, as of the date of such Opinion, fair to such stockholders, from a financial point of view. Stifel Nicolaus expressed no view as to any other aspect or implication of the Transaction, including, without limitation, the form or structure of the Transaction, or any other agreement, arrangement or understanding entered into in connection with the Transaction or otherwise. Without limiting the generality of the foregoing, Stifel Nicolaus' Opinion does not address any legal, tax or accounting matters, including the consequences any such matters may have on the Company or its stockholders.

For purposes of rendering its opinion Stifel Nicolaus assumed in all respects material to its analysis, that the representations and warranties of each party contained in the Merger Agreement and the CPR Agreement are true and correct, that each party will perform all of the covenants and agreements required to be performed by it under the Merger Agreement and the CPR Agreement and that all conditions to the consummation of the Offer and the Merger will be satisfied without waiver thereof. Stifel Nicolaus also assumed that the final forms of the Merger Agreement and the CPR Agreement will be substantially similar to the last drafts reviewed by it. Stifel Nicolaus also assumed that all governmental, regulatory and other consents and approvals required in connection with the Transaction will be obtained and that in the course of obtaining any of those consents no restrictions will be imposed or waivers made that would have an adverse effect on the contemplated benefits of the Transaction.

Stifel Nicolaus did not consider any potential legislative or regulatory changes currently being considered by the United States Congress, the SEC, or any other governmental or regulatory bodies, or

22

any changes in accounting methods or generally accepted accounting principles that may be adopted by the SEC or the Financial Accounting Standards Board. The Opinion is not a solvency opinion and does not in any way address the solvency or financial condition of the Company or any other person.

Stifel Nicolaus' Opinion was necessarily based on economic, market, financial and other conditions as they existed on, and on the information made available to it as of, the date of the Opinion. It is understood that subsequent developments may affect the conclusions reached in Stifel Nicolaus' Opinion and that Stifel Nicolaus does not have any obligation to update, revise or reaffirm its Opinion.

The summary set forth below does not purport to be a complete description of the analyses performed by Stifel Nicolaus, but describes, in summary form, the material elements of the presentation that Stifel Nicolaus made to the Company Board on October 23, 2011, in connection with Stifel Nicolaus' Opinion.

In accordance with customary investment banking practice, Stifel Nicolaus employed generally accepted valuation methods and financial analyses in reaching its Opinion. The following is a summary of the material financial analyses performed by Stifel Nicolaus in arriving at its Opinion. These summaries of financial analyses alone do not constitute a complete description of the financial analyses Stifel Nicolaus employed in reaching its conclusions. None of the analyses performed by Stifel Nicolaus were assigned a greater significance by Stifel Nicolaus than any other, nor does the order of analyses described represent relative importance or weight given to those analyses by Stifel Nicolaus. The summary text describing each financial analysis does not constitute a complete description of Stifel Nicolaus' financial analyses, including the methodologies and assumptions underlying the analyses, and if viewed in isolation could create a misleading or incomplete view of the financial analyses performed by Stifel Nicolaus. The summary text set forth below does not represent and should not be viewed by anyone as constituting conclusions reached by Stifel Nicolaus with respect to any of the analyses performed by it in connection with its Opinion. Rather, Stifel Nicolaus made its determination as to the fairness to the common stockholders of Adolor of the consideration to be received by such stockholders in the Transaction, from a financial point of view, on the basis of its experience and professional judgment after considering the results of all of the analyses performed.

Except as otherwise noted, the information utilized by Stifel Nicolaus in its analyses, to the extent that it is based on market data, is based on market data as it existed on or before October 21, 2011 and is not necessarily indicative of current market conditions. The analyses described below do not purport to be indicative of actual future results, or to reflect the prices at which any securities may trade in the public markets, which may vary depending upon various factors, including changes in interest rates, dividend rates, market conditions, economic conditions and other factors that influence the price of securities.

In conducting its analysis, Stifel Nicolaus used five primary methodologies: selected publicly traded companies analysis; selected precedent transactions analysis; discounted cash flow analysis; sum-of-the-parts analysis; and premiums paid analysis. No individual methodology was given a specific weight, nor can any methodology be viewed individually. Additionally, no company or transaction used in any analysis as a comparison is identical to Adolor or the Transaction, and they all differ in material ways. Accordingly, an analysis of the results described below is not mathematical; rather it involves complex considerations and judgments concerning differences in financial and operating characteristics of the companies and other factors that could affect the public trading value of the selected companies or transactions to which they are being compared. Stifel Nicolaus used these analyses to determine the impact of various operating metrics on the implied equity value of Adolor. Each of these analyses yielded a range of implied equity values, and therefore, such implied equity value ranges developed from these analyses were viewed by Stifel Nicolaus collectively and not individually.

In delivering its Opinion to the Company Board, Stifel Nicolaus utilized the financial projections and estimates as provided by Adolor management. These projections and estimates include combined

23

projections for ENTEREG and two scenarios for ADL5945: (i) the "*Competitive Label Case*," which assumes that ADL5945 is approved without a competitively disadvantageous Black Box warning or Risk Evaluation and Mitigation Strategy; and (ii) the "*Non-Competitive Label Case*," which assumes that ADL5945 is approved with a competitively disadvantageous Black Box warning or Risk Evaluation and Mitigation Strategy. These scenarios for ADL5945 are based on two different projections for payments under the CPR Agreement.

    *Selected Companies Analysis.*    Stifel Nicolaus reviewed, analyzed and compared certain financial information relating to Adolor to corresponding publicly available financial information and market multiples for the following 13 publicly traded, mid- and small-cap specialty pharmaceutical companies that are developing or have marketed products in OIC, pain or hospital-based markets, and six publicly traded, mature, specialty pharmaceutical companies that are developing or have marketed products in OIC and pain:

| Selected Mid/Small-Cap Specialty Pharmaceutical Companies | Selected Mature Specialty Pharmaceuticals Companies |
|---|---|
| Alexza Pharmaceuticals Inc. | Endo Pharmaceuticals Holdings Inc. |
| Avanir Pharmaceuticals Inc. | Forest Laboratories Inc. |
| Cadence Pharmaceuticals Inc. | Medicis Pharmaceutical Corporation |
| Cornerstone Therapeutics Inc. | Salix Pharmaceuticals Ltd. |
| Cubist Pharmaceuticals Inc. | Valeant Pharmaceuticals International Inc. |
| Cumberland Pharmaceuticals Inc. | Warner Chilcott Plc |
| Medicines Co. | |
| NeurogesX Inc. | |
| Pain Therapeutics Inc. | |
| Progenics Pharmaceuticals Inc. | |
| Santarus Inc. | |
| ViroPharma Inc. | |
| Zogenix Inc. | |

    Stifel Nicolaus reviewed, among other things, the range of enterprise values of the selected mid-cap and small-cap specialty pharmaceutical companies, calculated as equity value using the closing stock prices on October 21, 2011, plus the book value of debt and minority interests, less cash and equivalents, as a multiple of calendar year 2011 and 2012 estimated revenue, as provided by FactSet estimates.

    The following table sets forth, for the periods indicated, the ranges of enterprise value as a multiple of revenue utilized by Stifel Nicolaus in performing its analysis, which were derived from the selected publicly traded, mid- and small-cap specialty pharmaceutical companies identified above, and the ranges of the equity values per share for Adolor implied by this analysis.

| Enterprise Value to: | Relevant Range of Revenue Multiples | Range of Equity Values Per Share |
|---|---|---|
| 2011E Revenues | 2.00x–3.00x | $1.58–$2.27 |
| 2012E Revenues | 1.75x–2.75x | $1.82–$2.74 |

    Stifel Nicolaus also reviewed the range of price to earnings ("*P/E*") ratios of the selected publicly traded, mature, specialty pharmaceutical companies, calculated using the closing stock prices on October 21, 2011, as a multiple of calendar year 2011 and 2012 estimated earnings per share, as provided by FactSet estimates. The implied P/E ratio ranges were utilized to calculate Adolor's equity values implied by Adolor's 2017 and 2018 estimated net income in both the Competitive Label Case

24

and Non-Competitive Label Case, as provided by Adolor management, and were discounted to present value at a 20% discount rate to arrive at an implied equity value per share.

The following table sets forth, for the periods indicated, the ranges of P/E multiples utilized by Stifel Nicolaus in performing its analysis, which were derived from the selected publicly traded, mature, specialty pharmaceutical companies identified above, and the ranges of equity values per share for Adolor implied by this analysis.

| Enterprise Value to: | Relevant Range of P/E Multiples | Range of Implied Equity Values Per Share |
|---|---|---|
| 2017E Net Income (Competitive Label Case) | 11.0x–15.0x | $3.16–$4.28 |
| 2018E Net Income (Competitive Label Case) | 11.0x–15.0x | $5.23–$7.06 |
| 2017E Net Income (Non-Competitive Label Case) | 11.0x–15.0x | $1.09–$1.49 |
| 2018E Net Income (Non-Competitive Label Case) | 11.0x–15.0x | $2.29–$3.09 |

Stifel Nicolaus selected publicly traded companies on the basis of various factors, including the size of the public company and the similarity of the lines of business or therapeutic focus, although, as noted above, no public company used as a comparison is identical to Adolor. Accordingly, these analyses are not purely mathematical, but also involve complex considerations and judgments concerning the differences in financial and operating characteristics of the selected companies and other factors.

*Selected Precedent Transactions Analysis.*    Stifel Nicolaus reviewed and analyzed certain publicly available information for the following 17 recent business combinations in the life sciences (defined as biotechnology and pharmaceutical company targets with a therapeutic focus and excluding companies with over-the-counter or generic products) industry that were announced subsequent to January 1, 2008 and where the acquired company had a marketed product or had filed an NDA.

| Date | Target | Acquiror |
|---|---|---|
| 07/20/11 | Allos Therapeutics, Inc. | Amag Pharmaceuiticals, Inc. |
| 05/02/11 | Cephalon, Inc. | Teva Pharmaceutical Industries, Ltd. |
| 02/22/11 | Clinical Data, Inc. | Forest Laboratories, Inc. |
| 02/16/11 | Genzyme Corp. | sanofi-aventis |
| 10/12/10 | King Pharmaceuticals, Inc. | Pfizer Inc. |
| 10/06/10 | Crucell N.V. | Johnson & Johnson |
| 09/07/10 | Zymogenetics, Inc. | Bristol-Myers Squibb Co. |
| 08/09/10 | Penwest Pharmaceuticals Co. | Endo Pharmaceuticals Holdings Inc. |
| 07/19/10 | Cypress Bioscience, Inc. | Ramius LLC |
| 03/01/10 | OSI Pharmaceuticals, Inc. | Astellas Pharma, Inc. |
| 03/12/09 | CV Therapeutics, Inc. | Gilead Sciences, Inc. |
| 01/05/09 | Indevus Pharmaceuticals, Inc. | Endo Pharmaceuticals Holdings Inc. |
| 10/06/08 | ImClone Systems Inc. | Eli Lilly & Co. |
| 09/01/08 | Sciele Pharma, Inc. | Shionogi & Co., Ltd. |
| 07/15/08 | Lev Pharmaceuticals, Inc. | ViroPharma Incorporated |
| 02/26/08 | CollaGenex Pharmaceuticals, Inc. | Galderma SA |
| 02/20/08 | Encysive Pharmaceuticals, Inc. | Pfizer, Inc. |

25

The following table sets forth, for the periods indicated, the ranges of revenue multiples utilized by Stifel Nicolaus in performing its analysis, which were derived from the selected life sciences business combinations identified above, and the ranges of equity values per share for Adolor implied by this analysis.

| Enterprise Value to: | Relevant Range of Transaction Multiples | Range of Implied Equity Value Per Share |
|---|---|---|
| 2011E Revenues | 3.75x–4.50x | $2.78–$3.30 |
| 2012E Revenues | 3.25x–4.00x | $3.20–$3.89 |

Because the market conditions, rationale and circumstances surrounding each of the transactions analyzed were specific to each transaction and because of the inherent differences between Adolor's businesses, operations and prospects and those of the acquired companies above, Stifel Nicolaus believed that it was inappropriate to, and therefore did not, rely solely on the quantitative results of the analysis. Accordingly, Stifel Nicolaus also made qualitative judgments concerning the differences between the characteristics of these transactions (including market conditions, rationale and circumstances surrounding each of the transactions, and the timing, type and size of each of the transactions) and the Transaction that could affect Adolor's acquisition value.

*Premiums Paid Analysis.*    Stifel Nicolaus reviewed the consideration paid in 54 selected life sciences transactions involving an equity value between $50 million and $15 billion announced subsequent to January 1, 2008. Stifel Nicolaus also reviewed the premiums for the transactions identified in the "Selected Precedent Transactions Analysis" above. Stifel Nicolaus calculated the premiums paid in these transactions over the applicable, unaffected stock price of the target company on each of the trading day one trading day prior to the announcement of the acquisition offer and the trading day 20 trading days prior to the announcement of the acquisition offer.

| | $50 million–$15 billion Life Sciences Transactions | Selected Precedent Transactions |
|---|---|---|
| | Median / Mean | Median / Mean |
| 1-Day | 55.3% / 73.9% | 48.6% / 55.1% |
| 20 Days | 61.7% / 82.0% | 55.8% / 73.1% |

The following table sets forth the ranges of premiums paid utilized by Stifel Nicolaus in performing its analysis, which were derived from the selected life sciences transactions identified above, and the ranges of equity values per share of Adolor common stock implied by this analysis.

| | Relevant Range of Premiums Paid | Range of Implied Equity Values Per Share* |
|---|---|---|
| 1-Day | 50.0%–75.0% | $2.88–$3.36 |
| 20 Days | 60.0%–85.0% | $2.77–$3.20 |

\*    For these purposes, Stifel Nicolaus used Adolor's closing price of $1.92 on October 21, 2011 for the 1-day premium analysis and $1.73 on September 23, 2011 for the 20-day premium analysis.

In addition, Stifel Nicolaus also reviewed and analyzed the trading history of Adolor's common stock for various intervals prior to the announcement of the Transaction on October 24, 2011.

The non-contingent, up-front portion of the per share consideration of $4.25 (without interest), represents a 121.4% premium over the closing price of the shares on October 21, 2011 and a 145.7% premium over the closing price of the shares on September 23, 2011.

26

*Discounted Cash Flow Analysis.*     Stifel Nicolaus used the Company Projections for the Competitive Label Case and the Non-Competitive Label Case for calendar years 2011 through 2030, as provided by Adolor management, to perform discounted cash flow analyses on each of the two scenarios. In conducting these analyses, Stifel Nicolaus assumed that Adolor would perform in accordance with these forecasts. Stifel Nicolaus performed an analysis of the present value of the unlevered free cash flows that Adolor management projects it will generate from the fourth quarter of 2011 through 2030. Stifel Nicolaus discounted both the cash flows projected from the fourth quarter of 2011 through 2030 and the terminal value to present value using a range of discount rates and terminal growth rates. The terminal value is calculated using 2031 unlevered free cash flow, which is assumed to be half of 2030 free cash flow given projected ADL5945 patent expiry and assumed generic competition, per Adolor management's estimates. The terminal value assumes negative perpetuity growth rates due to ADL5945 patent expiry. From this analysis, Stifel Nicolaus selected a range of discount rates from 18% to 22% and terminal growth rates from (20%) to (10%) for its valuation reference range. The discount rates were selected based on a weighted-average cost of capital analysis for the selected, publicly traded, mid- and small-cap specialty pharmaceutical companies and publicly traded, mature, specialty companies and Stifel Nicolaus estimates, adjusted to appropriately capture the approval risk of ADL5945. This analysis resulted in implied equity per share values ranging from $3.89 to $5.61 in the Competitive Label Case and implied equity per share values ranging from $1.54 to $2.36 in the Non-Competitive Label Case.

*Sum-of-the-Parts.*     Stifel Nicolaus performed a sum-of-the-parts valuation by aggregating the values of Adolor's currently marketed product, ENTEREG, its late-stage clinical program, ADL5945, corporate overhead, and tax savings associated with net operating losses in order to derive a range of implied equity values per share for Adolor.

Stifel Nicolaus calculated an implied enterprise value range for ENTEREG by applying a range of revenue multiples to projected 2012 revenue of $47 million as provided by Adolor management. From this analysis Stifel Nicolaus selected a range of revenue multiples from 2.50x to 3.00x for its valuation reference range.

Stifel Nicolaus performed a discounted cash flow analysis for the ADL5945 development program, which is designed to provide insight into the value of ADL5945 as a function of its future cash flows. Using Adolor's management's estimates for 2011 to 2030, Stifel Nicolaus performed an analysis of the present value of the unlevered free cash flows that the ADL5945 development program could generate from the fourth quarter of 2011 through 2030. The aggregate projected cash flows were discounted to determine their present value using a range of discount rates and a cumulative range of probabilities that ADL5945 successfully completes Phase 3 trials, has an NDA filed with the FDA, and is approved by the FDA. For this analysis, Stifel Nicolaus selected a range of discount rates from 13% to 15% and a range of sensitivity to probability of success ranging from 55% to 75% for its valuation reference range. The discount rates were selected based on a weighted-average cost of capital analysis for the selected, publicly traded, mid- and small-cap specialty pharmaceutical companies and publicly traded, mature, specialty companies and Stifel Nicolaus estimates.

Corporate overhead of $63.5 million was discounted at a non-probability adjusted rate of 14%. Discounted cash flows from tax savings associated with net operating losses of $449.4 million as of December 31, 2010 of $73.7 million (assuming the Competitive Label case) and $63.7 million (assuming the Non-Competitive Label case) were also discounted at a non-probability adjusted rate of 14%. The discount rate is based on a weighted-average cost of capital analysis for the selected, publicly traded, mid- and small-cap specialty pharmaceutical companies and publicly traded, mature, specialty companies and Stifel Nicolaus estimates.

Stifel Nicolaus combined these sum-of-the parts valuation analyses and added Adolor's net cash balance of $23.2 million as of September 30, 2011, as provided by Adolor's management, to determine

27

---

the implied equity value per share of Adolor in both the Competitive Label and Non-Competitive Label cases. This analysis resulted in implied equity per share values ranging from $5.44 to $7.90 in the Competitive Label Case and implied equity per share values ranging from $3.00 to $4.02 in the Non-Competitive Label Case.

### Conclusion

Based upon the foregoing analyses and the assumptions and limitations set forth in full in the text of Stifel Nicolaus' Opinion, Stifel Nicolaus was of the opinion that, as of the date of Stifel Nicolaus' Opinion, the consideration to be paid to the common stockholders of Adolor in the Transaction was fair to such stockholders, from a financial point of view.

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to a partial analysis or summary description. In arriving at its Opinion, Stifel Nicolaus considered the results of all of its analyses as a whole and did not attribute any particular weight to any analysis or factor considered by it. Stifel Nicolaus believes that the summary provided and the analyses described above must be considered as a whole and that selecting portions of these analyses, without considering all of them, would create an incomplete view of the process underlying Stifel Nicolaus' analyses and the Opinion; therefore, the range of valuations resulting from any particular analysis described above should not be taken to be Stifel Nicolaus' view of the actual value of Adolor.

Stifel Nicolaus is acting as financial advisor to the Company in connection with the Transaction. It received a fee for rendering its Opinion which was not contingent upon consummation of the Transaction but is creditable against transaction fees payable to Stifel Nicolaus which are contingent upon the completion of the Transaction. Adolor has granted to Stifel Nicolaus a right of first refusal to act as underwriter, placement agent, financial advisor or in any other similar capacity, on industry standard terms, if during the term of Stifel Nicolaus' engagement by Adolor, or within 12 months of the termination thereof, Adolor pursues a financing, restructuring or an acquisition or disposition transaction. In addition, Adolor has agreed to indemnify Stifel Nicolaus for certain liabilities arising out of Stifel Nicolaus' engagement. No other material relationships existed between Stifel Nicolaus and any party to the Transaction during the two years prior to the date of Stifel Nicolaus' Opinion or are mutually understood to be contemplated in which any compensation was received or is intended to be received as a result of the relationship between Stifel Nicolaus and any party to the Transaction. Stifel Nicolaus may seek to provide investment banking services to Parent or its affiliates in the future, for which Stifel Nicolaus would seek customary compensation. See Item 5 for more details on the engagement of Stifel Nicolaus, as financial advisor.

*(e)   Certain Projected Financial Information of the Company*

The Company does not, as a matter of course, make public long-term projections as to future performance or other prospective financial information beyond the current fiscal year, and the Company is especially wary of making projections for extended periods due to the unpredictability of the underlying assumptions and estimates. However, as part of their analysis of the Offer and the Merger, the Company's management provided the Company Board and Stifel Nicolaus with certain non-public projections about the Company that were utilized by Stifel Nicolaus. These projections also were considered by the Company Board for purposes of evaluating the Offer and the Merger. The Company has included below a summary of these projections that it considered when evaluating the Offer and the Merger for the purpose of providing stockholders and investors access to certain non-public information that was furnished for these specific, limited purposes, with the caveat that such information may not be appropriate for other purposes for reasons outlined below.

The Company's internal projections were not prepared with a view toward public disclosure, nor were they prepared with a view toward compliance with published guidelines of the SEC, the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation

28

of financial forecasts or with United States generally accepted accounting principles. Neither the Company's independent registered public accounting firm, nor any other independent accountants, has compiled, examined or preformed any procedures with respect to the prospective financial information included below, or expressed any opinion or any other form of assurance on such information or its achievability. The summary of these internal projections included below is not being included to influence your decision whether to tender your Shares in the Offer or, if required, vote for the Merger.

In preparing the financial projections, the Company's management made assumptions and estimates with respect to ENTEREG regarding pricing, market penetration, competition, intellectual property, promotion costs and manufacturing costs. The Company's management also made assumptions and estimates with respect to the development and commercialization of ADL5945 regarding development costs and timing, the timing of regulatory approval and the impact on the product of different labeling possibilities, the terms and timing of partnering the product outside the United States, commercialization costs, manufacturing costs, market size and penetration, competition and intellectual property. The Company's management also assumed that the Company would need to raise at least $60 million in additional capital, when needed, in order to fund operations.

While presented with numeric specificity, these internal projections were based on numerous variables and assumptions (including, but not limited to, those related to industry performance and competition and general business, economic, market and financial conditions and other matters specific to the Company's business) that are inherently subjective and uncertain and are beyond the control of the Company's management. Important factors that may affect actual results and cause these results to differ from internal projections include, but are not limited to, the factors listed in the parenthetical above as well as risks and uncertainties relating to the Company's business (including its ability to achieve strategic goals, objectives and targets over applicable periods) and other factors described in the "Risk Factors" section of the Company's Annual Report on Form 10-K, as updated by subsequent Quarterly Reports on Form 10-Q, all of which are filed with the SEC. These Risk Factors should be read and considered in conjunction with the internal projections. These internal projections also reflect numerous variables, expectations and assumptions available at the time they were prepared as to certain business decisions and matters that are subject to change. As a result, actual results may differ materially from these internal projections. Accordingly, there can be no assurance that the forecasted results summarized below will be realized.

The inclusion of a summary of these internal projections in this Schedule 14D-9 should not be regarded as an indication that the Company or its affiliates, advisors or representatives consider these internal projections to be predictive of actual future events, and these internal projections should not be relied upon as such nor should the information contained in these internal projections be considered appropriate for other purposes. Neither the Company nor any of its affiliates, advisors, officers, directors, partners, employees or representatives can give you any assurance that actual results will not differ materially from these internal projections, and none of them undertakes any obligation to update or otherwise revise or reconcile these internal projections to reflect actual performance or circumstances existing after the date these internal projections were generated or to reflect the occurrence of future events, even in the event that any or all of the assumptions underlying these projections are shown to be in error. Since the projections cover multiple years, such information by its nature becomes less meaningful and predictive with each successive year. The Company does not intend to make publicly available any update or other revision to these internal projections. Neither the Company nor any of its affiliates, advisors, officers, directors, partners, employees or representatives has made or makes any representation to any stockholder or other person regarding the Company's ultimate performance compared to the information contained in these internal projections or that the forecasted results will be achieved. The Company has made no representation to Parent, in the Merger Agreement or otherwise, concerning these internal projections. The below forecasts do not give effect

29

to the Merger. The Company urges all stockholders to review the Company's most recent SEC filings for a description of the Company's reported financial results.

As noted above under "Opinion of Financial Advisor to the Company," the Company's management provided two sets of projections. The projections set forth below in the table labeled "Competitive Label Case" assume the Competitive Label Case for ADL5945, and the projections set forth below in the table below labeled "Non-Competitive Label Case" assume the Non-Competitive Label Case for ADL5945. Both projections set forth below assume the same results for ENTEREG.

### Competitive Label Case

| | 2011E*** | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADL5945 Revenue ($) | — | 14 | 4 | — | 80 | 161 | 241 | 322 | 402 | 482 | 536 | 547 | 557 | 569 | 580 | 482 | 375 | 268 | 161 | 54 |
| ENTEREG Revenue ($) | 35 | 47 | 54 | 62 | 65 | 65 | 65 | 65 | 65 | 65 | 13 | 10 | 7 | 7 | 7 | | | | | |
| Total Revenue ($) | 35 | 61 | 58 | 62 | 145 | 226 | 306 | 387 | 467 | 547 | 549 | 556 | 565 | 576 | 587 | 482 | 375 | 268 | 161 | 54 |
| Total Cost of Goods Sold ($) | (13) | (10) | (11) | (31) | (38) | (32) | (43) | (50) | (77) | (73) | (77) | (78) | (80) | (81) | (98) | (68) | (53) | (38) | (23) | (8 |
| Total Research & Development ($) | (19) | (39) | (32) | (16) | (4) | (4) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3 | (3 |
| Total Selling, General & Administrative ($) | (30) | (30) | (30) | (30) | (112) | (191) | (193) | (190) | (192) | (188) | (185) | (183) | (186) | (186) | (185) | (107) | (66) | (43) | (29) | (22 |
| Operating Income ($) | (26) | (17) | (15) | (15) | (8) | (2) | 66 | 143 | 195 | 282 | 284 | 292 | 296 | 306 | 301 | 304 | 253 | 184 | 106 | 21 |
| Net Income ($)* | (26) | (17) | (15) | (15) | (8) | (2) | 40 | 86 | 117 | 169 | 171 | 175 | 178 | 184 | 181 | 182 | 152 | 110 | 64 | 12 |
| Unlevered Free Cash Flow** | (7)**** | (15) | (12) | (12) | (9) | (1) | 67 | 139 | 192 | 206 | 171 | 175 | 177 | 183 | 180 | 187 | 157 | 115 | 69 | 17 |

All dollar values in millions

\*   Assumes no usage of net operating loss carry forwards.

\*\*   Excludes depreciation, amortization and capital expenditures. Excludes guaranteed payments to Glaxo Group Limited and reflects full usage of net operating loss carry forwards to offset taxes.

\*\*\*   Product sales only; does not include contract revenues or non-cash deferred revenue from the Collaboration Agreement dated as of April 14, 2002, by and between the Company and Glaxo Group Limited and subsequent amendments.

\*\*\*\*   Fourth Quarter 2011E only.

### Non-Competitive Label Case

| | 2011E*** | 2012E | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADL5945 Revenue($) | — | 14 | 4 | — | 41 | 80 | 121 | 161 | 202 | 241 | 268 | 273 | 279 | 284 | 290 | 241 | 188 | 134 | 80 | 27 |
| ENTEREG Revenue ($) | 35 | 47 | 54 | 62 | 65 | 65 | 65 | 65 | 65 | 65 | 13 | 10 | 7 | 7 | 7 | — | — | — | — | |
| Total Revenue ($) | 35 | 61 | 58 | 62 | 105 | 145 | 186 | 226 | 266 | 306 | 281 | 283 | 286 | 292 | 297 | 241 | 188 | 134 | 80 | 27 |
| Total Cost of Goods Sold ($) | (13) | (10) | (11) | (31) | (33) | (21) | (26) | (27) | (33) | (39) | (39) | (39) | (40) | (41) | (42) | (34) | (27) | (19) | (11) | (4 |
| Total Research & Development ($) | (19) | (39) | (32) | (16) | (4) | (4) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3 | (3 |
| Total Selling, General & Administrative ($) | (30) | (30) | (30) | (30) | (84) | (136) | (136) | (134) | (135) | (132) | (127) | (125) | (128) | (127) | (126) | (76) | (48) | (34) | (24) | (20 |
| Operating Income ($) | (26) | (17) | (15) | (15) | (15) | (16) | 19 | 61 | 95 | 132 | 112 | 115 | 116 | 121 | 126 | 129 | 110 | 79 | 42 | |
| Net Income ($)* | (26) | (17) | (15) | (15) | (15) | (16) | 12 | 37 | 57 | 79 | 67 | 69 | 70 | 73 | 76 | 77 | 66 | 47 | 25 | |
| Unlevered Free Cash Flow** | (7)**** | (15) | (12) | (12) | (14) | (13) | 22 | 59 | 93 | 130 | 114 | 112 | 69 | 72 | 75 | 80 | 68 | 50 | 28 | |

All dollar values in millions

\*   Assumes no usage of net operating loss carry forwards.

\*\*   Excludes depreciation, amortization and capital expenditures. Excludes guaranteed payments to Glaxo Group Limited and reflects full usage of net operating loss carry forwards to offset taxes.

\*\*\*   Product sales only; does not include contract revenues or non-cash deferred revenue from the Collaboration Agreement dated as of April 14, 2002, by and between the Company and Glaxo Group Limited and subsequent amendments.

\*\*\*\*   Fourth Quarter 2011E only.

30

(f)   *Intent to Tender.*

As discussed above, each of the Company's directors and executive officers has entered into a Tender and Voting Agreement in which each such director or executive officer has agreed (i) to tender in the Offer (and not to withdraw) all Shares beneficially owned by him, *provided, however*, that there shall be no duty to tender Shares if such action would give rise to liability under Section 16(b) of the Exchange Act, (ii) to vote such Shares in support of the Merger in the event stockholder approval is required to consummate the Merger, (iii) to appoint Parent as his proxy to vote such shares in connection with the Merger Agreement, and (iv) not to otherwise transfer any of his Shares. The obligations under the Tender Voting Agreements terminate upon the termination of the Merger Agreement.

To the knowledge of the Company after reasonable inquiry, the Company and all of its executive officers and directors currently intend to tender or cause to be tendered all Shares held of record or beneficially owned by them pursuant to the Offer, provided that doing so would not give rise to liability under Section 16(b) of the Exchange Act. The foregoing does not include any Shares over which, or with respect to which, any such person acts in a fiduciary or representative capacity or is subject to the instructions of a third-party with respect to the offer.

**Item 5.   Person/Assets, Retained, Employed, Compensated or Used.**

Pursuant to an engagement letter dated October 5, 2011, Stifel Nicolaus was engaged by the Company to act as financial advisor to the Company in connection with the Offer and the Merger and will receive a fee equal to approximately $3,527,000, $625,000 of which was payable upon delivery of the Opinion and the remainder of which is payable contingent upon consummation of the Offer and Merger. Stifel Nicolaus will also receive an additional fee equal to 1.5% of any payments made to holders of the CPRs. Such fee is payable at the time any payments are made with respect to the CPRs. Assuming each holder of a CPR is paid $4.50, the maximum amount payable with respect to each CPR, Stifel Nicolaus' additional fee will be equal to approximately $3,377,000. Stifel Nicolaus also will be reimbursed for all out-of-pocket expenses incurred. The Company has agreed to indemnify Stifel Nicolaus against liabilities arising out of or in connection with the services rendered and to be rendered by Stifel Nicolaus under such engagement. Stifel Nicolaus has not, in the past two years, provided financial advisory or financing services to the Company or affiliates of the Company. Stifel Nicolaus may in the future provide financial advisory and financing services to the Company and affiliates of the Company, and may receive fees for the rendering of such services.

Neither the Company nor any person acting on its behalf has employed, retained or compensated any person to make solicitations or recommendations to the Company's stockholders on its behalf concerning the Offer or the Merger, except that such solicitations or recommendations may be made by directors, officers or employees of the Company, for which services no additional compensation will be paid.

**Item 6.   Interest in Securities of the Subject Company.**

To the knowledge of the Company, no transactions in the Company's Common Stock have been effected during the past 60 days prior to the date of this Schedule 14D-9 by the Company or by any of its executive officers, directors, affiliates or subsidiaries.

**Item 7.   Purposes of the Transaction and Plans or Proposals.**

(a)   Except as indicated in Items 3 and 4 above, no negotiations are being undertaken or are underway by the Company in response to the Offer that relate to a tender offer or other acquisition of the securities of the Company by the Company, any of its subsidiaries or any other person.

31

(b)   Except as indicated in Items 3 and 4 above or in Item 8 below, no negotiations are being undertaken or are underway by the Company in response to the Offer that relate to, or would result in, (i) any extraordinary transaction, such as a merger, reorganization or liquidation, involving the Company or any subsidiary thereof, (ii) any purchase, sale or transfer of a material amount of assets by the Company or any subsidiary thereof or (iii) any material change in the present dividend rate or policy or indebtedness or capitalization of the Company.

(c)   Except as indicated in Items 3 and 4 above, there are no transactions, resolutions of the Company Board, agreements in principle or signed contracts entered into in response to the Offer that relate to, or would result in, one or more of the matters referred to in this Item 7.

**Item 8.    Additional Information.**

**Appraisal Rights**

No appraisal rights are available to the holders of Shares in connection with the Offer. However, if the Merger is consummated, each holder of Shares at the Effective Time who has neither voted in favor of the Merger nor consented thereto in writing, and who otherwise complies with the applicable statutory procedures under Section 262 of the DGCL, will be entitled to receive a judicial determination of the fair value of the holder's Shares (exclusive of any element of value arising from the accomplishment or expectation of the Merger) and to receive payment of such judicially determined amount in cash, together with such rate of interest as the Delaware court may determine for Shares held by such holder. Unless the Delaware court in its discretion determines otherwise for good cause shown, this rate of interest will be five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time between the Effective Time and the date of payment and will be compounded quarterly.

Any such judicial determination of the fair value of the Shares could be based upon considerations other than or in addition to the price paid in the Merger and the market value of the Shares. Stockholders should recognize that the value so determined could be higher or lower than the price per Share paid pursuant to the Offer or the per share price to be paid in the Merger, both of which include the CPRs. Moreover, the Company may argue in an appraisal proceeding that, for purposes of such a proceeding, the fair value of the Shares is less than the price paid in the Offer and the Merger.

If any holder of Shares who demands appraisal under Section 262 of the DGCL fails to perfect, or effectively withdraws or loses his, her, or its rights to appraisal as provided in the DGCL, the Shares of such stockholder will be converted into the right to receive the Merger Consideration, without interest, in accordance with the Merger Agreement. A stockholder may withdraw a demand for appraisal by delivering to the Company a written withdrawal of the demand for appraisal and acceptance of the Merger.

**The foregoing summary of the rights of dissenting stockholders under the DGCL does not purport to be a statement of the procedures to be followed by stockholders desiring to exercise any appraisal rights under Delaware law. The preservation and exercise of appraisal rights require strict and timely adherence to the applicable provisions of Delaware law which will be set forth in their entirety in the proxy statement or information statement for the Merger, unless the Merger is effected as a short-form merger, in which case they will be set forth in the notice of Merger. The foregoing discussion is not a complete statement of law pertaining to appraisal rights under Delaware law and is qualified in its entirety by reference to Delaware law.**

**APPRAISAL RIGHTS CANNOT BE EXERCISED AT THIS TIME. THE INFORMATION SET FORTH ABOVE IS FOR INFORMATIONAL PURPOSES ONLY WITH RESPECT TO ALTERNATIVES AVAILABLE TO STOCKHOLDERS IF THE MERGER IS COMPLETED. STOCKHOLDERS WHO WILL BE ENTITLED TO APPRAISAL RIGHTS IN CONNECTION WITH**

32

**THE MERGER WILL RECEIVE ADDITIONAL INFORMATION CONCERNING APPRAISAL RIGHTS AND THE PROCEDURES TO BE FOLLOWED IN CONNECTION THEREWITH BEFORE SUCH STOCKHOLDERS HAVE TO TAKE ANY ACTION RELATING THERETO. STOCKHOLDERS WHO TENDER SHARES IN THE OFFER WILL NOT BE ENTITLED TO EXERCISE APPRAISAL RIGHTS WITH RESPECT THERETO BUT, RATHER, WILL RECEIVE THE MERGER CONSIDERATION.**

### Top-Up Option

Subject to the terms and conditions of the Merger Agreement, the Company has granted Purchaser an option (the "*Top-Up Option*") to purchase newly issued Shares so that, when added to the number of Shares owned by Purchaser prior to the exercise of the Top-Up Option, Purchaser will own at least 90% of the Shares then outstanding (determined on a "fully diluted basis" as defined in the Merger Agreement). The Top-Up Option may not be exercised unless, following the acceptance of Shares pursuant to the Offer (the "*Acceptance Time*"), Purchaser owns 70% or more of the Shares. For each Share purchased pursuant to the Top-Up Option, Purchaser will pay the greater of (i) the last reported sale price of a Share on the NASDAQ stock market on the last trading day prior to the date on which the Top-Up Option is exercised or (ii) the Closing Amount for each Share acquired upon exercise of the Top-Up Option. The Top-Up Option shall be exercisable only after Purchaser or Parent has acquired at least 70% of the outstanding Shares.

### Information about Golden Parachute Compensation.

The following table sets forth information required by Item 402(t) of Regulation S-K regarding the compensation and benefits that will or may be paid or provided to Messrs. Dougherty, Webster, Limongelli and Maurer, each an NEO, in connection with the Merger in the circumstances described below. Regardless of the manner in which each NEO's employment terminates, each NEO is entitled to receive his base salary earned through the date of termination, unpaid expense reimbursements and unused accrued vacation days. Please note that the amounts indicated below are estimates based on multiple assumptions described herein. Some of these assumptions are based on currently available information and, as a result, the actual amounts, if any, to be received by an NEO may differ in material respects from the amounts set forth below. The Acceptance Time will constitute a "change in control" for purposes of the calculation of the compensation and benefits described below. Furthermore, for purposes of calculating such amounts, we have assumed (i) that the Acceptance Time and the Effective Time occurred on November 4, 2011 (the last practicable date prior to the filing of this Schedule 14D-9) and that the NEOs will be terminated on the same date, (ii) that all Company Options with an exercise price of less than or equal to $4.25 per share were exercised upon vesting at the Acceptance Time and the NEOs received, before any reduction for taxes, the Closing Amount and one CPR for each Share received upon exercise, and (iii) that all CPRs will pay out $4.50 per CPR (the maximum amount payable per Share with respect to a CPR) in the future. Because (a) the actual dates of the Acceptance Time and the Effective Time will be later than November 4, 2011, (b) the actual dates of the payment of the CPRs will be later than November 4, 2011, (c) the CPRs will not necessarily pay out at their full value if they pay out at all, and (d) the NEOs will not receive CPRs with respect to Shares underlying Company Options that they do not exercise or Shares constituting or underlying Company Restricted Shares or DSUs that they tender or have withheld to satisfy withholding tax obligations connected with such awards, the actual number of CPRs each NEO receives and the actual amount those CPRs pay out could differ substantially from what is set forth in the table. In addition, if the NEOs do not undergo a termination within twelve (12) months following the

33

---

Acceptance Time, they will not be entitled to the cash payments, perquisites and benefits set forth below. All values are shown before reduction for applicable withholding tax.

| Name | Cash ($) | Equity ($)(5) | Perquisites / Benefits ($)(10) | Other ($)(11) | Total ($) |
|------|----------|---------------|-------------------------------|---------------|-----------|
| Michael R Dougherty | 629,572(1) | 2,746,341(6) | 50,584 | 3,279,384(12) | 6,705,881 |
| Stephen W. Webster | 433,635(2) | 799,590(7) | 50,584 | 956,255(13) | 2,240,064 |
| John M. Limongelli | 433,635(3) | 1,088,126(8) | 50,584 | 1,391,724(14) | 2,964,069 |
| George R. Maurer | 354,006(4) | 823,744(9) | 44,611 | 982,508(15) | 2,204,869 |

(1)   Under his letter agreement with the Company, dated October 24, 2002 and amended on each of January 26, 2004, December 14, 2006, February 21, 2008 and December 31, 2008, if Mr. Dougherty's employment is terminated by the Company without Cause or by Mr. Dougherty for Good Reason within ninety (90) days prior to and twelve (12) months following a Change in Control (as each such capitalized term is defined in the letter agreement) of the Company, Mr. Dougherty will be entitled to receive, subject to his execution of a release, a cash amount, payable in twelve (12) monthly installments, equal to the sum of (i) 1x his current base salary ($457,668) and (ii) 1x his bonus amount paid for his performance for the immediately preceding calendar year ($171,904) (double trigger benefit).

(2)   Under his letter agreement with the Company, dated June 12, 2008, if Mr. Webster's employment is terminated by the Company without Cause or by Mr. Webster for Good Reason within ninety (90) days prior to and twelve (12) months following a Change in Control (as each such capitalized term is defined in the letter agreement) of the Company, Mr. Webster will be entitled to receive a cash amount, payable in twelve (12) monthly installments, equal to the sum of (i) 1x his current base salary ($349,981) and (ii) 1x his bonus amount paid for his performance for the immediately preceding calendar year ($83,654) (double trigger benefit).

(3)   Under his letter agreement with the Company, dated August 15, 2008, if Mr. Limongelli's employment is terminated by the Company without Cause or by Mr. Limongelli for Good Reason within ninety (90) days prior to and twelve (12) months following a Change in Control (as each such capitalized term is defined in the letter agreement) of the Company, Mr. Limongelli will be entitled to receive a cash amount, payable in twelve (12) monthly installments, equal to the sum of (i) 1x his current base salary ($349,981) and (ii) 1x his bonus amount paid for his performance for the immediately preceding calendar year ($83,654) (double trigger benefit).

(4)   Under his letter agreement with the Company, dated as of January 6, 2009, if Mr. Maurer's employment is terminated by the Company without Cause or by Mr. Maurer for Good Reason within ninety (90) days prior to and twelve (12) months following a Change in Control (as each such capitalized term is defined in the letter agreement) of the Company, Mr. Maurer will be entitled to receive a cash amount, payable in twelve (12) monthly installments, equal to the sum of (i) 1x his current base salary ($285,000) and (ii) 1x his bonus amount paid for his performance for the immediately preceding calendar year ($69,006) (double trigger benefit).

(5)   Amounts set forth in this column reflect the Closing Amount ($4.25) received by each NEO at the Effective Time in connection with each share constituting or underlying each Company Restricted Share, DSU and unvested Company Option with an exercise price of less than or equal to $4.25 per share that is exercised immediately prior to the Effective Time (net of exercise price in the case of such Company Options). These amounts do not reflect the market value of the Shares at the Acceptance Time or the value of the CPRs received with respect to such Shares. Column 5 ("Other") sets forth the maximum amount that could be paid per CPR for each CPR received at the Effective Time in connection with such shares.

34

(6)    The Company has entered into equity award agreements with Mr. Dougherty granting him Company Options, Company Restricted Shares and DSUs. Pursuant to these equity award agreements and the Merger Agreement, 100% of Mr. Dougherty's outstanding unvested awards will vest at the Acceptance Time (single trigger benefit). The amount set forth in the table above reflects the aggregate value of the unvested Company Options, Company Restricted Shares and DSUs that will fully vest at the Acceptance Time. It was assumed for purposes of this valuation that Mr. Dougherty will exercise his unvested Company Options upon vesting at the Acceptance Time (other than Company Options with an exercise price greater than $4.25 per share) and will receive $4.25 in respect of each Share received upon exercise plus one CPR pursuant to the Merger Agreement. The value of the unvested Company Options that will vest at the Acceptance time was determined by multiplying (i) the number of Shares underlying the unvested options by (ii) the difference between $4.25 and the applicable exercise price of each Company Option, which has a total value of $647,903. The value of the accelerated Company Restricted Shares and DSUs (which pursuant to the Merger Agreement will be settled in Shares) was determined by multiplying (i) the number of Shares constituting or underlying the referenced Restricted Shares and DSUs by (ii) $4.25 (the Closing Amount), which has a total value of $2,098,438.

(7)    The Company has entered into equity award agreements with Mr. Webster granting him Company Options and DSUs. Pursuant to these equity award agreements and the Merger Agreement, 100% of Mr. Webster's outstanding unvested awards will vest at the Acceptance Time (single trigger benefit). The amount set forth in the table above reflects the aggregate value of the unvested Company Options and DSUs that will fully vest at the Acceptance Time. It was assumed for purposes of this valuation that Mr. Webster will exercise his unvested Company Options upon vesting at the Acceptance Time (other than Company Options with an exercise price greater than $4.25 per share) and will receive $4.25 in respect of each Share received upon exercise plus one CPR for each underlying Share pursuant to the Merger Agreement. The value of the unvested Company Options that will vest at the Acceptance time was determined by multiplying (i) the number of Shares underlying the unvested Company Options by (ii) the difference between $4.25 and the applicable exercise price of each Company Option, which has a total value of $199,277. The value of the accelerated DSUs (which pursuant to the Merger Agreement will be settled in Shares) was determined by multiplying (i) the number of Shares underlying the DSUs by (ii) $4.25 (the Closing Amount), which has a total value of $600,313.

(8)    The Company has entered into equity award agreements with Mr. Limongelli granting him Company Options and DSUs. Pursuant to these equity award agreements and the Merger Agreement, 100% of Mr. Limongelli's outstanding unvested awards will vest at the Acceptance Time (single trigger benefit). The amount set forth in the table above reflects the aggregate value of the unvested Company Options and DSUs that will fully vest at the Acceptance Time. It was assumed for purposes of this valuation that Mr. Limongelli will exercise his unvested Company Options upon vesting at the Acceptance Time (other than Company Options with an exercise price greater than $4.25 per share) and will receive $4.25 in respect of each Share received upon exercise plus one CPR pursuant to the Merger Agreement. The value of the unvested Company Options that will vest at the Acceptance time was determined by multiplying (i) the number of Shares underlying the unvested Company Options by (ii) the difference between $4.25 and the applicable exercise price of each Company Option, which has a total value of $275,313. The value of the accelerated DSUs (which pursuant to the Merger Agreement will be settled in Shares) was determined by multiplying (i) the number of Shares underlying the DSUs by (ii) $4.25 (the Closing Amount), which has a total value of $812,813.

(9)    The Company has entered into equity award agreements with Mr. Maurer granting him Company Options and DSUs. Pursuant to these equity award agreements and the Merger Agreement, 100% of Mr. Maurer's outstanding unvested awards will vest upon a Change in Control (single trigger

35

benefit). The amount set forth in the table above reflects the aggregate value of the unvested Company Options and DSUs that will fully vest at the Acceptance Time. It was assumed for purposes of this valuation that Mr. Maurer will exercise his unvested Company Options upon vesting at the Acceptance Time (other than Company Options with an exercise price greater than $4.25 per share) and will receive $4.25 in respect of each Share received upon exercise plus one CPR. The value of the unvested Company Options that will vest at the Acceptance time was determined by multiplying (i) the number of Shares underlying the unvested Company Options by (ii) the difference between $4.25 and the applicable exercise price of each option, which has a total value of $191,557. The value of the accelerated DSUs (which pursuant to the Merger Agreement will be settled in Shares) was determined by multiplying (i) the number of Shares underlying the DSUs by (ii) $4.25 (the Closing Amount), which has a total value of $632,188.

(10) Under their letter agreements with the Company, each of Messrs. Dougherty, Webster, Limongelli and Maurer and their spouses and dependents are entitled to continuation of their medical, dental and life insurance coverage for a period of twelve (12) months following a Qualifying Termination. Values reported in the table reflect the projected value based on premium equivalent rates for continued medical and dental coverage for each executive officer and his spouse and dependents ($25,584 for each of Messrs. Dougherty, Webster and Limongelli, and $19,611 for Mr. Maurer). The Company also will provide outplacement services to each NEO for a period of twelve (12) months following a Qualifying Termination ($25,000 per executive officer).

(11) Amounts set forth in this column give the maximum amount that could be paid with respect to each CPR received by each NEO at the Effective Time in connection with each Share constituting or underlying each Company Restricted Share, DSU and unvested Company Option with an exercise price less than or equal to $4.25 per share that is exercised immediately prior to the Effective Time. This table assumes that no shares constituting or underlying an NEO's Company Restricted Shares or DSUs were withheld or tendered in connection with any withholding tax obligations connected with such awards. If any Shares were tendered or withheld in connection with such awards for withholding tax purposes, this would reduce the number of CPRs received by the NEO.

(12) Pursuant to the Merger Agreement, Mr. Dougherty is entitled to receive one CPR for each Share received upon exercise of unvested Company Options (assuming such Company Options are exercised prior to the Effective Time), one CPR for each Company Restricted Share which vests at the Acceptance Time and one CPR for each Share received upon settlement of DSUs which are vested at the Acceptance Time. This column sets forth the value of the CPRs with respect to such Shares by multiplying (i) the number of Shares underlying the unvested Company Options (other than Company Options with an exercise price greater than $4.25 per share) and the number of Shares constituting or underlying the referenced Restricted Shares and DSUs awards by (ii) $4.50 (the maximum amount payable per Share with respect to the CPRs), for a total value of $3,279,384. The number of CPRs and the total amount, if any, actually received by Mr. Dougherty in payment of the CPRs could be substantially less than the amount set forth in this column.

(13) Pursuant to the Merger Agreement, Mr. Webster is entitled to receive one CPR for each Share received upon exercise of unvested Company Options (assuming such Company Options are exercised prior to the Effective Time) and one CPR for each Share received upon settlement of DSUs which are vested at the Acceptance Time. This column sets forth the value of the CPRs with respect to such Shares by multiplying (i) the number of Shares underlying the unvested Company Options (other than Company Options with an exercise price greater than $4.25 per share) and the number of Shares underlying the DSUs by (ii) $4.50 (the maximum amount payable per Share with respect to the CPRs), for a total value of $956,255. The number of CPRs and the total amount, if any, actually received by Mr. Webster in payment of the CPRs could be substantially less than the amount set forth in this column.

36

(14)    Pursuant to the Merger Agreement, Mr. Limongelli is entitled to receive one CPR for each Share received upon exercise of unvested Company Options (assuming such Company Options are exercised) and one CPR for each Share received upon settlement of DSUs which are vested at the Acceptance Time. This column sets forth the value of the CPRs with respect to such Shares by multiplying (i) the number of Shares underlying the unvested Company Options (other than Company Options with an exercise price greater than $4.25 per share) and the number of Shares underlying the DSUs by (ii) $4.50 (the maximum amount payable per Share with respect to the CPRs), for a total value of $1,391,724. The number of CPRs and the total amount, if any, actually received by Mr. Limongelli in payment of the CPRs could be substantially less than the amount set forth in this column.

(15)    Pursuant to the Merger Agreement, Mr. Maurer is entitled to receive one CPR for each Share received upon exercise of unvested Company Options (assuming such Company Options are exercised prior to the Effective Time) and Shares received upon settlement of DSUs which are vested at the Acceptance Time. This column sets forth the value of the CPRs with respect to such Shares by multiplying (i) the number of Shares underlying the unvested Company Options (other than Company Options with an exercise price greater than $4.25 per share) and the number of Shares underlying the DSUs by (ii) $4.50 (the maximum amount payable per Share with respect to the CPRs), for a total value of $982,508. The number of CPRs and the total amount, if any, actually received by Mr. Maurer in payment of the CPRs could be substantially less than the amount set forth in this column.

### Vote Required to Approve the Merger

The Company Board unanimously approved the Merger Agreement and the transactions contemplated thereby, including the Offer and the Merger, in accordance with the applicable rules of the DGCL. Under Section 253 of the DGCL, if Purchaser acquires, pursuant to the Offer or otherwise, including the exercise of the Top-Up Option, at least 90% of the outstanding Shares, Purchaser will be able to effect the Merger after the consummation of the Offer without a vote by the Company's stockholders. If Purchaser acquires, pursuant to the Offer or otherwise, less than 90% of the outstanding Shares, the affirmative vote of the holders of a majority of the outstanding Shares will be required under the DGCL to effect the Merger.

### State Takeover Laws

Section 203 of the DGCL generally prevents an "interested stockholder" (including a person who owns or has the right to acquire 15% or more of a corporation's outstanding voting stock) from engaging in a "business combination," which includes mergers and certain other transactions, with a Delaware corporation for a period of three years following the date such person became an interested stockholder. If, among other requirements, the "business combination" with a person is approved by the board of directors prior to the date such person became an "interested stockholder," the transaction becomes permissible under Delaware law. The Company Board unanimously approved the Offer and the Merger for purposes of Section 203 of the DGCL, and Parent and Purchaser have represented in the Merger Agreement that neither is an interested stockholder.

The Company has not attempted to comply with any other state takeover laws or regulations. If any government official or third party should seek to apply any such state takeover law to the Offer or the Merger or any of the other transactions contemplated by the Merger Agreement, Parent will take such action as then appears desirable, which action may include challenging the applicability or validity of such statute in appropriate court proceedings. In the event it is asserted that one or more state takeover statutes are applicable to the Offer or the Merger and an appropriate court does not determine that it is or they are inapplicable or invalid as applied to the Offer or the Merger, Parent might be required to file certain information with, or to receive approvals from, the relevant state

37

---

authorities or holders of Shares, and Parent might be unable to accept for payment or pay for Shares tendered pursuant to the Offer, or might be delayed in continuing or consummating the Offer or the Merger. In such case, Purchaser may not be obligated to accept for payment or pay for any tendered Shares.

**Antitrust**

Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended and the rules that have been promulgated thereunder (the "*HSR Act*"), certain transactions having a value above specified thresholds and that meet other jurisdictional tests may not be consummated until each party has filed a premerger notification and report form ("*HSR Form*") containing certain information and documentary material with both the Federal Trade Commission (the "*FTC*") and the Antitrust Division of the Department of Justice (the "Antitrust Division") and certain waiting period requirements have been satisfied.

It is a condition to Purchaser's obligation to accept for payment and pay for the Shares tendered pursuant to the Offer that the waiting period (and any extension thereof) under the HSR Act applicable to the purchase of Shares pursuant to the Offer has expired or been terminated. Under the HSR Act, the purchase of Shares in the Offer may not be completed until the expiration of a 15 calendar day waiting period following the filing by Parent of a Premerger Notification and Report Form concerning the Offer with the FTC and the Antitrust Division, unless the waiting period is earlier terminated by the FTC and the Antitrust Division.

If the HSR Act waiting period expires or is terminated, completion of the Merger will not require an additional filing under the HSR Act so long as Purchaser acquires more that 50% of the outstanding Shares within one year after the HSR Act waiting period applicable to the Offer expires or is terminated.

The FTC and the Antitrust Division frequently scrutinize the legality under the antitrust laws of transactions such as Purchaser's proposed acquisition of the Company. At any time before or after the purchase of Shares by Purchaser, the FTC or the Antitrust Division could take any action under the antitrust laws that it either considers necessary or desirable in the public interest, including seeking to enjoin the purchase of Shares in the Offer and the Merger, the divestiture of Shares purchased in the Offer or the divestiture of substantial assets of the Company or any of its respective subsidiaries or affiliates. Private parties as well as state attorneys general also may bring legal actions under the antitrust laws under certain circumstances.

The foregoing is qualified in its entirety by reference to the Offer to Purchase, filed herewith as Exhibit (a)(1)(A) and is incorporated herein by reference in its entirety and the Merger Agreement, filed herewith as Exhibit (e)(1) and incorporated by reference in its entirety.

**Section 14(f) Information Statement**

The Information Statement attached as Annex I hereto is being furnished to the Company's stockholders and filed with the SEC pursuant to Section 14(f) of the Securities Exchange Act of 1934, as amended, and Rule 14f-1 promulgated thereunder, in connection with the possible designation by Parent of certain persons to be appointed to the Company Board, other than at a meeting of the Company's stockholders.

**Amendment to Rights Agreement**

In contemplation of the Merger Agreement, on October 24, 2011, Adolor and Broadridge Corporate Issuer Solutions, Inc. ("*Broadridge*") entered into the Amendment (the "*Amendment*") to the Amended and Restated Rights Agreement, dated as of January 31, 2011 (the "*Rights Agreement*"),

38

between Adolor and Broadridge, which provides, among other things, that neither Parent nor Purchaser will become an "Acquiring Person" within the meaning of the Rights Agreement as a result of the execution of the Merger Agreement or the transactions contemplated thereby. In addition, the Amendment amends the Rights Agreement so the Rights Agreements will terminate by its terms at the Acceptance Time.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the Amendment, which is attached to this Schedule 14D-9 as Exhibit (e)(32) and is incorporated herein by reference.

### Recent Developments

On October 25, 2011, a lawsuit was filed in the Court of Common Pleas of Chester County, Pennsylvania, Civil Division against the Company, each member of the Company Board, Parent and the Purchaser (the "*Moskal Complaint*"). The action is brought by Stanley L. Moskal, who claims to be a stockholder of the Company, on his own behalf, and seeks certification as a class action on behalf of all of the Company's stockholders, except the defendants and their relations and affiliates. The complaint alleges that the defendants breached their fiduciary duties, and/or aided and abetted the breach of fiduciary duties, owed to the Company's stockholders in connection with the Offer and the Merger. The complaint seeks injunctive relief enjoining the Offer and the Merger, or, in the event the Offer or the Merger has been consummated prior to the court's entry of final judgment, rescinding the Offer and the Merger. The complaint also seeks an accounting for all damages and an award of costs, including a reasonable allowance for attorneys' and experts' fees and expenses. The Company and the Company Board believe the allegations in the complaint are without merit.

The foregoing summary and the information are qualified in their entirety by reference to the Moskal Complaint, a copy of which has been filed as Exhibits (e)(30) hereto and is incorporated herein by reference.

Additionally, on October 28, 2011, a purported stockholder of the Company filed a lawsuit in the Court of Chancery of the State of Delaware against the Company, each member of the Company Board, Parent and the Purchaser (the "*Machado Complaint*"). This action purports to be brought individually by the plaintiff, Cari Machado, and on behalf of all of the Company's stockholders. The suit alleges that each member of the Company Board breached his fiduciary duties owed to the Company's stockholders in connection with the Offer and the Merger and further alleges that the Company, Parent and Purchaser aided and abetted the Company Board's breach of fiduciary duties. The complaint seeks, among other things, injunctive relief enjoining the Offer, or, in the event the Offer has been consummated prior to the court's entry of final judgment, rescission of the Offer or awarding recissory damages to the plaintiff and the class. Additionally, the complaint seeks an award of damages and costs, including a reasonable allowance for attorneys' and experts' fees and expenses. The Company and the Company Board believe the allegations in the complaint are without merit.

The foregoing summary and the information are qualified in their entirety by reference to the Machado Complaint, a copy of which has been filed as Exhibits (e)(31) hereto and is incorporated herein by reference.

Additionally, on October 31, 2011, a lawsuit was filed in the Court of Common Pleas of Chester County, Pennsylvania, Civil Division against the Company, each member of the Company Board, Parent and the Purchaser (the "*Pearson Complaint*"). The action is brought by William Pearson, II, who claims to be a stockholder of the Company, on his own behalf, and seeks certification as a class action on behalf of all of the Company's stockholders. The complaint alleges that the defendants breached their fiduciary duties, and/or aided and abetted the breach of fiduciary duties, owed to the Company's stockholders in connection with the Offer and the Merger. The complaint seeks injunctive relief enjoining the Offer and the Merger, as well as a declaration that the deal protections in the Merger

39

Agreement are unenforceable, amongst other things. The complaint also seeks an accounting for all damages and an award of costs, including a reasonable allowance for attorneys' and experts' fees and expenses. The Company and the Company Board believe the allegations in the complaint are without merit.

The foregoing summary and the information are qualified in their entirety by reference to the Pearson Complaint, a copy of which has been filed as Exhibits (e)(33) hereto and is incorporated herein by reference.

Additionally, on November 1, 2011, a purported stockholder of the Company filed a lawsuit in the Court of Chancery of the State of Delaware against the Company, each member of the Company Board, Parent and the Purchaser (the "*Fellman Complaint*"). This action purports to be brought individually by the plaintiff, Thomas Fellman, and on behalf of all of the Company's stockholders. The suit alleges that each member of the Company Board breached his fiduciary duties owed to the Company's stockholders in connection with the Offer and the Merger and further alleges that the Company, Parent and Purchaser aided and abetted the Company Board's breach of fiduciary duties. The complaint seeks, among other things, injunctive relief enjoining the Offer, or, in the event the Offer has been consummated prior to the court's entry of final judgment, rescission of the Offer or awarding recissory damages to the plaintiff and the class. Additionally, the complaint seeks an award of damages and costs, including a reasonable allowance for attorneys' and experts' fees and expenses. The Company and the Company Board believe the allegations in the complaint are without merit.

The foregoing summary and the information are qualified in their entirety by reference to the Fellman Complaint, a copy of which has been filed as Exhibits (e)(34) hereto and is incorporated herein by reference.

Additionally, on November 4, 2011, a purported stockholder of the Company filed a lawsuit in the Court of Chancery of the State of Delaware against the Company, each member of the Company Board, Parent and the Purchaser (the "*Currell Complaint*"). This action purports to be brought individually by the plaintiff, James Currell, and on behalf of all of the Company's stockholders. The suit alleges that each member of the Company Board breached his fiduciary duties owed to the Company's stockholders in connection with the Offer and the Merger and further alleges that the Company, Parent and Purchaser aided and abetted the Company Board's breach of fiduciary duties. The complaint seeks, among other things, injunctive relief enjoining the Offer, or, in the event the Offer has been consummated prior to the court's entry of final judgment, rescission of the Offer or awarding recissory damages to the plaintiff and the class. Additionally, the complaint seeks an award of damages and costs, including a reasonable allowance for attorneys' and experts' fees and expenses. The Company and the Company Board believe the allegations in the complaint are without merit.

The foregoing summary and the information are qualified in their entirety by reference to the Currell Complaint, a copy of which has been filed as Exhibits (e)(35) hereto and is incorporated herein by reference.

40

**Item 9.   Exhibits.**

The following exhibits are filed as part of this report:

(a)(1)(A)   Offer to Purchase for Cash dated November 7, 2011 (incorporated by reference to Exhibit (a)(1)(A) to the Schedule TO filed by Parent on November 7, 2011)

(a)(1)(B)   Form of Letter of Transmittal dated November 7, 2011 (incorporated by reference to Exhibit (a)(1)(B) to the Schedule TO filed by Parent on November 7, 2011)

(a)(1)(C)   Form of Notice of Guaranteed Delivery dated November 7, 2011 (incorporated by reference to Exhibit (a)(1)(C) to the Schedule TO filed by Parent on November 7, 2011)

(a)(1)(D)   Information Statement pursuant to Section 14(f) of the Securities Exchange Act of 1934 and Rule 14f-1 thereunder (attached as Annex I hereto)*

(a)(2)   Letter from Michael R. Dougherty, Adolor Corporation's President and Chief Executive Officer, to the stockholders of Adolor Corporation dated November 7, 2011*

(a)(5)(A)   Opinion of Stifel, Nicholas & Company, Incorporated to the Board of Directors of Adolor Corporation, dated October 24, 2011 (attached as Annex II hereto)*

(a)(5)(B)   Joint Press Release issued by Cubist Pharmaceuticals, Inc. and Adolor Corporation, dated October 24, 2011, announcing the execution of the Merger Agreement and the transactions contemplated thereby (incorporated by reference to Exhibit 99.1 to the Form 8-K filed by Adolor Corporation on October 25, 2011)

(e)(1)   Agreement and Plan of Merger, dated October 24, 2011, by and among FRD Acquisition Corporation, Cubist Pharmaceuticals, Inc., and Adolor Corporation (incorporated by reference to Exhibit 2.1 to the Form 8-K filed by Adolor Corporation on October 25, 2011)

(e)(2)   Mutual Confidentiality and Non-Use Agreement, dated as of July 26, 2011, by and between Cubist Pharmaceuticals, Inc. and Adolor Corporation

(e)(3)   Letter Agreement between Adolor Corporation and Michael R. Dougherty, dated October 24, 2002, (incorporated by reference to Exhibit 10.15 to the Annual Report on Form 10-K filed by Adolor Corporation on March 18, 2003)

(e)(4)   Amendment dated January 26, 2004 to Letter Agreement between Adolor Corporation and Michael R. Dougherty, dated October 24, 2002 (incorporated by reference to Exhibit 10.6 to the Annual Report filed by Adolor Corporation on Form 10-K on March 4, 2004)

(e)(5)   Letter Agreement between Adolor Corporation and Michael R. Dougherty dated December 14, 2006 amending letter agreement dated October 24, 2002, as amended January 26, 2004 (incorporated by reference to Exhibit 10.1 to the Current Report filed by Adolor Corporation on Form 8-K on December 14, 2006)

(e)(6)   Amendment dated February 21, 2008 to Letter Agreement between Adolor Corporation and Michael R. Dougherty dated October 24, 2002, as amended January 26, 2004, as further amended December 14, 2006 (incorporated by reference to Exhibit 10.20 to the Annual Report filed by Adolor Corporation on Form 10-K on February 29, 2008)

41

(e)(7)    Amendment dated December 31, 2008 to Letter Agreement between Adolor Corporation and Michael R. Dougherty dated October 24, 2002, as amended January 26, 2004, as further amended December 14, 2006, as further amended February 21, 2008 (incorporated by reference to Exhibit 10.11 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2009)

(e)(8)    Letter Agreement between Adolor Corporation and Stephen Webster, M.B.A. dated June 13, 2008 (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Adolor Corporation on June 13, 2008)

(e)(9)    Letter Agreement between Adolor Corporation and John M. Limongelli, Esq., dated August 15, 2008, (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Adolor Corporation on September 15, 2008)

(e)(10)    Letter Agreement between Adolor Corporation and George R. Maurer, dated January 6, 2009 (incorporated by reference to Exhibit 10.19 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

(e)(11)    Stock Award Letter Agreement between Adolor Corporation and Michael R. Dougherty dated December 14, 2006 (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K filed by Adolor Corporation on December 14, 2006)

(e)(12)    Performance Stock Option Award between Adolor Corporation and Michael R. Dougherty dated January 8, 2008 (incorporated by reference to Exhibit 10.22 to the Annual Report on Form 10-K filed by Adolor Corporation on February 29, 2008)

(e)(13)    Summary of Oral Agreement for Payment of Services between Adolor Corporation and its Board of Directors (effective as of May 2009) (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Adolor Corporation on May 14, 2009)

(e)(14)    Summary of Oral Agreement for Payment of Services between Adolor Corporation and its Board of Directors (effective as of May 17, 2011) (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Adolor Corporation on February 23, 2011)

(e)(15)    Form of Stock Option Agreement for members of the Board of Directors of Adolor Corporation, (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Adolor Corporation on July 31, 2006)

(e)(16)    Form of Stock Option Agreement (monthly vesting) (incorporated by reference to Exhibit 10.26 to the Annual Report on Form 10-K filed by Adolor Corporation on March 1, 2005)

(e)(17)    Form of Stock Option Agreement (annual vesting; effective 2009) (incorporated by reference to Exhibit 10.26 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

(e)(18)    Form of Deferred Stock Agreement with Annual Vestings (incorporated by reference to Exhibit 10.27 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

(e)(19)    Form of Deferred Stock Agreement with Vestings at year 2 and 4 (effective December 2009) (incorporated by reference to Exhibit 10.28 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

42

(e)(20)    Form of Non-Employee Director Stock Option Agreement (equal two-year vesting) (incorporated by reference to Exhibit 10.3 to the Quarterly Report on Form 10-Q filed by Adolor Corporation on April 29, 2011)

(e)(21)    Form of Performance Deferred Stock Award (January 2008) (incorporated by reference to Exhibit 10.29 to the Annual Report on Form 10-K filed by Adolor Corporation on February 29, 2008)

(e)(22)    Form of Performance-Based Deferred Stock Award dated September 9, 2010 (incorporated by reference to Exhibit 10.24 to the Annual Report on Form 10-K filed by Adolor Corporation on February 24, 2011)

(e)(23)    Form of Deferred Stock Agreement dated September 9, 2010 (incorporated by reference to Exhibit 10.25 to the Annual Report on Form 10-K filed by Adolor Corporation on February 24, 2011)

(e)(24)    Amended and Restated 1994 Equity Compensation Plan (effective as of May 12, 2009) (incorporated by reference to Exhibit 10.2 to the Current Report on Form 8-K/A filed by Adolor Corporation on July 20, 2009)

(e)(25)    Adolor Corporation Amended and Restated 2011 Stock-Based Incentive Compensation Plan (effective as of May 17, 2011) (incorporated by reference to Exhibit 10.1 to Adolor Corporation's Current Report on Form 8-K filed on May 18, 2011)

(e)(26)    Amended and Restated Adolor Corporation Incentive Compensation Plan (effective as of January 2009) (incorporated by reference to Exhibit 10.2 to Adolor Corporation's Current Report on Form 8-K filed on January 12, 2009)

(e)(27)    Adolor Corporation Incentive Compensation Plan, as amended and restated February 22, 2011 (incorporated by reference to Exhibit 10.2 to Adolor Corporation's Current Report on Form 8-K filed on February 23, 2011)

(e)(28)    Adolor Corporation Executive Severance Pay Program (for executives appointed prior to December 31, 2008) (incorporated by reference to Exhibit 10.8 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

(e)(29)    Adolor Corporation Executive Severance Pay Program (for executives appointed after December 31, 2008) (incorporated by reference to Exhibit 10.9 to the Annual Report on Form 10-K filed by Adolor Corporation on February 26, 2010)

(e)(30)    Complaint filed on October 25, 2011 in Court of Common Pleas of Chester County, Pennsylvania, Civil Division.

(e)(31)    Complaint filed on October 28, 2011 in Court of Chancery of the State of Delaware.

(e)(32)    Amendment to Amended and Restated Rights Agreement, by and among Adolor Corporation and Broadridge Corporate Issuer Solutions, Inc., dated as of October 24, 2011 (incorporated by reference to Exhibit 4.1 to Adolor Corporation's Current Report on Form 8-K filed on October 25, 2011)

(e)(33)    Complaint filed on October 31, 2011 in Court of Common Pleas of Chester County, Pennsylvania, Civil Division.

(e)(34)    Complaint filed on November 1, 2011 in Court of Chancery of the State of Delaware.

(e)(35)    Complaint filed on November 4, 2011 in Court of Chancery of the State of Delaware.

---

\*    Included in copies mailed to stockholders of Adolor Corporation.

43

**SIGNATURE**

After due inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

By:   /s/ MICHAEL R. DOUGHERTY
_____

Name:    Michael R. Dougherty
Title:    *President and Chief Executive Officer*

Dated: November 7, 2011

---

ANNEX I

**ADOLOR CORPORATION**
**INFORMATION STATEMENT PURSUANT TO SECTION 14(F) OF**
**THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14F-1 THEREUNDER.**
**NO VOTE OR OTHER ACTION OF SECURITY HOLDERS IS REQUIRED IN**
**CONNECTION WITH THIS INFORMATION STATEMENT.**

This Information Statement is being mailed on or about November 7, 2011, as part of the Solicitation/Recommendation Statement on Schedule 14D-9 (together with its exhibits and annexes, the "*Schedule 14D-9*") of Adolor Corporation ("*Adolor*" or the "*Company*") to the holders of record of shares of common stock of the Company (the "*Shares*"). You are receiving this Information Statement in connection with the possible election of persons designated by Cubist Pharmaceuticals, Inc., a Delaware corporation ("*Parent*"), the parent corporation of FRD Acquisition Corporation, a Delaware corporation ("*Purchaser*"), to a majority of the seats on the Board of Directors of Adolor (the "*Board*" or the "*Board of Directors*").

On October 24, 2011, Adolor entered into an Agreement and Plan of Merger (the "*Merger Agreement*") with Parent and Purchaser pursuant to which, subject to certain conditions and as more fully described in the Merger Agreement, (1) Purchaser shall, and Parent shall cause Purchaser to, commence a cash tender offer (the "*Offer*") to purchase all of the outstanding Shares at a purchase price of $4.25 per Share in cash (the "*Closing Amount*"), plus one contingent payment right for each Share (a "*CPR*"), which shall represent the right to receive up to $4.50 in cash subject to the fulfillment of certain conditions and/or the attainment of certain milestones, and (2) Purchaser will be merged with and into Adolor (the "*Merger*"). If the Offer and the Merger are completed, the Company will become a wholly-owned subsidiary of Parent.

**RIGHT TO DESIGNATE DIRECTORS; PARENT'S DESIGNEES**

The Merger Agreement provides that, promptly upon the first acceptance for payment of, and payment by Purchaser for, an aggregate amount of Shares that represents at least a majority of the issued and outstanding Shares pursuant to the Offer (the "*Appointment Time*"), and at all times thereafter, Parent shall be entitled to designate such number of directors on the Board as will give Parent, subject to compliance with Section 14(f) of the Securities Exchange Act of 1934 and the regulations promulgated thereunder (the "*Exchange Act*"), representation on the Board equal to at least that number of directors, rounded up to the next whole number, which is the product of (x) the total number of directors on the Board (giving effect to the directors elected pursuant to this sentence) multiplied by (y) the percentage that (I) such number of Shares so accepted for payment and paid for by Purchaser plus the number of Shares otherwise owned by Parent, Purchaser or any other subsidiary of Parent bears to (II) the number of such Shares outstanding, and the Company shall, at such time, cause Parent's designees to be so elected; *provided, however,* that in the event that Parent's designees are appointed or elected to the Board, until the time and date on which the Merger shall become effective (the "*Effective Time*"), the Board shall have at least three directors who are directors on the date of the Merger Agreement and who are not Adolor officers (the "*Independent Directors*"); and *provided, further,* that, in such event, if the number of Independent Directors shall be reduced below three, any remaining Independent Directors(s) shall be entitled to designate persons to fill such vacancies who shall be deemed to be Independent Directors for purposes of the Merger Agreement or, if no Independent Directors then remain, the other directors shall designate three persons to fill such vacancies who are not officers or affiliates of the Company, Parent or Purchaser, and such persons shall be deemed to be Independent Directors. At such time, the Company shall, upon Parent's request, also cause persons elected or designated by Parent to constitute the same percentage (rounded up to the next whole number) as is on the Board of (i) each committee of the Board, (ii) each board of directors

I-1

(or similar body) of each of Adolor's subsidiaries and (iii) each committee (or similar body) of each such board, in each case only to the extent required by applicable law. In connection with the foregoing, the Company shall promptly, at the option of Purchaser, either increase the size of the Board or obtain the resignation of such number of its current directors, or both, as is necessary to enable Purchaser's designees to be elected or appointed to the Board.

If Parent's designees constitute a majority of the Board after the acceptance of Shares pursuant to the Offer (the "*Acceptance Time*") and prior to the Effective Time, then the affirmative vote of a majority of the Independent Directors (or if only one (1) exists, then the vote of such Independent Director) shall be required to (i) amend or terminate the Merger Agreement by the Company, (ii) exercise or waive any of the Company's rights, benefits or remedies under the Merger Agreement, if such action would materially and adversely affect holders of Shares other than Parent or Purchaser, (iii) amend the certificate of incorporation or bylaws of the Company, or (iv) take any other action of the Board under or in connection with the Merger Agreement or the transactions contemplated thereby; *provided, however,* that if there shall be no Independent Directors as a result of such persons' deaths, disabilities or refusal to serve, then such actions may be effected by majority vote of the entire Board.

You are urged to read this Information Statement carefully. You are not, however, required to take any action in connection with this Information Statement.

The information contained in this Information Statement concerning Parent and Purchaser and their Board designees has been furnished to us by Parent and Purchaser. The Company assumes no responsibility for the accuracy or completeness of such information.

Parent will select its designees from among the individuals listed on the section entitled "Parent Designees to the Board" in this Information Statement. If additional designees are required in order to constitute a majority of the Board, such additional designees will be selected by Parent from among the directors and executive officers of Purchaser contained in *Annex I* to the Offer to Purchase, which is incorporated by reference herein.

None of the persons from among whom Parent's Designees will be selected, or their associates, is a director of, or holds any management or other employment position with, Adolor. To our knowledge, except as set forth in *Schedule I* annexed hereto, none of the persons from among whom Parent's Designees will be selected or their associates beneficially owns any equity securities, or rights to acquire any equity securities, of Adolor or has been involved in any transactions with Adolor or any of its directors or executive officers that are required to be disclosed pursuant to the rules and regulations of the Securities and Exchange Commission (the "*SEC*").

## GENERAL INFORMATION REGARDING THE COMPANY

The Shares represent the only class of voting securities of Adolor currently outstanding. Each Share entitles its holder to one stockholder vote. As of November 4, 2011, there were 46,603,391 Shares issued and outstanding. As of the date of this Information Statement, Parent and its affiliates, including Purchaser, are not the owners of record of any Shares.

## COMMUNICATIONS WITH THE BOARD

Stockholders may communicate with the Board by sending their communications to Adolor Corporation Board of Directors, c/o Secretary, 700 Pennsylvania Drive, Exton, PA 19341. The Nominating Committee has approved a process for handling letters received by the Company and addressed to independent members of the Board. Under that process, the Secretary reviews all such correspondence and regularly forwards to the Board a summary of all such correspondence and copies of all correspondence that, in the opinion of the Secretary, deal with the functions of the Board or its

I-2

committees or that he otherwise determines require the Board's attention. Directors may at any time review a log of all correspondence received by the Company that is addressed to members of the Board and request copies of any such correspondence. Concerns relating to accounting, internal controls or auditing matters are immediately brought to the attention of the Company's Chief Compliance Officer and handled in accordance with procedures established by the Audit Committee with respect to such matters.

## OVERSIGHT AND RISK MANAGEMENT

The Board plays an active role in the oversight of risk and the Company's risk management practices and on a regular basis discusses the material risks affecting the Company, its industry and the general business environment. Each year, the Board approves the Company's annual budget; in addition, it regularly reviews with management the Company's long-range strategic plans, providing management with its guidance and its views on potential risks and benefits inherent in any such plans. The Audit Committee primarily is responsible for review of financial and compliance risks, with the full Board responsible for other risks. Because of its size and available resources, the Company does not have a dedicated risk management function; rather, certain employees within the Company are charged with responsibility for specific risk areas including operational, liquidity, legal and compliance risks. These individuals make regular reports to the Board and the Audit Committee on their areas of risk oversight. In addition, the Company's Chief Compliance Officer provides regular reports to both the Board and the Audit Committee and has a direct reporting relationship to the Audit Committee. Both the Board and the Audit Committee routinely meet in executive session without management present to discuss material risks facing the Company.

## CURRENT BOARD

Set forth below are the name, age and position of each director of the Company as of November 4, 2011.

| Name | Age | Position |
| --- | --- | --- |
| David M. Madden | 49 | Chairman of the Board |
| Michael R. Dougherty | 53 | President and Chief Executive Officer |
| Armando Anido(3) | 54 | Director |
| Georges Gemayel, Ph.D.(1)(3) | 51 | Director |
| Paul Goddard, Ph.D.(2) | 62 | Director |
| George V. Hager, Jr.(1) | 55 | Director |
| Guido Magni, M.D., Ph.D(3) | 58 | Director |
| Claude H. Nash, Ph.D.(2) | 68 | Director |
| Donald Nickelson(1)(2) | 78 | Director |

(1)   Member of Audit Committee.

(2)   Member of Compensation Committee.

(3)   Member of Governance and Nominating Committee.

I-3

| Name of Director | Principal Occupations During Past Five Years and Certain Directorships |
|---|---|
| David M. Madden<br>(First became a Director in 2000) | Mr. Madden was elected Chairman of the Board in May 2005. Mr. Madden served as our Interim President and Chief Executive Officer from August 8, 2005 to December 14, 2006. Mr. Madden is a Founder and Principal with Narrow River Management, LP, an investment management company with a focus on equity investments in the emerging pharmaceutical industry. Mr. Madden also is Chairman of the Board of Dicerna Pharmaceuticals, Inc., a private, development-stage biopharmaceutical company. Mr. Madden was Co-Chief Executive Officer of Royalty Pharma AG, a private investment management firm specializing in the acquisition of royalty interests in pharmaceutical products, from October 2000 to 2003, and from 1997 to October 2000, he served as a Managing Member of Pharmaceutical Partners, LLC. From 1992 to 1995, Mr. Madden was President, Chief Executive Officer and a Director of Selectide Corporation, a development-stage pharmaceutical company that was acquired by Marion Merrill Dow in 1995. Mr. Madden was a consultant to Marion Merrill Dow during part of 1995. Mr. Madden serves as member of the board of directors of the Hospital for Special Surgery. Mr. Madden served as a member of the board of directors of Royalty Pharma AG until March 2004. Mr. Madden has a B.S. in Electrical Engineering from Union College and an M.B.A. from Columbia University. |
| Michael R. Dougherty<br>(First became a Director and President and Chief Executive Officer in 2006) | Mr. Dougherty was appointed as President and Chief Executive Officer and a member of the Board of Directors on December 14, 2006. Mr. Dougherty served as our Senior Vice President, Chief Operating Officer and Treasurer from April 2003 until December 14, 2006. From April 2003 until October 31, 2005, he also was our Chief Financial Officer. He joined us as our Senior Vice President of Commercial Operations in November 2002. From November 2000 to November 2002, Mr. Dougherty was President and Chief Operating Officer of Genomics Collaborative, Inc., a privately-held functional genomics company. Previously, Mr. Dougherty served as President and Chief Executive Officer at Genaera Corporation, formerly Magainin Pharmaceuticals Inc., a publicly-traded biotechnology company, and as Senior Vice President and Chief Financial Officer at Centocor, Inc., a publicly-traded biotechnology company. Mr. Dougherty has served on the Board of Directors of ViroPharma Incorporated since January 2004. Mr. Dougherty received a B.S. from Villanova University. |

I-4

| Name of Director | Principal Occupations During Past Five Years and Certain Directorships |
|---|---|
| Armando Anido. (First became a Director in 2003) | Mr. Anido serves as Chief Executive Officer and President of Auxilium Pharmaceuticals, Inc., a publicly-traded specialty biopharmaceutical company focused on developing and marketing products to urologists, endocrinologists, orthopedists and select primary care physicians. Prior to becoming CEO of Auxilium, Mr. Anido held the position of Executive Vice President, Sales and Marketing for MedImmune, Inc. from 1999 to 2006, where he was responsible for worldwide commercialization of its portfolio. He also served on the Executive Committee and Product Development Committee. Prior to MedImmune, from 1995 to 1999, Mr. Anido was with GlaxoWellcome, Inc. where he served as Vice President, Central Nervous System Marketing after joining the company as Director, HIV Marketing. Mr. Anido was employed by Lederle Labs from 1989 to 1995 in various commercial roles, culminating as Vice President, Anti-infectives. Mr. Anido serves on the board of Auxilium Pharmaceuticals, Inc. Mr. Anido received his B.S. in Pharmacy and his M.B.A. in Marketing and Finance from West Virginia University. |
| Georges Gemayel, Ph.D. (First became a Director in 2007) | Dr. Gemayel is the Chairman of the Board of Syndexa Pharmaceuticals, a privately held company. From April 2010 to October 2010, Dr. Gemayel served as Executive Chairman of FoldRx Pharmaceuticals, Inc., a privately-held drug discovery and clinical development company that was acquired by Pfizer Inc. From June 2008 until November 2009, Dr. Gemayel served as President, Chief Executive Officer and a director of Altus Pharmaceuticals Inc., a publicly-traded pharmaceutical company. From 2003 to May 2008, Dr. Gemayel served as Executive Vice President Therapeutics and Biosurgery for Genzyme Corporation, where he was responsible for Genzyme's global therapeutics, transplant, renal and biosurgery businesses. From 2000 to 2003, Dr. Gemayel was employed as Vice President National Specialty Care for Hoffmann-La Roche, responsible for its U.S. business for dermatology, oncology, transplantation, hepatitis and HIV. Dr. Gemayel joined Hoffmann-La Roche in 1988 and served in various positions of increasing responsibility over his tenure there. Dr. Gemayel received his doctorate in pharmacy from St. Joseph University in Beirut, Lebanon and his Ph.D. in Pharmacology from Paris-SUD University. In November 2009, while Dr. Gemayel was President, Chief Executive Officer and a director, Altus Pharmaceuticals filed a voluntary petition for relief under Chapter 7 of the U.S. Bankruptcy Code and ceased operations at such time. |

I-5

| Name of Director | Principal Occupations During Past Five Years and Certain Directorships |
|---|---|
| Paul Goddard, Ph.D.<br>(First became a Director in 2000) | Dr. Goddard served as a consultant for us from August 2003 to July 2005. In 2003, Dr. Goddard joined ARYx Therapeutics, Inc., a publicly-traded product-based biopharmaceutical company, as the Chairman of the Board and in April 2005 was appointed as Chief Executive Officer. In the period between 2000 and 2005, he served as chairman and part-time executive of several companies, including XenoPort, Inc., a private biopharmaceutical company, and AP Pharma, Inc., a specialty pharmaceutical company focused on the development and commercialization of innovative medical treatments, and he currently serves as AP Pharma's chairman. From 1998 until 2000, Dr. Goddard served as Chief Executive Officer of Elan Pharmaceuticals, a division of Elan Corporation, plc. Dr. Goddard served as Chairman, Chief Executive Officer and a director of Neurex Corporation from 1991 to 1998 when the company was acquired by Elan. Prior to 1991, Dr. Goddard held various senior management positions at SmithKline Beecham, including senior vice president strategic marketing and senior vice president Far East region. Dr. Goddard is on the Board of Directors of ARYx Therapeutics, Inc., AP Pharma, Inc. and Onyx Pharmaceuticals. Dr. Goddard served as Chairman of the Board of XenoPort, Inc. from 2000 to 2005 and a director of Molecular Devices, Inc. from 1999 to 2006. Dr. Goddard received a Ph.D. in Atieology and Epidemiology of Colon Cancer from St. Mary's Hospital, University of London. |
| George V. Hager, Jr.<br>(First became a Director in 2003) | Mr. Hager serves as Chairman and Chief Executive Officer of Genesis HealthCare, a privately-held provider of healthcare and support services to the elderly which was spun off by Genesis Health Ventures, Inc. in 2003. Prior to becoming CEO of Genesis HealthCare, Mr. Hager was Executive Vice President and Chief Financial Officer and was responsible for corporate finance, information services, reimbursement and risk management of Genesis Health Ventures, Inc. He joined Genesis Health Ventures, Inc. in 1992 as Vice President and Chief Financial Officer and was named Senior Vice President and Chief Financial Officer in 1994. Mr. Hager has over 20 years experience in the health care industry including leading KPMG LLP's health care practice in Philadelphia from 1989 to 1992. He received a Bachelor of Arts in Economics from Dickinson College and a Master of Business Administration degree from Rutgers Graduate School of Management. He is a certified public accountant; a member of the Board and strategic planning and executive committees of the National Investment Center, a member of the Board of the Delaware Valley Chapter of the Alzheimer's Association; and a member of the Board and audit committee chair of REACH Medical Holdings, Inc., a medical transportation company. |

I-6

| Name of Director | Principal Occupations During Past Five Years and Certain Directorships |
|---|---|
| Guido Magni, M.D., Ph.D<br>(First became a Director in 2008) | Dr. Magni was appointed to the Board in June 2008. In the last 20 years, Dr. Magni has held senior positions in the drug development departments of Wyeth Ayerst and F. Hoffmann-La Roche. From 1995 to January 2008, Dr. Magni served as the Global Head of Medical Science, Global Drug Development, Pharmaceuticals Division, at F. Hoffmann-La Roche. Since he left Roche in 2008, Dr. Magni has been managing director of EuroVentures/Versant and CMO of River Vision, LLC, a private pharmaceutical company focused on ophthalmology. Dr. Magni received his M.D. from the University of Padua, Italy, and a Ph.D. from the University of Rome, Italy. |
| Claude H. Nash, Ph.D.<br>(First became a Director in 2000) | Dr. Nash currently is President of Nash Consulting LLC, which is focused on advising start-up companies. From 2007 to 2010, he was Chairman of the Board of Directors of Bloodstone Ventures, plc, a United Kingdom Company focused on working with universities to start new companies, and he previously served as Chief Executive Officer and Chairman of Bloodstone from August 2007 through December 2007. From 2004 through 2006, he held the position of Vice President Research and Development at the University of Maryland Biotechnology Institute. He served on the board of directors of ViroPharma Incorporated from that company's inception in 1994 to 2003, serving as Chairman from 1997 to 2002, and served as Chief Executive Officer and President from 1994 until 2000. From 1983 to 1994, Dr. Nash served as Vice President, Infectious Disease and Tumor Biology at Schering-Plough Research Institute. From 1969 to 1983, he held various positions at Sterling Drug, Smith Kline and Eli Lilly. Dr. Nash currently serves as the Chairman of the Board of Directors of Accera Incorporated & CEO, a commercial biotechnology company with a proprietary focus on Alzheimer's disease. He also serves as Chairman of the Board of Directors of Selectx Pharma & CEO, a private biotechnology company focused on the discovery of new antibiotics, and as an advisor to Rapid Trials, a private company focused on optimizing clinical site performance to speed enrollment and reduce costs. Dr. Nash has a B.S. in Biology and Chemistry from Lamar University, an M.S. in Microbiology and a Ph.D. in Microbial Genetics and Biochemistry from Colorado State University. |

I-7

| Name of Director | Principal Occupations During Past Five Years and Certain Directorships |
|---|---|
| Donald Nickelson<br>(First became a Director in 2003) | Mr. Nickelson is Chairman of the Board of Cross Match Technologies, Inc., a leading provider of biometric identity management systems. Mr. Nickelson also is Vice Chairman and Director of Harbour Group Industries Inc., a leveraged buy-out firm, Chairman of the Board of Advisors of Celtic Therapeutics and serves on the Advisory Board of Celtic Pharmaceutical Holdings, L.P. and is a director at several private companies. Mr. Nickelson retired as President of Paine Webber Group in 1990, after a distinguished career in the financial industry for over 39 years. He also previously served as Lead Trustee of the Mainstay Mutual Fund Groups from 1994 to 2007, was Chairman of the Board of Omniquip International, Inc, Greenfield Industries, Vie Financial Group, and Flair Corporation. From June 2003 to November 2009, Mr. Nickelson served as a director of First Advantage Corporation, a publicly-traded provider of risk mitigation and business solutions. Mr. Nickelson also has served as a director of W.P. Carey & Co., LLC, Royalty Pharma AG, Allied Healthcare Products, DT Industries, as well as Selectide Corporation and Sugen, Inc., two biotechnology companies. In addition, Mr. Nickelson served as Chairman of the Pacific Stock Exchange and as Director of the Chicago Board Options Exchange. |

There are no material proceedings in which any director or officer of the Company is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company of any of its subsidiaries.

There are no family relationships among the directors and executive officers of the Company.

I-8

## THE BOARD OF DIRECTORS AND BOARD COMMITTEES

As of the date of this Information Statement, the Board has nine directors and maintains an Audit Committee, a Compensation Committee and a Governance and Nominating Committee (each, a "*Committee*"). The current membership and the function of each of these committees are described below.

*Meetings of the Board of Directors*

Our directors are expected to attend meetings of the Board of Directors and meetings of committees on which they serve. Our directors are expected to spend the time needed at each meeting and to meet as frequently as necessary to properly discharge their responsibilities. Our Board of Directors held nine meetings during the year ended December 31, 2010. Each director attended at least seventy-five percent of the meetings of the Board of Directors and the respective Committee or Committees on which he served during such period. Each director is expected to regularly attend meetings of the Board and his respective Committees, with the understanding that on occasion a director may be unable to attend a meeting.

All directors are expected to make every reasonable effort to attend the Annual Meeting of Stockholders. All of the directors of the Company as of May 17, 2011, attended the 2011 Annual Meeting of Stockholders. We expect that all of the directors will attend the 2012 Annual Meeting.

*Committees of the Board of Directors*

The Board has established an Audit Committee, a Compensation Committee and a Nominating and Governance Committee, which are the only standing committees of the Board.

*Director Independence*

A majority of the Company's directors are independent within the meaning of the applicable rules of the SEC. The Board affirmatively determined that all of the directors are independent, with the exception of Mr. Dougherty. Mr. Dougherty is considered an inside director because of his employment as an executive officer of the Company.

Each executive officer serves at the discretion of the Board and holds office until his successor is elected and qualified or until his earlier resignation or removal. There are no family relationships among any of our directors and executive officers.

The bylaws of the Company provide that the Board may designate committees by resolution, each of which shall consist of one or more directors. The Board presently has standing Audit, Compensation, and Governance and Nominating Committees.

*Audit Committee*

The functions of the Audit Committee are described in detail below under the heading "Report of the Audit Committee." The charter of the Audit Committee is available on the Investor Insights section of the Company's website (www.adolor.com) by selecting "Corporate Governance." The Audit Committee met six times during fiscal 2010.

Mr. Hager has chaired the Audit Committee since 2005. Mr. Hager is qualified as an audit committee financial expert within the meaning of SEC regulations. In addition, the Board has determined, in accordance with the listing standards of NASDAQ, that Mr. Hager meets the standards of financial sophistication set forth therein and that each other member of the Audit Committee is able to read and understand fundamental financial statements.

I-9

All of the members of the Audit Committee are independent within the meaning of SEC regulations, NASDAQ listing standards and the Company's Corporate Governance Guidelines.

*Compensation Committee*

The Compensation Committee annually: reviews the performance and total compensation program for the Company's executive officers, including the Chief Executive Officer; considers the modification of existing compensation and employee benefit programs, and the adoption of new plans; administers the terms and provisions of the Company's equity compensation plans; and reviews the compensation and benefits of non-employee directors. The charter of the Compensation Committee is available on the Investor Insights section of the Company's website (www.adolor.com) by selecting "Corporate Governance." The Compensation Committee met five times during 2010. All of the members of the Compensation Committee are independent within the meaning of SEC regulations, the NASDAQ listing standards and the Company's Corporate Governance Guidelines.

*Governance and Nominating Committee*

The Governance and Nominating Committee (the "*Nominating Committee*") is responsible for developing and implementing policies and practices relating to corporate governance, including reviewing and monitoring implementation of the Company's Corporate Governance Guidelines. In addition, the Nominating Committee develops and reviews background information on candidates for the Board and makes recommendations to the Board regarding such candidates. The Nominating Committee also prepares and supervises the Board's review of director independence and the Board's performance evaluation. The charter of the Nominating Committee is available on the Investor Insights section of the Company's website (www.adolor.com) by selecting "Corporate Governance." The Nominating Committee met two times during fiscal 2010. All of the members of the Nominating Committee are independent within the meaning of SEC regulations, the NASDAQ listing standards and the Company's Corporate Governance Guidelines.

The Nominating Committee considers candidates for Board membership suggested by its members and other Board members, as well as by management and stockholders. The Nominating Committee is authorized to retain third-party executive search firms to identify candidates as necessary. A stockholder who wishes to recommend a prospective nominee for the Board should notify the Company's Secretary in writing and provide the information set forth in Section 1.1.10 of the Company's bylaws. The Nominating Committee also will consider whether to nominate any person nominated by a stockholder pursuant to the provisions of the Company's bylaws relating to stockholder nominations.

Once a prospective nominee has been identified, the Nominating Committee makes an initial determination (which may include input from the Chairman of the Board) as to whether to conduct a full evaluation of the candidate. This initial determination is based on whatever information is provided to the Nominating Committee with the recommendation of the prospective candidate, as well as the Nominating Committee's own knowledge of the prospective candidate, which may be supplemented by inquiries to the person making the recommendation or others. The preliminary determination is based primarily on the need for additional Board members to fill vacancies or expand the size of the Board and the likelihood that the prospective nominee can satisfy the evaluation factors described below. If the Nominating Committee determines, in consultation with the Chairman of the Board and other Board members as appropriate, that additional consideration is warranted, it may request that a third-party search firm gather additional information about the prospective nominee's background and experience and report its findings to the Nominating Committee. The Nominating Committee then

I-10

evaluates the prospective nominee against the standards and qualifications set out in the Company's Corporate Governance Guidelines and its policy on consideration of director candidates, including:

- the ability of the prospective nominee to represent the best interests of all of the stockholders of the Company;

- the prospective nominee's standards of integrity, ethics, commitment and independence of thought and judgment;

- the prospective nominee's record of professional accomplishment in his/her chosen field;

- the prospective nominee's ability to dedicate sufficient time, energy and attention to the diligent performance of his or her duties on the Board and its Committees, including the prospective nominee's service on other public company boards;

- the extent to which the prospective nominee contributes to the range of talent, skill and expertise currently present on the Board; and

- the prospective nominee's independence from a material personal, financial or professional interest in any present or potential competitor of the Company.

The Nominating Committee also considers such other relevant factors as it deems appropriate, including the current composition of the Board, the balance of management and independent directors, the need for Audit Committee expertise and the evaluations of other prospective nominees. In connection with this evaluation, the Nominating Committee determines whether to interview the prospective nominee and, if warranted, one or more members of the Nominating Committee, and others as appropriate, interview prospective nominees in person or by telephone. After completing this evaluation and interview, the Nominating Committee makes a recommendation to the full Board as to the persons who should be nominated by the Board, and the Board determines the nominees after considering the recommendation and report of the Nominating Committee.

## Code of Ethics

The Company has a Code of Business Conduct that is applicable to all directors, officers and employees of the Company. The Code of Business Conduct also covers financial and non-financial business practices and procedures and applies to the Company's CEO, Chief Financial Officer and certain other employees of the Company responsible for accounting and financial reporting. The Code of Business Conduct is available on the Investor Insights section of the Company's website (www.adolor.com) by selecting "Corporate Governance" and then "Code of Business Conduct." The Company intends to post amendments to, or waivers from, its Code of Business Conduct (if any and to the extent applicable to the Company's CEO, principal financial officer or principal accounting officer) at this location on its website.

## CURRENT MANAGEMENT

Set forth below are the name, age and position of each executive officer of the Company as of November 4, 2011.

| Name | Age | Position |
|------|-----|----------|
| Michael R. Dougherty | 53 | President and Chief Executive Officer |
| John M. Limongelli | 42 | Senior Vice President, General Counsel and Secretary |
| George R. Maurer | 56 | Senior Vice President, Technical Operations |
| Stephen W. Webster | 50 | Senior Vice President and Chief Financial Officer |

I-11

**Name of Officer**

| | |
|---|---|
| Michael R. Dougherty | See the description of Mr. Dougherty in the section entitled "Current Board" |

John M. Limongelli

Mr. Limongelli joined us as our Senior Vice President, General Counsel and Secretary in September 2008. From July 2002 to September 2008, Mr. Limongelli held several roles of increasing responsibility with Cephalon, Inc., most recently serving as Vice President and Associate General Counsel. Prior to joining Cephalon in 2002, Mr. Limongelli was an associate with the law firm of Morgan, Lewis & Bockius, LLP, in Philadelphia. From 1995 to 1997, Mr. Limongelli worked as a financial analyst for Bell Atlantic Corp., and from 1991 to 1995 he was an auditor with KPMG LLP. Mr. Limongelli obtained both his Juris Doctor and Masters in Business Administration from Temple University.

George R. Maurer

Mr. Maurer was named as our Senior Vice President, Manufacturing and Pharmaceutical Technologies, in January 2009. Mr. Maurer joined Adolor in 2002 as Senior Director, Commercial Manufacturing, and then served as Vice President, Commercial Manufacturing from 2005 to January 2009. Prior to joining Adolor, Mr. Maurer was Director, Commercial Manufacturing at ViroPharma Incorporated. Prior to ViroPharma, for 22 years Mr. Maurer held positions of increasing responsibility with Schering-Plough Corporation, including directing production planning of manufacturing functions supporting domestic sales and management of manufacturing operations in Puerto Rico and New Jersey. Mr. Maurer earned his B.S. in Biology from Rensselaer Polytechnic Institute.

Stephen W. Webster

Mr. Webster joined us as our Senior Vice President, Finance and Chief Financial Officer in June 2008. From 2007 until joining Adolor, Mr. Webster was Managing Director, Investment Banking Division, Health Care Group for Broadpoint Capital (formerly First Albany Capital). From 2000 to 2006, he was with Neuronyx, Inc., a development-stage biotechnology company he co-founded, as President from 2000 to 2006 and Chief Executive Officer from 2003 to 2006. From 1987 to 2000, he served in positions of increased responsibility including as Director, Investment Banking Division, Health Care Group for PaineWebber Incorporated. He received his A.B. in Economics *cum laude* from Dartmouth College in 1983 and his Master of Business Administration in Finance from The Wharton School, The University of Pennsylvania in 1987. Mr. Webster serves on the Board of Directors of HearUSA Inc. and Pennsylvania Bio.

There are no material proceedings in which any director or officer of the Company is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company of any of its subsidiaries.

There are no family relationships among the directors and executive officers of the Company.

I-12

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

*Stock Owned by Directors, Executive Officers and Greater-Than-5% Stockholders*

The following table sets forth the beneficial ownership of the Company's Common Stock as of November 4, 2011 (except as noted) by (i) the named executive officers ("*NEOs*") and the Company's directors; (ii) owners of more than five percent of the outstanding shares of the Company's Common Stock; and (iii) all executive officers and directors as a group. As of November 4, 2011, there were 46,603,391 shares of Common Stock outstanding.

| Name | Amount and Nature of Beneficial Ownership(1) | Percentage of Class(2) |
|---|---|---|
| Felix J. Baker(3) | 6,947,343 | 14.91% |
| Julian C. Baker | | |
|   *667 Madison Avenue, New York, NY 10021* | | |
| Wellington Management Company, LLP(4) | 6,287,572 | 13.49% |
|   *75 State Street, Boston, MA 02109* | | |
| FMR LLC(5) | 3,745,889 | 8.04% |
| Edward C. Johnson 3d | | |
|   *82 Devonshire Street, Boston, MA 02109* | | |
| Michael R. Dougherty(6)(7) | 1,482,326 | 3.10% |
| John M. Limongelli(6) | 232,553 | * |
| George R. Maurer(6) | 287,829 | * |
| Stephen W. Webster(6) | 211,873 | * |
| Armando Anido(6) | 176,017 | * |
| Georges Gemayel(6) | 139,448 | * |
| Paul Goddard(6)(8) | 223,448 | * |
| George V. Hager, Jr.(6) | 178,007 | * |
| David M. Madden(6)(9) | 1,135,461 | 2.42% |
| Guido Magni, M.D., Ph.D(6) | 97,183 | * |
| Claude H. Nash(6) | 230,672 | * |
| Donald Nickelson(6)(10) | 285,107 | * |
| All executive officers and directors as a group (12 persons) (6) | 4,679,924 | 9.37% |

\*    Less than 1%.

(1)    This table and the information included in the notes below are based upon information supplied by officers, directors and principal stockholders, including, in particular, reports filed on Schedule 13G and Form 4 with the SEC. Unless otherwise noted, the address for each individual above is c/o Adolor Corporation, 700 Pennsylvania Dr., Exton, PA 19341.

(2)    Based on 46,603,391 shares of Common Stock outstanding on November 4, 2011. Shares of Common Stock subject to stock options currently exercisable, or exercisable within 60 days of November 4, 2011, are deemed beneficially owned by the person holding such options. The percent of the outstanding shares of our Common Stock for any person or group who beneficially owned

I-13

any shares pursuant to options that are exercisable within 60 days of November 4, 2011, is calculated assuming all such options have been exercised in full and adding the number of shares subject to such options to the total number of shares issued and outstanding on November 4, 2011 for such individual.

(3)   Messrs. Felix and Julian Baker (collectively, the "Baker Brothers") have shared voting and dispositive power with respect to 6,947,343 shares. According to a Schedule 13G filed on February 14, 2011, as of December 31, 2010, The Baker Brothers have the power to control the investment decisions of the shares held by the following limited partnerships: (i) Baker Bros. Investments II, L.P.—2,902 shares; (ii) 667, L.P.—79,054 shares; (iii) Baker Brothers Life Sciences, L.P.—6,666,436 shares; (iv) 14159, L.P.—186,272 shares; and (v) Baker/Tisch Investments, L.P.—12,679 shares. As such, the Baker Brothers may each be deemed to be beneficial owners of shares owned by such entities and may be deemed to have shared power to vote or direct the vote of and shared power to dispose of or direct the disposition of such securities.

(4)   Represents shares owned by clients of Wellington Management Company, LLP ("Wellington"), which serves as investment advisor to such clients. According to a Schedule 13G filed on February 14, 2011, as of December 31, 2010, Wellington has shared voting power with respect to 5,863,761 shares and shared dispositive power with respect to 6,287,572 shares. Wellington has indicated that the Treasurer of the State of North Carolina Equity Investment Pooled Trust is the owner of record of more than five percent of Adolor's common stock.

(5)   The following information is based upon a Schedule 13G, as filed by FMR LLC ("FMR") on February 11, 2011, and Edward C. Johnson 3d with the SEC:

As of December 31, 2010, Fidelity Management & Research Company ("Fidelity"), a wholly owned subsidiary of FMR and an investment adviser, is the beneficial owner of 3,745,889 shares as a result of acting as investment adviser to various investment companies. The ownership of one such investment company, Fidelity Select Biotechnology Portfolio, amount to 3,563,790 shares, or 7.6% of Adolor's common stock.

As of December 31, 2010, Edward C. Johnson, 3d, Chairman of FMR, and FMR, through its control of Fidelity and its funds (the "Funds") each has sole dispositive power of the 3,745,889 shares owned by the Funds. Neither FMR nor Edward C. Johnson, 3d, has the sole power to vote or direct the voting of the shares owned directly by the Funds, which power resides with the Funds' Boards of Trustees. Fidelity carries out the voting of the shares under written guidelines established by the Funds' Boards of Trustees.

Members of the family of Edward C. Johnson 3d, Chairman of FMR LLC, are the predominant owners, directly or through trusts, of Series B voting common shares of FMR LLC, representing 49% of the voting power of FMR LLC. The Johnson family group and all other Series B shareholders have entered into a shareholders' voting agreement under which all Series B voting common shares will be voted in accordance with the majority vote of Series B voting common shares. Accordingly, through their ownership of voting common shares and the execution of the shareholders' voting agreement, members of the Johnson family may be deemed, under the Investment Company Act of 1940, to form a controlling group with respect to FMR LLC. Neither FMR LLC nor Edward C. Johnson 3d has the sole power to direct the voting of the shares owned directly by the Funds, which power resides with the Funds' Board of Trustees. Fidelity carries out the voting of the shares under written guidelines established by the Funds' Board of Trustees.

(6)   Common Stock and the percentage of class listed as being beneficially owned include outstanding options to purchase Common Stock which are exercisable within 60 days of November 4, 2011, as follows: Mr. Dougherty, 1,229,165 shares; Mr. Limongelli, 197,603 shares; Mr. Maurer, 261,804;

I-14

Mr. Webster, 188,123 shares; Mr. Anido, 170,000 shares; Dr. Gemayel, 135,000 shares; Dr. Goddard, 194,000 shares; Mr. Hager, 170,000 shares; Mr. Madden, 315,000 shares; Dr. Magni, 95,000 shares; Dr. Nash, 194,000 shares; Mr. Nickelson, 170,000 shares; and all directors and executive officers as a group, 3,319,695 shares.

(7)    Includes 37,500 restricted shares of Common Stock that will vest on the date that the FDA approves for commercial sale a new drug application ("*NDA*") for alvimopan for use in opioid bowel dysfunction.

(8)    Includes 27,265 shares owned by The Goddard Family Trust, Paul Goddard and Jacqueline Goddard Trustees.

(9)    Includes 70,000 shares owned by the Madden 2002 Trust.

(10)    Includes 10,000 shares owned by The Nickelson Family Trust, of which Mr. Nickelson is the sole trustee.

## COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS
## COMPENSATION DISCUSSION AND ANALYSIS

*This Compensation Discussion and Analysis ("CD&A") section provides information regarding the compensation program in place in 2010 for the Company's President and Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), the Company's two other executive officers and one individual who served as an executive officer in 2010 (collectively, the "Named Executive Officers" or "NEOs"). It includes information regarding, among other things, how compensation decisions are made, the overall objectives of our compensation program, a description of the various components of compensation that we provide and other information pertinent to understanding our executive officer compensation program.*

**Governance Relating to Executive Compensation Decisions**

The Compensation Committee of our Board of Directors (the "*Committee*") consists of three independent members of the Board of Directors and has responsibility for reviewing and approving all compensation decisions for the NEOs. The Committee submits its decisions to the independent members of the Board for ratification. The Committee acts pursuant to a written charter that has been approved by our Board. In connection with these duties, the Company's Human Resources Department supports the Committee in its work. In addition, the Committee retained Radford, an outside compensation consulting firm with substantial experience in the life sciences industry, to advise the Committee on matters related to the compensation of the NEOs. The following summarizes the roles of each of the key participants in the executive compensation decision-making process.

*Compensation Committee*

- Fulfills the Board of Directors' responsibilities relating to compensation of the Company's executive officers.

- Oversees implementation and administration of the Company's compensation and employee benefits programs, including incentive compensation and equity compensation plans.

- Reviews and approves Company goals and objectives and in light of these, evaluates the CEO's performance and sets his annual base salary, annual incentive opportunity, long-term incentive opportunity and any special/supplemental benefits or payments.

- Reviews and approves compensation for all other executive officers of the Company including annual base salary, annual incentive opportunity, long-term incentive opportunity and any special/supplemental benefits or payments.

I-15

*Board of Directors*

- Ratifies executive compensation decisions made by the Committee.

*CEO*

- Presents to the Committee the performance evaluation of and compensation recommendations for each of the other executive officers.

*Compensation Consultant*

- Reports directly to the Committee.

- Assists the Committee with the review and update of the Peer Group (as defined below) for competitive pay and benchmarking purposes.

- Reviews relevant market data and advises the Committee on setting the CEO's pay.

- Reviews relevant market data and compensation recommendations for all other executive officers.

- Informs the Committee of regulatory developments and how these may affect the Company's compensation program.

**Objectives of Our Compensation Program**

The compensation program for our executive officers is designed to attract, retain and reward talented executives who can contribute to the Company's long-term success and thereby build value for our stockholders. In general terms, the Committee believes that by seeking to place greater emphasis on variable pay incentives and longer-term compensation, rather than base salary compensation, it will more effectively align the interests of executives with the Company's stockholders. Furthermore, this emphasis enables the Company to attract executives who are willing to sacrifice current earnings and the retirement benefits generally offered by larger companies for potential long-term gains in a less stable and riskier environment. The Committee believes that Adolor stockholders share a similar risk profile.

We strive to closely align the compensation paid to our executive officers with the performance of the Company on both a short-term and long-term basis. The compensation program for executive officers consists of the following principal components:

- base salary;

- annual cash incentive award; and

- long-term incentive compensation in the form of stock options and/or stock awards or units.

The Committee believes that our stockholders are best served when we can attract and retain talented executives by providing compensation packages that are competitive but fair. The Committee seeks to structure a compensation program for NEOs that is competitive to the "Collected Market Data" (as more fully described below) with respect to cash compensation and long-term equity compensation. At the same time, the Committee believes it is important to provide its NEOs with the opportunity to exceed the targeted compensation levels for achievement of key strategic initiatives and superior operational performance as evidenced by such benchmarks as research and development program progress, revenue growth and management of capital.

By providing our executives with a mix of equity and cash compensation, the Committee believes it can better align the interests of our executives with the short- and long-term interests of our stockholders. While there is no pre-established target for the allocation of equity and cash

I-16

compensation, the Committee believes that the current mix of compensation programs for the NEOs strikes the correct balance between equity and cash compensation and is aligned with the Company's stated pay philosophy. The Committee believes that, by delivering a meaningful percentage of compensation in the form of equity, the level of executive compensation will correlate with the creation of long-term value for our stockholders as measured by stock price appreciation. Depending on whether, and to what extent, established strategic, financial and operational goals are achieved, the actual split between cash and equity compensation in any given year could vary from the target levels. For 2010, the mix of compensation between cash and equity as reflected in the Summary Compensation Table was approximately 69% and 31%, respectively, for the CEO and approximately 83% and 17%, respectively, for the other NEOs.

The equity component of our compensation plan for our NEOs historically has taken the form of stock options; over the past several years, equity compensation also has included the use of time-based or performance-based deferred stock units ("DSUs"). Performance-based DSUs may be triggered upon specified clinical, regulatory or commercial milestones. We believe these are appropriate instruments to drive long-term stockholder value, provide retention incentives to our NEOs and manage our equity shares in an efficient manner.

*Collected Market Data.*    The Collected Market Data consist of the total compensation delivered by certain comparable publicly-traded biotechnology companies with which we compete for executive talent (the *"Peer Group"*), as well as additional published survey data provided by Radford, including the Radford Global Life Sciences Survey of compensation data.

In late 2009 and again in late 2010, Radford assisted the Committee in updating the Peer Group for competitive pay and performance benchmarking. The Peer Group is developed by reference to a number of criteria, including: number of employees; last fiscal year revenue; market capitalization; business model; and therapeutic area and stage of development. The appropriateness of the Peer Group is reviewed annually by the Committee against these criteria. Based on this review, companies may be excluded due to acquisitions or changes in trading status or size; likewise, relevant peer companies may be added. The 2009 Peer Group, which consisted of 20 companies, was considered when determining the NEO base salaries for 2010 and the equity awards granted in September 2010. The 2010 Peer Group was considered when establishing the NEO base salaries for 2011.

The 2010 Peer Group consists of the following 21 companies*:

| | |
|---|---|
| Acadia Pharmaceuticals Inc. | Osiris Therapeutics, Inc. |
| ARIAD Pharmaceuticals, Inc. | Pain Therapeutics, Inc. |
| BioCryst Pharmaceuticals, Inc. | POZEN, Inc. |
| Cornerstone Therapeutics Inc. | Progenics Pharmaceuticals, Inc. |
| DURECT Corporation | Repligen Corporation |
| Dyax Corp. | Spectrum Pharmaceuticals, Inc. |
| Dynavax Technologies Corporation | Synta Pharmaceuticals Corp. |
| Idenix Pharmaceuticals, Inc. | Telik, Inc. |
| Infinity Pharmaceuticals, Inc. | XOMA, Ltd. |
| Ligand Pharmaceuticals Incorporated | Zalicus Inc. |
| NPS Pharmaceuticals, Inc. | |

--------

\*    The 2010 Peer Group includes three companies (Cornerstone Therapeutics Inc., POZEN, Inc. and Zalicus Inc.) that were not included in the 2009 Peer Group, and it does not include two companies (Akorn, Inc. and InterMune, Inc.) that were included in the 2009 Peer Group.

I-17

**Material Tax and Accounting Implications of the NEO Compensation Program**

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "*Code*"), generally disallows a tax deduction to public companies for certain compensation in excess of $1 million paid to the company's Chief Executive Officer and the three other most highly compensated executive officers. Specified compensation, including qualified performance-based compensation, will not be subject to the deduction limit if certain requirements are met. Where possible, the Committee generally seeks to structure compensation amounts and plans that meet the requirements for deductibility under this provision. Specifically, the Committee has taken steps to qualify the stock option awards as performance-based compensation for this purpose. While the Committee believes it is important to consider Section 162(m), it also believes that stockholder interests are best served by not restricting the Committee's discretion and flexibility in crafting the executive compensation program, even if non-deductible compensation expenses could result.

The Committee also considers the accounting implications to the Company of its executive compensation decisions, including, among other things, the financial statement impact of equity compensation awards as determined pursuant to Financial Accounting Standards Board Accounting Standards Codification 718, *Stock Compensation* ("*ASC 718*").

**Discussion and Analysis of our 2010 Compensation Program and Awards**

This section describes and analyzes each of the elements of our compensation program for our executive officers, including why the Committee chooses to include these items in the compensation program, the details of the compensation amounts granted to NEOs in 2010 and the Committee's rationale for awarding these compensation amounts.

*Cash Compensation*

Total cash compensation is delivered in the form of base salary and annual cash incentive awards or bonuses under a performance-based Incentive Compensation Plan (the "*ICP*") approved by the Board. Base salary is included in the Company's compensation package for the executive officers because the Committee believes it is both necessary and appropriate that some portion of the compensation be provided to executives in a form that is fixed and liquid. Performance-based bonuses under the ICP are included in the package because they permit the Committee to incentivize our executives in any particular year to pursue particular objectives that the Committee believes are consistent with the overall goals and strategic direction that the Board has set for our Company and that also are aligned with stockholder interests. The components comprising the cash portion of total compensation are described below.

*Salary.* In setting salaries, the Committee is generally mindful of its overall goal of keeping base salary compensation for its executive officers competitive with the Collective Market Data for that particular position. Because the Company's business is becoming more complex and the industry and general economic environment have become more challenging, the Committee takes particular care to ensure that these factors are recognized in the calculation of base salary. While we generally seek to be competitive, we reserve the right to pay base salaries at a higher percentile to entice or retain select executives with particular skill sets and/or experience.

Merit increases are typically approved each year in December or January for the upcoming fiscal year. In addition, the Committee will review and approve salaries of our executive officers at the time of a promotion or other change in responsibilities. Increases in salary are based on an evaluation of an individual's performance compared to an individual's responsibilities and objectives, contribution and level of pay compared to the Collected Market Data. For the NEOs other than the CEO, our CEO makes recommendations to the Committee concerning adjustments to salary. As the value of the

I-18

annual bonus is expressed as a multiple of base salary, a higher base salary will result in a higher bonus award, assuming the same level of achievement against goals.

For 2010, our CEO's base salary was set by the Committee at $446,505, which is at approximately the 25th percentile of CEO base salaries reflected in the Collected Market Data. Salaries for our other NEOs employed as of December 31, 2010 (Messrs. Webster, Limongelli and Maurer) ranged from $262,880 to $341,445; the Committee believes that the base salaries of these NEOs are consistent with the 50th percentile of executive base salaries reflected in the Collective Market Data for comparable positions. In December 2010, the Committee approved, and the Board ratified, an increase of 2.5% in base salaries for 2011 over 2010 levels for each of the NEOs, except for Mr. Maurer, who received an 8.4% increase in his base salary.

For 2010, base salary of the CEO constituted approximately 72% of his total cash compensation (excluding all other compensation); for the other NEOs employed by the Company at year-end, base salaries constituted approximately 79% to 80% of the total cash compensation (excluding all other compensation), with bonuses in each case constituting the remaining portion of cash compensation.

*Bonus Plan.* Our NEOs participate in a cash bonus plan, the ICP. This plan provides cash compensation to our executive officers only if, and to the extent that, annual performance conditions set by the Committee are achieved. Whether, and to what extent, bonuses under the ICP are paid depends entirely on the extent to which the established corporate objectives contained within the ICP for that year are attained. The Committee believes that the achievement of these objectives ultimately will contribute to the long-term success of the Company. Following a determination of achievement against the corporate objectives, the Committee may subjectively consider the individual achievements of each NEO in arriving at a final determination of the amount of bonus, if any, to be awarded to an NEO.

The corporate objectives referenced in the ICP are developed with input from management, the Committee and the Board. Management, including the NEOs, develops preliminary recommendations for the Committee's review. The Committee then reviews management's preliminary recommendations and establishes the final ICP goals and weightings, which are intended to reflect the most important strategic and operational objectives for the Company. The final corporate objectives and weightings are then ratified by the independent members of the Board. In establishing final goals, the Committee strives to ensure that:

- the incentives provided pursuant to the ICP are consistent with the strategic goals set by the Board for the Company;

- the objectives set are sufficiently ambitious to provide a meaningful incentive; and

- bonus payments, assuming target levels of performance are attained, will be consistent with the overall philosophy of the executive compensation program established by the Committee.

The Committee reserves the discretion to reduce or not pay bonuses under the ICP, even if the relevant performance targets are met, or to increase the bonus amount awarded under the ICP.

The ICP and the corporate objectives for 2010 (the "*2010 Corporate Objectives*") were approved by the Board at its December 2009 meeting. The 2010 Corporate Objectives consisted of the following two components:

- A commercial objective (50%) tied to net sales of ENTEREG of $35 million in 2010; and

- A series of research and development objectives (50%) primarily consisting of the following elements:

  - in the Company's opioid induced constipation ("*OIC*") program, the completion of Phase 1 studies and the initiation of a Phase 2 study;

I-19

- in the Company's *delta* opioid receptor agonist program, the completion of the osteoarthritis studies of ADL5859 and ADL5747 and the attainment of specified enrollment targets in the post-herpetic neuralgia (PHN) study of ADL5747; and

- the advancement of the Company's preclinical programs.

In addition to the nearer-term focus of the commercial objective, the Board felt that a 50% weighting on R&D objectives provided a strong incentive to focus on attaining goals that it believes will further the creation of long-term value for Adolor stockholders. The Committee believes that the combination of the performance objectives within the 2010 ICP created a significantly high hurdle for achievement by each NEO.

Each year, the Committee also considers the target bonuses under the ICP for each NEO in light of several factors, including:

- the desire to ensure that a substantial portion of total compensation is performance-based;

- the relative importance, in any given year, of the short-term performance objectives established pursuant to the ICP; and

- the advice of Radford as to compensation practices at other companies in the Collective Market Data.

The target bonus percentage in 2010 for the CEO was 55% of base salary, which is at the 50th percentile of target bonus percentages in the Collected Market Data. In setting this target bonus percentage, the Committee considered that Mr. Dougherty's base salary was at approximately the 25th percentile of the Collected Market Data and that, even with a bonus payout at target, his total cash compensation would be only at the 25th percentile for the Collected Market Data. For the other NEOs, the target bonus was 35% of base salary for Messrs. Webster, Limongelli and Maurer, which is at the 50th percentile of the Collected Market Data.

The actual amount of an ICP bonus award is determined based on the level of achievement against the pre-established corporate objectives, and also may include a subjective assessment of individual performance for each NEO. The ICP provides the NEOs with the opportunity to earn bonuses that exceed target levels for exceeding performance objectives and, conversely, penalizes the NEOs for missing these objectives. For 2010, a minimum ICP score of 60% was required for any awards to be paid under the ICP. At the end of each fiscal year, the Committee is responsible for assessing the performance of the Company against the ICP performance criteria and determining the level of awards, if any, under the ICP. The CEO provides his recommendations to the Committee with respect to the performance and award levels, if any, under the ICP for each NEO other than the CEO. The Committee will make its own determination, which it then presents to the independent members of the Board for ratification.

For 2010, the Committee assessed the Company's level of achievement against each of the 2010 Corporate Objectives and determined that the Company had achieved at a level equal to 73%. With respect to the commercial objective, the Board considered ENTEREG net sales of $25.4 million for the year ended December 31, 2010, which resulted in a weighted average score of 36.3. For the R&D objectives, the Committee considered, among other things, the following in assessing a weighted average achievement of 36.7 against the established goals:

- in the OIC program, the successful conclusion of a series of Phase 1 studies and the initiation of a Phase 2 study of ADL5945, in each case on timelines consistent with the approved objectives;

- in the *delta* opioid receptor agonist program, the completion of the osteoarthritis studies of ADL5859 and ADL 5747 ahead of schedule, offset slightly by enrollment levels in the PHN study of ADL5747 that were below targeted levels; and

I-20

- the Company's progress on its early-stage candidates, particularly with ADL6906 (beloxepin) where the Company completed Phase 1 testing during 2010.

The Committee also considered certain other factors outside of the ICP, including the decision to discontinue the *delta* opioid receptor agonist program in light of the results from the Phase 2 studies, the Company's stock price performance during 2010 and the overall level of ENTEREG sales during 2010. In light of these considerations, the Committee exercised its discretion to reduce the level of targeted payout under the ICP to 70% of the target bonus levels.

With respect to the Committee's subjective assessment of the individual performance of the NEOs, the Committee determined that the performances of Messrs. Dougherty, Webster and Limongelli were consistent with expectations and determined their respective ICP scores were equal to 70.0. For Mr. Maurer, the Committee determined that he should be recognized with a larger ICP award because of his assumption of additional responsibilities at the Company and determined his individual ICP score to be 75.0.

*Long-term Incentive Compensation*

*Types of Equity Awards.*   Equity awards to our NEOs can be made pursuant to our Amended and Restated 2003 Stock-Based Incentive Compensation Plan (the "*2003 Plan*"), which has been approved by Adolor stockholders. The 2003 Plan provides for awards in the form of incentive stock options and non-qualified stock options (collectively, "*stock options*") and for DSUs and restricted stock awards (collectively, "*stock awards*"). In determining the mix of stock options and stock awards, the Committee considers the following factors, discussed in more detail below: the total shares available under the 2003 Plan and the most efficient use of the available shares; Peer Group and Collected Market Data comparisons; and retention and motivation of the NEOs.

*Equity Compensation Awards for 2010.*   In September 2010, the independent members of the Board ratified the Committee's award of time-vested DSUs and performance-based DSUs to the NEOs shown in the table below and to the Company's Vice Presidents; all other employees of the Company as of the grant date received time-vested DSUs. The time-vested DSU awards will vest in full on September 10, 2012. The performance-based DSU awards will vest with respect to fifty percent (50%) of the shares at such time as annual net sales of ENTEREG as measured through the year ended December 31, 2012 and as reported in the Company's Form 10-K for the year ended December 31, 2011 or December 31, 2012 (as the case may be) filed with the SEC are equal to or in excess of $40 million. The other fifty percent (50%) of the performance-based DSU award shares shall vest at such time as the Company successfully completes a Phase 2 study in patients suffering from OIC.

The stock awards granted in September 2010 to the NEOs of the Company are as follows:

| | Fiscal Year 2010 Awards | |
| --- | --- | --- |
| | Time-vested DSUs | Performance-based DSUs |
| Michael R. Dougherty | 262,500 | 87,500 |
| John M. Limongelli | 112,500 | 37,500 |
| Stephen W. Webster | 82,500 | 27,500 |
| George R. Maurer | 82,500 | 27,500 |

In determining the type and level of equity awards granted to the NEOs in September 2010, the Committee put significant emphasis on its desire to retain the current management team in light of the business challenges facing the Company and to align the interests of the NEOs with the Company's stockholders. The time-vested DSU awards that were made to all employees, including the NEOs, were primarily intended to foster retention of the current employees of the Company; the performance-based DSU awards also were intended to foster retention of the NEOs and the other management employees within the Company, but to more closely align the interests of the Company's stockholders with the

I-21

NEOs through specified and measurable goals that the Committee believes ultimately will improve the Company's valuation. The Committee considered awarding stock options in lieu of, or in combination with, stock awards, but felt that solely using stock awards in 2010 would be a more effective retention tool. In addition, the Committee considered the total shares available under the 2003 Plan and concluded that, given the limited capacity of the 2003 Plan at that time, stock awards were a more efficient tool. During its deliberations, the Committee considered an analysis prepared by Radford that considered various designs for executive retention programs, historical examples of such programs within the life sciences industry and the appropriate award levels for each NEO in light of the Peer Group and the Collected Market Data and the program design.

*Practices Regarding the Grant of Options.*   The Company generally has followed a practice of making all annual stock option grants to its executive officers on a single date each year. For the last several years, at its regularly scheduled meeting usually in December or early January, the Board has ratified the annual option grants made by the Committee. At a meeting prior to the last Board meeting of the year, the Committee approves these annual grants, which are then subject to the ratification by the Board. The dates of the Board and Committee meetings are determined approximately a year in advance based on the Board members availability for a meeting. We do not otherwise have any program, plan or practice to time annual option grants to our executives in coordination with the release of material non-public information. In 2010, the Company did not grant any stock options to its executive officers.

While the bulk of our stock option awards to NEOs have historically been made pursuant to our annual grant program, the Committee retains the discretion to make additional awards to NEOs at other times, in connection with the initial hiring of a new officer, for retention purposes or otherwise. In 2010, the September award grants of time-vested DSUs and performance-based DSUs were made primarily to encourage retention of the NEOs in light of the Company's financial condition. The Committee generally follows the practice of making awards outside of the annual grants only during a time when our NEOs would be permitted, pursuant to our insider trading policy, to trade in our securities. Other than in this respect, we do not have any program, plan or practice to time equity awards in coordination with the release of material non-public information.

*Other Benefits*

*401(k) Plan.*   Under the Adolor Corporation 401(k) Savings Plan (the "*401(k) Plan*"), a tax-qualified retirement savings plan, all employees, including our NEOs, may contribute up to 90 percent of regular earnings on a before-tax or after-tax basis into their 401(k) Plan accounts, subject to the limits imposed by the IRS. In addition, under the 401(k) Plan, we may determine to make a matching contribution to a participating employee's account. We have determined to match an amount equal to $0.50 for each dollar contributed by participating employees on the first six percent of their regular earnings, subject to any limitations imposed by the IRS. Because we do not sponsor a defined benefit pension plan, the 401(k) Plan matching contribution allows Adolor to remain competitive with other companies in its industry that provide retirement savings vehicles for their employees. Adolor employees vest in all matching contributions made by the Company under the 401(k) Plan ratably over a four-year period. As of December 31, 2010, approximately 77% of the Company's employees participated in the 401(k) Plan.

*Letter Agreements.*   The Company has entered into letter agreements with each NEO that provide for payments and other benefits if the officer's employment is involuntarily terminated by the Company for any reason other than "Cause," death or "Disability," as these terms are defined in the letter agreements. These letter agreements also provide for payments and other benefits upon a qualifying event or circumstances after there has been a "Change in Control" (as defined in the agreements) of the Company. The Committee reviews and approves the terms of each letter agreement prior to execution and believes that the terms contained in these agreements are reasonable and customary for

I-22

agreements of this type. For additional information regarding the letter agreements, including a definition of key terms and a quantification of benefits that would have been received by our NEOs had termination occurred on December 31, 2010, please see the section entitled "Potential Payments Upon Termination or Change in Control."

The Committee believes that these letter agreements are an important part of overall compensation for our NEOs. The Committee believes that these agreements will help to secure the continued employment and dedication of our NEOs, notwithstanding any concern that they might have at such time regarding their own continued employment, prior to or following a change in control. The Committee also believes that these agreements are important as a recruitment and retention device, as many of the biotechnology and pharmaceutical companies with which we compete for executive talent have similar agreements in place for their executive officers.

**COMPENSATION COMMITTEE REPORT**

The Compensation Committee of the Board of Directors of Adolor Corporation oversees the Company's compensation program on behalf of the Board. In fulfilling its oversight responsibilities, the Committee reviewed and discussed with management the Compensation Discussion and Analysis set forth in this Information Statement. In reliance on the review and discussions referred to above, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in the Company's Information Statement, which will be filed with the Securities and Exchange Commission.

**COMPENSATION COMMITTEE**

Paul Goddard, Ph.D.
Claude H. Nash, Ph.D. (Chair)
Donald Nickelson

NO PORTION OF THE FOREGOING REPORT SHALL BE DEEMED "SOLICITING MATERIAL" OR INCORPORATED BY REFERENCE INTO ANY FILING UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, BY ANY GENERAL STATEMENT INCORPORATING BY REFERENCE THIS INFORMATION STATEMENT EXCEPT TO THE EXTENT THAT ADOLOR SPECIFICALLY INCORPORATES THIS INFORMATION BY REFERENCE. IN ADDITION, THIS REPORT SHALL NOT OTHERWISE BE DEEMED FILED UNDER SUCH ACTS.

I-23

**Compensation Committee Interlocks and Insider Participation**

The members of the Compensation Committee are Drs. Goddard and Nash and Mr. Nickelson. There are currently no compensation committee interlocks or insider participation on the Compensation Committee.

## EXECUTIVE COMPENSATION TABLES

The following table summarizes the compensation of the Company's NEOs for the years ended December 31, 2010, 2009 and 2008.

### Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-equity Incentive Plan Compensation ($)(4) | Change in Pension Value and Non-qualified Deferred Compensation Earnings ($) | All Other Compensation ($)(5) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| Michael R. Dougherty | 2010 | $446,370 | — | $283,500 | — $ | 171,904 | — $ | 7,350 $ | 909,124 |
| *President & CEO* | 2009 | $453,949 | — | $201,000 | $404,800 $ | 120,381 | — $ | 7,350 | $1,187,480 |
| | 2008 | $423,942 | — | $ 33,840 | $397,600 $ | 151,900 | — $ | 4,600 | $1,011,882 |
| Stephen W. Webster(6) | 2010 | $341,342 | — | $ 89,100 | — $ | 83,654 | — $ | 7,350 $ | 521,446 |
| *Senior Vice President, Finance & Chief Financial Officer* | 2009 | $347,138 | — | $ 60,300 | $133,800 $ | 45,191 | — $ | 7,350 $ | 593,779 |
| | 2008 | $156,250 | — | — | $437,500 $ | 63,400 | — $ | 3,000 $ | 660,150 |
| John M. Limongelli(6) | 2010 | $341,342 | — | $121,500 | — $ | 83,654 | — $ | 7,350 $ | 553,846 |
| *Senior Vice President, General Counsel & Secretary* | 2009 | $347,138 | — | $ 80,400 | $163,600 $ | 55,234 | — $ | 7,350 $ | 653,722 |
| | 2008 | $ 77,500 | — | — | $277,500 $ | 63,400 | — $ | 1,750 $ | 420,150 |
| George R. Maurer(6) | 2010 | $262,651 | — | $ 89,100 | — $ | 69,006 | — $ | — $ | 420,757 |
| *Senior Vice President, Technical Operations* | 2009 | $256,424 | — | $ 86,850 | $122,000 $ | 39,060 | — $ | — $ | 504,334 |
| Eliseo O. Salinas, MD, MSc(6) | 2010 | $223,118 | — $ | — | — | — | — $ | 4,462 $ | 227,580 |
| *Senior Vice President, Research & Development & Chief Medical Officer* | 2009 | $453,949 | — | $107,200 | $202,400 $ | 109,438 | — $ | 7,350 $ | 880,337 |
| | 2008 | $228,846 | — | — | $556,500 $ | 138,100 | — $ | 3,923 $ | 927,369 |

(1)   Amounts in this column would include non-equity guaranteed or discretionary bonuses, hiring bonuses and relocation bonuses. Bonuses awarded under the Company's ICP are reflected in the column entitled "Non-Equity Incentive Plan Compensation."

(2)   The amounts shown in this column represent the aggregate grant date fair value computed in accordance with ASC 718. For information related to stock awards made to the NEOs in 2010, see the 2010 Grants of Plan-Based Awards Table below. For those stock awards made in 2010, 2009 and 2008 that are subject to performance conditions, the amounts shown include the value of the award at the grant date based upon the probable outcome of such condition, which amount is consistent with the estimate of aggregate compensation cost to be recognized over the service period determined as of the grant date under ASC 718, excluding the effect of estimated forfeitures. Assuming all performance conditions were achieved, the value of the stock awards is as follows: Mr. Dougherty: $378,000, $271,800 and $33,840 in 2010, 2009 and 2008, respectively; Mr. Webster: $118,800 and $104,550 in 2010 and 2009, respectively; Mr. Limongelli: $162,000 and $124,650 in 2010 and 2009, respectively; Mr. Maurer: $118,800 and $86,850 in 2010 and 2009, respectively; and Dr. Salinas: $178,000 and $141,000 in 2010 and 2008, respectively.

(3)   The amounts shown in this column represent the aggregate grant date fair value computed in accordance with ASC 718. For information related to stock option awards made to the NEOs in 2010, see the 2010 Grants of Plan-Based Awards Table below.

(4)   The amounts shown in this column constitute awards earned in 2010 under the ICP; amounts earned were paid in March 2011.

I-24

(5)     For each NEO, amounts in 2010 consist of Company matching contributions to the Company's 401(k) Plan made on behalf of each of the NEOs.

(6)     Messrs. Webster and Limongelli and Dr. Salinas joined the Company on June 23, 2008, September 18, 2008 and June 2, 2008, respectively. Mr. Maurer was appointed as an Executive Officer of the Company on January 6, 2009. Dr. Salinas resigned effective as of July 2, 2010.

## 2010 Grants of Plan-based Awards Table

The table below sets forth certain information with respect to plan-based awards granted during the year ended December 31, 2010, to each of the NEOs listed in the Summary Compensation Table above.

| Name | Grant Date | Estimated Possible Payouts Under Non-equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units (#)(2) | All Other Option Awards: Number of Securities Underlying Options (#) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Stock and Option Awards ($)(3) |
|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | | | | |
| Michael R. Dougherty | 1/1/2010 | $ 147,347 | $ 245,578 | $ 491,156 | | | | |
| | 9/9/2010 | | | | 262,500 | | | $ 283,500 |
| | 9/9/2010 | | | | 87,500 | | | $     0 |
| Stephen W. Webster | 1/1/2010 | $ 71,703 | $ 119,506 | $ 239,012 | | | | |
| | 9/9/2010 | | | | 82,500 | | | $ 89,100 |
| | 9/9/2010 | | | | 27,500 | | | $     0 |
| John M. Limongelli | 1/1/2010 | $ 71,703 | $ 119,506 | $ 239,012 | | | | |
| | 9/9/2010 | | | | 112,500 | | | $ 121,500 |
| | 9/9/2010 | | | | 37,500 | | | $     0 |
| George R. Maurer | 1/1/2010 | $ 55,205 | $ 92,008 | $ 184,016 | | | | |
| | 9/9/2010 | | | | 82,500 | | | $ 89,100 |
| | 9/9/2010 | | | | 27,500 | | | $     0 |

(1)     Represents the range of possible payments related to 2010 under the ICP. The "Threshold" amount represents payment at the 60% minimum ICP score. For 2010, the following awards were granted to the NEOs under the ICP, all of which are reported as Non-equity Incentive Plan Compensation in the Summary Compensation Table above: Mr. Dougherty: $171,904; Mr. Webster: $83,654; Mr. Limongelli: $83,654; and Mr. Maurer: $69,006.

(2)     Consists of stock unit awards under our 2003 Plan related to 2010 (awarded on September 9, 2010). The time-vested DSU awards (Mr. Dougherty: 262,500; Mr. Webster and Mr. Maurer: 82,500 each; and Mr. Limongelli 112,500) vest in full on September 10, 2012. The performance-based DSU awards (Mr. Dougherty: 87,500; Mr. Webster and Mr. Maurer: 27,500 each; and Mr. Limongelli 37,500) will vest with respect to fifty percent (50%) of the shares at such time as annual net sales of ENTEREG as measured through the year ended December 31, 2012 and as reported in the Company's Form 10-K for the year ended December 31, 2011 or December 31, 2012 (as the case may be) filed with the SEC are equal to or in excess of $40 million. The other fifty percent (50%) of the performance-based DSU award shares shall vest at such time as the Company successfully completes a Phase 2 study in patients suffering from OIC.

(3)     Amounts shown for awards are valued based on the aggregate grant date fair value of the awards granted in 2010 determined pursuant to ASC 718. See Note 8 to our Consolidated Financial Statements included in our Annual Report on Form 10-K for a discussion of the assumptions used in calculating the grant date fair value pursuant to ASC 718. For those stock unit awards that are subject to performance conditions, the amounts shown reflect the fair value of the award at the grant date based upon the probable outcome of such condition, which amount is consistent with the estimate of aggregate compensation cost to be recognized over the service period determined as of the grant date under ASC 718, excluding the effect of estimated forfeitures. For the awards of 87,500 DSUs, 27,500 DSUs, 37,500 DSUs and 27,500 DSUs to Messrs. Dougherty, Webster, Limongelli and Maurer, respectively, the fair value of the award at the grant date was determined to be $0.

I-25

**Narrative to Summary Compensation and Grants of Plan-based Awards Tables**

*Salary*

We have employment agreements with each of our NEOs. For a more complete description of these agreements, please see the section of this Information Statement entitled "Potential Payments Upon Termination or Change in Control."

Base salaries for each NEO are reviewed and approved on at least an annual basis by the Compensation Committee. In December 2010, the Compensation Committee approved the following salaries for 2011: Mr. Dougherty $457,668; Mr. Webster $349,981; Mr. Limongelli $349,981; and Mr. Maurer $285,000. These amounts are not reflected in the summary compensation table above.

*Awards*

The Compensation Committee approved the ICP, which provided our NEOs with the opportunity to earn a cash incentive award if certain pre-established objectives were attained. For 2010, each NEO earned a bonus amount that was at a level equal to approximately 70% of the target bonus levels approved by the Board, except for Mr. Maurer, who received approximately 75% of his target bonus level. The bonus amounts earned by the NEOs are reported as "Non-Equity Incentive Plan Compensation" in the Summary Compensation Table above.

*2008 Equity Awards:*    On January 4, 2008, Mr. Dougherty received a grant of 120,000 stock options, as well as a performance-based stock option award, the amount of which was to be determined by reference to the date by which the Company secured U.S. Food and Drug Administration ("*FDA*") approval of ENTEREG. The performance-based stock option became subject to vesting on May 20, 2008 upon FDA approval of ENTEREG and will vest over three years following May 20, 2008 at the rate of 1/36th of the shares subject to the option per month. The stock options expire on January 4, 2018. Mr. Dougherty also received a grant of performance-based DSUs on January 4, 2008 under the Company's 2003 Plan. The amount of the award and the vesting of such award were determined by reference to the date on which the FDA approved ENTEREG for the treatment of postoperative ileus. Under the terms of the award, Mr. Dougherty received 8,000 shares of common stock following FDA approval of ENTEREG in May 2008.

Upon the commencement of their employment with the Company in 2008, Messrs. Webster and Limongelli and Dr. Salinas received grants of 125,000, 125,000 and 150,000 stock options, respectively, with per share exercise prices of $5.32, $3.39 and $5.64, respectively. Dr. Salinas also received a performance-based DSU award for 25,000 shares that vest as follows: (i) 12,500 shares on initiation of the first pivotal Phase 3 study for a product candidate (other than alvimopan or any combination product containing alvimopan) for the Company during his employment as Chief Medical Officer and (ii) 12,500 shares on the filing under his direction of an Investigational New Drug Application ("*IND*") with the FDA for a product candidate that was not a current IND development target at the time he joined the Company. In May 2010, Dr. Salinas vested in 12,500 shares following the filing of an IND related to ADL6906 (beloxepin). Dr. Salinas resigned from the Company, effective as of July 2, 2010.

*2009 Equity Awards:*    In January 2009, Messrs. Dougherty, Webster, Limongelli and Maurer and Dr. Salinas received stock options of 160,000, 60,000, 70,000, 50,000 and 80,000, respectively, that vest over four years at the rate of 1/48th of the shares subject to the option per month (assuming continued employment), expire ten years after the grant date and have a per share exercise price of $1.77. Messrs. Dougherty, Webster and Limongelli and Dr. Salinas also received performance-based DSUs that would have vested in full at such time as the quarterly net sales of ENTEREG as measured through the quarterly period ending June 30, 2010 and as reported in the Company's Form 10-Q and/or Form 10-K (as the case may be) filed with the SEC are equal to or in excess of $12.5 million for two consecutive fiscal quarterly periods. As this

I-26

performance condition was not met, these awards expired without vesting in 2010. Mr. Maurer received a time-vested DSU award of 15,000 shares that vests 25% per year over four years, the first vesting of which occurred on January 6, 2010.

In December 2009, Messrs. Dougherty, Webster, Limongelli and Maurer and Dr. Salinas received stock options of 240,000, 70,000, 90,000, 70,000 and 120,000, respectively, that vest 25% per year over four years beginning one year after the date of grant, expire ten years after the grant date and have a per share exercise price of $1.34. Messrs. Dougherty, Webster, Limongelli and Maurer and Dr. Salinas also received time-vested DSUs of 150,000, 45,000, 60,000, 45,000 and 80,000, respectively. The DSU awards vest 40% on December 15, 2011 and 60% on December 15, 2013.

*2010 Equity Awards:*    In September 2010, Messrs. Dougherty, Webster, Limongelli and Maurer received time-vesting DSUs of 262,500, 82,500, 112,500 and 82,500, respectively, that vest in full on September 10, 2012. Messrs. Dougherty, Webster, Limongelli and Maurer also received performance-based DSUs of 87,500, 27,500, 37,500 and 27,500, respectively. These performance-based DSU awards will vest with respect to fifty percent (50%) of the shares at such time as annual net sales of ENTEREG as measured through the year ended December 31, 2012 and as reported in the Company's Form 10-K for the year ended December 31, 2011 or December 31, 2012 (as the case may be) filed with the SEC are equal to or in excess of $40 million. The other fifty percent (50%) of the performance-based DSU award shares vested when the Company successfully completed the Phase 2 study in patients suffering from OIC.

*Salary and Bonus in Proportion to Total Compensation*

For 2010, approximately 68% of our CEO's total compensation was delivered in the form of base salary and incentive bonus; for the other NEOs employed by the Company at year-end, the percentages ranged from approximately 77% to 82% of total compensation. As noted in the "Compensation Discussion and Analysis," we believe that our current compensation program aligns the interests of our NEOs with the interests of our stockholders, while also permitting the Compensation Committee to incentivize the NEOs to pursue specific performance goals. Please see the section of this Information Statement entitled "Compensation Discussion and Analysis" for a description of our compensation program and overall compensation philosophy.

I-27

## Outstanding Equity Awards at Fiscal Year-End 2010

| | Option Awards | | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options (#) Exercisable(1) | Number of Securities Underlying Unexercised Options (#) Unexercisable(1) | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date(2) | Number of Shares or Units of Stock that Have Not Vested | Market Value of Shares or Units of Stock that Have Not Vested ($)(3) | Equity Incentive Plan Awards: Number of Unearned Shares, Units, or Other Rights that Have Not Vested | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units, or Other Rights that Have Not Vested ($) |
| Michael R. Dougherty | 100,000 | — | — | $ 14.55 | 11/04/2012 | | | | |
| | 5,000 | — | — | 13.15 | 1/9/2013 | | | | |
| | 20,000 | — | — | 18.86 | 10/27/2013 | | | | |
| | 50,000 | — | — | 20.49 | 1/6/2014 | | | | |
| | 65,000 | — | — | 9.78 | 1/6/2015 | | | | |
| | 100,000 | — | — | 14.71 | 1/6/2016 | | | | |
| | 400,000 | — | — | 8.24 | 12/14/2016 | 37,500(4) | $ 45,375 | | |
| | 93,437 | 21,563 | — | 3.72 | 9/17/2017 | | | | |
| | 20,000(5) | — | — | 4.23 | 1/4/2018 | | | | |
| | 87,499 | 32,501 | — | 4.23 | 1/4/2018 | | | | |
| | 76,666 | 83,334 | — | 1.77 | 1/6/2019 | | | | |
| | 60,000 | 180,000 | — | 1.34 | 12/15/2019 | 150,000(6) | $181,500 | | |
| | — | — | — | — | — | 262,500(8) | $317,625 | | |
| | — | — | — | — | — | 87,500(9) | $105,875 | | |
| Stephen W. Webster | 78,124 | 46,876 | — | $ 5.32 | 6/23/2018 | | | | |
| | 28,749 | 31,251 | — | 1.77 | 1/6/2019 | | | | |
| | 17,500 | 52,500 | — | 1.34 | 12/15/2019 | 45,000(6) | $ 54,450 | | |
| | — | — | — | — | — | 82,500(8) | $ 99,825 | | |
| | — | — | — | — | — | 27,500(9) | $ 33,275 | | |
| John M. Limongelli. | 70,312 | 54,688 | — | $ 3.39 | 9/18/2018 | | | | |
| | 33,541 | 36,459 | — | 1.77 | 1/6/2019 | | | | |
| | 22,500 | 67,500 | — | 1.34 | 12/15/2019 | 60,000(6) | $ 72,600 | | |
| | — | — | — | — | — | 112,500(8) | $136,125 | | |
| | — | — | — | — | — | 37,500(9) | $ 45,375 | | |
| George R. Maurer | 9,000 | — | — | $ 14.82 | 11/11/2012 | | | | |
| | 729 | — | — | 13.24 | 1/17/2013 | | | | |
| | 8,500 | — | — | 22.24 | 1/12/2014 | | | | |
| | 4,035 | — | — | 11.54 | 9/20/2014 | | | | |
| | 3,812 | — | — | 9.78 | 1/6/2015 | | | | |
| | 25,000 | — | — | 10.30 | 4/13/2015 | | | | |
| | 35,000 | — | — | 14.71 | 1/6/2016 | | | | |
| | 44,062 | 938 | — | 7.54 | 1/4/2017 | | | | |
| | 21,874 | 3,126 | — | 3.83 | 6/13/2017 | | | | |
| | 25,520 | 9,480 | — | 4.23 | 1/4/2018 | | | | |
| | 23.958 | 26,042 | — | 1.77 | 1/6/2019 | 11,250(7) | $ 13,613 | | |
| | 17,500 | 52,500 | — | 1.34 | 12/15/2019 | 45,000(6) | $ 54,450 | | |
| | — | — | — | — | — | 82,500(8) | $ 99,825 | | |
| | — | — | — | — | — | 27,500(9) | $ 33,275 | | |

(1)   All stock options granted prior to December 15, 2009 vest over four years at the rate of 1/48th of the shares subject to the option per month. All stock options granted on or after December 15, 2009 vest annually in equal parts of 1/4 of the grant amount beginning one year after the date of grant.

(2)   The stock option grant date for each award listed is ten years prior to the respective option expiration date.

(3)   Calculated as the number of unvested shares multiplied by the closing price of our Common Stock on December 31, 2010 of $1.21.

(4)   These shares of restricted stock vest on the earlier of the date that the FDA approves for commercial sale an NDA for alvimopan for use in opioid bowel dysfunction or a change in control of the Company as defined in the Plan.

(5)   This performance-based stock option was granted January 4, 2008, subject to an initial vesting event that occurred on the date the alvimopan NDA was approved for use in postoperative ileus (May 20, 2008). The options vest in equal parts 1/36th of the total per month beginning one month after date of initial vesting.

(6)   Time-vested DSU awards that vest 40% on December 15, 2011 and 60% on December 15, 2013.

(7)   Time-vested DSU award that vests 25% per year over four years with the first vesting to occur on January 6, 2010.

(8)   Time-vested DSU awards that vest in full on September 10, 2012.

(9)    Performance-based DSU awards that vest 50% at such time as annual net sales of ENTEREG as measured through the year ended December 31, 2012 and as reported in the Company's
       Form 10-K for the year ended December 31, 2011 or December 31, 2012 (as the case may be) filed with the SEC are equal to or in excess of $40 million. 50% of these performance-based DSU
       awards vested when the Company successfully completed a Phase 2 study in patients suffering from OIC. The terms of the award do not provide for the right to vote or receive dividends or other
       distributions in respect of our Common Stock prior to the lapse of the restrictions.

I-28

**Option Exercises and Stock Vested in 2010**

| Name | Option Awards | | Stock Awards | |
|---|---|---|---|---|
| | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#)(1) | Value Realized on Vesting ($)(2) |
| Michael R. Dougherty. | — | — | — | — |
| Stephen W. Webster | — | — | — | — |
| John M. Limongelli | — | — | — | — |
| George R. Maurer | — | — | 3,750 | $ 5,700 |
| Eliseo O. Salinas, M.D., MSc. | — | — | 12,500 | $ 19,625 |

(1)    For Mr. Maurer, represents the vesting on January 6, 2010, of a time-vested DSU award originally granted in January 2009; for Dr. Salinas, represents the vesting on May 24, 2010, of a performance-based DSU award upon the filing under his direction of an IND application with the FDA for a product candidate that was not a current IND development target at the time he joined the Company.

(2)    Calculated as the number of vested shares multiplied by the closing price of our common stock on January 6, 2010 ($1.52) and May 24, 2010 ($1.57), respectively.

I-29

## POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL

We have entered into letter agreements with each of our NEOs that provide for compensation and benefits in the event that the NEO's employment with us is terminated, including terminations in connection with a Change in Control (as described below) of Adolor. To be covered by the letter agreements, an NEO must be either terminated by the Company "without cause" or the NEO must terminate his employment for "good reason." A termination by the Company of an NEO for "cause" would not trigger any liability to an NEO under his respective letter agreement. The letter agreements define "cause" as:

- a conviction of a felony;

- an intentional act of fraud, embezzlement or theft in the course of his employment with the Company;

- a willful and deliberate failure to perform his duties in any material respect; or

- engagement in gross negligence in the course of his employment with the Company.

For an act to be considered "intentional" or "gross negligence," an NEO must act in bad faith and without reasonable belief that the act or omission was in the best interest of the Company.

Under the agreements, "good reason" will exist if, without the NEO's written consent:

- the NEO is assigned any duties or responsibilities inconsistent with the scope of the duties and responsibilities associated with the NEO's title or position;

- the NEO suffers a material change in the duties, responsibilities, reporting rights or obligations, or effective authority associated with that NEO's title and position as set out in the letter agreement;

- the NEO's base salary is decreased by the Company, or the NEO's benefits under any of the Company's plans or programs are in aggregate materially decreased;

- we fail to pay the NEO's compensation, employee benefits or reimbursements when due; or

- there is in connection with a Change of Control a relocation of the NEO's place of employment by more than fifty miles from the NEO's then-current principal office.

Any of the following situations would constitute a "Change of Control" under the letter agreements:

- the consummation of a merger or consolidation of the Company in which the stockholders of the Company immediately prior to such merger or consolidation would not, immediately after such merger or consolidation, beneficially own fifty percent or more of the combined voting power of the acquiring company;

- the stockholders of the Company approve a plan of complete liquidation or dissolution of the company; or

- the sale or disposition by the Company of all or substantially all of the Company's assets, subject to certain limited exceptions.

In the case of a termination due to death of an NEO, an NEO's estate will be entitled to receive the continuation of the NEO's base salary through the end of the month in which the NEO's death occurs and a pro-rated bonus payment for the year of death (based on the bonus paid in the preceding calendar year). The estate also will receive any benefits available under any program (including life insurance) maintained by the Company that cover the NEO.

I-30

The letter agreements are intended to comply with the requirements of Section 409A of the Code, which generally provides that any payments required to be made under the letter agreements would be delayed for a period of six months following the termination of employment.

**Payment Obligations under Executive Letter Agreements upon Termination of Employment of a Named Executive Officer**

The following table sets forth our lump-sum payment obligations under the letter agreements upon a termination of the employment of our NEOs under various scenarios. The table assumes termination on November 4, 2011 and payment of such termination obligations as provided for in the letter agreements.

| Name | Benefit(3) | Prior to Change in Control(1) | | After or in Connection with Change of Control(2) | |
|---|---|---|---|---|---|
| | | Agreement Provision | Dollar Value of Benefit | Agreement Provision | Dollar Value of Benefit |
| Michael R. Dougherty | Severance—Base Salary(4) | 1x base salary | $ 457,668 | 1x base salary | $ 457,668 |
| | Severance —Bonus(4) | 1x bonus paid for performance during prior calendar year | 171,904 | 1x bonus paid for performance during prior calendar year | 171,904 |
| | Stock Options/Awards(5) | n/a | — | Unvested awards immediately vest; exercise period may be extended up to one year beyond termination date | 2,746,341 |
| | Benefits(6) | Coverage for 12 months | 25,584 | Coverage for 12 months | 25,584 |
| | Outplacement Services(7) | Coverage for 12 months | 25,000 | Coverage for 12 months | 25,000 |
| | | Total | $ 680,156 | Total | $ 3,426,497 |
| Stephen W. Webster | Severance—Base Salary(4) | 1x base salary | $ 349,981 | 1x base salary | $ 349,981 |
| | Severance —Bonus(4) | 1x bonus paid for performance during prior calendar year | 83,654 | 1x bonus paid for performance during prior calendar year | 83,654 |
| | Stock Options/Awards(5) | n/a | — | Unvested awards immediately vest | 799,590 |
| | Benefits(6) | Coverage for 12 months | 25,584 | Coverage for 12 months | 25,584 |
| | Outplacement Services(7) | Coverage for 12 months | 25,000 | Coverage for 12 months | 25,000 |
| | | Total | $ 484,219 | Total | $ 1,283,809 |

I-31

| Name | Benefit(3) | Prior to Change in Control(1) | | After or in Connection with Change of Control(2) | |
|---|---|---|---|---|---|
| | | Agreement Provision | Dollar Value of Benefit | Agreement Provision | Dollar Value of Benefit |
| John M. Limongelli | Severance—Base Salary (4) | 1x base salary | $ 349,981 | 1x base salary | $ 349,981 |
| | Severance —Bonus(4) | 1x bonus paid for performance during prior calendar year | 83,654 | 1x bonus paid for performance during prior calendar year | 83,654 |
| | Stock Options/Awards(5) | n/a | — | Unvested awards immediately vest | 1,088,126 |
| | Benefits(6) | Coverage for 12 months | 25,584 | Coverage for 12 months | 25,584 |
| | Outplacement Services(7) | Coverage for 12 months | 25,000 | Coverage for 12 months | 25,000 |
| | | Total | $ 484,219 | Total | $ 1,572,345 |
| George R. Maurer | Severance—Base Salary(4) | 1x base salary | $ 285,000 | 1x base salary | $ 285,000 |
| | Severance —Bonus(4) | 1x bonus paid for performance during prior calendar year | 69,006 | 1x bonus paid for performance during prior calendar year | 69,006 |
| | Stock Options/Awards(5) | n/a | — | Unvested awards immediately vest | 823,744 |
| | Benefits(6) | Coverage for 12 months | 19,611 | Coverage for 12 months | 19,611 |
| | Outplacement Services(7) | Coverage for 12 months | 25,000 | Coverage for 12 months | 25,000 |
| | | Total | $ 398,617 | Total | $ 1,222,361 |

(1)  For termination more than 90 days prior to a Change in Control, an NEO is entitled to benefits under their respective letter agreement if his employment is terminated at any time (i) by him for good reason following 15 days written notice to the Company or (ii) by the Company without cause.

(2)  For termination after or in connection with a Change in Control, an NEO is entitled to benefits under his respective letter agreement if the NEO is terminated at any time during the 90 days before or the first twelve months following such change of control (i) by him for good reason following 15 days written notice to the Company or (ii) by the Company without cause.

(3)  The Company will not pay benefits to an NEO under his respective letter agreement if the NEO is terminated for cause by the Company.

(4)  The payment due to an NEO is equal to one times the NEO's then-current base salary and one times the NEO's bonus paid for his performance during the preceding calendar year.

(5)  For termination after or in connection with a Change in Control, all unvested stock options, restricted stock awards and DSUs held by an NEO vest immediately. The Merger described in this Schedule 14D-9 will constitute a Change in Control. Pursuant to the Merger Agreement, each NEO will receive $4.25 (the Closing Amount) and one CPR for each share constituting or underlying the NEO's Company Restricted Shares, DSUs and Company Options with an exercise price less than or equal to $4.25 per share that the NEO exercises prior to the Effective Time. As of November 4, 2011, the NEOs held the following Company Options with an exercise price less than or equal to $4.25 per share: Mr. Dougherty, 235,002 options; Mr. Webster, 71,251 options; Mr. Limongelli, 118,022 options; and Mr. Maurer, 69,585 options. The amounts set forth in this table assume that the NEOs exercised each such Company Option and received the Closing Amount net of the exercise price as follows: Mr. Dougherty, $647,903; Mr. Webster, $199,277; Mr. Limongelli, $275,313; and Mr. Maurer, $191,557. As of November 4, 2011, the NEOs

I-32

held the following shares of time-vested and performance-vested stock award units that would vest immediately upon a Change of Control and are included in this column at a price of $4.25 per share (the Closing Amount): Mr. Dougherty, 493,750 shares; Mr. Webster, 141,250 shares; Mr. Limongelli, 191,250 shares; and Mr. Maurer, 148,750 shares. For purposes of this table, it is assumed that no amounts are paid with respect to the CPRs received in connection with such Shares. The maximum amount that could be paid out on each CPR is $4.50. Assuming each NEO received one CPR for each Share for which they received the Closing Amount in respect of Company Options, restricted stock awards and DSUs, the maximum amount payable to each NEO on such CPRs would be as follows: Mr. Dougherty, $3,279,384; Mr. Webster, $956,255; Mr. Limongelli, $1,391,724; and Mr. Maurer, $982,508.

(6)     Under the letter agreements, medical, dental and life insurance coverage is provided to the NEO and his/her spouse and dependents for a period of 12 months. Values reported in the table reflect the projected value based on premium equivalent rates for continued medical and dental coverage for each NEO.

(7)     While outplacement services are not specifically provided for in the letter agreements, the Company has a practice of providing twelve months of this benefit to executive officers whose employment has been terminated.

I-33

## NON-EMPLOYEE DIRECTOR COMPENSATION

The Company compensates its non-employee directors through a mix of cash compensation and stock option grants. The elements of the non-employee directors' compensation during 2010 were as follows:

### 2010 Non-Employee Director Compensation

**Annual Retainers/Meeting Fees:**

| | | |
|---|---|---|
| • Board Service Annual Retainer ($15,000 cash, paid quarterly; $5,000 paid in the form of a grant of DSUs) | $ | 20,000 |
| • In-person or Telephonic Board Meeting Fees | $ | 2,000/mtg. |
| • Committee Service Fees | | |
|    • Audit Committee Chair Annual Retainer ($5,000 cash, paid quarterly; $4,000 in a grant of DSUs) | $ | 9,000 |
|    • Compensation and Nominating Committee Chair Annual Retainers ($2,500 cash, paid quarterly; $2,500 in a grant of DSUs) | $ | 5,000 |
|    • Non-chair Committee Member Fees (paid in cash, quarterly) | $ | 2,500 |
| • Chairman of the Board Annual Retainer (paid in a grant of DSUs) | $ | 13,500 |

**Stock Option Compensation:**

| | |
|---|---|
| • Initial Grant (upon first election or appointment to Board) | 25,000 shares |
| • Annual Grant (upon the date of the Annual Meeting) | 20,000 shares |

The initial grant of 25,000 stock options to a non-employee director is made at the time of the earlier to occur of such director's appointment as a director by the Board or first election to the Board by stockholders. This initial award vests over a three-year period, with 33.3% becoming exercisable on each anniversary of the grant date. Upon the date of re-election to the Board at the Annual Meeting, a non-employee director will receive an annual grant of 20,000 stock options that vest in full on the first anniversary of the date of grant. The Board of Directors also may grant options to non-employee directors in addition to the automatic grants described above. Stock options granted to non-employee directors have a ten-year term and are granted with an exercise price equal to the fair market value of our Common Stock on the date of grant. On May 18, 2010, each non-employee director received an annual grant of stock options to purchase 20,000 shares of Common Stock at an exercise price of $1.60 per share, which will become fully exercisable as of May 18, 2011.

The Company also reimburses directors for travel expenses incurred in connection with attending Board, committee and stockholder meetings and for other Company business-related expenses. The Company does not provide retirement benefits or other perquisites to non-employee directors under any current program. Mr. Dougherty receives no remuneration for his service as a director.

I-34

In February 2011, the Board approved certain changes to non-employee director compensation that will be effective following this Annual Meeting. The elements of the non-employee directors' compensation, effective as of May 17, 2011, are as follows:

### 2011 Non-Employee Director Compensation (effective as of May 17, 2011)

**Annual Retainers/Meeting Fees:**

- Board Service Annual Retainer ... $ 25,000
- In-person or Telephonic Board Meeting Fees ... $ 2,000/mtg.
- Committee Chair Service Fees
  - Audit Committee Chair Annual Retainer ... $ 11,000
  - Compensation Committee Chair Annual Retainer ... $ 10,000
  - Governance & Nominating Committee Chair Annual Retainer ... $ 5,000
- Committee Member Service Fees (Non-chair)
  - Audit Committee Member ... $ 7,500
  - Compensation Committee Member ... $ 6,500
  - Governance & Nominating Committee Member ... $ 2,500
- Chairman of the Board Annual Retainer ... $ 23,500

**Stock Option Compensation:**

- Initial Grant (upon first election or appointment to Board) ... 45,000 shares
- Annual Grant (upon the date of the Annual Meeting) ... 30,000 shares

The initial grant of 45,000 stock options to a non-employee director is made at the time of the earlier to occur of such director's appointment as a director by the Board or first election to the Board by stockholders. This initial award vests over a three-year period, with 33.3% becoming exercisable on each anniversary of the grant date. At the Annual Meeting, each non-employee director who will continue to serve as such will receive an annual grant of 30,000 stock options that vest in full on the first anniversary of the date of grant. Stock options granted to non-employee directors have a ten-year term and are granted with an exercise price equal to the fair market value of our Common Stock on the date of grant. The Board of Directors also may grant options to non-employee directors in addition to the automatic grants described above.

### 2010 Non-employee Director Compensation Table

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($)(3) | Non-equity Incentive Plan Compensation ($) | Non-qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Armando Anido | $ 33,500 | $ 7,500 | $ 20,800 | — | — | — | $ 61,800 |
| Georges Gemayel, Ph.D | $ 38,000 | $ 5,000 | $ 20,800 | — | — | — | $ 63,800 |
| Paul Goddard, Ph.D. | $ 35,500 | $ 5,000 | $ 20,800 | — | — | — | $ 61,300 |
| George V. Hager, Jr. | $ 38,000 | $ 9,000 | $ 20,800 | — | — | — | $ 67,800 |
| David M. Madden | $ 33,000 | $ 18,500 | $ 20,800 | — | — | — | $ 72,300 |
| Guido Magni, M.D., Ph.D. | $ 33,500 | $ 5,000 | $ 20,800 | — | — | — | $ 59,300 |
| Claude H. Nash, Ph.D. | $ 35,500 | $ 7,500 | $ 20,800 | — | — | — | $ 63,800 |
| Donald Nickelson. | $ 30,000 | $ 5,000 | $ 20,800 | — | — | — | $ 55,800 |

(1) Consists of the cash portion of the amounts described above under "Annual Retainers/Meeting Fees."

(2) The amounts in this column reflect the aggregate grant date fair value computed in accordance with ASC 718. In 2010, each of the above directors received an award of 2,958 shares of Company Common Stock with a grant date fair value of $5,000, as computed in accordance with ASC 718. In addition, the Chairman of each of the Compensation Committee and Governance and Nominating Committee received an award of 1,479 shares of Company Common Stock with a grant date

I-35

fair value of $2,500, the Chairman of the Audit Committee received an award of 2,366 shares of Company Common Stock with a grant date fair value of $4,000, and the non-executive chairman of the Board of Directors received an award of 7,988 shares of Company Common Stock with a grant date fair value of $13,500. These amounts represent Common Stock awards that were granted in 2010.

(3)     The amounts in this column reflect the aggregate grant date fair value computed in accordance with ASC 718. The grant date fair value of the stock options to purchase 20,000 shares of Common Stock that were awarded to each director in May 2010 each computed in accordance with ASC 718, is $20,800. On December 31, 2010, the aggregate number of stock option awards outstanding for each director was as follows: Mr. Anido, 170,000; Dr. Gemayel, 135,000; Dr. Goddard, 194,000; Mr. Hager, 170,000; Mr. Madden, 315,000; Dr. Magni, 95,000; Dr. Nash, 194,000; and Mr. Nickelson, 170,000.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires that each director and executive officer of the Company, and any other person who owns more than ten percent of the Company's Common Stock, file with the SEC initial reports of ownership and reports of changes in ownership of Common Stock of the Company. Such directors, executive officers and greater-than-ten-percent stockholders are required by regulation to furnish the Company with copies of such reports. To the knowledge of the Company, based solely upon its review of reports furnished to it, as well as written representations from its directors and executive officers to the effect that no other such reports were required to be filed, each covered person met all fiscal 2010 Section 16(a) filing requirements.

I-36

## REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS

The Audit Committee of the Company's Board of Directors is composed of three independent directors and operates under a written charter adopted by the Board that is designed to comply with rules adopted by NASDAQ Global and the SEC. A copy of the written charter is available on the Investor Insights section of the Company's website (www.adolor.com) by selecting "Corporate Governance." The current members of the Audit Committee are Dr. Gemayel, Mr. Hager (chair) and Mr. Nickelson.

Management is responsible for the preparation, presentation and integrity of the Company's financial statements, accounting and financial reporting principles, internal controls and procedures designed to ensure compliance with accounting standards, applicable laws and regulations. The Company's independent registered public accountants are responsible for performing an independent audit of the Company's financial statements in accordance with the standards of the Public Company Accounting Oversight Board and issuing a report thereon. The Audit Committee's responsibility is to monitor and oversee these processes, including the selection of the Company's independent registered public accountants.

The functions performed by the Audit Committee are not intended to duplicate or to certify the activities of management and the independent registered public accountants, nor can the Audit Committee certify that the independent registered public accountants are "independent" under applicable rules. The Audit Committee serves a Board-level oversight role, in which it provides advice, counsel and direction to management and the independent registered public accountants on the basis of the information it receives, its discussions with management and the independent registered public accountants and the experience of the Committee's members in business, financial and accounting matters.

In this context, the Audit Committee met and held discussions periodically in 2010 with management and the independent registered public accountants, including meetings with the independent registered public accountants during which management was not present. Management represented to the Audit Committee that the Company's financial statements were prepared in accordance with accounting principles generally accepted in the United States of America, and the Audit Committee has reviewed and discussed the financial statements with management and the independent registered public accountants. The Audit Committee discussed with the independent registered public accountants matters required to be discussed by Statement on Auditing Standards No. 61, as amended by Statement on Auditing Standards No. 90, as adopted by the Public Company Accounting Oversight Board in Rule 3200T.

The Company's independent registered public accountants also provided to the Audit Committee the written disclosures and letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the communications of the independent registered public accountants with the Audit Committee concerning independence, and the Audit Committee discussed with the independent registered public accountants that firm's independence.

Based upon the Audit Committee's discussion with management and the independent registered public accountants and the Audit Committee's review of the representations of management and the report of the independent registered public accountants to the Audit Committee, the Audit Committee recommended that the Board of Directors include the audited financial statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2010, as filed with the SEC.

NO PORTION OF THE FOREGOING REPORT SHALL BE DEEMED "SOLICITING MATERIAL" OR INCORPORATED BY REFERENCE INTO ANY FILING UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, BY ANY GENERAL STATEMENT INCORPORATING BY REFERENCE THIS INFORMATION STATEMENT EXCEPT TO THE EXTENT THAT ADOLOR SPECIFICALLY INCORPORATES THIS INFORMATION BY REFERENCE. IN ADDITION, THIS REPORT SHALL NOT OTHERWISE BE DEEMED FILED UNDER SUCH ACTS.

I-37

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

Under its charter, the Audit Committee is responsible for reviewing and approving all related-party transactions that would require disclosure under SEC rules. Under these rules and the Company's policy, a "related-party transaction" is a transaction in which the Company participates and in which a related party has a direct or indirect material financial interest, other than transactions involving less than $120,000 in any calendar year. In determining whether to approve or ratify a related party transaction, the Audit Committee will take into account whether the transaction is on terms no less favorable to the Company than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related party's interest in the transaction, as well as any other factors the Audit Committee deems appropriate. During 2010, there were no related-party transactions that were required to be approved by the Audit Committee or disclosed in this Information Statement.

I-38

---

### PARENT DESIGNEES TO THE BOARD

**Information with respect to the Designees**

As of the date of this Information Statement, Parent has not determined who will be its designees to the Board. However, the designees will be selected from the list of potential designees provided below (the "*Potential Designees*"). The Potential Designees have consented to serve as directors of the Company if so designated. None of the Potential Designees currently is a director of, or holds any position with, the Company. Purchaser has informed the Company that, to its knowledge, none of the Potential Designees beneficially owns any equity securities or rights to acquire any equity securities of the Company, has a familial relationship with any director or executive officer of the Company or has been involved in any transactions with the Company or any of its directors, executive officers or affiliates that are required to be disclosed pursuant to the rules of the SEC.

**List of Potential Designees**

The following sets forth information with respect to the Potential Designees (including, as of November 7, 2011, age, current principal occupation or employment and five-year employment history). The business address of each Potential Designee is c/o Cubist Pharmaceuticals, Inc. 65 Hayden Avenue, Lexington, Massachusetts 02421.

*Michael W. Bonney* (53) has served as Parent's President and Chief Executive Officer and as a member of the Board of Directors of Parent since June 2003. From January 2002 to June 2003, he served as Parent's President and Chief Operating Officer. Mr. Bonney is a director of NPS Pharmaceuticals, Inc. and is the Chair of the Bates College Board of Trustees. Mr. Bonney is also a board member of the Pharmaceutical Research and Manufacturers of America (PhRMA).

*Robert J. Perez, MBA* (47) has served as Parent's Executive Vice President and Chief Operating Officer since August 2007. Prior to this, he was Parent's Senior Vice President, Commercial Operations from July 2004 to August 2007. From August 2003 to July 2004, he served as Parent's Senior Vice President, Sales and Marketing. Mr. Perez is a director of AMAG Pharmaceuticals, Inc.

*Steven C. Gilman, Ph.D.* (58) has served as Parent's Executive Vice President, Research & Development and Chief Scientific Officer since September 2010. Prior to this, he served as Parent's Senior Vice President, Discovery & Nonclinical Development and Chief Scientific Officer from February 2008 to September 2010. From April 2007 until February 2008, Dr. Gilman served as Chairman of the Board of Directors and Chief Executive Officer of ActivBiotics. From 2004 to April 2007, he served as President, Chief Executive Officer, and a member of the Board of Directors of ActivBiotics. Dr. Gilman serves on the boards of directors of the Massachusetts Biotechnology Association and Inhibikase Therapeutics (a privately held biotechnology company), and serves on the Pennsylvania State University Biotechnology Advisory Board.

*Tamara L. Joseph, J.D.* (49) has served as Parent's Senior Vice President, General Counsel and Secretary since May 2008. Ms. Joseph was Executive Vice President, General Counsel and Company Secretary of Mayne Pharma Ltd. from July 2006 until joining Parent. Previously, Ms. Joseph was Vice President, General Counsel and Secretary, at Transkaryotic Therapies, Inc. from 2005 to 2006, and before that, Ms. Joseph worked at Biogen Idec from 1998 to 2005, based in Paris, France, where she established and then had overall responsibility for the international legal and public affairs functions of Biogen Idec's international operations, serving as Vice President, International, Legal, from March 2002 until she left Biogen Idec in 2005.

*David W.J. McGirr, MBA* (57) has served as Parent's Senior Vice President and Chief Financial Officer since November 2002. He also served as Parent's Treasurer from November 2002 until January 2003. Mr. McGirr served as Chief Operating Officer of Hippo Inc., or Hippo, from October 1999 to October 2002 and as President of Hippo over an approximately two-year period during that time,

I-39

ending in October 2002. Mr. McGirr also served as a director of Hippo from October 1999 until October 2003. In December 2003, Hippo liquidated under Chapter 7 of the Federal bankruptcy laws.

**Gregory Stea** (53) has served as Parent's Senior Vice President, Commercial Operations since February 2009. Prior to this, he served as Parent's Vice President, Sales and Marketing from September 2007 to February 2009. Previously, Mr. Stea served as Parent's Vice President, Sales, from July 2005 to August 2007, and Parent's Executive Director, Sales, from August 2002 to June 2005.

**Santosh Vetticaden, Ph.D., M.D.** (52) has served as Parent's Senior Vice President, Chief Medical and Development Officer since September 2010. Prior to this, he was Parent's Senior Vice President, Clinical Development and Chief Medical Officer from December 2008 to September 2010. Dr. Vetticaden served as a consultant from August 2008 until joining Parent. From February 2007 to August 2008, he was Senior Vice President and Chief Medical Officer at Maxygen, Inc. Previously, from April 2003 to February 2007, Dr. Vetticaden was Vice President, Clinical Research, at Scios, Inc., a subsidiary of Johnson & Johnson, and was responsible for all development for Phase 1 through Phase 4 trials.

I-40

Annex II

October 23, 2011

Board of Directors
Adolor Corporation
700 Pennsylvania Drive
Exton, PA 19341

Gentlemen:

Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus" or "we") has been advised that Adolor Corporation (the "Company") is considering entering into an Agreement and Plan of Merger (the "Agreement") with Cubist Pharmaceuticals, Inc. (the "Acquiror") pursuant to which the Acquiror, through a wholly-owned subsidiary formed for such purpose ("Merger Sub"), shall commence a tender offer (the "Offer") for any and all of the issued and outstanding common stock, par value $0.0001 per share, of the Company ("Common Stock") followed by a merger of Merger Sub with and into the Company (the "Merger," and collectively with the Offer, the "Transaction"), pursuant to which the Company would become a wholly-owned subsidiary of the Acquiror. In connection with the Transaction, each stockholder of the Company would receive for each share of Common Stock held by such stockholder (i) $4.25 in cash, plus (ii) one contingent payment right pursuant to which the holder may be entitled to receive up to an additional $4.50 in cash subject to the fulfillment of certain conditions and/or the attainment of certain milestones (the "CPRs," and collectively with the $4.25 cash payment, the "Consideration"). The Transaction is more fully described in the Agreement, and the CPRs are more fully described in the form of Contingent Payment Rights Agreement to be entered into between the Acquiror and a Rights Agent to be determined (the "CPR Agreement").

Stifel Nicolaus, as a part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements and valuations for corporate and other purposes. In the ordinary course of our business, we and our affiliates may actively trade the securities of the Company and the Acquiror for our own account and for the accounts of our customers and, accordingly, may at any time hold a long or short position in such securities.

You have requested Stifel Nicolaus' opinion, as investment bankers, as to the fairness, from a financial point of view, to the common stockholders of the Company of the Consideration to be received by such stockholders in connection with the Transaction (the "Opinion").

In connection with rendering our Opinion, we have, among other things:

i)    reviewed the draft of the Agreement, dated October 23, 2011, which is the last draft made available to Stifel Nicolaus;

ii)   Reviewed the draft of the CPR Agreement, dated October 18, 2011, which is the last draft made available to Stifel Nicolaus;

iii)  reviewed and analyzed certain publicly available financial and other information for the Company, including equity research and certain relevant financial and operating data furnished to Stifel Nicolaus by the management of the Company;

iv)   reviewed and analyzed certain internal financial analyses, financial projections, reports and other information concerning the Company prepared by the management of the Company, including projections for the Company provided by the management of the Company (the "Company Projections");

II-1

v)   discussed with certain members of the management of the Company the historical and current business operations, financial condition and prospects of the Company and such other matters Stifel Nicolaus deemed relevant;

vi)   reviewed and analyzed certain operating results and the reported price and trading histories of the Company as compared to operating results and the reported price and trading histories of certain publicly traded companies Stifel Nicolaus deemed relevant;

vii)   reviewed and analyzed certain financial terms of the Transaction as compared to the financial terms of certain selected business combinations Stifel Nicolaus deemed relevant;

viii)   reviewed and analyzed, based on the Company Projections, the cash flows generated by the Company on a stand-alone basis to determine the present value of the Company's discounted cash flows;

ix)   performed, reviewed and analyzed a sum-of-the-parts analysis, based on the Company Projections; and

x)   reviewed and analyzed such other information and such other factors, and conducted such other financial studies, analyses and investigations, as Stifel Nicolaus deemed relevant for the purposes of our Opinion. In addition, we took into account our assessment of general economic, market and financial conditions and our experience in other transactions, as well as our experience in securities valuations and our general knowledge of the industry in which the Company operates.

In conducting our review and rendering our Opinion, we have, with your consent, relied upon and assumed, without independent verification, the accuracy and completeness of all of the financial and other information that was made available, supplied, or otherwise communicated to Stifel Nicolaus by or on behalf of the Company, or that was otherwise reviewed by Stifel Nicolaus, including, without limitation, publicly available information, and have not assumed any responsibility for independently verifying any of such information. We have further relied upon the assurances of the managements of the Company that they are unaware of any facts that would make such information incomplete or misleading. To the extent such information includes estimates, forecasts or projections of future financial performance, prepared by or reviewed with management of the Company or obtained from public sources (including the Company Projections), Stifel Nicolaus has relied upon the statements of the Company's management that such estimates, forecasts and projections (and the assumptions and bases therefor) are reasonable and has assumed that such estimates, forecasts and projections represent the best available estimates, forecasts and projections and, with respect to estimates, forecasts and projections prepared by management of the Company, have been prepared in good faith on assumptions which, in light of the circumstances under which they were made, are reasonable, as has been represented and warranted by the Company or, with respect to estimates, forecasts and projections obtained from public sources, represent reasonable estimates, forecasts and projections. Such estimates, forecasts and projections were not prepared with the expectation of public disclosure and are based on numerous variables and assumptions that are inherently uncertain, including, without limitation, factors related to general economic and competitive conditions. Accordingly, actual results could vary significantly from those set forth in estimates, forecasts and projections. We have relied on these estimates, forecasts and projections without independent verification or analyses and do not in any respect assume any responsibility for the accuracy or completeness thereof. We have relied upon, without independent verification, the assessment of the Company's management as to the existing products and services of the Company and viability of, and risks associated with, the future products and services of the Company. We express no opinion as to the Company Projections or any other estimates, forecasts and assumptions or the assumptions on which they were made.

II-2

We have not been requested to make, nor have we made or assumed the obligation to make, any independent evaluations, physical inspections, valuations or appraisals of the properties, facilities, assets or liabilities of the Company, nor have we been furnished with such materials. Stifel Nicolaus assumed, with your consent, that any material liabilities (contingent or otherwise, known or unknown) of the Company are set forth in its financial statements or were disclosed to us by the Company's management. Stifel Nicolaus has assumed that there has been no material change in the assets, financial condition, business or prospects of the Company since the date of the most recent relevant financial statements made available to Stifel Nicolaus. With respect to all legal matters relating to the Company, the Acquiror and the Transaction, we have relied on the advice of legal counsel to the Company.

Our Opinion is limited to whether the Consideration to be received by the common stockholders of the Company in connection with the Transaction is, as of the date hereof, fair to such stockholders, from a financial point of view. We express no view as to any other aspect or implication of the Transaction, including, without limitation, the form or structure of the Transaction, or any other agreement, arrangement or understanding entered into in connection with the Transaction or otherwise. Without limiting the generality of the foregoing, our Opinion does not address: (i) any legal, tax or accounting matters, including the consequences any such matters may have on the Company or its stockholders; (ii) any advice or opinions provided by any other advisor to the Company or the Acquiror; or (iii) the fairness of the amount or nature of any compensation that may be paid to any of the Company's officers, directors or employees, or any class of such persons, in connection with the Transaction relative to the Consideration.

Our Opinion is necessarily based on economic, market, financial and other conditions as they exist on, and the information made available to us as of, the date of this letter. It is understood that subsequent developments may affect the conclusions reached in this Opinion and that Stifel Nicolaus does not have any obligation to update, revise or reaffirm this Opinion except as otherwise may be specifically set forth in, and subject to the terms of, the engagement letter between Stifel Nicolaus and the Company, dated October 5, 2011 (the "Engagement Letter"). Our Opinion is for the information of, and directed to, the board of directors of the Company (the "Board") for its information and assistance in connection with its consideration of the financial terms of the Transaction. Our Opinion does not constitute a recommendation to the Board or any stockholder of the Company as to how to vote on or otherwise act with respect to the Transaction, including, without limitation, whether any stockholder should tender his, her or its shares in connection with the Offer. In addition, the Opinion does not compare the relative merits of the Transaction with any other alternative transaction or business strategy which may be or may have been available to the Board or the Company and does not address the underlying business decision of the Board or the Company to proceed with or effect the Transaction.

For purposes of rendering our opinion we have assumed in all respects material to our analysis, that the representations and warranties of each party contained in the Agreement and the CPR Agreement are true and correct, that each party will perform all of the covenants and agreements required to be performed by it under the Agreement and the CPR Agreement and that all conditions to the consummation of the Offer and the Merger will be satisfied without waiver thereof. We have assumed that the final forms of the Agreement and the CPR Agreement will be substantially similar to the last drafts reviewed by us. We have also assumed that all governmental, regulatory and other consents and approvals required in connection with the Transaction will be obtained and that in the course of obtaining any of those consents no restrictions will be imposed or waivers made that would have an adverse effect on the contemplated benefits of the Transaction.

Stifel Nicolaus has not considered any potential legislative or regulatory changes currently being considered by the United States Congress, the Securities and Exchange Commission (the "SEC"), or any other governmental or regulatory bodies, or any changes in accounting methods or generally

II-3

accepted accounting principles that may be adopted by the SEC or the Financial Accounting Standards Board. This Opinion is not a solvency opinion and does not in any way address the solvency or financial condition of the Company or any other person.

We have acted as financial advisor to the Company in connection with the Transaction. We will receive a fee upon the delivery of this Opinion that is not contingent upon consummation of the Offer or the Merger and a success fee, a portion of which is contingent upon the consummation of the Offer. In addition, the Company has agreed to reimburse us for our expenses and indemnify us for certain liabilities arising out of our engagement. In the two years preceding the date of this Opinion, we have not served as financial advisor to the Company or the Acquiror. We may seek to provide other investment banking services to the Company or to the Acquiror in the future, for which we would seek customary compensation.

Stifel Nicolaus' Fairness Opinion Committee has approved the issuance of this Opinion. Our Opinion may not be published, quoted or otherwise used or referred to, in whole or in part, nor shall any public reference to Stifel Nicolaus or this Opinion be made, in any registration statement, prospectus or proxy statement, or in any other document used in connection with the Transaction, nor shall this Opinion be used for any other purposes, without the prior written consent of Stifel Nicolaus, except as specifically permitted by the Engagement Letter.

Based upon and subject to the foregoing, including the various assumptions and limitations set forth herein, we are of the opinion that, as of the date hereof, the Consideration to be received by the common stockholders of the Company in the Transaction is fair to such stockholders, from a financial point of view.

Very truly yours,

/s/ Stifel Nicolaus

STIFEL, NICOLAUS & COMPANY, INCORPORATED

II-4

QuickLinks

Item 1. Subject Company Information.
Item 2. Identity and Background of Filing Person.
Item 3. Past Contacts, Transactions, Negotiations and Agreements.

Item 4. The Solicitation or Recommendation.

Competitive Label Case
Non-Competitive Label Case

Item 5. Person/Assets, Retained, Employed, Compensated or Used.
Item 6. Interest in Securities of the Subject Company.
Item 7. Purposes of the Transaction and Plans or Proposals.
Item 8. Additional Information.

Item 9. Exhibits.

SIGNATURE

ANNEX I

ADOLOR CORPORATION INFORMATION STATEMENT PURSUANT TO SECTION 14(F) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14F-1 THEREUNDER. NO VOTE OR OTHER ACTION OF SECURITY HOLDERS IS REQUIRED IN CONNECTION WITH THIS INFORMATION STATEMENT.
RIGHT TO DESIGNATE DIRECTORS; PARENT'S DESIGNEES
GENERAL INFORMATION REGARDING THE COMPANY
COMMUNICATIONS WITH THE BOARD
OVERSIGHT AND RISK MANAGEMENT
CURRENT BOARD
THE BOARD OF DIRECTORS AND BOARD COMMITTEES
CURRENT MANAGEMENT
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT
COMPENSATION OF EXECUTIVE OFFICERS AND DIRECTORS COMPENSATION DISCUSSION AND ANALYSIS
COMPENSATION COMMITTEE REPORT
EXECUTIVE COMPENSATION TABLES
Summary Compensation Table
2010 Grants of Plan-based Awards Table
Option Exercises and Stock Vested in 2010
POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE IN CONTROL
NON-EMPLOYEE DIRECTOR COMPENSATION
2010 Non-Employee Director Compensation
2011 Non-Employee Director Compensation (effective as of May 17, 2011)
2010 Non-employee Director Compensation Table
REPORT OF THE AUDIT COMMITTEE OF THE BOARD OF DIRECTORS
CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS
PARENT DESIGNEES TO THE BOARD

Annex II